UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

JARVIS KHATTRI, an individual

Civil Action No.:

Plaintiff,

vs.

AKIN GUMP STRAUSS HAUER & FELD LLP,
a Limited Liability Partnership; SARAH LINK
SCHULTZ, an individual; and DOES1 to 20,
inclusive

Defendants

---

**COMPLAINT FOR**

**1) PROFESSIONAL NEGLIGENCE (LEGAL MALPRACTICE) ; and (2) BREACH**

**OF CONTRACT-THIRD PARTY BENEFICIARY**

Plaintiff, JARVIS KHATTRI (hereinafter referred to as "Plaintiff") files this

Complaint against Defendants AKIN GUMP STRAUSS HAUER & FELD LLP,

a Limited Liability Partnership; and SARAH LINK SCHULTZ,  an individual, for his

claims as follows:

1

## I.

## PARTIES, JURISDICTION AND VENUE

1.  Plaintiff, JARVIS KHATTRI, an individual, (hereinafter referred to as "Plaintiff") whose principal residence is located in the City of Las Vegas, Clark County, State of Nevada.

2.  Plaintiff is informed, believes and thereupon alleges Defendant AKIN GUMP STRAUSS HAUER & FELD LLP (hereinafter referred to as "Akin Gump"), is a Texas Limited Liability Partnership, and at all times herein mentioned was, transacting and conducting business in the City of Dallas, Dallas County with its principal place of business located at 2300 N. Field Street, Suite 1800, Dallas, Texas 75201.

3.  Plaintiff is informed, believes and thereupon alleges that SARAH LINK SCHULTZ, ("Schultz"), an individual, is an attorney licensed to practice law in the State of Texas, is a partner and agent of Akin Gump, and in doing the things herein alleged was acting within the course and scope of such employment and agency with Akin Gump. Plaintiff is informed, believes and thereupon alleges that Schultz, works in the City of Dallas, State of Texas. Further, Plaintiff is informed, believes and thereupon alleges that Defendant Akin Gump is vicariously liable and responsible for the damages alleged herein caused by Schultz's errors and negligence. (Collectively referred to as "Akin Gump/Schultz").

4.  Plaintiff is informed, believes and thereupon alleges that at all times herein mentioned, that on or about May 5, 2021, FaZe Clan, Inc. ("FaZe") entered into an Engagement Letter Agreement with Akin Gump to retain Akin Gump as its legal counsel

2

to provide legal advice, legal representation and services and general legal advise on issues. ( A true and correct copy of the Engagement Letter and Statement of Firm Policies is attached hereto as Exhibit 1). At all times mentioned herein, Akin Gump/ Schultz knew and were aware that they owed a duty to Plaintiff, as a third party beneficiary of the services provided under the Engagement Letter with FaZe Clan, Inc., one of the most prominent gaming organizations, in which Plaintiff was a member, including but not limited to, a duty to use such skill, prudence and diligence at a level commensurate with other members of the legal profession.

5.  Plaintiff is ignorant of the true names and capacities, whether corporate, associate, individual or otherwise, of Defendants sued herein as Does 1 to 20, inclusive, and Plaintiff therefore sues said Defendants by such fictitious names.  Each of the Defendants designated herein as Doe is responsible in some manner for the events and happenings herein referred to, and proximately caused the  damages to Plaintiff, in a manner hereinafter alleged. Plaintiff will ask leave of court to amend this Complaint to show their true names and capacities when the same have been ascertained.

6.  Defendant, and each of them, were at all times mentioned herein, the agents, partners, employees and/or directors of each of the remaining Defendants, and each of them, and in doing the things hereinafter alleged, were acting within the course and scope of their authority as such agents,  employees and/or directors with the knowledge, authority, approval, permission and/or consent of the remaining Defendants, and each of them.

7.  Plaintiff is informed, believes and thereupon alleges that at all times herein

3

mentioned, each of the Defendants, named of fictitiously named are responsible in some manner or way from the events and/or circumstances referred to herein, and/or caused injury or damages directly and/or proximately thereby to Plaintiff as alleged herein.

8.   Further, at all times herein mentioned, at the time of the errors and negligence by Akin Gump/Schultz, Plaintiff's principal residence was in the City of Los Angeles County of Los Angeles, State of California.

9.   The amount in controversy in this proceeding, exclusive of interest and costs, exceeds the sum of $75,000.00.

10.  At all times mentioned herein, pursuant to the Engagement Letter and Statement of Firm Policies Engagement, entered into between Akin Gump and FaZe on behalf of third party beneficiary/assigee Plaintiff, states that it shall be governed by the laws of the jurisdiction where Akin Gump's office rendered the services is located and venue for any action shall be in the county where its office rendered such services is located. Akin Gump/ Schultz rendered services in this matter from their offices located at 2300 N. Field Street, Suite 1800, Dallas, Texas 75201.Therefore, jurisdiction and venue is proper in the United States District Court for the Northern District of Texas.

11.  Jurisdiction and venue are proper in this Court pursuant to the terms of 28 U.S.C. § 1332(a) and 28 U.S.C § 1391.

4

## GENERAL ALLEGATIONS

**FACTUAL BACKGOUND:**

**1. SGP, Plaintiff, and FaZe Clan Enter into a Talent Agreement to Perform at the Social Gloves: Battle of the Platforms:**

12. Plaintiff is a social media personality and influencer best known for his videos on E-sport Gaming and Cross-Over Boxing. From April 2019 to 2021, Plaintiff was a member of the gaming organization FaZe. Social Gloves: Battle of the Platforms ("Event") was an amateur celebrity boxing exhibition featuring various YouTube and TikTok celebrities. Conceived by and organized by Simply Greatness Productions ("SGP") and its principal members, Austin McBroom and Allen McBroom (collectively "McBrooms").

13. On March 4, 2021, SGP, FaZe and Plaintiff entered into a written Talent Agreement for the services of Plaintiff (the "Talent Agreement"). FaZe negotiated the Talent Agreement on behalf of Plaintiff. Pursuant to the Talent Agreement, Plaintiff agreed to participate in the boxing match and promote his participation in the Event across Plaintiff's social media channels. FaZe also agreed to have members of FaZe provide marketing services on various social media platforms. In consideration of Plaintiff's participation, SGP agreed to pay Plaintiff Twenty-Five Thousand Dollars ($25,000.00) as an initial payment within five (5) business days of the execution of the Talent Agreement. Further, SGP agreed to pay Plaintiff One Million Dollars ($1,000,000.00) provided that Plaintiff participate in the Event. Plaintiff received the

initial payment of $25,000.00 under the Talent Agreement. (A true and correct copy of the March 4, 2021, Talent Agreement is attached hereto as Exhibit 2).

### 3. SGP's Breach of the Talent Agreement:

14.  Plaintiff fully performed his part of the Talent Agreement, by participating in the Event on June 12, 2021, and boxing against another social influencer on the TikTok platform Michael Le at the Event as well as promoting the Event across his social media channels. SGP breached the Talent Agreement, by failing to pay Plaintiff $1,000,000.00 a required under the Talent Agreement.

### 4. SGP and Plaintiff enter into a Settlement Agreement and Mutual General Release:

15. To avoid litigation, SGP decided to settle this matter with Plaintiff. Plaintiff and SGP were represented by competent counsel in negotiating and drafting the Settlement Agreement. FaZe and Plaintiff were represented by Akin Gump and SGP was represented by Pryor Cashman, LLP.

16. Plaintiff is informed, believes and thereupon alleges that at all times herein mentioned, FaZe's in house counsel Alyson Yamauchi and Tammy Brandt, fully disclosed to Schultz that she was acting on behalf of and representing both FaZe and Plaintiff in negotiating the terms of the Settlement Agreement.

17. At all times mentioned herein, Akin Gump/Schultz were aware that they owed a duty to Plaintiff, as a third party beneficiary of the services provided under the Engagement Letter with FaZe  including but not limited to, a duty to use such skill, prudence and diligence at a level commensurate with other members of the legal

profession in the State of California, in negotiating, advising, drafting and approving the terms and conditions of the Settlement Agreement and Mutual General Release on behalf of Plaintiff. Further, Akin Gump/Schultz owed a duty of care to Plaintiff, requiring them to exercise the knowledge, skill and ability ordinarily exercised by other similarly situated lawyers in the State of California.

18.    At all times mentioned herein, Akin Gump/Schultz were aware that the pursuant to the terms of the Settlement Agreement, they were negotiating on behalf of Plaintiff, that all issues and disputes between the parties concerning the Settlement Agreement were to be construed and shall be enforced pursuant to the laws of the State of California.

19.    At all times mentioned herein, Akin Gump and Schultz held themselves out to be well practiced attorneys, competent, experienced, well-trained lawyers with expertise in representing, advising and providing legal services in negotiating and drafting settlement agreements in accordance with the laws of the State of California. At all times mentioned herein, Faze and Plaintiff, assumed that Akin Gump and Schultz were familiar with California law and were competent and experienced in California law.

20.    During the course of the negotiation process between Akin Gump, Schultz and SGP's counsel James G.Sammataro, Akin Gump and Schultz specifically assured and advised FaZe in house Attorneys Alyson Yamauchi and Tammy Brandt, whom were acting on behalf of Plaintiff's interest and rights, that in event Plaintiff enter into the Settlement Agreement for a reduced amount, if SGP breached the Settlement Agreement, the reduced settlement amount would be of no affect and *void ab initio*

7

and the original contract amount of One Million Dollars ($1,000,000.00), would be in full force and effect.

21. Based upon the legal advice, recommendations, assurances, and representations of Akin Gump and Schultz, that in event SGP did not pay the settlement amount, when due, that Plaintiff would be entitled to proceed against SGP to recover the original contract amount of One million Dollars ($1,000,000.00), Plaintiff agreed to enter into a Settlement Agreement.

22. On June 9, 2022, SGP and Plaintiff entered into a Confidential Settlement Agreement and Mutual General Release ("Settlement Agreement"). Pursuant to the Settlement Agreement, the parties agreed that SGP would pay Plaintiff the amount of Two Hundred Thousand Dollars ($200,000.00), by wiring within thirty (30) days of execution of the Settlement Agreement a first installment in the amount of $100,000.00 and a second installment within ninety (90) days after the first installment was paid.

(A true and correct copy of the Settlement Agreement is attached hereto as Exhibit 3)

### 5. SGP's Breach of the Settlement Agreement:

23. On July 8, 2022, SGP breached the Settlement Agreement by not making the first payment of One Hundred Thousand Dollars ($100,000.00), within thirty (30) days of execution of the Settlement Agreement . On July 11, 2022, Schultz and Akin Gump sent a Notice of Default letter to Allen McBroom ,Simply Greatness Productions LLC. In that letter, Schultz wrote in ¶ 3 and ¶ 4, as follows:

> "...*Talent reserved the right to pursue its rights, powers, privileges and remedies under the Talent Agreement including, but not limited to, payment of the Original Contractual Amount and/or under the Settlement Agreement.*"( ¶ 3 Notice of Default Letter)

8

*"Talent has not waived this default, and Talent expressly reserves all its rights, powers, privileges and remedies under the Settlement Agreement and/or Talent Agreement, applicable law or otherwise with respect to any event of default now existing or hereunder arising under the Settlement Agreement and/or the Talent Agreement.The failure of Talent to exercise any such rights, powers, privileges and remedies is not intended, and shall not be construed, to be a waver of any such event of default. Talent may elect to exercise any or all of their rights, at their sole option, at any time hereafter, without the necessity of any further notice, demand or other action on the part of Talent."* ( ¶ 4 Notice of Default Letter).

(A true and correct copy of the July 11, 2022, Akin Gump/Schultz Notice of Default Letter is attached hereto as Exhibit 4).

24. Thereafter, SPG requested additional time to make the settlement payment which was denied and did not pay the One Hundred Thousand Dollars ($100,000.00) on or before the end of the cure period of July 15, 2022.

### 6. The Settlement Agreement was Drafted to be Construed and Enforced Pursuant to California Law:

25. Plaintiff relied on Schultz and Akin Gump's, advice, representations, and assurances, and entered into the Settlement Agreement after being reassured by Schultz/Akin Gump, that Plaintiff was fully protected under the jointly drafted Settlement Agreement, that in the event of breach of the payment requirements under the Settlement Agreement, Plaintiff would retain the legal right to proceed against SGP for the original unpaid One Million Dollars ($1,000,000.00) under the Talent Agreement.

26. On September 15, 2022, FaZe assigned Plaintiff all its interests, rights and benefits under the Talent Agreement. (A true and correct copy of the Assignment is attached hereto as Exhibit 5).

27. The Settlement Agreement was drafted and to be construed and enforced pursuant to California law. (See Exhibit 3 § 10, Settlement Agreement). SGP counsel, James G. Sammataro is a licensed California attorney and Schultz of Akin Gump was not a licensed attorney in the State of California. Schultz is a licensed attorney in

the State of Texas and Plaintiff is informed, believes and thereupon alleges that Schultz was not familiar with and had no legal training, experience or expertise in laws that were particular to the State of California.

28. The Settlement Agreement states in § 8 e. *"Each party has cooperated in the drafting and preparation of this Settlement Agreement. Consequently, this Settlement Agreement shall not be construed against any party on the basis that one such party was the drafter of the Settlement Agreement....."* (See, Exhibit 2 § 8 e., Settlement Agreement). In negotiating and drafting the Settlement Agreement, both parties were represented by competent counsel,. Accordingly, each party was of equal bargaining power.

29. During the entire period, that Schultz and Akin Gump's represented Plaintiff and FaZe ,Schultz and Akin Gump, never disclose to Plaintiff or FaZe that Schultz was not licensed in the State of California or unfamiliar with the laws that may be applicable to preservation of damages in the event of breach of a Settlement Agreement under the laws of the State of California.

30. In Texas, where Schultz is licensed to practice law, when a claim is released for a promised consideration that is not given, the claimant may either pursue rights under the release or treat the release as rescinded and recover on the underlying claim. *Murry Crest.Constr.*, 900 S.W. 2d 342, 344 (Tex.1995).

31. In California, settlement agreements are contracts (*Owens v. County of Los Angeles* (2013) 220 Cal.App.4th 107, 114 n.3 ["A settlement agreement is simply a contract."].) Therefore, settlement agreements are governed by contract law. Without a basis to avoid the settlement agreement or a limitation in its terms, the settlement agreement operates as a bar to any reopening of the original controversy. (*Carachure v. Scott* (2021) 70 Cal.App.5th 16, 34).

32. The Settlement Agreement that Schultz ,Akin Gump and Pryor Cashman jointly drafted in their legal representation of the parties, in accordance with California law, is an enforceable contract. Unbeknownst to Plaintiff and apparently to Schultz and Akin

Gump, the Settlement Agreement terminated the disputes concerning the merits of the original controversy, the unpaid One Million Dollars ($1,000,000.00) under the Talent Agreement. Unlike under Texas law, a breach of the Settlement Agreement by one party does not restore the parties to their status before the settlement.

33. In the drafting of the Settlement Agreement, Schultz and Akin Gump fell below the applicable standard of care in not being trained, experienced or familiar with California law and had a duty on behalf of their client FaZe and third party beneficiary/assigee Plaintiff, to fully protect him so that in the event of breach for non-payment of the Settlement Agreement by SGP, Plaintiff would maintain the legal ability to recovery under the original One Million Dollars ($1,000,000.00) under the Talent Agreement.

34. It is further evident from, Schultz/Akin Gump's letter dated July 11, 2022, that Schultz was not competent, experienced, well-trained or familiar in the applicable California law when Schultz  wrote in ¶ 3 "...*Talent reserved the right  to pursue its rights, powers, privileges and remedies under the Talent Agreement including, but not limited to, payment of the Original Contractual Amount ...... Talent has not waived this default, and Talent expressly reserves all its rights, powers, privileges and remedies under the Settlement Agreement and/or Talent Agreement.*" (See Exhibit 5, ¶ 3, July 11, 2022, Notice of Default Letter).

35. In fact, it was based upon the legal advice, opinions, assurances, direction and representations by Schultz/Akin Gump, that Plaintiff entered into and executed the Settlement Agreement which resulted in Plaintiff not reserving his rights and waiving his remedies under the Talent Agreement for recovery of the original One Million Dollars ($1,000,000.00) . Schultz/Akin Gump fell below the applicable standard of care instructing and permitting Plaintiff to enter into a Settlement Agreement, which limits Plaintiff to the maximum recovery of Two Hundred Thousand Dollars ($200,000.00) in the event of non-payment of the Settlement Agreement, given the

execution of a settlement agreement under California law serves to extinguish the original contractual amount under the Talent Agreement.

**7. The Action- Plaintiff files a Lawsuit Against SGP and McBrooms:**

36. On December 7, 2022, Plainitff filed suit in the Superior Court of Los Angeles to enforce the underlying amount due under the Original Talent Contract in the sum of $1,000,000.00. (A true and correct copy of the Summons and Complaint are attached hereto as Exhibit 6).

37. On or about July 11, 2023, the parties entered into a written stipulation to submit all claims to arbitration with Judicial Arbitration and Mediation Services ("JAMS") pursuant to JAMS Comprehensive Arbitration Rules and Procedures, in accordance with the arbitration provision contained in the Settlement Agreement. The civil action in the Los Angeles Superior Court was to be stayed pending the outcome of the arbitration with JAMS. (A true and correct copy of the Stipulation and Order to Arbitrate and Stay action is  attached hereto as Exhibit 7).

**8.  The Arbitration- Motion to Limit The Scope of Arbitration to Claims Arising Out of the Settlement Agreement:**

38. After moving the case to JAMS, the parties selected the Honorable Gail Andler, Retired, a Judge with over a decade of serving on Complex Civil Litigation Panel during her 22 years on the Orange County Superior Court.

39. On December 4, 2023, Mr. Sammataro on behalf of SGP and the McBrooms filed a Motion to Limit the Scope of Arbitration to Claims Arising Out of the Parties Enforceable Settlement Agreement, (A true and correct copy of the Motion to Limit the Scope of Arbitration to Claims  Arising Out of the Parties Enforceable Settlement

is attached hereto as Exhibit 8).

40  Plaintiff was legally required to do everything within his ability to try to mitigate his damages. Given California law is clearly in Plaintiff's opposition, Plaintiff in his Opposition to SGP and McBrooms' Motion to Limit the Scope of Arbitration  was forced to rely on Washington law for the proposition that a settlement agreement is presumptively an "executory accord" unless explicitly stated to the contrary.(*Rosen v. Ascentry Technologies* (2008) 143 Wash App. 364). (A true and correct copy of the Plaintiff's Opposition to the Motion to Limit the Scope of Arbitration to Claims  Arising Out of the Parties Enforceable Settlement is attached hereto as Exhibit 9).

41. In  Reply, SGP and the McBrooms *state: "Claimant was represented by "top-notch counsel in negotiating the Talent Agreement and the subsequent Settlement Agreement" and that based on the fully negotiated Settlement Agreement, as a matter of California law, Claimants damages are "**limited** to the settlement amount, and nothing more". That Claimant "cannot now ignore California precedent.....".* (A true and correct copy of the Respondent's  Reply to Claimant's Opposition to the  Motion to Limit the Scope of Arbitration to Claims  Arising Out of the Parties Enforceable Settlement is attached hereto as Exhibit 10).

42.  On February 6, 2023, Judge Andler heard oral argument and on February 8, 2024, Judge Andler granted Respondents Motion to Limit The Scope Of Arbitration To Claims Arising out of The Parties Settlement Agreement.  In Judge Andler's Order she stated:

*"Settlement agreements are contracts. (Owens v. County of Los Angeles (2013) 220 Cal.App.4th 107, 114 n.3 ["A settlement agreement is simply a contract."].) As such, settlement agreements are generally governed by contract law principles. (Stewart v. Preston Pipeline Inc. (2005)134 Cal.App.4th 1565, 1585–86 ["A settlement agreement is a contract, and the legal principles [that] apply to contracts generally apply to settlement contracts."].) When interpreting a contract, courts give effect to the parties' mutual intentions, first examining the contract's plain language. (Civ. Code, §*

1636; *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264.) *The language governs if it is clear, explicit, and does not involve an absurdity. (Civ. Code § 1638.) It must be read in the context of the whole instrument and circumstances of the case. (Bank of the West, supra, at p. 1265.) The construction should give effect to all provisions without inserting or omitting text. (Code Civ. Proc., § 1858.) In the absence of extrinsic evidence interpreting a contract is a matter of law. (Taylor v. Nu Digital Marketing, Inc. (2016) 245 Cal.App.4th 283, 288.)"* (A true and correct copy of Judge Adler's Order is attached hereto as Exhibit 11).

"Any grounds that exist in contract law to avoid a contract may be asserted to avoid a settlement if the facts support the assertion. (*Levitz v. The Warlocks* (2007) 148 Cal.App.4th 531, 534–35 ["A settlement with open material terms is not a ... settlement at all because, like all contracts, it is not binding until the settling parties agree on all its material terms."] However, without a basis to avoid the settlement agreement or a limitation in its terms, the settlement agreement operates as a bar to any reopening of the original controversy. (*Carachure v. Scott* (2021) 70 Cal.App.5th 16, 34 ["It is generally the rule that the merits of the original controversy are no longer an issue where a compromise agreement is made in good faith and without fraud, duress or undue influence."].)" ( See Exhibit 11, Judge Adler's Order Pg. 4 ¶ 3,).

"Here the Settlement Agreement itself demonstrated each element of the contract. It identified the parties, facially evidenced mutual consent, had a lawful object (resolution of a dispute regarding the Talent Agreement, the Original Contractual Amount, the Event, the Bout, etc.), and contained mutual promises (sufficient consideration). The Settlement Agreement states that the parties agreed that it was entered into *"to avoid litigation and to obtain finality and repose with respect to any and all past, present and future claims and potential claims pertaining to the Talent Agreement, the Original Contractual Amount, Event the Bout, and the other claims of [Jarvis], ...."*Thus, the evidence indicates that the *parties reached an enforceable agreement, even if Claimant challenges the scope of that agreement. The*

14

*Settlement Agreement terminated the disputes concerning the merits of the original controversy and constitutes the measure of the rights and obligations of the parties going forward. In other words, a breach of the Settlement Agreement by one party does not restore the parties to their status before the settlement. (Ebensteiner Co., Inc. v. Chadmar Group (2006)143 Cal.App.4th 1174, 1181 ["Plaintiff's remedy for the failure to perform the settlement agreement must be based 'exclusively' on that agreement"]"* ( See Exhibit 11, Judge Adler's Order Pg. 4 ¶ ).

43.  In conclusion, Judge Adler stated:

*" .......here, the parties did not include a* liquidated *damages clause in the Settlement Agreement. Of note, the Parties do not dispute that they were each represented by competent counsel in negotiating and drafting the Settlement Agreement. Claimant was represented by Akin Gump Strauss Hauer & Feld, LLP and Respondents were represented by Pryor Cashman LLP. The Arbitrator finds that the parties were of relatively equal bargaining power. Each had the ability to negotiate the types of remedies desired for breach of the Settlement Agreement, including breach due to nonpayment. The parties could have but did not, agree to a stipulated judgment or liquidated damages under Civil Code section 1671(b) in the event of a breach of the Settlement Agreement for nonpayment. This Arbitrator cannot rewrite the party's Settlement Agreement to fit what the Claimant believes, in hindsight, is fair and reasonable. (Walnut Creek Pipe Distributors, Inc. v. Gates Rubber Co. (1964) 228 Cal. App. 2d 810, 815 ["The courts cannot make better agreements for parties than they themselves have been satisfied to enter into or rewrite contracts because they operate harshly or inequitably."])".* ( See Exhibit 11, Judge Adler's Order Pg. 4 ¶ 5 & Pg. 5 ¶ 1).

44.  As a result of the legal advice, opinions, guidance, and representations by Schultz/Akin Gump, Plaintiff entered into the Settlement Agreement which resulted in Plaintiff not reserving his rights and waiving his remedies under the Talent Agreement. Schultz/Akin Gump had the ability to negotiate the types of remedies

desired for breach of the Settlement Agreement, including breach due to nonpayment. Schultz/Akin Gump could have but did not, agreed to a stipulated judgment or liquidated damages under California Civil Code section 1671(b) in the event of a breach of the Settlement Agreement for nonpayment. Schultz/Akin Gump fell below the applicable standard of care in allowing Plaintiff to enter into a Settlement Agreement, they jointly drafted, which limits Plaintiff to the maximum recovery of Two Hundred Thousand Dollars ($200,000.00) in the event of non-payment of the Settlement Agreement.

45. Schultz and Akin Gump failed to exercise reasonable care and skill in their representation of Plaintiff, and owed a duty of care to Plaintiff to exercise the knowledge, skill and ability ordinarily exercised by other similarly situated attorneys and should have known that the execution of a settlement agreement under California law serves to extinguish the original contractual amount under the Talent Agreement.

## COUNT 1

### (Professional Negligence-Legal Malpractice)

46. Plaintiff realleges and incorporates herein the General Allegations stated in Paragraphs 1 through 45 alleged herein, as though fully set forth herein.

47. Defendants Akin Gump and Schultz owed a duty of care to Plaintiff, requiring them to exercise the skill, prudence and diligence as members of the legal profession commonly posses and exercise , in providing legal services to Plaintiff.

48. Defendants Akin Gump and Schultz knew and understood that they owed a duty to Plaintiff, as a third party beneficiary of the legal services provided by Akin Gump to FaZe , in the same or similar regard, including but not limited to, a duty to use the skill, knowledge and ability ordinarily exercised by other members of the legal profession. Further, Akin Gump and Schultz had a duty to use the skill, knowledge and ability ordinarily exercised by other members of the legal profession in California,

16

and in particular, as attorneys' with knowledge and experience in applying California law to settlement agreements and the remedies available in the event of breach of nonpayment of the settlement agreement.

49. Defendant, Akin Gump and Schultz breached the standard of care owed to Plaintiff, and did not provide the degree of legal competence and expertise that Akin Gump and Schultz were required to possess, in connection with the legal services, guidance, and advice rendered by Akin Gump and Schultz to Plaintiff.

50. As set forth herein, it was upon the legal advice, opinions,, guidance, assurances and representations to Plaintiff that Plaintiff entered into the Settlement Agreement, with the understanding that he would retain the legal right and interest to proceed against SGP for the original contractual amount of One Million Dollars ($1,000,000.00) under the Talent Agreement in the event SGP breached the Settlement Agreement for non-payment.

51. Defendant Schultz /Akin Gump's legal advice, opinions, representations, and assurances was below the standard of care, as Akin Gump and Schultz reasonably should have known that their legal advice, opinions, direction, representations, and assurances  would result in dire results for Plaintiff, namely that the execution of a settlement agreement under California law serving to extinguish the original contractual amount under the Talent Agreement. Plaintiff entered into the Settlement Agreement which resulted in Plaintiff waiving his remedies under the Talent Agreement. Akin Gump and Schultz had the ability to negotiate the types of remedies desired for breach of the Settlement Agreement, including breach due to nonpayment. Schultz and Akin Gump could have but did not agree to a stipulated judgment or liquidated damages under California Civil Code section 1671(b) in the event of a breach of the Settlement Agreement for non-payment. Akin Gump and Schultz fell below the applicable standard of care in allowing Plaintiff to enter into the Settlement Agreement, which limits Plaintiff to the maximum recovery of Two Hundred Thousand Dollars ($200,000.00) in the event of

non-payment of the Settlement Agreement.

52. The negligent acts and omissions of Akin Gump and Schultz were below the standard or care for comparable attorneys who practice in the State of California. Defendants Akin Gump and Schultz's professional negligence is the only factor in Plaintiff being limited to the maximum recovery of Two Hundred Thousand Dollars ($200,000.00) in the event of non-payment of the Settlement Agreement. The proper handling, drafting and negotiating of the terms of the Settlement Agreement, as well as having the proper knowledge and experience in applying the appropriate California law to settlement agreements and the remedies available in the event of breach for non-payment of the settlement agreement, would have have resulted in Plaintiff retaining his rights and interest to enforce and recover the original contractual amount in the amount of one million dollars ($1,000.000.00) under the Talent Agreement.

53. As a direct and proximate result of Akin Gump and Schultz's professional negligence, incompetence, and other wrongful conduct, Plaintiff has sustained damages in an amount according to proof at the time of trial.

## <u>COUNT 2</u>
### (Breach of Contract-Third Party Beneficiary)

54. Plaintiff realleges and incorporates herein paragraphs 1 through 53 alleged herein, as though fully set forth herein.

55. In May 2021, FaZe Clan retained Akin Gump as their legal counsel to including but not limited to, provide legal advice, legal representation and services in a competent fashion. On May 5, 2021, FaZe executed an Engagement Letter which contained Akin Gump's Statement of Firm Policies. ("Exhibit 1").

56. At all times mentioned herein, Akin Gump and Schultz had and were aware that they owed a duty to Plaintiff, as a third party beneficiary of the services

provided under the Engagement Letter with FaZe including but not limited to, a duty to use such skill, prudence and diligence at a level commensurate with other members of the legal profession in negotiating, advising, representing, drafting and approving the terms and conditions of the Settlement Agreement and Mutual General Release on behalf of Plaintiff. Further, Akin Gump and Schultz owed a duty of care to Plaintiff, requiring them to exercise the knowledge, skill and ability ordinarily exercised by other similarly situated lawyers.

57. Defendant Akin Gump and Schultz breached their duty under the Engagement Letter by incompetently handling, drafting and negotiating the terms of the Settlement Agreement, and not being familiar, understanding or experienced with the applicable California law with regard to the types of remedies available for breach of the Settlement Agreement, for nonpayment. Akin Gump and Schultz breached their duty to Plaintiff by incompetently not including and having SGP agree to a stipulated judgment or liquidated damages under California Civil Code section 1671(b) in the event of a breach of the Settlement Agreement for non-payment. As a result of Akin Gump and Schultz's negligence, Plaintiff is limited to the maximum recovery of Two Hundred Thousand Dollars ($200,000.00) for non-payment by SGP under the Settlement Agreement.

58. As a direct and proximate result of Akin Gump and Schultz's negligence, incompetence, breaches and other wrongful conduct, Plaintiff has sustained damages in an amount according to proof at the time of trial.

**WHEREFORE**, Plaintiff prays for Judgment against the Defendants Akin Gump , Schultz and each of them as follows:

1. For all compensatory damages, according to proof at the time of trial
2. For all general and special damages in an amount according to proof at the time of trial;
3. For all costs of the suit herein incurred;

19

4. Reasonable attorney fees according to proof at the time of trial;

5. For pretrial interest at the legal rate of interest per annum on all damages awarded to Plaintiff; and

6. For such other and further relief as the Court may deem just and proper.

Respectfully Submitted,

Dated: May 23, 2025

GALEN & DAVIS LLP

By: _/s/_   Jeffrey M. Galen

Jeffrey M. Galen, Esq.
GALEN & DAVIS LLP
2829 Townsgate Road, Suite 100
Westlake Village, CA 91361
Telephone 818-986-5685
Facsimile 818-986-1859

Email:jeffrey.galen@galendavislaw.com
Attorneys for Plaintiff
JARVIS KHATTRI

# EXHIBIT 1

# Akin Gump

## STRAUSS HAUER & FELD LLP

COURTNEY S. YORK
+1 214.969.2855/fax: +1 214.969.4343
cyork@akingump.com

May 5, 2021

VIA E-MAIL

Ms. Tammy Brandt
Chief Legal Officer
FaZe Clan Inc.
1800 North Highland Avenue, Suite 600
Los Angeles, CA 90028

Re:     Terms of Engagement

Dear Ms. Brandt:

I am pleased to confirm our representation of FaZe Clan Inc. in connection with providing general corporate advice to answer discrete issues on an ad hoc basis and confirmed in writing. The firm appreciates your confidence in us, and we look forward to working with you. In the event that FaZe Clan Inc. seeks our assistance with a specific matter, that will be the subject of a separate confirmation letter at that time.

At the beginning of our representation of a client, the firm's policy is to describe the manner in which we will bill for legal services and disbursements. A clear understanding of those matters helps to maintain a harmonious professional relationship. I encourage you to consider the matters set forth in this letter carefully and to raise with us any question that you may have now or later about its contents.

We refer matters to those lawyers in this firm who in our judgment can perform the highest quality work, in a timely and efficient manner, and at the lowest cost. We also employ non-lawyer personnel in tasks where lawyers are not necessary, to facilitate the efficient performance of services.

To help provide greater transparency for budgeting and estimating legal spend, for general corporate matters only, we can offer a blended hourly rate structure of $850 to apply to all core team lawyers. If and as specific matters arise and once we determine precise staffing needs, we may also be able to further adjust this blended rate or offer a tiered blended rate structure by title or subject matter. Please be aware of the firm's standard practice to implement annual rate increases and attorney progressions as of January 1st each year. Our standard practice is to bill on a monthly basis. This allows our clients to monitor both current and cumulative fees

Ms. Tammy Brandt
May 5, 2021
Page 2

and expenses. We require that payment of statements be made within 30 days of receipt, and we may suspend or terminate any work in progress if timely payment is not made. We may also withdraw from the representation in a manner consistent with applicable ethical standards.

Attached to this letter is our Statement of Firm Policies (the **"Statement"**) that will apply to our representation of you in the matter set forth above and in each matter agreed to from time to time. In the event of a conflict between the terms of the Statement and the terms of this letter, the terms of this letter shall control. Please review these policies and let me know if you have any questions concerning them.

If the terms described above and in the attached Statement are satisfactory, please sign the enclosed copy of this letter and return a signed copy. If you choose not to notify us in writing of any objection to these terms, then that will also serve as agreement to these terms, subject, of course, to your right to terminate our engagement at any time.

Sincerely,

AKIN GUMP STRAUSS HAUER & FELD LLP

Courtney S. York

THE STATE BAR OF TEXAS INVESTIGATES AND PROSECUTES PROFESSIONAL MISCONDUCT COMMITTED BY TEXAS ATTORNEYS. ALTHOUGH NOT EVERY COMPLAINT AGAINST OR DISPUTE WITH A LAWYER INVOLVES PROFESSIONAL MISCONDUCT, THE STATE BAR'S OFFICE OF GENERAL COUNSEL WILL PROVIDE YOU WITH INFORMATION ABOUT HOW TO FILE A COMPLAINT. PLEASE CALL 1-800-932-1900 TOLL-FREE FOR MORE INFORMATION.

Ms. Tammy Brandt
May 5, 2021
Page 3

**AGREED**:

FaZe Clan

By: _Tammy Brandt_____
       Ms. Tammy Brandt, Chief Legal Officer

Date: _5/5/2021_____

## STATEMENT OF FIRM POLICIES

We appreciate your decision to retain Akin Gump Strauss Hauer & Feld LLP ("**Akin Gump**") as your legal counsel and look forward to developing our relationship with you in the course of our representation. Except as may be modified by a separate written agreement, the following summarizes our billing practices and certain other terms that will apply to any engagement. If you provide us with outside counsel guidelines, billing requirements, or other similar policies, we will endeavor to abide by them to the extent reasonably practicable and consistent with our obligations to other clients and the applicable rules of professional conduct. However, the terms of our engagement letter together with this Statement cannot be modified in any material respect by the tender of such policies, without a writing signed by us.

### 1.    Determination of Fees

When establishing fees for services that we render, we are guided primarily by the time and labor required, although we also consider other appropriate factors, such as the novelty and difficulty of the legal issues involved; the legal skill required to perform the particular assignment; time-saving use of resources (including research, analysis, data and documentation) that we have previously developed and stored electronically or otherwise in quickly retrievable form; the fee customarily charged by comparable firms for similar legal services; the amount of money involved or at risk and the results obtained; and the time constraints imposed by either the client or the circumstances. The firm generally requires a retainer in an amount which is appropriate with respect to the proposed representation. Unless otherwise agreed, the retainer will be applied to statements tendered in connection with the representation, with any unused portion being returned to the client.

In determining a reasonable fee for the time and labor required for a particular matter, we consider the ability, experience, and reputation of the professionals in our firm who perform the services. To facilitate this determination, we internally assign to each professional an hourly rate based on these factors. When selecting professionals to perform services for a client, we generally seek to assign professionals having the lowest hourly rates consistent with the skills, time demands, and other factors influencing the professional responsibility required for each matter. Of course, our internal allocation of values for professional time changes periodically (at least annually) to account for increases in our cost of delivering legal service, other economic factors, and the augmentation of a particular professional's ability, experience and reputation. Any such changes in hourly rates are applied prospectively. We record and bill our time in one-tenth hour (six-minute) increments.

The time for which a client will be charged will include, but will not be limited to, telephone and office conferences between client and counsel, witnesses, consultants, court personnel and others; conferences among our legal personnel; factual investigation; legal research; responding to clients' requests for us to provide information to their auditors in connection with reviews or audits of financial invoices; drafting of agreements, contracts, letters, pleadings, briefs and other documents; travel time; waiting time in court; and time in depositions

and other discovery proceedings. In an effort to reduce legal fees, we utilize paralegal personnel. Time devoted by paralegals to client matters is charged at special billing rates, which also are subject to adjustment from time to time by the firm.

2.    **Expenses**

In addition to legal fees, our statements will include out-of-pocket expenses that we have advanced on behalf of the client and our internal charges (which may exceed direct costs) for certain support activities. Advanced costs generally will include such items as travel expenses and fees for postage, filing, recording, certification, registration, and the like. Our internal charges typically cover such items as long distance telephone calls, facsimile transmissions, messenger services, overnight courier services, terminal time for computer research and complex document production, secretarial and paralegal overtime and photocopying or printing materials sent to the client or third parties or required for our use. We may request an advance cost deposit (in addition to the advance fee deposit) when we expect that we will be required to incur substantial costs on behalf of the client.

During the course of our representation, it may be appropriate or necessary to hire third parties to provide services on your behalf. These services may include such things as consulting or testifying experts, investigators, providers of computerized litigation support, court reporters, providers of filing services and searches of governmental records and filings, and local counsel. Because of the legal "work product" protection afforded to services that an attorney requests from third parties, in certain situations, our firm may assume responsibility for retaining the appropriate service providers. If we do so, you will be responsible for paying all fees and expenses directly to the service providers or reimbursing us for these costs.

3.    **Billing**

We bill monthly throughout the engagement for a particular matter, and our monthly statements are due within thirty days after your receipt thereof. In instances in which we represent more than one person with respect to a matter, each person that we represent is jointly and severally liable for our fees with respect to the representation. Our statements contain a concise summary of each matter for which legal services were rendered and a fee was charged.

We invite our clients to discuss freely with us any questions that they have concerning a fee charged for any matter. We want our clients to be satisfied with both the quality of our services and the reasonableness of the fees that we charge for those services. We will attempt to provide as much billing information as the client requires and in such customary form that it desires, and are willing to discuss with our clients any of the various billing formats we have available that best suits their needs.

If any monthly statement is not paid within 60 days after the original statement date, we reserve the right to discontinue services on all pending matters for you until all of your accounts with us have been brought current. Additionally, if any statement is not paid within 60 days from

the date of the original statement, we may, by written notice to you on a subsequent statement or otherwise, declare the overdue account to be delinquent. We have no obligation to declare any account delinquent. If we declare an account to be delinquent, the amount owing on that account will accrue interest at a rate equal to one percent (1%) per month (a 12% annual percentage rate) from the date of our delinquency notice to you until the balance is paid in full, but in no event shall such rate exceed the maximum rate permitted by applicable law. Any payments made on past due statements are applied first to interest, if any, and then to the account balance, beginning with the oldest outstanding statement. In addition, we are entitled to attorneys' fees and costs if collection activities are necessary.

**4.    Client and Scope of Engagement**

Our engagement is limited to the specific party or parties and matter identified in an engagement letter or similar writing confirming our representation. As a result, our engagement with you does not create a lawyer-client relationship with any other persons or entities, including parents, subsidiaries, affiliates, joint venture entities, successors, acquirers, employees, officers, directors, shareholders, partners, members, or trustees, even if such persons or entities control, are controlled by, or are under common control with you. Nor does our engagement create a lawyer-client relationship with you for any other matter than that agreed to in the engagement letter or similar writing confirming our representation.

We will provide services of a strictly legal nature of the kind generally described in the engagement letter that accompanies this attachment. It is understood that you are not relying on us for business, investment, or accounting decisions, or to investigate the character or credit of persons with whom you may be dealing, or to advise you about changes in the law that might affect you unless otherwise specified in the letter. We will keep you advised of developments as necessary to perform our services and will consult with you as necessary to ensure the timely, effective, and efficient completion of our work. Professionals in the firm typically have several client matters pending and are required to coordinate the scheduling of activities required for each pending client matter.

**5.    Necessary Information**

It is anticipated that you and any other entities affiliated with you will furnish us promptly with all information that we deem to be required to perform the services described in our engagement letter, including financial statements from qualified accountants and auditors, as appropriate, and documents prepared by other legal counsel employed by you in connection with prior or other matters. You will make such business or technical decisions or determinations as are appropriate to carry out our engagement.

Our engagement is premised and conditioned upon your representation that you are not aware of any material facts or current or historical problem (involving without limitation such matters as court orders, injunctions, cease and desist orders, judgments, liabilities, litigation, administrative proceedings, crimes, prosecutions, bankruptcies or securities violations) on the

part of any person to be connected with you that you have not fully disclosed to us. You understand that the accuracy and completeness of any document (including securities disclosure documents, litigation pleadings and court filings) prepared by us is dependent upon your alertness to assure that it contains all material facts relating to the subject and purpose of such document and that such document must not contain any misrepresentation of a material fact nor omit information necessary to make the statements therein not misleading. To that end, you agree to review all documents prepared by us for their factual accuracy and completeness prior to any use thereof. You also acknowledge that this responsibility continues through our engagement in the event that such document becomes deficient in this regard. You hereby represent and warrant that any material, information, reports and financial statements, whether rendered orally or in writing, furnished to us by you will be accurate, and that we may rely upon the truth or accuracy of such information.

### 6.    Confidentiality and Conflicts

Akin Gump is a large law firm with multiple offices and a large number of clients around the world. Because of the firm's size and geographic scope, as well as the breadth and diversity of our practice, other present or future clients of the firm inevitably will have contacts with you. Accordingly, to prevent any future misunderstanding and to preserve the firm's ability to represent you and our other clients, we confirm the following understanding about certain conflicts of interest issues:

Unless we have your agreement that we may do so, we will not represent another client in a matter that is substantially related to a matter in which we represent you and in which the other client is adverse to you. We understand the term "matter" to refer to transactions, negotiations, proceedings and other representations involving specific parties.

To the extent permitted by applicable law (including rules) you agree that we may (i) continue to represent any existing client and (ii) undertake to represent any new or former client, in each case, in any matter that is not substantially related to a matter in which we represent you, even if we represent you in a matter in which the other client is adverse to you or we represent the other client in a matter in which you are adverse to the other client. By way of example, this would include assisting another client on various types of agreements, financings or restructurings and bankruptcies in which you may have an interest as a counterparty, or advancing another client's position on legislative or regulatory issues with which you may disagree. Additionally, we may be instructed to act for more than one client interested in the same objective, asset or financing target. You agree that if we are, for example, advising you in relation to an auction or bid we may also act for other bidders and/or financiers to other bidders in relation to that auction or bid, subject to implementation of reasonable safeguards to ensure that confidential information is kept within the relevant team (e.g. using separate teams of lawyers to advise each of you and any other bidders and finance providers to other bidders).

We do not view this advance consent to permit unauthorized disclosure or use of any client confidences. Under applicable rules of professional conduct, we are obligated to and shall

preserve the confidentiality of any confidential information you provide to us. In this connection, we may obtain nonpublic information about you in the course of our representation. We maintain appropriate physical, electronic, and procedural safeguards to protect your nonpublic information. We do not disclose nonpublic information about our clients or former clients to anyone, except as permitted by law and applicable rules of professional conduct.

We will not disclose to you or use on your behalf any documents or information with respect to which we owe a duty of confidentiality to another client or person.

The fact that we may have your documents and/or information that may be relevant to another matter in which we are representing another client will not prevent us from representing that other client in that matter in reliance upon the foregoing advance waiver. We will maintain appropriate measures to ensure that the confidentiality of your documents and/or information is preserved.

Our professional obligations to you and to our other clients will require us to run a conflicts check if there is any change in the parties to the matter or any material change in its nature. We must also run a conflicts check before undertaking any new matters with you.

### 7.    Termination of Engagement

Upon completion of any matter, or upon earlier termination of our relationship, the lawyer-client relationship arising from such matter will end unless you and we have expressly agreed to a continuation with respect to other matters. We hope, of course, that such a continuation will be the case. You have the right at any time to terminate our services and representation upon written notice to the firm. We reserve the right to withdraw from our representation if circumstances arise that under the applicable rules of professional conduct, allow or require us to.

### 8.    Disagreements Regarding Fees

In the event that you believe any statement for our services is erroneous for any reason, you shall notify us of the same within ten business days after receipt of such statement stating the basis for your belief. If agreement cannot be reached with respect to the amount owed, you agree to promptly pay the non-disputed portion of our statement and submit the disputed portion for resolution by the appropriate committee of the organized bar of the city where our office rendering such services is located. If no organized bar exists in that city, then you can submit to the Committee on Arbitration Relating to Fee Disputes (or similar committee) of the regulatory body governing the practice of law in the state or jurisdiction where our office rendering such services is located.

9.    **Governing Law**

OUR ENGAGEMENT SHALL BE GOVERNED BY THE LAWS OF THE JURISDICTION WHERE OUR OFFICE RENDERING OUR SERVICES IS LOCATED AND, EXCEPT FOR DISAGREEMENTS REGARDING FEES SUBMITTED TO ARBITRATION PURSUANT TO PARAGRAPH 8 ABOVE, VENUE FOR ANY OTHER ACTION HEREUNDER SHALL BE IN THE COUNTY WHERE OUR OFFICE RENDERING SUCH SERVICES IS LOCATED.

10.    **Record Retention**

Following termination of a matter, any otherwise nonpublic information you have supplied to us that is retained by us will be kept confidential in accordance with applicable rules of professional conduct. Upon your request, we will return to you documents and materials that you provided to us in connection with our representation. You hereby acknowledge and agree that if you do not instruct us to have your client file returned to you, we will retain it for a reasonable time period (presently ten years) pursuant to the Firm's then –current Record Retention Policy, after which, we will be free to destroy at our discretion, without further notice to you, any portion of the file left with us that we are not legally required to preserve. Clients may be charged shipping costs for the return of client files. The responsible lawyer should determine if it is appropriate depending upon the size of the matter and the extent of the likely cost to the firm. If you instruct us to return your file to you, we reserve the right to retain materials pertaining to each matter, including without limitation administrative and accounting records, conflicts and new business intake materials, internal documents, lawyer notes, firm form files, communications, and other materials intended for our internal use or that we are prohibited from providing to you by law, court order or third party agreement. By agreeing to and accepting our representation as described in this letter, you agree to keep us informed of your most current address during the stated retention period.

11.    **Miscellaneous**

The engagement letter together with this Statement of Firm Policies constitutes our entire understanding and agreement with respect to the terms of our engagement and supersedes any prior understandings and agreements, written or oral. If any provision of our engagement letter is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions shall remain in full force and effect. Our engagement letter may only be amended in writing by the parties hereto.

Your agreement to this engagement constitutes your acceptance of the foregoing terms and conditions. If any of them is unacceptable to you, please advise us now so that we can resolve any differences and proceed with a clear, complete, and consistent understanding of our relationship.

**EXHIBIT 2**

DocuSign Envelope ID: 114BE470-887E-4E68-AC06-2AC59D528991

AGREEMENT

This agreement ("Agreement") is made and entered into as of March 4, 2021 ("Effective Date"), by and between Simply Greatness Productions ("SGP"), a Delaware LLC, and FaZe Clan Inc. ("Faze") f/s/o Jarvis Khattri p/k/a Faze Jarvis ("Talent") with respect to Talent's Boxing and Publicity services in connection with the live pay per view exhibition boxing event (the "Event"), and marketing services by members of Faze Clan.

1.  Grant of Rights. Faze shall cause Talent to hereby grant to SGP the right to require Talent to render reasonable amateur exhibition boxing entertainment and publicity services (collectively referred to herein as the "Services") solely in connection with the Event and to use the results and proceeds of Talent's Services therefrom, including but not limited to all commercial media rights, streaming rights, rights in connection with the advertising and publicity, and the right to commercially exploit any and all such right in perpetuity and throughout the universe, all as more specifically set forth herein. SGP shall at all times use reasonable efforts to portray Talent in a favorable light. For the avoidance of doubt, all copyrights, design rights, patents, trademarks, trade secrets, and other intellectual property and proprietary rights (i) in FaZe Clan, Talent and/or other members shall be and remain the sole and exclusive property of FaZe Clan and/or Talent, and (ii) in SGP's logos and trademarks shall be and remain the sole and exclusive property of SGP. The parties hereby acknowledge and agree that, except as otherwise set forth explicitly herein, all intellectual property rights in and to any photos, videos, social media posts and similar digital and promotional content created, conceived or developed in whole or in part by FaZe Clan, Talent, or other members of FaZe Clan in connection with its activities under this Agreement and Addendum A shall be owned by FaZe Clan. SGP assumes all liability in connection with the Event and releases FaZe Clan from any and all liability in connection therewith.

2.  Date. The Event will be held in May or June of 2021, subject to Events of Force Majeure (described below). The Event shall not occur prior to May 2021. If the Event is cancelled for Force Majeure, the Event will be rescheduled within three (3) months of the original Event date.

3.  Services.

    a.  Faze shall cause Talent to commence the Services by participating in a boxing match against a competitor to be mutually agreed upon between the parties. The competitor shall be Michael Le. In the event there is a required substitution, Talent has agreed to fight a replacement, subject to approval of the replacement by Talent, with any proposed replacement to be of a similar level of size, stature and boxing experience. Talent shall not unreasonably withhold approval.

    Each round will last approximately two-three minutes. Talent shall prepare for the Event in a manner in line with industry standard for an amateur boxing exhibition. Talent shall make reasonable efforts to

DocuSign Envelope ID: 114BE470-887E-4E68-AC05-2AC59D528991

comply with all reasonable directions, rules and regulations of SGP in connection with such Services.

    b. **Marketing Services.** Faze shall cause members of FaZe Clan to provide marketing services in Addendum A (the "Marketing Services").

4. <u>Compensation</u>. SGP agrees to pay Faze, and Faze agrees to accept, as full and complete compensation for all rights granted herein and all undertakings and services:

    a. <u>Initial Payment</u>. SGP shall pay Faze Twenty-Five Thousand Dollars USD ($25,000) within five business days upon Faze's execution of Agreement. Notwithstanding, Talent must submit an invoice to SGP.

    b. <u>Contingent Compensation</u>. Provided that Talent participates in Event and is not in uncured material breach of the Agreement and Faze fully completes the Marketing Services, SGP shall pay Talent an amount equal One Million USD ($1,000,000) ("Contingent Compensation").

All payments due to Faze hereunder shall be made to FaZe Clan Inc. by domestic wire transfer using payment instructions to be provided by FaZe Clan's Chief Financial Officer (umit.bajaj@fazeclan.com). SGP's billing contact is as follows: Name: Gelfand Rehnert & Feldman Attn: Mark Goodman; Email: mgoodman@grfllp.com; Address: 1800 Century Park East #1600 Los Angeles, CA 90067; Phone: (310) 556-6658.

SGP shall pay Talent within fifteen (15) business days of Producer's receipt of revenue from streaming partner. Notwithstanding, Talent must submit an invoice to SGP.

If SGP cancels Event for any other reason, aside from a reason listed below in section 12, then SGP will pay talent Two Hundred Thousand USD ($200,000) within ten days of notifying Talent of the cancelation.

SGP shall provide Talent with at least thirty-five (35) tickets to the Event for Talent's guests.

5. <u>Promotion</u>. Talent shall promote his participation in the Event across Talent's social media channels, including but not limited to Instagram, YouTube, Twitter, and TikTok. Talent shall have full creative approval over the post and caption, as applicable. Specific promotions shall be negotiated in good faith but shall not be less than the below:

    a. Twitter.

        i. Talent shall post a minimum of three (3) static tweets ("Tweet") in connection with (i) the announcement of the fight card; (ii) any pre-sale date of the fight; (iii) promotion of Event within the last

DocuSign Envelope ID: 114BE470-887E-4E68-AC05-2AC59D628991

week and date of the fight. Talent may not remove the post for at least five business days after the completion of Event.

    ii.  Each Tweet shall include the image of the official fight poster and the link to purchase tickets to the stream.

    iii.  Talent shall pin the first two Tweets for a minimum of five (5) days.

  b.  Instagram.

    i.  Talent shall post a minimum of three (3) static posts in connection with (i) the announcement of the fight card; (ii) any pre-sale date of the fight; (iii) promotion of Event within the last week and date of the fight. Talent may not remove the post for at least five business days after the completion of Event.

    ii.  Talent must simultaneously publish at least two (2) Instagram stories in promotion of Event in conjunction with each of the three static Instagram posts referenced above. The stories must include a swipe up link to the Event, provided to Talent by SGP. Thus, Talent must publish at least six (6)

  c.  YouTube. Talent must publish three (3) separate YouTube videos that promotes the Event with an integration that lasts a minimum of sixty (60) seconds within the first two minutes of the respective video. The promotional videos should correspond to: (i) the announcement of the fight card; (ii) any pre-sale date of the fight; (iii) the week before the Event.

  d.  Tik Tok. Talent must publish at least one promotion video on Tik Tok that includes a call to action to buy streams to the Event.

  e.  Talent represents and warrants that they shall at all times comply with all required FTC regulations with respect to social media post.

  f.  Talent shall provide a reasonable amount of approved audio and visual materials to be used in conjunction with promotion of Event.

  g.  Talent's social media posts in promotion of Event are defined as "Social Media Posts."

6.  Photoshoot. Talent agrees to participate in a photoshoot lasting at least two (2) days. For clarity, each day shall be no longer than eight (8) hours. SGP shall arrange and directly pay for Talent's ground transportation within Southern California to and from the photoshoot, as well as a reasonable per diem to cover Talent's meals.

7.  Name and Likeness. During the Term, SGP shall have the right, solely in connection with Event, to use Talent's name, approved nickname, approved biographical information, approved image and approved likeness and Social Media Posts solely in the form originally posted by Talent, in the following media, manner and formats: (i) via any websites, e-mail and digital and social media channels, owned or operated by SGP or by any production partner (including via paid media), (ii) in print media, (iii) for public relation, marketing and publicity purposes via any and all media and formats throughout the universe.

DocuSign Envelope ID: 114BE470-887E-4E68-AC05-2AC59D528991

If Talent objects to any of the aforementioned uses, SGP shall work with Talent in good faith to resolve such objection. SGP has the non-exclusive right to record Talent as part of content produced in conjunction with the Event such as behind the scenes footage and/or documentary and/or docu-series to be used solely in connection with the commercial exploitation, marketing and promotion of the Event, subject to Talent's prior written approval in each instance. SGP shall at all times use reasonable efforts to portray Talent in a favorable light. For the avoidance of doubt, SGP may use "FaZe Jarvis" solely in connection with the Event, but no license shall be granted to FaZe Clan's intellectual property, including without limitation the use of the word "FaZe," the words "FaZe Clan" or the FaZe Clan logo without FaZe Clan's prior written approval.

8. <u>Exclusivity</u>. Talent shall not participate in any exhibition boxing match "Competitive Event" from the Effective Date until six months after the Event.

9. <u>Option</u>. SGP will have the option to contract Talent to participate in a derivative event within twelve months following the Event, subject to good faith negotiations.

10. <u>Further documents</u>. Talent agrees to execute any and all other documents and perform any and all acts and deeds reasonably necessary to carry out Talent's obligations under the Agreement.

11. <u>Insurance</u>. SGP shall, at no cost to FaZe Clan, maintain the following minimum insurance in full force and effect throughout the Term, naming both FaZe Clan and Talent as additional insureds on the policies: public liability and general liability insurance (either in combined form or in separate policies), including coverage for bodily injury, claims by one insured against another insured, and SGP's defense and indemnity obligations under the Agreement, with coverage of not less than $2,000,000 USD combined single limit per occurrence and $2,000,000 USD annual aggregate; and errors and omission insurance in line with industry standard.

12. <u>Suspension and Termination</u>. SGP shall have the right to suspend and/or terminate its obligations for Talent's incapacity, default, or the occurrence of a force majeure event (defined below).

Default shall include (i) Talent's uncured material breach (after receiving written or e-mail notification per section 19(f) below and failing to cure within seventy-two hours); (ii) Talent's inability to be insured to SGP's reasonable satisfaction; (iii) Talent being charged with a crime involving moral turpitude in SGP reasonable determination that adversely affects Event; or (iv) Talent's actions (including publication or declaration of a statement) that may reasonably be considered immoral, scandalous and/or obscene; and such action damages or otherwise negatively affects the Event's reputation.

Force Majeure. An event of "Force Majeure" shall exist hereunder if Event is impaired, hampered, interrupted, prevented, suspended, postponed or

4

DocuSign Envelope ID: 114BE470-887E-4E68-AC05-2AC59D528991

discontinued by reason of any war or armed conflict, public health crisis, act of a
public enemy, riot, civil disturbance, epidemic, fire, casualty, flood, explosion,
earthquake, boycott, labor controversy, governmental statute, law, act of God.

13. Remedies. If Faze is in uncured material breach of any of the material marketing
obligations, then Faze's compensation will be reduced by twenty percent (20%)
percent (after receiving written or e-mail notification per section 20(f) below and
failing to cure within seventy-two hours), pro-rata. Faze acknowledges that the
rights granted hereunder and Talent services hereunder are unique and

DocuSign Envelope ID: 114BE470-887E-4E68-AC05-2AC59D528991

extraordinary, SGP therefore would be entitled to all available equitable remedies in case of breach or threatened breach of Agreement by Talent. Any remedies, rights, and obligations contained in this Agreement shall be cumulative and none of them shall be in limitation of any other remedy, rights, undertaking, or obligation of either party. **HOWEVER, NO BREACH OF THIS AGREEMENT BY TALENT SHALL ENTITLE TALENT TO TERMINATE OR RESCIND ANY OF THE RIGHTS GRANTED TO SGP HEREIN, AND IN THE EVENT OF ANY QUESTION OF SGP'S PERFORMANCE OF ITS OBLIGATION HEREUNDER, TALENT HEREBY WAIVES THE RIGHT, IN THE EVENT OF ANY SUCH BREACH, TO EQUITABLE RELIEF OR TO ENJOIN, RESTRAIN OR INTERFERE WITH THE EXHIBITION OF EVENT OR THE EXERCISE OF ANY OF THE GRANTED RIGHTS, IT BEING TALENT'S UNDERSTANDING THAT THE SOLE REMEDY SHALL BE THE RIGHT TO RECOVER MONETARY DAMAGES WITH RESPECT ONLY TO THE ACTUAL HARM CAUSED BY ANY SUCH BREACH. IN ANY EVENT, NEITHER PARTY WILL BE LIABLE TO THE OTHER FOR CONSEQUENTIAL, INCIDENTAL PUNITIVE OR SPECIAL DAMAGES, OR DAMAGES FOR LOST PROFITS OR LOSS OF BUSINESS OPPORTUNITIES. Notwithstanding the foregoing, either party may bring an action or suit seeking injunctive relief to protect its intellectual property rights in any court having jurisdiction. Notwithstanding anything to the contrary contained herein, FaZe Clan's aggregate liability under this Agreement shall under no circumstances exceed the payments which Talent received or is entitled to receive under this Agreement.**

14. <u>Representations and Warranties</u>. Each party hereby represents and warrants that
    a. It has full right, power and authority to enter into and fully perform this Agreement and no third party's consent is required;
    b. the execution and delivery of the Agreement and the performance of its obligations hereunder will not constitute a breach or default of or otherwise violate any agreement to which such party or any of its affiliates are a party;
    c. The content it provides under this Agreement does not infringe or violate the rights of any third party;
    d. It will not use any images or marks to which it does not have the rights;
    e. It will comply with all applicable ordinances, codes, standards, laws, rules, regulations, and orders of any governmental authority having jurisdiction in its performance under this Agreement.

15. <u>Indemnification</u>. Each party will indemnify, defend, and hold harmless the other and each of its officers, directors, owners, shareholders, representatives, officials, employees, agents, subsidiaries, affiliates, successors and assigns, harmless from any and all claims, damages, losses, liabilities, actions, judgments, costs and expenses (including reasonable attorneys' fees) brought by the other party or a third party arising out of or in connection with indemnifying party's breach or claimed breach of its representations, warranties, or covenants hereunder.

6

DocuSign Envelope ID: 114BE470-887E-4E68-AC05-2AC59D528991

16. <u>Relationship of Parties</u>. Nothing contained herein shall constitute a partnership between or by the Parties hereto.

DocuSign Envelope ID: 114BE470-887E-4E68-AC05-2AC59D528991

17. <u>Confidentiality</u>. This Agreement shall be deemed confidential in its entirety and no publication, distribution or dissemination of any kind shall be permitted, except upon the express prior and written consent of both parties, to any other individuals outside of the immediate parties to this contract, their attorneys, agents and authorized representatives. Notwithstanding the foregoing, the terms of this Agreement may be disclosed subject to any requirement by a judicial process, from a court of competent jurisdiction or otherwise as a matter of law, pursuant to a mutually agreeable press release, or in connection with a proposed merger (of any kind), any debt or equity financing, in connection with a public offering of shares or sale of such party's business.

18. <u>Governing Law; Dispute</u>. This Agreement shall be governed by under the laws of California, without reference to conflicts of law principles. Any dispute, claim or controversy arising out of or relating to this Agreement shall be determined by confidential and binding arbitration in Los Angeles, California, before a single neutral arbitrator who shall be a retired state or federal jurist. The arbitration shall be administered by JAMS pursuant to its Streamlined Arbitration Rules and Procedures. Judgment on the Award may be entered in any court having jurisdiction. The arbitrator(s) are not empowered to award punitive or exemplary damages, and the parties waive any right to recover any such damages.

19. Miscellaneous
    a. <u>Entire Agreement</u>. This Agreement constitutes the complete agreement of the parties with respect to the subject matter hereof, and this Agreement supersedes and replaces any or all prior or contemporaneous negotiations, promises, covenants, representation and agreement of every kind or nature whatsoever with respect thereto, retroactive to the inception thereof, all of which have become merged and finally integrated into this Agreement.
    b. <u>Waiver and Amendment</u>. No modification, amendment, or waiver of any provision of this Agreement will be effective unless such amendment or waiver is made in writing and signed by authorized representatives of both Parties.
    c. <u>Partial Invalidity</u>. If any provision of this Agreement is held be invalid, illegal or unenforceable, then the validity, legality and enforceability of all of the other provisions of the Agreement shall remain in full force and effect.
    d. <u>Assignability</u>. Neither party may not assign this Agreement or its rights hereunder in whole or in part.
    e. <u>Counterparts</u>. This Agreement may be executed in one or counterparts, each of which shall be deemed to be an original and, which taken together, shall be deemed to constitute one and the same agreement.
    f. <u>Notices</u>. All notices to Talent shall be sent to Talent, with a copy to Talent's manager (Jordan.galen@fazeclan.com) and FaZe Clan Business and Legal Affairs (Erika.georgiou@fazeclan.com).

8

DocuSign Envelope ID: 114BE470-887E-4E68-AC05-2AC59D528991

[SIGNATURE TO FOLLOW]

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the day and year first written above.

FAZE

By: *Erika Georgiou*

Name: Erika Georgiou

Date: 3/8/2021

SGP, LLC

By: _____

Name: _____
        Paul Cazers

Date: _____
        3/10/2021

TALENT

By: *Jarvis Khattri*

Name: Jarvis Khattri

Date: 3/8/2021

9

DocuSign Envelope ID: 114BE470-887F-4E68-AC05-2AC59D528991

Addendum A

Faze shall cause the below talent to promote the Event:

Faze Kay
    a. Instagram.
        i. Talent shall post the fight flier on Talent's static Instagram feed at least five days before Event. Talent shall not remove the post for a minimum of Three (3) days after the Event.
        ii. Talent must simultaneously publish at least three (3) Instagram stories in promotion of Event in conjunction with Talent's static post. Each story must include a swipe up link to the Event, provided to Faze by SGP.
    b. Twitter. Talent shall post a minimum of one Tweet at least five (5) days before Event that includes the image of the official fight poster and the link to purchase tickets to the stream. Talent shall pin the Tweet for a minimum of forty-eight hours before Event.
    c. YouTube. Talent must publish at least two (2) separate YouTube videos that promotes the Event with an integration that lasts a minimum of sixty (60) seconds within the first two minutes of the respective video. The promotional videos should correspond to: (i) the announcement of the fight card; (ii) any pre-sale date of the fight; or (iii) the week before the Event.
    d. Tik Tok. Talent must publish at least one promotion video on Tik Tok that includes a call to action to buy streams to the Event.

Faze Adapt
    a. Faze shall cause Faze Adapt to publish the official fight flier one (1) time as an Instagram story with a swipe up link and call to action to purchase streams, and one (1) Instagram story with a swipe up link and call to action to purchase streams, creative content of story per Talent's discretion. For avoidance of doubt, Faze will cause Faze Adapt to publish two (2) Instagram Stories in promotion of Event.

Additional Faze Talent
    b. Faze shall cause eight (8) additional FaZe Clan talent to publish the official fight flier as an Instagram story with a swipe up link and call to action to purchase streams within five days of the Event.

FAZE represents and warrants that talent shall at all times comply with all required FTC regulations with respect to social media post.

DocuSign Envelope ID: 114BE470-887E-4E68-AC05-2AC59D528991

FAZE                                          SGP, LLC

By ___Erika Georgiou___                       By: _____

Name: ___Erika Georgiou___                    Name: _____

Date: ___3/8/2021___                          Date: _____

1

**EXHIBIT 3**

DocuSign Envelope ID: 7A0E9FFA-BF34-4987-B96D-ECCACB85EB15

**CONFIDENTIAL SETTLEMENT AGREEMENT AND MUTUAL GENERAL RELEASE**

This Confidential Settlement Agreement and Release ("Settlement Agreement"), effective as of June __, 2022 ("Effective Date"), is entered into between Simply Greatness Productions, LLC ("SGP"), on the one hand, and Jarvis Khattri *p/k/a* Faze Jarvis ("Talent"), on the other hand. SGP and the Talent may be individually referred to as a "Party" and collectively as the "Parties."

## RECITALS

**WHEREAS,** SGP was the promoter of a celebrity boxing event known as the "Social Gloves: Battle of the Platforms: YouTubers vs. TikTokers" ("Event") that took place on June 12, 2021 at the Hard Rock Stadium near Miami, Florida;

**WHEREAS,** the Parties entered into an Agreement, dated March 4, 2021 ("Talent Agreement"), in which Talent was to participate in the Event;

**WHEREAS,** Talent fought Michael Le ("Bout");

**WHEREAS,** the Talent Agreement provided that Talent was to receive an initial payment of twenty-five thousand dollars (U.S. $25,000.00) and one million dollars (U.S $1,000,000.00) provided that Talent participated in the Event and was not in uncured material breach of the Agreement, for a total potential compensation of one million and twenty-five thousand dollars (U.S. $1,025,000.00) ("Original Contractual Amount");

**WHEREAS,** the Bout occurred;

**WHEREAS,** to avoid litigation and to obtain finality and repose with respect to any and all past, present and future claims and potential claims pertaining to the Talent Agreement, the Original Contractual Amount, Event, the Bout, and the other claims of Talent, SGP and Talent have agreed fully, finally and forever to settle any claims and demands which exist, may exist, are pending or anticipated between them relating to or concerning the Event, the Talent Agreement, the Bout and SGP's financial obligations to Talent and agree to compromise the claims and causes of action held, asserted or threatened or that could have been asserted or threatened in any legal proceedings related to or concerning the Event, the Talent Agreement, the Bout; the Original Contractual Amount, and SGP's contractual and financial obligations to the Talent (collectively, the "Dispute");

**NOW, THEREFORE,** in consideration of the mutual promises, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties hereby stipulate and agree as follows:

## AGREEMENT

1.    Recitations.  The foregoing recitations are true and correct and are incorporated herein.

2.    Settlement Consideration.  In full and final consideration of the Original Contractual Amount, the settlement of the Dispute, as well as all pending disagreements and all

DocuSign Envelope ID: 7A0E9FFA-BF34-49B7-B98D-ECCACB85EB15

prospective claims, SGP will pay Talent the amount of one hundred thousand dollars (U.S. $100,000.00) by wire within thirty (30) days of Talent executing and returning this Agreement and an additional one hundred thousand dollars (U.S. $100,000.00) within ninety (90) days after the first payment, for a total of two hundred thousand dollars (U.S. $200,000.00) ("Settlement Payment"). The Settlement Payment shall be wired to the following account:

Name on Account: Faze Clan, Inc.
Bank Name: Bank of America
Bank Address: 6300 Sunset Blvd
                    Hollywood, CA 90028
RTN/ABA: 026009593
Account #: 483065076191

Talent shall provide all information reasonably required by SGP to process and transfer the Settlement Payment, a W-9 Statement, within ten (10) days of the full execution of this Agreement.

3.    No Admissions. The Parties hereto acknowledge and agree that this Agreement and the settlement of claims and potential claims hereunder are entered into by the Parties to avoid the costs, expenses and uncertainties of litigation.   To this end, SGP and Talent acknowledge and agree that this Settlement Agreement is not in any respect, nor for any purpose, in any proceeding, to be deemed or construed to be an admission or conclusion of any liability or wrongdoing whatsoever on the part of any party, and other than as set forth in this Settlement Agreement.

4.    Release.

a.    Talent's Release in Favor of SGP and Covenant Not Sue. Subject to SGP's timely payment in full of the Settlement Payment, Talent hereby releases and forever discharges SGP, as well as SGP's parents, principals (including but not limited Allen McBroom, Austin McBroom and Catherine Paiz McBroom), subsidiaries, affiliates, attorneys, agents and other representatives (collectively, the "SGP Parties"), of and from all causes of action, suits, debts, dues, sums of money, commissions, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, executions, claims and demands whatsoever, in law or in equity, which Talent ever had, now has, or may have, against the SGP Parties in relation to the Dispute, including, but not limited to the Talent Agreement (including the Original Contractual Amount and all other amounts otherwise owed under the Talent Agreement), the Event, the Bout and SGP's contractual and financial obligations to the Talent under the Talent Agreement, SGP's conduct in connection with the Event and all other claims of any kind or nature which were raised or could have been raised by Talent in relation to the Event and/or the Dispute, whether known, unknown, suspected or unsuspected to exist, from the beginning of time to the end of the world.

b.    SGP's Release in Favor of Talent and Covenant Not to Sue. SGP hereby releases and forever discharges Talent, as well as his affiliates, employees, attorneys, agents (including but not limited to A3 Artists) and other representatives (collectively, the "Talent Parties"), of and from all causes of action, suits, debts, dues, sums of money, commissions, accounts, reckonings, bonds, bills, specialties, controversies, variances, trespasses, damages, judgments, executions, claims and demands whatsoever, in law or in equity, which SGP ever had,

DocuSign Envelope ID: 7A0E9FFA-BF34-4987-B98D-ECCAC885EB15

now has, or may have, against the Talent Parties, in relation to the Dispute, including, but not limited to the Talent Agreement, the Event, the Bout and the Talent's contractual and financial obligations to the SGP, the Talent's conduct in connection with the Event and all other claims of any kind or nature which were raised or could have been raised by SPG in relation to the Event or the Parties' relationship and/or and all other claims of any kind or nature which were raised or could have been raised in relation to the Event and/or the Dispute, whether known, unknown, suspected or unsuspected to exist, from the beginning of time to the end of the world.

       c.    Waiver Under California Civil Code Section 1542.  The Parties each realize and acknowledge that, at the time of this Settlement Agreement, there may exist claims and/or causes of action herein released that are not known to the Party releasing the same or the nature of which has not yet been discovered.  It is expressly understood and agreed by each of the Parties that the possibility that such claims and/or causes of action may exist has been explicitly taken into account by them in determining the consideration to be given by the Parties to this Settlement Agreement. Accordingly:

     (i)    Talent hereby specifically waives to the fullest extent permitted by law the provisions of California Civil Code Section 1542 with respect to any and all claims against the SGP Parties which are released under the terms of this Settlement Agreement.

     (ii)    SGP hereby specifically waives to the fullest extent permitted by law the provisions of California Civil Code Section 1542 with respect to any and all claims against the Talent Parties which are released under the terms of this Settlement Agreement.

     (iii)    Section 1542 provides as follows:

        "CERTAIN CLAIMS NOT AFFECTED BY GENERAL RELEASE. A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

    5.    Final Accord and Satisfaction.  Subject to the timely and full payment of the Settlement Payment, this Agreement and the releases contained herein are intended to be final and binding between the Parties hereto and are further to be effective as a full and complete accord and satisfaction between the Parties hereto as to the claims, causes of action, and other matters released herein.   The Parties acknowledge that they are each expressly relying on the finality of this Agreement as a substantial, material factor inducing its execution of this Agreement.

    6.    Non-Disparagement.

       a.    Talent agrees that he will not make any derogatory or disparaging statement(s) to anyone concerning the SGP Parties, at any time, the impact of which would materially damage the reputation of the SGP Parties, including statements relating to SGP's

DocuSign Envelope ID: 7A0E9FFA-BF34-4987-B96D-ECCACB85EB15

production capabilities, marketability, integrity, honor, character or skill. Specifically, Talent agrees to refrain from making any statement regarding the Event, the Event's financial success, SGP's failure to satisfy the Original Contractual Amount outlined in the Talent Agreement; and SGP's financial wherewithal.

        b.     SGP agrees that it will not make any derogatory or disparaging statement(s) to anyone concerning the Talent Parties at any time, the impact of which would materially damage the reputation of the Talent Parties including statements relating to the Talent's capabilities, marketability, integrity, honor, character or skill.

        c.     The Parties acknowledge and agree that the non-disparagement obligation is an important, essential component of this Settlement Agreement, and that but for this clause, the Parties would not have resolved the Dispute or entered into this Settlement Agreement.

7.    <u>Confidentiality.</u>

        a.     The Parties expressly agree that confidentiality of the terms and provisions of this Agreement is of material importance to the Parties and was a material inducement to the execution of this Agreement. Each Party promises and covenants not to directly or indirectly divulge, disclose, or publicize (including via any social media platform, app, or website), or cause to be divulged, disclosed or publicized, any of the specific terms of this Agreement to any person or entity or to the public; <u>provided however</u>, that the Parties and each of them are entitled to make general statements, including via any social media platform, app, or website, along the lines of the "matter has been resolved amicably," "the terms of such settlement are confidential" and/or, in the case of SGP, "SGP reached an agreement with Faze Jarvis on payment" or "SGP and Faze Jarvis have amicably resolved their Dispute."

        b.     Notwithstanding the provisions of Paragraph 7(a), this confidentiality provision shall not preclude the Parties or their counsel from disclosing the terms of this Agreement as follows:

        i.     Information contained in this Agreement may be disclosed by the Parties to their present and future attorneys, accountants, beneficiaries, insurers, indemnitors, lenders, and investors, provided that such persons are made aware that the information is confidential and are advised to keep such information confidential;

        ii.     Information contained in this Agreement may be disclosed to the extent required by law or any court order in any proceedings provided that such persons are made aware that the information is confidential and written notice with a reasonable opportunity to object is given to the other non-disclosing Parties;

        iii.     Information contained in this Agreement may be disclosed to any duly authorized public authority or regulator such as the Internal Revenue Service or local taxing authority;

        iv.     Information contained in this Agreement may be disclosed in any Court proceeding as necessary to enforce the terms of this Agreement or in response to a proper discovery

DocuSign Envelope ID: 7A0E9FFA-BF34-4987-B96D-ECCACB85EB15

request, provided however that disclosure of this Agreement and its terms shall be afforded protection under a Court-issued confidentiality or protective order;

    v. Information contained in this Agreement may, upon the entry of a confidentiality agreement/protective order/non-disclosure agreement, be used by SGP in an attempt to resolve other outstanding claims relating to the Event; and

    vi. Information contained in this Agreement may be disclosed as otherwise may be agreed upon by the Parties in writing.

    c. The Parties shall keep the material terms and amount of this Settlement Agreement confidential. Nothing in this section, however, shall prohibit any Party from disclosing the relevant terms of this Settlement Agreement: (i) in confidence to its representatives, attorneys, auditors, investors, or others who, in the ordinary course of such Party's business, are required to know the terms of this Settlement Agreement; (ii) if ordered by a court of competent jurisdiction to disclose such information; (iii) if necessary for the preparation and filing of tax returns; (iv) if necessary for compliance with any applicable national, local, state, territorial or federal laws and process; or (v) in an action to enforce the terms of the Settlement Agreement.

    d. In the event that either Party breaches this confidentiality clause, each Party acknowledges and agrees that: (i) the non-breaching Party will suffer irreparable harm; (ii) the non-breaching Party shall have no adequate remedy at law; (iii) an injunction would serve the public interest; and (iv) the non-breaching Party shall be entitled to immediate injunctive relief, a temporary restraining order, and/or other equitable relief without the necessity of posting a bond. Any right to obtain an injunction, restraining order, or other equitable relief shall not be deemed a waiver of the arbitration provision or any other right to assert any other remedy that may be available at law or in equity. Additionally, if a court of competent jurisdiction determines that a Party breached this confidentiality clause, the breaching Party may be liable for other claims and damages.

    e. The Parties acknowledge and agree that this confidentiality clause is an important, essential component of this Settlement Agreement, and that but for this clause, the Parties would not have resolved the Dispute or entered into this Settlement Agreement.

  8. Nature and Effect of the Settlement Agreement.

    a. The Parties represent and warrant that they have each taken all corporate, partnership and/or other action on its part necessary for the authorization, execution and delivery of this Settlement Agreement, and that this Settlement Agreement constitutes a legal, valid and binding obligation, enforceable in accordance with its terms.

    b. Talent represents and warrants he is the sole, exclusive and lawful owner of all right, title and interest in and to every claim, cause of action, and other matter released herein, and he has not assigned or transferred, or purported to assign or transfer, to any person or entity any claims or other matters herein released.

    c. SPG represents and warrants that it is the sole exclusive and lawful owner

DocuSign Envelope ID: 7A0E9FFA-BF34-4987-B96D-ECCACB85EB15

of all right, title and interest in and to every claim, cause of action, and other matter released herein, and it has not assigned or transferred, or purported to assign or transfer, to any person or entity any claims or other matters herein released.

   d. This Settlement Agreement is entered into by the Parties without reliance upon any statement, representation or promise not expressly contained within this Settlement Agreement.

   e. Each Party has cooperated in the drafting and preparation of this Settlement Agreement. Consequently, this Settlement Agreement shall not be construed against any Party on the basis that one such Party was the drafter of the Settlement Agreement. The headings are for the convenience of the Parties and are not to be used in construing the meaning of any provision of this Settlement Agreement.

   f. The Parties acknowledge that they have been represented by independent legal counsel of their own choice, or had the opportunity to obtain legal representation and voluntarily declined to do so, throughout the negotiations that preceded the execution of this Settlement Agreement, and that they have executed this Settlement Agreement with the consent of, and on the advice of, such independent legal counsel, if so represented. The Parties further acknowledge that they and their counsel (if counsel was obtained) have had adequate opportunity to make whatever investigation or inquiry that they may deem necessary or desirable in connection with the subject matter of this Settlement Agreement prior to the execution hereof, and the delivery and acceptance of the consideration specified herein.

  9. Severability. In the event that any one or more of the provisions of this Settlement Agreement is held void, voidable, invalid, illegal, or unenforceable for any reason, then said provision shall be deemed to be severed and removed from this Settlement Agreement and the remainder of this Settlement Agreement shall remain in full force and effect as if said provision(s) had never been contained herein.

  10. Arbitration, Choice of Law and Venue. ALL ISSUES, MATTERS, AND DISPUTES BETWEEN THE PARTIES CONCERNING THIS SETTLEMENT AGREEMENT SHALL BE CONSTRUED, AND SHALL BE ENFORCED, PURSUANT TO THE LAWS OF THE STATE OF CALIFORNIA WITHOUT REGARD TO ITS CHOICE OF LAW PROVISIONS AND REGARDLESS OF THE PLACE OR PLACES OF EXECUTION OR PERFORMANCE. THE PARTIES AGREE THAT ANY ACTION ARISING OUT OF OR RELATED TO THIS SETTLEMENT AGREEMENT SHALL BE RESOLVED THROUGH A FINAL AND BINDING ARBITRATION ADMINISTERED BY JAMS IN ACCORDANCE WITH ITS ARBITRATION RULES AND PROCEDURES OR SUBSEQUENT VERSIONS THEREOF, INCLUDING ITS OPTIONAL APPEAL PROCEDURE (THE "JAMS RULES, AVAILABLE AT WWW.JAMSADR.COM), INCLUDING WITHOUT LIMITATION, THE RULE PROVIDING THAT EACH PARTY SHALL PAY ITS PRO RATA SHARE OF JAMS FEES AND EXPENSES, AND THE RULES PROVIDING FOR LIMITED DISCOVERY AND EXCHANGE OF INFORMATION. THE JAMS RULES FOR SELECTION OF AN ARBITRATOR SHALL BE FOLLOWED EXCEPT THAT THE ARBITRATOR SHALL BE EXPERIENCED IN THE ENTERTAINMENT INDUSTRY AND LICENSED TO PRACTICE LAW IN CALIFORNIA OR A RETIRED JUDGE. ALL PROCEEDINGS BROUGHT

DocuSign Envelope ID: 7A0E9FFA-BF34-4987-B96D-ECCACB85EB15

PURSUANT TO THIS PARAGRAPH SHALL BE CONDUCTED IN THE COUNTY OF LOS ANGELES. THE PARTIES FURTHER AGREE, THAT WITH THE SOLE EXCEPTION OF A BREACH OF THE CONFIDENTIALITY PROVISION, NEITHER PARTY SHALL BE ENTITLED TO RECOVER PUNITIVE OR EXEMPLARY DAMAGES OR SEEK INJUNCTIVE OR ANY OTHER EQUITABLE RELIEF.

11.    Notice and Cure. Prior to initiating a lawsuit or other legal proceeding relating to any purported breach of this Settlement Agreement, other than the failure to timely pay the Settlement Payment, the Party claiming the breach ("Complaining Party") agrees to first provide written notice of the alleged breach ("Notice of Dispute") to the other Party ("Noticed Party"). The Noticed Party shall have ten (10) business days to respond to the Complaining Party's Notice of Dispute. Thereafter, the Complaining Party and the Noticed Party shall participate in a conference call within ten (10) business days after the Complaining Party's receipt of the Noticed Party's response. Should the Noticed Party fail to provide a written response, or should the Parties not resolve the dispute during the conference call, either the Complaining Party or the Noticed Party may pursue their legal actions, defenses or remedies in accordance with Paragraph 10. With respect any failure to timely pay the Settlement Payment, SPG shall have five (5) Business Days from the date such Settlement Payment is due pursuant to this Agreement to cure any such default.

12.    Execution of Additional Documents. The Parties shall execute and deliver such additional documents that are consistent with the terms of this Settlement Agreement, and which may be reasonably necessary to effectuate the intent, terms and purpose of this Settlement Agreement.

13.    Notices. All notices, requests, demands, and other communications hereunder shall be in writing and shall be deemed to have been duly given when delivered by hand, courier, or express delivery addressed as follows:

If to SGP:                          Simply Greatness Productions, LLC
                                    Attn: Allen McBroom
                                    514 Commerce Avenue, Suite D
                                    Palmdale, California 93551
                                    Email: allenm@shopacefamily.com

with a mandatory copy               Pryor Cashman  LLP
(which shall not constitute         James G. Sammataro, Esq.
notice) to:                         855 Alhambra Circle, 8th Floor
                                    Miami, Florida 33134
                                    Telephone: (786) 582-3010
                                    Email: jsammataro@pryorcashman.com

DocuSign Envelope ID: 7A0E9FFA-BF34-4987-B96D-ECCACB85EB15

If to Talent:                              Jarvis Khattri
                                           6 Church Lane
                                           Oxtejd, Surrey, RH8 9LH
                                           United Kingdom
                                           Telephone: +44.7795.578623
                                           jarvisjaay@gmail.com

with a mandatory copy                      Faze.Clan, Inc.
(which shall not constitute                Tammy Brandt, CLO and Head of Business
notice) to:                                and Legal Affairs
                                           720 North Cahuenga Blvd
                                           Los Angeles, CA 90038
                                           tb@fazeclan.com

                                           Akin Gump Strauss Hauer & Feld, LLP
                                           Sarah Link Schultz, Esq.
                                           2300 N. Field Street, Suite 1800
                                           Dallas, Texas 75201-2481
                                           Telephone: (214) 969-4367
                                           Email: sschultz@AkinGump.com

14.    Amendment.  This Settlement Agreement may not be amended, altered or modified except by a writing executed by the Parties hereto.

15.    Agents, Successors, and Assigns.  This Settlement Agreement shall inure to the benefit of, and shall be binding upon, the Parties, and each of them, and their respective parents, subsidiaries, divisions, licensees, successors, assigns, representatives, and agents of any kind.

16.    Execution in Counterparts.  This Settlement Agreement may be executed in multiple counterparts and transmitted by facsimile, PDF or electronic copy, each of which shall constitute an original and, when taken together, shall constitute a single instrument.

17.    If either party brings legal proceeding or action to enforce or interpret the terms hereof or declare the rights hereunder, the prevailing party in any such proceeding, action, or appeal thereon, shall be entitled to recover its reasonable attorneys' fees and court costs incurred therein, and to be paid by the losing party.  The attorneys' fee award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees and court costs reasonably incurred in good faith.

18.    Entire Agreement.  This Settlement Agreement constitutes the entire agreement among the Parties pertaining to the subject matter hereof.  This Settlement Agreement supersedes all prior or contemporaneous agreements, representations or negotiations among the Parties hereto, including but not limited to the Talent Agreement, and cannot be modified or amended except in writing executed by each of the Parties.  The promises and undertakings set forth herein are the sole consideration for this Settlement Agreement and, upon satisfaction of the express condition precedent outlined in Paragraph 3, the conditions stated herein are contractual and not a mere

DocuSign Envelope ID: 7A0E9FFA-BF34-4987-B96D-ECCACB85EB16

recital and all agreements and undertakings on the subject matter hereof are expressed and embodied herein. Anything herein to the contrary notwithstanding, this Settlement Agreement may be fully enforced by any action at law or in equity and nothing herein contained shall preclude or be construed to preclude any action at law or in equity to enforce by specific performance the provisions of this Settlement Agreement.

19.    Waiver.    No waiver of any term, covenant or condition of this Settlement Agreement shall be construed as a waiver of any other term, covenant or condition of this Settlement Agreement, nor shall any waiver of any default under this Settlement Agreement be construed as a continuing waiver of any term, condition or covenant or as a waiver of any other default.

19.    Authority to Execute.    Each individual signing this Agreement expressly represents and warrants that he has the right, legal capacity, and full authority to execute this Settlement Agreement.

*  *  *

IN WITNESS WHEREOF, the Parties have signed this Agreement effective for all purposes as of the Effective Date.

| SIMPLY GREATNESS PRODUCTIONS, LLC | JARVIS KHATTRI |
|---|---|
| By: _Austin M Br_ | By: _Jarvis khattri_ |
| Name: _Austin McBroom_ | Date: 6/8/2022 |
| Title: | |
| Date: 6/9/22 | |

**EXHIBIT 4**

# Akin Gump
## STRAUSS HAUER & FELD LLP

**SARAH LINK SCHULTZ**
+1 214.969.4367/fax: +1 214.969.4343
sschultz@akingump.com

**NOTICE OF DEFAULT**
July 11, 2022

**VIA E-MAIL (allenm@shopacefamily.com)**

Allen McBroom
Simply Greatness Productions, LLC
514 Commerce Avenue, Suite D
Palmdale, California 93551

Re: Confidential Settlement Agreement and Release ("**Settlement Agreement**"), entered into by Simply Greatness Productions, LLC ("**SGP**") and Jarvis Khattri *p/k/a* Faze Jarvis ("**Talent**").

Mr. McBroom:

Reference is hereby made to the Settlement Agreement. Capitalized terms not otherwise defined herein shall have the respective meanings assigned to such terms in the Settlement Agreement.

Under the terms of the Settlement Agreement, (i) the amount of One Hundred Thousand Dollars ($100,000.00) (i.e., a total of $100,000.00) was due and payable on July 8, 2022, and (ii) in the event SGP fails to timely pay the Settlement Payment, SGP shall have five (5) Business Days from the date such Settlement Payment is due pursuant to the Settlement Agreement to cure any such default.

Talent hereby provides this Notice and demands payment of the $100,000.00 by July 15, 2022. If SGP does not make the Settlement Payment by July 15, 2022, Talent reserved the right to pursue its rights, powers, privileges and remedies under the Talent Agreement including, but not limited to, payment of the Original Contractual Amount and/or under the Settlement Agreement.

Talent has not waived this default, and Talent expressly reserves all of its rights, powers, privileges and remedies under the Settlement Agreement and/or Talent Agreement, applicable law or otherwise with respect to any event of default now existing or hereafter arising under the Settlement Agreement and/or the Talent Agreement. The failure of Talent to exercise any such rights, powers, privileges and remedies is not intended, and shall not be construed, to be a waiver of any such event of default. Talent may elect to exercise any or all of their rights, at

**Akin Gump**
STRAUSS HAUER & FELD LLP

Simply Greatness Productions, LLC
July 11, 2022
Page 2

their sole option, at any time hereafter, without the necessity of any further notice, demand or other action on the part of Talent.

Sincerely,

*Sarah Link Schultz*

Sarah Link Schultz

cc:    James G. Sammataro, Esq., Pryor Cashman LLP

# EXHIBIT 5

DocuSign Envelope ID:

## ASSIGNMENT OF AREEMENT



This Assignment of Agreement a_____(the "Assignment a_____effective as of September 15, 2022 (the "Effective Date") by and between FaZe Clan Inc. a Delaware Corporation ("FaZe") ("Assignor"), and Jarvis Khattri p/k/a FaZe Jarvis ("Jarvis") ("Assignee"). The above- referenced parties may be collectively referred to herein as the "Parties."

WHEREAS Assignor and Assignee are parties, to an agreement dated March 4, 2021, ("the "Agreement") between Simply Greatness Productions ("SGP") on the one side and on the other FaZe and Jarvis. Wherein it was agreed that FaZe would cause Talent ("Jarvis") to participate in a boxing match against Michael Le on June 12, 2021 in The Battle of the Platforms at Hard Rock Stadium, Miami Florida.

WHEREAS Talent ("Jarvis") fully performed all obligations as required under the Agreement.

WHEREAS SGP had agreed to pay Talent ("Jarvis") the total amount of One Million Dollars ($1,000.000) by domestic wire to FaZe after completion of Talent (Jarvis) services thereunder.

WHEREAS SGP is in material breach of Section 4(B) of the Agreement by failing to pay the agreed upon compensation in the amount of One Million Dollars ($1,000,000).

WHEREAS Assignor desires to assign and Assignee desires to receive by assignment all of Assignor's rights and benefits under the Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1.    ASSIGNMENT: Assignor hereby assigns to Assignee all its interests, rights and benefits held by Assignor in and to the Agreement.

2.    ASSUMPTION OF OBLIGATIONS: Assignee acknowledges the receipt of a copy of the Agreement. As of the date of this Assignment, Assignee hereby assumes all of Assignor's interests, rights, and benefits remaining in the Agreement. As of the date of this Assignment, Assignee agrees to comply with all the terms, and perform all conditions and covenants in the Agreement.



DocuSign Envelope ID:



4.    BINDING EFFECT: The covenants and conditions contained in the Assignment shall apply to and bind the Parties and their heirs, legal representatives, successors and permitted assigns.

5.    GOVERNING LAW: This Assignment shall be governed by and construed in accordance with the laws of the State of California.

6.    WAIVER: The failure of either Party to enforce any provisions of this Assignment shall not be deemed a waiver or limitation of that Party's right to subsequently enforce and compel strict compliance with every provision of this Assignment.

COUNTERPARTS: This Assignment may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same document. In the event that any signature hereof is delivered by facsimile transmission or by e-mail as an attached, scanned document such signature shall create a valid and binding obligation of the Party or Other Party executing the same with the same force and effect as if such e-mailed or facsimile signature page were an original thereof.

IN WITNESS WHEREOF, the authorized representatives of the Parties have caused this Assignment to be executed effective as of the Effective Date.

**ASSIGNOR:** FaZe Clan Inc.

DocuSigned by:

_Tammy Brandt_
CC461F88487F404...
(Name)

CLO
(Title)

**ASSIGNEE:** Jarvis Khattri

DocuSigned by:

_Jarvis Khattri_
C6398F118FEA44C...

JARVIS KHATTRI
(Name)

Individual
(Title)

# EXHIBIT 6

Chronically FILED by Superior Court of California, County of Los Angeles on 12/07/2022 03:30 PM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Perez,Deputy Clerk
22STCV38165

Case 3:25-cv-01307-L    Document 1-1    Filed 05/23/25    Page 60 of 277    Page ID #:100

# SUMMONS
## *(CITACION JUDICIAL)*

**(FOR COURT USE ONLY)**

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
SIMPLY GREATNESS PRODUCTIONS, LLC, a Delaware Limited
Liability Company, AUSTIN MCBROOM, an individual, ALLEN
MCBROOM, an individual, and DOES 1 to 50, inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
JARVIS KHATTRI, an individual,

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
111 NORTH HILL STREET, LOS ANGELES, CALIFORNIA 90012

**CASE NUMBER:**
*(Número del Caso):*
22STCV38165

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Jeffrey M. Galen, Galen & Davis, LLP, 2945 Townsgate Road, Suite 200, Westlake Village, CA 91361 818-986-5685

DATE: 12/07/2022                    Sherri R. Carter Executive Officer / Clerk of Court
*(Fecha)*                           Clerk, by    R. Perez    , Deputy
                                    *(Secretario)*                *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. [  ] as an individual defendant.
2. [  ] as the person sued under the fictitious name of *(specify):*

3. [  ] on behalf of *(specify):*

   under: [  ] CCP 416.10 (corporation)          [  ] CCP 416.60 (minor)
          [  ] CCP 416.20 (defunct corporation)  [  ] CCP 416.70 (conservatee)
          [  ] CCP 416.40 (association or partnership) [  ] CCP 416.90 (authorized person)
          [  ] other *(specify):*
4. [  ] by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California              **SUMMONS**              Code of Civil Procedure §§ 412.20, 465

[SEAL]

Jeffrey M. Galen, Esq. [SBN 134705]
Glenn D. Davis, Esq. [SBN 150744]
GALEN & DAVIS, LLP
2945 Townsgate Road, Suite 200
Westlake Village, California 91361
Telephone:(818) 986-5685
Facsimile: (818) 986-1859

Attorneys for Plaintiff,
JARVIS KHATTRI

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

JARVIS KHATTRI, an individual,

Plaintiff,

vs.

SIMPLY GREATNESS PRODUCTIONS, LLC, a Delaware Limited Liability Company, AUSTIN MCBROOM, an individual, ALLEN MCBROOM, an individual, and DOES 1 to 50, inclusive,

Defendants,

Case No.: 22STCV38165

**COMPLAINT FOR:**

1) **BREACH OF CONTRACT**
2) **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING:**
3) **FRAUD**
4) **NEGLIGENT MISREPRESENTATION**
5) **INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**
6) **CIVIL CONSPIRACY**

1

**COMPLAINT FOR DAMAGES**

Plaintiff, JARVIS KHATTRI ("Plaintiff") by and through his undersigned

attorneys, submit this Complaint against Defendants SIMPLY GREATNESS

PRODUCTIONS, LLC, AUSTIN MCBROOM and ALLEN MCBROOM (collectively,

"Defendants"), and in support thereof, avers as follows:

## **INTRODUCTION**

1. Austin McBroom ("McBroom") and his family gained notoriety in 2017 on

YouTube vlogging their day-to-day lives on their own "Ace Family Channel". As

scandals involving McBroom surfaced and there were many (allegations of cheating

and rape, sexist and racist tweets, a staged burglary, fraudulent charity events, a sham

fan club with false promises of merchandise) - the McBrooms' number of followers

grew. As the number of followers grew, the McBroom financial fortune swelled

sustaining, for now, their insatiable appetite for extravagance; a $10 million house, an

orange Lamborghini, and a Rolls Royce.

2. Capitalizing on the introduction of boxing exhibitions involving social media

celebrities first introduced three years ago, McBroom conceived of Social Gloves:

Battle of the Platforms (the "Event" or "Social Gloves"). Like previous exhibitions, the

event would feature amateur boxing matches. However, Social Gloves event was

designed to drive more followers to the nascent Social Gloves empire.  This event

would pit YouTubers against TikTokers. The key, for McBroom, was to entice event

participants with large number of online followers. In turn, these followers would be

attracted to an event which gave top billing to Austin McBroom. In other words, Austin

2

McBroom sought to grow his empire on the shoulders of other internet social media personalities.

3.    First, to accomplish his scheme, McBroom needed credibility. McBroom engaged Paul Cazers as the Executive Producer-a veteran in the entertainment world specializing in new media, digital/social platforms. McBroom supplemented his team with two entertainment law firms to assist with organizing the Event and negotiating the deals with the Talent; Jason Ziven of Sanders Roberts and Jason Sammataro of Pryer Cashman (collectively, the "SGP's Attorneys").

4.    As the social media world can be very competitive, McBroom's ability to attract other social media stars would be contingent on his hiding his ownership of this Event from the other social media influencers whose involvement McBroom pursued. The ruse began with McBroom's incorporating a single-purpose limited liability company - Simply Greatness Productions ("SGP"). McBroom and Ziven chose Delaware as the state of incorporation where McBroom could take advantage of the state's anonymity protocols.

5.    When the other social media stars began to ask questions of SGP, Austin McBroom and the SGP Attorneys had a secondary scheme which they employed. Allen McBroom and Ziven suggested that ownership of the LLC be transferred to Cazers on the day of a significant contract signing. Allen McBroom further suggested that following the execution of the agreement, ownership would then be returned to Austin McBroom. Cazers was stunned by Allen McBroom and Ziven's devious plotting.

In other instances, McBroom and SGP Attorneys would simply forego SGP's executing the Talent Agreements.

6.   Next, it was important to entice an investor to underwrite the cost of producing the Event.  This McBroom would accomplish with promises of a large-scale event and a large payday. To do this, Austin McBroom packaged his own Marketing Deck entitled "The Largest PPV Event in History". (Exhibit "1"). In another version of his Marketing Deck, McBroom showed Kevin Hart as the Host for Social Gloves despite McBroom's never approaching Hart, directly, for the project. McBroom knew that Kevin Hart would be out of the country during the Event. (Exhibit 2").

7.   McBroom developed a dazzling mathematical formula based upon social media followers. The equation yielded promises of a combined reach of 393,000,000 million followers and projected gross revenue of $500,000,000.00.

8.   McBroom shopped the Event to potential investors.  McBroom landed James Harden and Lil Baby (Co-Investors).  The Investors advanced Two Million Dollars ($2,000,000.00) with the promise of being in a "first priorty position" to recoup their hard money and an additional 10% of the Adjusted Gross Revenue.

9.   McBroom would use the same Deck to entice prominent YouTubers and TikTokers.  With a Marketing Deck that demonstrated astronomical revenues, if McBroom was going to engage these social media influencers, he would have to tempt them with their own big paydays.  In a span of a month, McBroom - behind the veil of SGP and the SGP Attorneys - offered colossal payouts to the social media personalities (the "Talent").  For the Talent's promises to enter the ring for three to six

4

rounds, SGP agreed to pay the Talent as much as Five Million Dollars ($5,000,000.00). In the case of Plaintiff, Jarvis Khattri, SGP offered $1,025,000.00. Relatively small initial payments were paid prior to the Event, with regard to Plaintiff, he was paid $25,000.00 up front. The majority of the "Contingent Compensation" would be paid after the Event. For the Talent who were concerned about getting paid, McBroom had to secretly field requests for "first position and first priority".

10. The problem for McBroom was that there could only be one "first priority" position. However, as long as each Talent making the request did not know what the other Talent was promised, McBroom could acquiesce to the multiple requests for first position. So, under the cloak of confidentiality provisions in each agreement SGP secretly agreed to "first priority" provisions for at least 3 fighters, it's executive producer, and its primary investor, unbeknownst to Plaintiff.

11. The one-month spending spree in order to lock up the Talent with exorbitant contracts caused McBroom's business manager, Mark Goodman, to state to McBroom, "You are spending like a "drunken sailor".

12. McBroom and SGP attempted to land Live Nation to stream the Event. Live Nation ultimately opted to forego participating in the Event. Cazers managed to land LiveXLive with less than 3 months before the Event. As LiveXLive's revenue was transaction based, LiveXLive agreed to act as the livestream partner with the provision that SGP collaborate with LiveXLive on marketing strategies. LiveXLive developed an extensive marketing plan for SGP with the goal of achieving 2.2 million Pay Per View (PPV) sales. The plan, however, required an investment of marketing dollars.

5

13.   Austin McBroom refused to heed the recommendation of LiveXLive's marketing team.  McBroom insisted it was sufficient to rely on the power of social media.  In fact, SGP's agreements with the Talent all included the following provision: "Talent shall promote their participation in the Event across Talent's social media channels".  That is, SGP required the Talent to promote an event which gave top-billing to Austin McBroom.

14.   McBroom was warned by two experts that SGP's promotional strategy will not drive ticket purchases.  Jackie Stone, LiveXLive's Chief Marketing Officer, went on record with McBroom warning that his strategy will not generate no more than 200,000 PPV sales.  McBroom pointed to all the "impressions" the Event was generating.  Ms. Stone admonished that "impressions" do not equal "conversions".  But McBroom already knew that.  McBroom's goal was to elevate his number of followers - the element which brought him and his family wealth during the last 4 years.

15.   McBroom's business manager, Goodman, also sounded the alarm.  He advised McBroom to cancel the Event because there was little chance that, based upon the numbers at that point in time, the Event would generate sufficient sales to cover the Talent's contracts and other contracts.

16.   On or about April 12, 2021, Cazers left a message the McBrooms later acknowledged by Allen McBroom in a return text: "Hey Bro...You left us a voicemail over the weekend on how concerned you are with us not communicating and that we we're [sic.] making deals with artists and promising all this money that we don't have and that we we're {sic.] pulling a Ponzi scheme".

17.    Neither Allen McBroom nor Austin McBroom responded substantively to Cazers indictment. McBroom failed to listen to anyone, and had another plan.

18.    The Event did, in fact , proceed.  Plaintiff and the remaining Talent lived up to their end of the bargin.  On June 12, 2021, Plaintiff and the other Talent came to the Event and fought their fights. When the evening concluded, it was announced that the PPV audience was 136,000 - a far cry from the numbers McBroom had touted in his Deck. Yet, the numbers were consistent with the projections of Ms. Stone.

19.    McBroom then activated the final two components of his plan.  First, McBroom deflected and blamed LiveXLive for lying about the numbers. LiveXLive's accounting was audited by McBroom's consultant, FTI, and validated.  Second, McBroom and SGP retained the legal services of the high-powered bankruptcy attorney, Richard Pachulski of Pachulski, Stang, Ziehl & Jones. On June 21, 2021, Pachulski sent a letter to the Talent stating:

"In light of the apparent underperformance of the Event, our firm has been

retained to represent SGP in connection with either a workout of the claims of

all its creditors, or, if a workout is not feasible, a likely bankruptcy filing":

20.    While Pachulski was preparing the letter notifying the Talent of the impending cram down or a bankruptcy, McBroom, on June 19, 2021, dropped a new video in which the ACE Family touted the success of Social Gloves and, at the end of the video, McBroom announced part two of the Battle of the Platforms boxing event. Without paying Plaintiff the $1,000,000.00 as required under the Agreement, shockingly Defendants proceeded with Social Gloves 2 on September 10, 2022, at the

7

Bank of California Stadium in Los Angeles California, once again giving top billing to Austin McBroom. (Exhibit 3). It is believed that Defendants had five boxing matches in Social Gloves 2, which included Austin McBroom's brother Landon McBroom and that the fighters/talent in Social Gloves 2 were paid, despite Defendants not paying Plaintiff One Million Dollars ($1,000,000.00) he is due for his participation in Social Gloves 1.

21. Plaintiff JARVIS KHATTRI, is an entertainer and performer, who has over the course of his career, amassed a massive following over social media platforms. Plaintiff has over 13 million followers on the social media platforms, including 6.51 million subscribers on YouTube, 2.9 million followers on TikTok, 2.2 million followers on Instagram, and 707 thousand followers on Twitter. In April 2019, Plaintiff joined FaZeClan ("FaZe"), one of the worlds most prominent and influential gaming organizations with a global fan base of over 510 million combined across social platforms and quickly became one of FaZe's most popular entertainers. Plaintiff is ranked in the top 150 most followed social media entertainers in the United Kingdom, and bringing mass amounts of exposure to any brand or event he promotes.

22. In February 2021, Plaintiff was recruited by SGP to take part in a pay-per-view boxing event, Social Gloves: Battle of the Platforms (the "Event" or "Social Gloves"), to take place at Hard Rock Stadium, in Miami Florida. The Event pitted stars of some of the most-followed accounts on YouTube against some of the most-followed stars of TikTok, and it required Plaintiff and other boxers in the event (the "Talent") to train for the boxing match, market the Event on their own social media channels, and to ultimately participate in the Event. As one of the most-followed performer in the

Event, Plaintiff's presence was sought to expand the reach of the Event. Further, Defendants represented to Plaintiff that SGP was fully capitalized to make payment to the Talent.

23. In consideration for Plaintiff's performance in the Event, Plaintiff was promised a total of $1,025,000.00; $25,000 of which was paid as an initial payment for the Event, and the other $1,000,000 guaranteed to be paid upon Plaintiff's participation in the Event. However, despite Plaintiff and the other Talent participating in the event on June 12, 2021, SGP has failed to pay Plaintiff and purportedly failed to pay or paid reduced amounts to other Talent.

24. Instead of working to pay Plaintiff and the other Talent the compensation they are due, SGP has employed a series of tactics sought to allow SGP to shirk it's financial responsibilities, such as employing the services of a premier bankruptcy firm to threaten bankruptcy and to request the Talent not make any demand for payment due to the alleged underperformance of the Event on pay per view.

25. Despite Plaintiff's demand for payment to be made, none has yet come. Some of the other Talent have also enacted litigation, and SGP and LiveXLive had brought actions against one another. All the while evidence has arisen that SGP and Social Gloves was created and managed by Defendant, Austin McBroom, one of the fighters in the Event, and his father Defendant, Allen McBroom, for the sole purpose of avoiding personal liability if the Event underperformed. Further, Defendants McBroom and his father sought to keep their ownership of SGP anonymous by incorporating in the State of Delaware and devising a scheme whereby McBroom would transfer

9

ownership to Paul Cazers-executive producer of the Event-only for the days that SGP executed agreements with the Talent.

26.  Defendants Austin and Allen McBroom were also aware that the Event, which they promoted as likely receiving five to ten million pay-per-view purchases, would likely generate no more than 200,000 sales based on the their marketing strategy, as the LiveXLive Chief Marketing Officer, Jackie Stone, informed them. The McBrooms, however, did not let those projections and warnings slow them from putting on the Event, despite numerous indicators and warnings showing that the earnings would not be sufficient enough to pay the Talent.

27.  Despite these warning signs and red flags the Event proceeded, and ultimately garnered approximately 136,000 pay-per-view purchases, consistent with the projections of Ms. Stone to the McBrooms, but a far cry from the projections of five to ten million that the McBrooms touted to the Talent. These numbers were known to the McBrooms and SGP but ignored. The Defendants McBrooms hoped to build a social media boxing promotion enterprise that was leveraged on the backs of their fellow peers and social media stars. The plan was carried out on the false promises of financial gain to their investors and Talent. As a result, Plaintiff, Jarvis Khattri trained for months with a professional boxing trainer in Las Vegas, Nevada at his own expense, promoted the Event on his social media platforms and put his physical health at risk in a boxing ring, only to find out that Event itself and any promise of compensation was simply a fraud by the Defendants McBrooms for their own financial gain.

## PARTIES

28.  Plaintiff JARVIS KHATTRI, is a citizen of the United Kingdom of Great Britain and an individual residing inthe County of Los Angeles, State of California.

29.  Defendant SIMPLY GREATNESS PRODUCTIONS, LLC ("SGP"), is a Limited Liability Corporation organized and existing under the laws of the State of Delaware. The Event was run by SGP, which was incorporated in the State of Delaware on December 28, 2020, and thereafter assumed the name Social Gloves.

30.  Defendant AUSTIN MCBROOM, is an individual, who resides in the County of Los Angeles, State of California.

31.  Defendant ALLEN MCBROOM, is an individual, who resides in the County of Los Angeles, State of California.

32. Plaintiff is ignorant of the true names and capacities, whether corporate, associate, individual or otherwise, of defendants sued herein as Does 1 to 50, inclusive, and Plaintiffs therefore sue said Defendants by such fictitious names.  Each of the Defendants designated herein as Doe is responsible in some manner for the events and happenings herein referred to, and proximately caused the injuries and damages to Plaintiff, in a manner hereinafter alleged.  Plaintiffs will ask leave of court to amend this Complaint to show their true names and capacities when the same have been ascertained.

33. Defendants, and each of them, were at all times mentioned herein, the agents, servants, employees and/or directors of each of the remaining Defendants, and each of them, and in doing the things hereinafter alleged, were acting within the

**COMPLAINT FOR DAMAGES**

course and scope of their authority as such agents, servants, employees and/or directors with the knowledge, permission and/or consent of the remaining Defendants, and each of them.

## JURISDICTION AND VENUE

34.  This Court has jurisdiction over the subject matter in this action pursuant to Article VI, Section 10 of the California Constitution, because this case is not given by statue to other trial courts.

35.  The amount in controversy exceeds the minimum for unlimited civil jurisdiction of this Court.

36.  This Court has jurisdiction over Defendants because, on information and belief, they regularly conduct business in the State of California, and this unlawful conduct toward Plaintiff predominantly occurred and caused harm in the State of California.

37.  Venue properly lies in this County in that Defendants regularly conduct business in this County and the conduct and events giving rise to the claims described herein occurred in this County.  Moreover, a number of the witnesses to the events in question reside or regularly transact business in this County, and relevant evidence is believed to be located in ths County as well.

## FACTUAL ALLEGATIONS

38.  Social Gloves was an amateur boxing exhibition featuring various YouTube and TikTok celebrities.  The main event was between YouTube celebrity Defendant Austin McBroom and TikTok celebrity Bryce Hall. The undercard included a bout

COMPLAINT FOR DAMAGES

between YouTube celebrity and Plaintiff Jarvis Khattri (YouTube name "FaZe Jarvis") and TikToker Michael Le. The Event took place on June 12, 2021, at Hard Rock Stadium in Miami Gardens, Florida.

39. The event was organized by SGP and its principal members, Austin McBroom and Allen McBroom with the assistance of Jason Ziven of Sanders Roberts LLP. Paul Cazers was the Executive Producer of Social Gloves.

40. On or about February 2021, Austin McBroom approached Plaintiff and his representatives to participate in the Event. Subsequent meetings were held between Plaintiff and his representatives with Austin McBroom, Allen McBroom, Paul Cazers, and Jason Ziven regarding both the amount Plaintiff would be compensated for in participating in the Event and the agreed to pre-fight promotion of the Event that Plaintiff would provide on his various social media platforms.

41. Plaintiff, Jarvis Khattri is an social media personality and entertainer best known for his videos on YouTube. Plaintiff is one of the platforms' most- followed members with over 6.51 million followers.

42. Defendants Austin McBroom and SGP represented to Plaintiff,. through promotional materials, including a slide deck and verbal representations, that the Event would garner at least 5 million pay-per-view buyers and that the Event would generate more than $500 million. In order to get to the lofty number, Austin McBroom stated "We are marketing like crazy." On another occasion prior to Plaintiff agreeing to participate in the Event, Austin McBroom said "I am going to promote like a motherf**ker." Austin McBroom further stated "We will fully leverage the Ace Family

13

COMPLAINT FOR DAMAGES

YouTube channel." Catherine McBroom (Austin McBroom's wife) was also going to promote the Event on Instagram and Snapchat. Austin McBroom's whole power as a marketer was his YouTube channel; but he only did one video.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Breach of Contract**

**(By Jarvis Khattri against SGP only)**

43.   Plaintiff hereby incorporates by reference all preceding allegations as through fully set forth herein.

44.   On or about March 4, 2021, SGP, FaZe and Plaintiff entered into a written agreement for the services of Plaintiff (the "Agreement"). Pursuant to the Agreement Plaintiff was to participate in the boxing match and promote his participation in the Event across Plaintiff's social media channels. FaZe agreed to to have members of FaZe Clan to provide marketing services on various social media platforms. SGP agreed to pay Plaintiff twenty-five thousand dollars ($25,000.00) as a initial payment within five (5) business days of the execution of the Agreement. Further, SGP agreed to pay Plaintiff one million dollars ($1,000,000.00) provided that Plaintiff participate in the Event . Further, at the time of entering into the Agreement, Defendants represented that SGP was fully capitalized to make payment to the Talent. (A copy of the Agreement is attached hereto as Exhibit 4).

45.   On September 15, 2022, FaZe and Plaintiff entered into an Assignment of Agreement  (the "Assignment") . Pursuant to the Assignment, FaZe agreed to assign to Plaintiff all its interests, rights and benefits held by FaZe in the Agreement.

14

Accordingly, Plaintiff assumed all of FaZe's interests, rights and benefits remaining in the Agreement. (A redacted copy of the Assignment is attached hereto as Exhibit 5).

46.   Upon information and belief, SGP received the notice of revenues from LiveXLive no later than June 21, 2021, when SGP sent letters to members of the Talent notifying them of poor pay-per-view numbers and notifying Talent it would be holding on to all distributions of revenues indefinitely.

47.   Plaintiff fully performed his part of the Agreement by participating in the Social Gloves boxing exhibition on June 12, 2021, and fighting against TikToker Michael Le at the Event as well as promoting the Event across his social media channels. Further, FaZe fully performed it's duties under the Agreement by having various members promote the Event on various social media platforms.

48.   Defendant SGP, has breached the Agreement by failing to pay Plaintiff the $1,000,000.00 agreed to for the services of Plaintiff at the Event and remaining on the Agreement.

49.   Plaintiff has performed all conditions, covenants, and promises in accordance with the terms and conditions of the Agreement except for those which Defendant SGP prevented Plaintiff from performing or which were waived by Defendant SGP, or which were excused by SGP's breach and other misconduct.

50.   At all times pertinent hereto, Defendants Austin McBroom and Allen McBroom, were the agents of SGP; as such, Defendant SGP is vicariously liable for their actions occurring within the course and scope of their agency, which includes the misrepresentation regarding the capitalization of SGP.  Therefore, SGP's

15

undercapitalization makes Defendants Austin McBroom and Allen McBroom personally liable.

51.   As a direct and proximate result of Defendant SGP's continuous and willful breaches, Plaintiff has suffered an extreme financial loss in the amount of at least $1,000,000.00, or in an amount according to proof at the time of trial.

## SECOND CAUSE OF ACTION

### Breach of the Implied Covenant of Good Faith and Fair Dealing

### (By Jarvis Khattri against SGP only)

52.   Plaintiff hereby incorporates by reference all preceding allegations as through fully set forth herein.

53.   Implied in every contract is a covenant of good faith and fair dealing that neither party will engage in any act or omission that is intended or has the natural tendency to deprive the other party of the full benefits of its bargain.  This covenant is implied into the Agreement between SGP and Plaintiff. This covenant imposes upon SGP a duty not to engage in acts or omissions that would frustrate the enjoyment of Plaintiff of any of the rights and benefits owned or reasonably expected under their respective agreements.

54.   By virtue of the relationship between Plaintiff and SGP, Plaintiff placed trust and confidence in SGP to perform all the duties and obligations owed and reasonably expected pursuant to the terms of the Agreement. Plaintiff placed the trust and confidence in SGP to honor the implied covenant to act in good faith and not to take any action which would unduly or unreasonably impair or harm any rights or benefits

16

1  owed or reasonably expected under the Agreement.

2      55.   Despite Plaintiff's contract including numerous representation by Defendants,

3  Plaintiff is informed and believes that SGP secretly contracted with multiple other

4  members of the Talent for "first position and first priority" in the payments made to

5

6  Talent.

7      56.   Plaintiff is informed and believes that such priority provisions were offered by

8  SGP to Austin McBroom, Bryce Hall, and Tayler Holder of the Talent. Plaintiff is further

9  informed and believes that Paul Cazers, as well as SGP Co-Investors James Harden

10 and Dominique Jones ("Lil Baby") also had positions of "first priority." SGP was aware

11
   of these various and successive agreements yet intentionally withheld the existence of
12

13 these priorty positions from Plaintiff.

14     57.   Plaintiff is informed and believes that some of these "priority payments" have

15 been made by SGP or its agents to at least one of the Talent.

16     58.   SGP has breached the implied covenant of good faith and fair dealing and

17 denied Plaintiff the rights and benefits to which he is entitled or reasonably expected

18
   under the Agreement by engaging in the aforementioned conduct. By permitting and
19

20 conspiring with Defendants to allow for multiple parties gain "first position" and

21 concealing these dealings, SGP has frustrated the purpose of the payment provision of

22 the Agreement. SGP has prevented Plaintiff from receiving the benefits reasonably

23 expected under their respective agreement, including payment for his services

24
   contemplated in the Agreement in the amount of $1,000,000.00.
25

26     59.   Plaintiff is informed and believes and thereon alleges that SGP pursued this

27                                                    17

28 _____
                                **COMPLAINT FOR DAMAGES**

1  course of conduct in bad faith and with the intent and knowledge that it would interfere

2  with, injure and frustrate the enjoyment of the benefits and rights conferred upon

3  Plaintiff pursuant to the terms of the Agreement.

4

5  60.  Even if and to the extent that SGP's conduct did not constitute a breach of the

6  express contractual terms in the Agreement, SGP's conduct as alleged herein has

7  unfairly frustrated the agreed common purposes of the Agreement and has

8  disappointed the reasonable expectations of Plaintiff, and deprived Plaintiff of the

9  benefits reasonably expected under the Agreement.

10  61.  As a direct and proximate result of the breaches of the covenant of good faith

11  and fair dealing inherent in the Agreement, Plaintiff has sustained damages in an

12  amount of at least $1,000,000.00 or in an amount according to proof at the time of trial.

13

14  ### THIRD CAUSE OF ACTION

15  ### Fraud

16  ### (By Jarvis Khattri Against All Defendants)

17

18  62.  Plaintiff hereby incorporates by reference all preceding allegations as

19  through fully set forth herein.

20  ### A. Misrepresentation No. 1: That Plaintiff Would Be Paid For The Event

21  63.  On or about March 4, 2021, Defendants and each of them misrepresented to

22  Plaintiff that Plaintiff would be paid for his services if he performed in the Event

23  regardless of any revenue being collected. Defendants assured Plaintiff payment could

24  be made to Plaintiff and agreed to pay Plaintiff the full payment of compensation of

25  $1,000,000.00.  SGP was obligated to make full payment to Plaintiff within 15 days

26

27  18

28

1    after LiveXLive provides SGP notice of revenues.

2       64.   This representation was not true. At the time, SGP was not sufficiently

3    capitalized to make such a representation that guaranteed payment regardless of the

4    outcome of the event. Further, Defendants were at the time aware of low pay-per-view

5    projections.

6

7    **B.** **Misrepresentation No. 2: Intentionally Concealing That Priority Positions**

8       **For Payment Were Promised To Other Talent**

9       65.   On or about March 4, 2021, Defendants, and each of them, were aware that

10   SGP had agreed to multiple priority and first position promises with multiple other

11   Talent, producers, or investors. Defendants concealed this information from Plaintiff,

12   along with projections of low pay-per-view numbers, and the recommendations made

13   to Defendants to cancel the Event because of the probable low performance.

14

15   **C.** **Misrepresentation No. 3: Defendants Misrepresented That Paul Cazers**

16   **Was The Single Owner of SGP; and Concealed that Austin McBroom Was The**

17   **Sole Member of SGP**

18

19      66.   On or about March 4, 2021, Defendants and each of them concealed from

20   Plaintiff that Defendant, Austin McBroom was the single member owner of SGP, LLP.

21   Defendants further misrepresented to Plaintiff that Paul Cazers was the owner and

22   manager of SPG.

23      67.   The truth is that Paul Cazers is not now nor has he ever been a member of

24   the SGP limited liability company. Rather, SGP is owned by Defendant Austin

25   McBroom. Allen McBroom and the attorneys for SGP devised a fraudulent scheme to

26

27                                  19

28

1   hide from the Talent, Austin McBroom's ownership of SGP. The scheme entailed

2   removing Austin McBroom from his membership position with the LLC on the day of

3   SGP's execution and then returning Austin McBroom back to his ownership position

4   immediately following the signing date.

5

6       68.  Defendants further perpetuated this fraud by not returning to Plaintiff a

7   signed Agreement which would have reflected Austin McBroom as the sole member of

8   SGP.

9

10  D.  **Misrepresentation No. 4: Defendants Misrepresented That SGP would**

11      **Extensively Market The Event**

12

13      69.  On or about March 4, 2021, Defendants Austin McBroom, Allen McBroom

14  and each of them, misrepresented to Plaintiff and representatives that SGP intended

15  to extensively promote the Event.  The truth is, Defendants failed to market the Event,

16  other than one video.

17  E.  **Misrepresentation No. 5: Defendants Misrepresented That The Florida**

18      **Athletic Commission Sanctioned The Event**

19

20      70.  Defendants, Austin McBroom, Allen McBroom and each of them represented

21  to Plaintiff that the Florida Athletic Commission has sanctioned the amateur boxing

22  exhibition.

23      71.  The truth is that the Florida Athletic Commission did not sanction the Event.

24      72.  Defendants  Austin McBroom, Allen McBroom, SGP and each of them,

25  intended to induce Plaintiff to rely on their misrepresentations.

26

27                                      20

28  _____
                    COMPLAINT FOR DAMAGES

73. Plaintiff relied upon the representations of Defendants. Plaintiff's reliance on Defendants' representations was justified and reasonable.

74. Defendants Austin McBroom, Allen McBroom, SGP and each of them, knew they would be unlikely to perform on the payment provisions of their Agreement, and still allowed the Event to take place on June 12, 2021. Their actions constitute a fraudulent inducement.

75. As a proximate result of the fraudulent conduct of the Defendants as herein alleged, Plaintiff was induced to enter into the Agreement and to participate in the Event. Further, Plaintiff was induced to take only $25,000.00 as an initial payment.

76. At the time Defendants made the above promises and representations to Plaintiff, they had no intention of ever performing them and were made falsely and fraudulently with the intent to deceive, defraud, mislead and induce Plaintiff to enter into the Agreement and to participate in the Event.

77. In justifiable reliance on said promises and representations by Defendants Plaintiff entered into the Agreement and participated in the Event. If Plaintiff would have known the actual intentions of Defendants to not pay Plaintiff for participating in the Event, Plaintiff would not have entered into the Agreement.

78. As a direct result of the false representations by Defendants, Plaintiff has suffered damages in an amount of at least $1,000,000.00 or in an amount according to proof at the time of trial.

79. The aforementioned conduct of the Defendants was an intentional misrepresentation, deceit, or concealment of material facts known to Defendants with

COMPLAINT FOR DAMAGES

the intention on the part of the Defendants of thereby depriving Plaintiff of property and

legal rights otherwise causing injury, and this despicable conduct subjected the

Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights.

Defendants and have acted with malice, fraud, and/or oppression and Plaintiff is

therefore entitled to punitive and/or exemplary damages in an amount to be

determined at the time of trial.

## FOURTH CAUSE OF ACTION

### Negligent Misrepresentation

### (By Jarvis Khattri Against All Defendants)

80.   Plaintiff hereby incorporates by reference all preceding allegations as through

fully set forth herein.

81.   Defendants represented certain facts as true:

(A)  Plaintiff would be paid if he performed in the Event, and his pay was not

     contingent on any receipt of revenues from the Event;

(B)  Plaintiff would be paid for performing in the Event whether or not SGP

     made any money from the Event;

(C)  Paul Cazers was a single member of the SGP limited liability company

     and thus, concealed that Defendant Austin McBroom was the owner of SGP;

(D)  The Florida Athletic Commission sanctioned the Event; and

(E)   SGP would be extensively marketing the Event.

82.   These representations were false. Defendants made these representations

22

1    knowing the falsity of the representations and made them with the intent to induce

2    Plaintiff to perform under the Agreement.

3        83.  Defendants had no reasonable grounds for believing their representations

4
     were true when they were made.
5

6        84.  Defendants intended that Plaintiff rely on these representations to induce

7    Plaintiff to contract for his services, and to induce Plaintiff to fight in the Social Gloves

8    Event.

9        85.  Plaintiff reasonably and justifiable relied on Defendants' representations.

10
         86.  Plaintiff was harmed as a result of his reliance on Defendants'
11
     misrepresentations.
12

13       87.  Plaintiff's reliance on Defendants' representations was a substantial factor in

14   causing him harm.

15       88.  As a direct result of the misrepresentations by Defendants, Plaintiff

16   has incurred monetary and other damages in an amount of at least $1,000,000.00
17
     or in an amount according to proof at the time of trial.
18

19                        **FIFTH CAUSE OF ACTION**

20              **Intentional Interference with Contractual Relations**

21          **(By Jarvis Khattri Against Austin McBroom & Allen McBroom)**

22

23       89.  Plaintiff hereby incorporates by reference all preceding allegations as through

24   fully set forth herein.

25       90.  Ziven, Sanders Roberts, Sammataro, Pryor Cashman, Austin McBroom and

26

27                              23

28   _____
                   **COMPLAINT FOR DAMAGES**

Allen McBroom knew of SGP's first priority positions provided to other Talent and investors and intentionally concealed and withheld such information from Plaintiff in inducing him to execute the Agreement.

91.  Austin McBroom's self serving conduct prevented performance or made performance of Plaintiff's Agreement more risky. Austin McBroom was informed and aware that Brycehallbiz would not agree to lend out the services of Bryce Hall unless it was given priority and a Letter of Direction. Austin McBroom believed that he would reap greater financial benefits with Bryce Hall's participation in the Event and was willing to undercut the contractual obligations previously agreed to with Plaintiff.

92.  Defendants intended to disrupt the performance of the Plaintiff's Agreement or knew that disruption of performance was certain or substantially certain to occur.

93.  As a direct result of the intentional acts by Defendants, Plaintiff has suffered damages in an amount of at least $1,000,000.00 or in an amount according to proof at the time of trial.

94. The aforementioned conduct of the Defendants was an intentional misrepresentation, deceit, or concealment of material facts known to Defendants with the intention on the part of the Defendants of thereby depriving Plaintiff of property and legal rights otherwise causing injury, and this despicable conduct subjected the Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights. Defendants and have acted with malice, fraud, and/or oppression and Plaintiff is therefore entitled to punitive and/or exemplary damages in an amount to be determined at the time of trial.

24

## SIXTH CAUSE OF ACTION

### Civil Conspiracy

### (By Jarvis Khattri Against All Defendants)

95.  Plaintiff hereby incorporates by reference all preceding allegations as through fully set forth herein.

96.  From March through June 2021, Defendants and other nonparties and each of them knowingly and willfully conspired and agreed among themselves to fraudulently induce Plaintiff to participate in a boxing match.

97.  In order to secure the engagement of Plaintiff, Defendants conspired to conceal the true ownership of SGP, concealed promises of priority, withheld adequate event marketing, and misrepresented Defendants' engagement with the Florida Athletic Commission.

98.  As a direct result of the intentional acts by Defendants, Plaintiff has suffered damages in an amount of at least $1,000,000.00 or in an amount according to proof at the time of trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against the Defendants and each of them, as follows:

1.  For monetary damages in an amount of at least $1,000,000.00 or in an amount according proof at the time of trial;

25

2. For punitive and exemplary damages, according to proof at trial;

3. For pre-judgment interest allowable by law;

4. For costs of suit allowable by law; and

5. For such further relief as the Court may deem just and proper.

DATED: December 2, 2022                          GALEN & DAVIS LLP

                                                 By: _____
                                                 Jeffrey M. Galen, Esq.
                                                 Attorneys for Plaintiff
                                                 JARVIS KHATTRI

26

**COMPLAINT FOR DAMAGES**

# EXHIBIT 1



# EXHIBIT 2



**EXHIBIT 3**





# EXHIBIT 4

# AGREEMENT

This agreement ("Agreement") is made and entered into as of March 4, 2021 ("Effective Date"), by and between Simply Greatness Productions ("SGP"), a Delaware LLC, and FaZe Clan Inc. ("Faze") f/s/o Jarvis Khattri p/k/a Faze Jarvis ("Talent") with respect to Talent's Boxing and Publicity services in connection with the live pay per view exhibition boxing event (the "Event"), and marketing services by members of Faze Clan.

1. Grant of Rights. Faze shall cause Talent to hereby grant to SGP the right to require Talent to render reasonable amateur exhibition boxing entertainment and publicity services (collectively referred to herein as the "Services") solely in connection with the Event and to use the results and proceeds of Talent's Services therefrom, including but not limited to all commercial media rights, streaming rights, rights in connection with the advertising and publicity, and the right to commercially exploit any and all such right in perpetuity and throughout the universe, all as more specifically set forth herein. SGP shall at all times use reasonable efforts to portray Talent in a favorable light. For the avoidance of doubt, all copyrights, design rights, patents, trademarks, trade secrets, and other intellectual property and proprietary rights (i) in FaZe Clan, Talent and/or other members shall be and remain the sole and exclusive property of FaZe Clan and/or Talent, and (ii) in SGP's logos and trademarks shall be and remain the sole and exclusive property of SGP. The parties hereby acknowledge and agree that, except as otherwise set forth explicitly herein, all intellectual property rights in and to any photos, videos, social media posts and similar digital and promotional content created, conceived or developed in whole or in part by FaZe Clan, Talent, or other members of FaZe Clan in connection with its activities under this Agreement and Addendum A shall be owned by FaZe Clan. SGP assumes all liability in connection with the Event and releases FaZe Clan from any and all liability in connection therewith.

2. Date. The Event will be held in May or June of 2021, subject to Events of Force Majeure (described below). The Event shall not occur prior to May 2021. If the Event is cancelled for Force Majeure, the Event will be rescheduled within three (3) months of the original Event date.

3. Services.

   a. Faze shall cause Talent to commence the Services by participating in a boxing match against a competitor to be mutually agreed upon between the parties. The competitor shall be Michael Le. In the event there is a required substitution, Talent has agreed to fight a replacement, subject to approval of the replacement by Talent, with any proposed replacement to be of a similar level of size, stature and boxing experience. Talent shall not unreasonably withhold approval.

   Each round will last approximately two-three minutes. Talent shall prepare for the Event in a manner in line with industry standard for an amateur boxing exhibition. Talent shall make reasonable efforts to

comply with all reasonable directions, rules and regulations of SGP in connection with such Services.

 b.  Marketing Services. Faze shall cause members of FaZe Clan to provide marketing services in Addendum A (the "Marketing Services").

4.  Compensation. SGP agrees to pay Faze, and Faze agrees to accept, as full and complete compensation for all rights granted herein and all undertakings and services:

 a.  Initial Payment. SGP shall pay Faze Twenty-Five Thousand Dollars USD ($25,000) within five business days upon Faze's execution of Agreement. Notwithstanding, Talent must submit an invoice to SGP.

 b.  Contingent Compensation. Provided that Talent participates in Event and is not in uncured material breach of the Agreement and Faze fully completes the Marketing Services, SGP shall pay Talent an amount equal One Million USD ($1,000,000) ("Contingent Compensation").

All payments due to Faze hereunder shall be made to FaZe Clan Inc. by domestic wire transfer using payment instructions to be provided by FaZe Clan's Chief Financial Officer (amit.bajaj@fazeclan.com). SGP's billing contact is as follows: Name: Gelfand Rehnert & Feldman Attn: Mark Goodman; Email: mgoodman@grfllp.com; Address: 1800 Century Park East #1600 Los Angeles, CA 90067; Phone: (310) 556-6658.

SGP shall pay Talent within fifteen (15) business days of Producer's receipt of revenue from streaming partner. Notwithstanding, Talent must submit an invoice to SGP.

If SGP cancels Event for any other reason, aside from a reason listed below in section 12, then SGP will pay talent Two Hundred Thousand USD ($200,000) within ten days of notifying Talent of the cancelation.

SGP shall provide Talent with at least thirty-five (35) tickets to the Event for Talent's guests.

5.  Promotion. Talent shall promote his participation in the Event across Talent's social media channels, including but not limited to Instagram, YouTube, Twitter, and TikTok. Talent shall have full creative approval over the post and caption, as applicable. Specific promotions shall be negotiated in good faith but shall not be less than the below:

 a.  Twitter.

  i.  Talent shall post a minimum of three (3) static tweets ("Tweet") in connection with (i) the announcement of the fight card; (ii) any pre-sale date of the fight; (iii) promotion of Event within the last

week and date of the fight. Talent may not remove the post for at least five business days after the completion of Event.

 ii. Each Tweet shall include the image of the official fight poster and the link to purchase tickets to the stream.

 iii. Talent shall pin the first two Tweets for a minimum of five (5) days.

 b. Instagram.

  i. Talent shall post a minimum of three (3) static posts in connection with (i) the announcement of the fight card; (ii) any pre-sale date of the fight; (iii) promotion of Event within the last week and date of the fight. Talent may not remove the post for at least five business days after the completion of Event.

  ii. Talent must simultaneously publish at least two (2) Instagram stories in promotion of Event in conjunction with each of the three static Instagram posts referenced above. The stories must include a swipe up link to the Event, provided to Talent by SGP. Thus, Talent must publish at least six (6)

 c. YouTube. Talent must publish three (3) separate YouTube videos that promotes the Event with an integration that lasts a minimum of sixty (60) seconds within the first two minutes of the respective video. The promotional videos should correspond to: (i) the announcement of the fight card; (ii) any pre-sale date of the fight; (iii) the week before the Event.

 d. Tik Tok. Talent must publish at least one promotion video on Tik Tok that includes a call to action to buy streams to the Event.

 e. Talent represents and warrants that they shall at all times comply with all required FTC regulations with respect to social media post.

 f. Talent shall provide a reasonable amount of approved audio and visual materials to be used in conjunction with promotion of Event.

 g. Talent's social media posts in promotion of Event are defined as "Social Media Posts."

6. Photoshoot. Talent agrees to participate in a photoshoot lasting at least two (2) days. For clarity, each day shall be no longer than eight (8) hours. SGP shall arrange and directly pay for Talent's ground transportation within Southern California to and from the photoshoot, as well as a reasonable per diem to cover Talent's meals.

7. Name and Likeness. During the Term, SGP shall have the right, solely in connection with Event, to use Talent's name, approved nickname, approved biographical information, approved image and approved likeness and Social Media Posts solely in the form originally posted by Talent, in the following media, manner and formats: (i) via any websites, e-mail and digital and social media channels, owned or operated by SGP or by any production partner (including via paid media), (ii) in print media, (iii) for public relation, marketing and publicity purposes via any and all media and formats throughout the universe.

3

If Talent objects to any of the aforementioned uses, SGP shall work with Talent in good faith to resolve such objection. SGP has the non-exclusive right to record Talent as part of content produced in conjunction with the Event such as behind the scenes footage and/or documentary and/or docu-series to be used solely in connection with the commercial exploitation, marketing and promotion of the Event, subject to Talent's prior written approval in each instance. SGP shall at all times use reasonable efforts to portray Talent in a favorable light. For the avoidance of doubt, SGP may use "FaZe Jarvis" solely in connection with the Event, but no license shall be granted to FaZe Clan's intellectual property, including without limitation the use of the word "FaZe," the words "FaZe Clan" or the FaZe Clan logo without FaZe Clan's prior written approval.

8. Exclusivity. Talent shall not participate in any exhibition boxing match "Competitive Event" from the Effective Date until six months after the Event.

9. Option. SGP will have the option to contract Talent to participate in a derivative event within twelve months following the Event, subject to good faith negotiations.

10. Further documents. Talent agrees to execute any and all other documents and perform any and all acts and deeds reasonably necessary to carry out Talent's obligations under the Agreement.

11. Insurance. SGP shall, at no cost to FaZe Clan, maintain the following minimum insurance in full force and effect throughout the Term, naming both FaZe Clan and Talent as additional insureds on the policies: public liability and general liability insurance (either in combined form or in separate policies), including coverage for bodily injury, claims by one insured against another insured, and SGP's defense and indemnity obligations under the Agreement, with coverage of not less than $2,000,000 USD combined single limit per occurrence and $2,000,000 USD annual aggregate; and errors and omission insurance in line with industry standard.

12. Suspension and Termination. SGP shall have the right to suspend and/or terminate its obligations for Talent's incapacity, default, or the occurrence of a force majeure event (defined below).

Default shall include (i) Talent's uncured material breach (after receiving written or e-mail notification per section 19(f) below and failing to cure within seventy-two hours); (ii) Talent's inability to be insured to SGP's reasonable satisfaction; (iii) Talent being charged with a crime involving moral turpitude in SGP reasonable determination that adversely affects Event; or (iv) Talent's actions (including publication or declaration of a statement) that may reasonably be considered immoral, scandalous and/or obscene; and such action damages or otherwise negatively affects the Event's reputation.

Force Majeure. An event of "Force Majeure" shall exist hereunder if Event is impaired, hampered, interrupted, prevented, suspended, postponed or

4

discontinued by reason of any war or armed conflict, public health crisis, act of a public enemy, riot, civil disturbance, epidemic, fire, casualty, flood, explosion, earthquake, boycott, labor controversy, governmental statute, law, act of God.

13. Remedies. If Faze is in uncured material breach of any of the material marketing obligations, then Faze's compensation will be reduced by twenty percent (20%) percent (after receiving written or e-mail notification per section 20(f) below and failing to cure within seventy-two hours), pro-rata. Faze acknowledges that the rights granted hereunder and Talent services hereunder are unique and

extraordinary, SGP therefore would be entitled to all available equitable remedies in case of breach or threatened breach of Agreement by Talent. Any remedies, rights, and obligations contained in this Agreement shall be cumulative and none of them shall be in limitation of any other remedy, rights, undertaking, or obligation of either party. **HOWEVER, NO BREACH OF THIS AGREEMENT BY TALENT SHALL ENTITLE TALENT TO TERMINATE OR RESCIND ANY OF THE RIGHTS GRANTED TO SGP HEREIN, AND IN THE EVENT OF ANY QUESTION OF SGP'S PERFORMANCE OF ITS OBLIGATION HEREUNDER, TALENT HEREBY WAIVES THE RIGHT, IN THE EVENT OF ANY SUCH BREACH, TO EQUITABLE RELIEF OR TO ENJOIN, RESTRAIN OR INTERFERE WITH THE EXHIBITION OF EVENT OR THE EXERCISE OF ANY OF THE GRANTED RIGHTS, IT BEING TALENT'S UNDERSTANDING THAT THE SOLE REMEDY SHALL BE THE RIGHT TO RECOVER MONETARY DAMAGES WITH RESPECT ONLY TO THE ACTUAL HARM CAUSED BY ANY SUCH BREACH. IN ANY EVENT, NEITHER PARTY WILL BE LIABLE TO THE OTHER FOR CONSEQUENTIAL, INCIDENTAL PUNITIVE OR SPECIAL DAMAGES, OR DAMAGES FOR LOST PROFITS OR LOSS OF BUSINESS OPPORTUNITIES. Notwithstanding the foregoing, either party may bring an action or suit seeking injunctive relief to protect its intellectual property rights in any court having jurisdiction. Notwithstanding anything to the contrary contained herein, FaZe Clan's aggregate liability under this Agreement shall under no circumstances exceed the payments which Talent received or is entitled to receive under this Agreement.**

14. <u>Representations and Warranties</u>. Each party hereby represents and warrants that
    a. It has full right, power and authority to enter into and fully perform this Agreement and no third party's consent is required;
    b. the execution and delivery of the Agreement and the performance of its obligations hereunder will not constitute a breach or default of or otherwise violate any agreement to which such party or any of its affiliates are a party;
    c. The content it provides under this Agreement does not infringe or violate the rights of any third party;
    d. It will not use any images or marks to which it does not have the rights;
    e. It will comply with all applicable ordinances, codes, standards, laws, rules, regulations, and orders of any governmental authority having jurisdiction in its performance under this Agreement.

15. <u>Indemnification</u>. Each party will indemnify, defend, and hold harmless the other and each of its officers, directors, owners, shareholders, representatives, officials, employees, agents, subsidiaries, affiliates, successors and assigns, harmless from any and all claims, damages, losses, liabilities, actions, judgments, costs and expenses (including reasonable attorneys' fees) brought by the other party or a third party arising out of or in connection with indemnifying party's breach or claimed breach of its representations, warranties, or covenants hereunder.

6

DocuSign Envelope ID: D1A0E470-307E-4E68-A09C-24C9E0152091

16. <u>Relationship of Parties</u>. Nothing contained herein shall constitute a partnership between or by the Parties hereto.

DocuSign Envelope ID: 1148E476-987E-4E68-A20C-1AC9B0D2d991

17. <u>Confidentiality</u>. This Agreement shall be deemed confidential in its entirety and no publication, distribution or dissemination of any kind shall be permitted, except upon the express prior and written consent of both parties, to any other individuals outside of the immediate parties to this contract, their attorneys, agents and authorized representatives. Notwithstanding the foregoing, the terms of this Agreement may be disclosed subject to any requirement by a judicial process, from a court of competent jurisdiction or otherwise as a matter of law, pursuant to a mutually agreeable press release, or in connection with a proposed merger (of any kind), any debt or equity financing, in connection with a public offering of shares or sale of such party's business.

18. <u>Governing Law; Dispute</u>. This Agreement shall be governed by under the laws of California, without reference to conflicts of law principles. Any dispute, claim or controversy arising out of or relating to this Agreement shall be determined by confidential and binding arbitration in Los Angeles, California, before a single neutral arbitrator who shall be a retired state or federal jurist. The arbitration shall be administered by JAMS pursuant to its Streamlined Arbitration Rules and Procedures. Judgment on the Award may be entered in any court having jurisdiction. The arbitrator(s) are not empowered to award punitive or exemplary damages, and the parties waive any right to recover any such damages.

19. Miscellaneous
    a. <u>Entire Agreement</u>. This Agreement constitutes the complete agreement of the parties with respect to the subject matter hereof, and this Agreement supersedes and replaces any or all prior or contemporaneous negotiations, promises, covenants, representation and agreement of every kind or nature whatsoever with respect thereto, retroactive to the inception thereof, all of which have become merged and finally integrated into this Agreement.
    b. <u>Waiver and Amendment</u>. No modification, amendment, or waiver of any provision of this Agreement will be effective unless such amendment or waiver is made in writing and signed by authorized representatives of both Parties.
    c. <u>Partial Invalidity</u>. If any provision of this Agreement is held be invalid, illegal or unenforceable, then the validity, legality and enforceability of all of the other provisions of the Agreement shall remain in full force and effect.
    d. <u>Assignability</u>. Neither party may not assign this Agreement or its rights hereunder in whole or in part.
    e. <u>Counterparts</u>. This Agreement may be executed in one or counterparts, each of which shall be deemed to be an original and, which taken together, shall be deemed to constitute one and the same agreement.
    f. <u>Notices</u>. All notices to Talent shall be sent to Talent, with a copy to Talent's manager (Jordan.galen@fazeclan.com) and FaZe Clan Business and Legal Affairs (Erika.georgiou@fazeclan.com).

8

[SIGNATURE TO FOLLOW]

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the day and year first written above.

FAZE

By: *Erika Georgiou*
— 3ZU9E563B5TT4D4...

Name: Erika Georgiou

Date: 3/8/2021

SGP, LLC

By:
— 80E0557078AC4DA...

Paul Cazers

Name:

Date: 3/10/2021

TALENT

By: *Jarvis Khattri*
— A093BF4C2FFF46F...

Name: Jarvis Khattri

Date: 3/8/2021

9

DocuSign Envelope ID: 1A5EA7038F7E-4E68-A20C-2A0309012891

Addendum A

Faze shall cause the below talent to promote the Event:

Faze Kay

    a.  Instagram.
        i.  Talent shall post the fight flier on Talent's static Instagram feed at least five days before Event. Talent shall not remove the post for a minimum of Three (3) days after the Event.
        ii.  Talent must simultaneously publish at least three (3) Instagram stories in promotion of Event in conjunction with Talent's static post. Each story must include a swipe up link to the Event, provided to Faze by SGP.
    b.  Twitter. Talent shall post a minimum of one Tweet at least five (5) days before Event that includes the image of the official fight poster and the link to purchase tickets to the stream. Talent shall pin the Tweet for a minimum of forty-eight hours before Event.
    c.  YouTube. Talent must publish at least two (2) separate YouTube videos that promotes the Event with an integration that lasts a minimum of sixty (60) seconds within the first two minutes of the respective video. The promotional videos should correspond to: (i) the announcement of the fight card; (ii) any pre-sale date of the fight; or (iii) the week before the Event.
    d.  Tik Tok. Talent must publish at least one promotion video on Tik Tok that includes a call to action to buy streams to the Event.

Faze Adapt

    a.  Faze shall cause Faze Adapt to publish the official fight flier one (1) time as an Instagram story with a swipe up link and call to action to purchase streams, and one (1) Instagram story with a swipe up link and call to action to purchase streams, creative content of story per Talent's discretion. For avoidance of doubt, Faze will cause Faze Adapt to publish two (2) Instagram Stories in promotion of Event.

Additional Faze Talent

    b.  Faze shall cause eight (8) additional FaZe Clan talent to publish the official fight flier as an Instagram story with a swipe up link and call to action to purchase streams within five days of the Event.

FAZE represents and warrants that talent shall at all times comply with all required FTC regulations with respect to social media post.

FAZE                                          SGP, LLC

By _Erika Georgiou_____                  By:_____

Name:_Erika Georgiou_____                Name: _____

Date:_3/8/2021_____               Date:_____

1

# EXHIBIT 5

DocuSign Env lope ID: ████████████

## ASSIGNMENT OF AREEMENT



This Assignment of Agreement ███████████ (the "Assignment ████████ effective as of September 15, 2022 (the "Effective Date") by and between FaZe Clan Inc. a Delaware Corporation ("FaZe") ("Assignor"), and Jarvis Khattri p/k/a FaZe Jarvis ("Jarvis") ("Assignee"). The above- referenced parties may be collectively referred to herein as the "Parties."

WHEREAS Assignor and Assignee are parties, to an agreement dated March 4, 2021, ("the "Agreement") between Simply Greatness Productions ("SGP") on the one side and on the other FaZe and Jarvis. Wherein it was agreed that FaZe would cause Talent ("Jarvis") to participate in a boxing match against Michael Le on June 12, 2021 in The Battle of the Platforms at Hard Rock Stadium, Miami Florida.

WHEREAS Talent ("Jarvis") fully performed all obligations as required under the Agreement.

WHEREAS SGP had agreed to pay Talent ("Jarvis") the total amount of One Million Dollars ($1,000.000) by domestic wire to FaZe after completion of Talent (Jarvis) services thereunder.

████████████████████████████████████

WHEREAS SGP is in material breach of Section 4(B) of the Agreement by failing to pay the agreed upon compensation in the amount of One Million Dollars ($1,000,000).

WHEREAS Assignor desires to assign and Assignee desires to receive by assignment all of Assignor's rights and benefits under the Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

    1.    ASSIGNMENT: Assignor hereby assigns to Assignee all its interests, rights and benefits held by Assignor in and to the Agreement.

    2.    ASSUMPTION OF OBLIGATIONS: Assignee acknowledges the receipt of a copy of the Agreement. As of the date of this Assignment, Assignee hereby assumes all of Assignor's interests, rights, and benefits remaining in the Agreement. As of the date of this Assignment, Assignee agrees to comply with all the terms, and perform all conditions and covenants in the Agreement.



DocuSign Envelope ID: ████████████████████

████████████████████████████████████████

4. **BINDING EFFECT**: The covenants and conditions contained in the Assignment shall apply to and bind the Parties and their heirs, legal representatives, successors and permitted assigns.

5. **GOVERNING LAW**: This Assignment shall be governed by and construed in accordance with the laws of the State of California.

6. **WAIVER**: The failure of either Party to enforce any provisions of this Assignment shall not be deemed a waiver or limitation of that Party's right to subsequently enforce and compel strict compliance with every provision of this Assignment.

**COUNTERPARTS**: This Assignment may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same document. In the event that any signature hereof is delivered by facsimile transmission or by e-mail as an attached, scanned document such signature shall create a valid and binding obligation of the Party or Other Party executing the same with the same force and effect as if such e-mailed or facsimile signature page were an original thereof.

IN WITNESS WHEREOF, the authorized representatives of the Parties have caused this Assignment to be executed effective as of the Effective Date.

**ASSIGNOR:** FaZe Clan Inc.

DocuSigned by:

*Tammy Brandt*

CF1EDF9B4BFF484...
(Name)

CLO
(Title)

**ASSIGNEE:** Jarvis Khattri

DocuSigned by:

*Jarvis khattri*

C6398F11BFEA44C...

JARVIS KHATTRI
(Name)

Individual
(Title)

chronically FILED by Superior Court of California, County of Los Angeles on 12/07/2022 03:54 PM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Perez,Deputy Clerk

22STCV38165    Document 1-1    Filed 05/23/25    Page 109 of 277    PageID 111

**CM-010**

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
JEFFREY M. GALEN, ESQ. (SBN 134703)
GALEN & DAVIS, LLP
2945 TOWNSGATE ROAD, SUITE 200
WESTLAKE VILLAGE, CA 91361

TELEPHONE NO.: 818-986-5685    FAX NO.: 818-986-1859
ATTORNEY FOR (Name): Plaintiff, Jarvis Khattri

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS: 111 North Hill Street
CITY AND ZIP CODE: Los Angeles, California 90012
BRANCH NAME: Central/Stanley Mosk Courthouse

CASE NAME:
Jarvis Khattri v. Simply Greatness Productions, LLC, et. al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| ☑ Unlimited (Amount demanded exceeds $25,000) ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter ☐ Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | 22STCV38165 |
| | | JUDGE: |
| | | DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☑ Other contract (37)

**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition (not specified above) (43)

2. This case ☐ is ☑ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. ☑ monetary b. ☐ nonmonetary; declaratory or injunctive relief c. ☐ punitive
4. Number of causes of action (specify): Six (6)
5. This case ☐ is ☑ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related cases. (You may use form CM-015.)

Date: December 7, 2022

Jeffrey M. Galen
(TYPE OR PRINT NAME)                    ▶    _____
                                              (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

**INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET**

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice– Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award *(not unpaid taxes)*
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-harassment)*
  Mechanics Lien
  Other Commercial Complaint Case *(non-tort/non-complex)*
  Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late Claim
  Other Civil Petition

| SHORT TITLE | CASE NUMBER |
|---|---|
| JARVIS KHATTRI V. SIMPLY GREATNESS PRODUCTIONS, LLC et. al. | 22STCV38165 |

## CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION

### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

> **This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court**

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

| Applicable Reasons for Choosing Courthouse Location (Column C) | |
|---|---|
| 1. Class Actions must be filed in the Stanley Mosk Courthouse, Central District. | 7. Location where petitioner resides. |
| 2. Permissive filing in Central District. | 8. Location wherein defendant/respondent functions wholly. |
| 3. Location where cause of action arose. | 9. Location where one or more of the parties reside. |
| 4. Location where bodily injury, death or damage occurred. | 10. Location of Labor Commissioner Office. |
| 5. Location where performance required, or defendant resides. | 11. Mandatory filing location (Hub Cases — unlawful detainer, limited non-collection, limited collection). |
| 6. Location of property or permanently garaged vehicle. | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ 2201 Motor Vehicle – Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| | Uninsured Motorist (46) | ☐ 4601 Uninsured Motorist – Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| **Other Personal Injury/ Property Damage/ Wrongful Death** | Other Personal Injury/ Property Damage/ Wrongful Death (23) | ☐ 2301 Premise Liability (e.g., dangerous conditions of property, slip/trip and fall, dog attack, etc.) | 1, 4 |
| | | ☐ 2302 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, battery, vandalism, etc.) | 1, 4 |
| | | ☐ 2303 Intentional Infliction of Emotional Distress | 1, 4 |
| | | ☐ 2304 Other Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| | | ☐ 2305 Elder/Dependent Adult Abuse/Claims Against Skilled Nursing Facility | 1, 4 |
| | | ☐ 2306 Intentional Conduct – Sexual Abuse Case (in any form) | 1, 4 |

LASC CIV 109 Rev. 11/22

For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM**
**AND STATEMENT OF LOCATION**

LASC Local Rule 2.3

| SHORT TITLE | CASE NUMBER |
|---|---|
| JARVIS KHATTRI V. SIMPLY GREATNESS PRODUCTIONS, LLC et. al. | |

| | | A<br>Civil Case Cover<br>Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable<br>Reasons (see<br>Step 3 above) |
|---|---|---|---|---|
| **Other Personal Injury/ Property Damage/ Wrongful Death** | | | ☐ 2307 Construction Accidents | 1, 4 |
| | | | ☐ 2308 Landlord – Tenant Habitability (e.g., bed bugs, mold, etc.) | 1, 4 |
| | | Product Liability (24) | ☐ 2401 Product Liability (not asbestos or toxic/ environmental) | 1, 4 |
| | | | ☐ 2402 Product Liability – Song-Beverly Consumer Warranty Act (CA Civil Code §§1790-1795.8) (Lemon Law) | 1, 3, 5 |
| | | Medical Malpractice (45) | ☐ 4501 Medical Malpractice – Physicians & Surgeons | 1, 4 |
| | | | ☐ 4502 Other Professional Health Care Malpractice | 1, 4 |
| **Non-Personal Injury/Property Damage/Wrongful Death Tort** | | Business Tort (07) | ☐ 0701 Other Commercial/Business Tort (not fraud or breach of contract) | 1, 2, 3 |
| | | Civil Rights (08) | ☐ 0801 Civil Rights/Discrimination | 1, 2, 3 |
| | | Defamation (13) | ☐ 1301 Defamation (slander/libel) | 1, 2, 3 |
| | | Fraud (16) | ☐ 1601 Fraud (no contract) | 1, 2, 3 |
| | | Professional Negligence (25) | ☐ 2501 Legal Malpractice | 1, 2, 3 |
| | | | ☐ 2502 Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | | Other (35) | ☐ 3501 Other Non-Personal Injury/Property Damage Tort | 1, 2, 3 |
| **Employment** | | Wrongful Termination (36) | ☐ 3601 Wrongful Termination | 1, 2, 3 |
| | | Other Employment (15) | ☐ 1501 Other Employment Complaint Case | 1, 2, 3 |
| | | | ☐ 1502 Labor Commissioner Appeals | 10 |
| **Contract** | | Breach of Contract / Warranty (06) (not insurance) | ☐ 0601 Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | | ☐ 0602 Contract/Warranty Breach – Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | | ☐ 0603 Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
| | | | ☐ 0604 Other Breach of Contract/Warranty (no fraud/ negligence) | 1, 2, 5 |
| | | | ☐ 0605 Breach of Rental/Lease Contract (COVID-19 Rental Debt) | 2, 5 |
| | | Collections (09) | ☐ 0901 Collections Case – Seller Plaintiff | 5, 6, 11 |
| | | | ☐ 0902 Other Promissory Note/Collections Case | 5, 11 |
| | | | ☐ 0903 Collections Case – Purchased Debt (charged off consumer debt purchased on or after January 1, 2014) | 5, 6, 11 |
| | | | ☐ 0904 Collections Case – COVID-19 Rental Debt | 5, 11 |
| | | Insurance Coverage (18) | ☐ 1801 Insurance Coverage (not complex) | 1, 2, 5, 8 |

CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION

| SHORT TITLE | CASE NUMBER |
|---|---|
| JARVIS KHATTRI V. SIMPLY GREATNESS PRODUCTIONS, LLC et. al. | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Contract** (Continued) | Other Contract (37) | ☑ 3701 Contractual Fraud | 1, 2, 3, 5 |
| | | ☐ 3702 Tortious Interference | 1, 2, 3, 5 |
| | | ☐ 3703 Other Contract Dispute (not breach/insurance/fraud/ negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | Eminent Domain/ Inverse Condemnation (14) | ☐ 1401 Eminent Domain/Condemnation<br>                          Number of Parcels _____ | 2, 6 |
| | Wrongful Eviction (33) | ☐ 3301 Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ 2601 Mortgage Foreclosure | 2, 6 |
| | | ☐ 2602 Quiet Title | 2, 6 |
| | | ☐ 2603 Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | Unlawful Detainer – Commercial (31) | ☐ 3101 Unlawful Detainer – Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Residential (32) | ☐ 3201 Unlawful Detainer – Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Post Foreclosure (34) | ☐ 3401 Unlawful Detainer – Post Foreclosure | 2, 6, 11 |
| | Unlawful Detainer – Drugs (38) | ☐ 3801 Unlawful Detainer – Drugs | 2, 6, 11 |
| **Judicial Review** | Asset Forfeiture (05) | ☐ 0501 Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ 1101 Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ 0201 Writ – Administrative Mandamus | 2, 8 |
| | | ☐ 0202 Writ – Mandamus on Limited Court Case Matter | 2 |
| | | ☐ 0203 Writ – Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ 3901 Other Writ/Judicial Review | 2, 8 |
| | | ☐ 3902 Administrative Hearing | 2, 8 |
| | | ☐ 3903 Parking Appeal | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ 0301 Antitrust/Trade Regulation | 1, 2, 8 |
| | Asbestos (04) | ☐ 0401 Asbestos Property Damage | 1, 11 |
| | | ☐ 0402 Asbestos Personal Injury/Wrongful Death | 1, 11 |

| | | |
|---|---|---|
| LASC CIV 109 Rev. 11/22 | CIVIL CASE COVER SHEET ADDENDUM | LASC Local Rule 2.3 |
| For Mandatory Use | AND STATEMENT OF LOCATION | |

| SHORT TITLE | CASE NUMBER |
|---|---|
| JARVIS KHATTRI V. SIMPLY GREATNESS PRODUCTIONS, LLC et. al. | |

| | **A**<br>Civil Case Cover Sheet Case Type | **B**<br>Type of Action<br>(check only one) | **C**<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Provisionally Complex Litigation** (Continued) | Construction Defect (10) | ☐ 1001 Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ 4001 Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ 2801 Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort Environmental (30) | ☐ 3001 Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ 4101 Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ 2001 Sister State Judgment | 2, 5, 11 |
| | | ☐ 2002 Abstract of Judgment | 2, 6 |
| | | ☐ 2003 Confession of Judgment (non-domestic relations) | 2, 9 |
| | | ☐ 2004 Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ 2005 Petition/Certificate for Entry of Judgment Unpaid Tax | 2, 8 |
| | | ☐ 2006 Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ 2701 Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints (not specified above) (42) | ☐ 4201 Declaratory Relief Only | 1, 2, 8 |
| | | ☐ 4202 Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ 4203 Other Commercial Complaint Case (non-tort/noncomplex) | 1, 2, 8 |
| | | ☐ 4204 Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ 2101 Partnership and Corporation Governance Case | 2, 8 |
| | Other Petitions (not specified above) (43) | ☐ 4301 Civil Harassment with Damages | 2, 3, 9 |
| | | ☐ 4302 Workplace Harassment with Damages | 2, 3, 9 |
| | | ☐ 4303 Elder/Dependent Adult Abuse Case with Damages | 2, 3, 9 |
| | | ☐ 4304 Election Contest | 2 |
| | | ☐ 4305 Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ 4306 Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ 4307 Other Civil Petition | 2, 9 |

| SHORT TITLE | CASE NUMBER |
|---|---|
| JARVIS KHATTRI V. SIMPLY GREATNESS PRODUCTIONS, LLC et. al. | |

**Step 4: Statement of Reason and Address:** Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address, which is the basis for the filing location including zip code. (No address required for class action cases.)

| REASON:<br>☐ 1. ☐ 2. ☑ 3. ☐ 4. ☐ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☐ 10. ☐ 11 | ADDRESS:<br>6173 MELROSE AVENUE |
|---|---|
| CITY:<br>LOS ANGELES | STATE:<br>CA | ZIP CODE:<br>90038 | |

**Step 5: Certification of Assignment:** I certify that this case is properly filed in the  CENTRAL/STANLEY MOSK  District of the Superior Court of California, County of Los Angeles [Code of Civ. Proc., 392 et seq., and LASC Local Rule 2.3(a)(1)(E)]

Dated: 12/07/2022

(SIGNATURE OF ATTORNEY/FILING PARTY

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.
2. If filing a Complaint, a completed Summons form for issuance by the Clerk.
3. Civil Case Cover Sheet Judicial Council form CM-010.
4. Civil Case Cover Sheet Addendum and Statement of Location form LASC CIV 109 (10/22).
5. Payment in full of the filing fee, unless there is a court order for waiver, partial or schedule payments.
6. A signed order appointing a Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court to issue a Summons.
7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the Summons and Complaint, or other initiating pleading in the case.

CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION

**Superior Court of California, County of Los Angeles**

---

# ALTERNATIVE DISPUTE RESOLUTION (ADR)
# INFORMATION PACKAGE

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS** must serve this ADR Information Package on any new parties named to the action with the cross-complaint.

---

## What is ADR?
ADR helps people find solutions to their legal disputes without going to trial. The main types of ADR are negotiation, mediation, arbitration, and settlement conferences. When ADR is done by phone, videoconference or computer, it may be called Online Dispute Resolution (ODR). These alternatives to litigation and trial are described below.

## Advantages of ADR
- **Saves Time:** ADR is faster than going to trial.
- **Saves Money:** Parties can save on court costs, attorney's fees, and witness fees.
- **Keeps Control** (with the parties): Parties choose their ADR process and provider for voluntary ADR.
- **Reduces Stress/Protects Privacy:**  ADR is done outside the courtroom, in private offices, by phone or online.

## Disadvantages of ADR
- **Costs:** If the parties do not resolve their dispute, they may have to pay for ADR, litigation, and trial.
- **No Public Trial:** ADR does not provide a public trial or a decision by a judge or jury.

## Main Types of ADR
1. **Negotiation:** Parties often talk with each other in person, or by phone or online about resolving their case with a settlement agreement instead of a trial. If the parties have lawyers, they will negotiate for their clients.

2. **Mediation:** In mediation, a neutral mediator listens to each person's concerns, helps them evaluate the strengths and weaknesses of their case, and works with them to try to create a settlement agreement that is acceptable to all.  Mediators do not decide the outcome. Parties may go to trial if they decide not to settle.

   **Mediation may be appropriate when the parties**
   - want to work out a solution but need help from a neutral person.
   - have communication problems or strong emotions that interfere with resolution.

   **Mediation may <u>not</u> be appropriate when the parties**
   - want a public trial and want a judge or jury to decide the outcome.
   - lack equal bargaining power or have a history of physical/emotional abuse.

---

## How to Arrange Mediation in Los Angeles County

Mediation for **civil cases** is voluntary and parties may select any mediator they wish. Options include:

    a.  **The Civil Mediation Vendor Resource List**
        If all parties in an active civil case agree to mediation, they may contact these organizations to request a "Resource List Mediation" for mediation at reduced cost or no cost (for selected cases).

-   **ADR Services, Inc.** Case Manager Elizabeth Sanchez, elizabeth@adrservices.com (949) 863-9800
-   **Mediation Center of Los Angeles** Program Manager info@mediationLA.org (833) 476-9145

**These organizations cannot accept every case and they may decline cases at their discretion**. They may offer online mediation by video conference for cases they accept. Before contacting these organizations, review important information and FAQs at www.lacourt.org/ADR.Res.List

**NOTE: The Civil Mediation Vendor Resource List program does not accept family law, probate or small claims cases.**

    b.  **Los Angeles County Dispute Resolution Programs**
        https://hrc.lacounty.gov/wp-content/uploads/2020/05/DRP-Fact-Sheet-23October19-Current-as-of-October-2019-1.pdf

        Day of trial mediation programs have been paused until further notice.

        **Online Dispute Resolution (ODR).** Parties in small claims and unlawful detainer (eviction) cases should carefully review the Notice and other information they may receive about (ODR) requirements for their case.

    c.  Mediators and ADR and Bar organizations that provide mediation may be found on the internet.

3. **Arbitration**: Arbitration is less formal than trial, but like trial, the parties present evidence and arguments to the person who decides the outcome. In "binding" arbitration, the arbitrator's decision is final; there is no right to trial. In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision. For more information about arbitration, visit http://www.courts.ca.gov/programs-adr.htm

4. **Mandatory Settlement Conferences (MSC)**: MSCs are ordered by the Court and are often held close to the trial date or on the day of trial. The parties and their attorneys meet with a judge or settlement officer who does not make a decision but who instead assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. For information about the Court's MSC programs for civil cases, visit http://www.lacourt.org/division/civil/C10047.aspx

Los Angeles Superior Court ADR website: http://www.lacourt.org/division/civil/C10109.aspx
For general information and videos about ADR, visit http://www.courts.ca.gov/programs-adr.htm

## VOLUNTARY EFFICIENT LITIGATION STIPULATIONS



**Superior Court of California
County of Los Angeles**



**Los Angeles County
Bar Association
Litigation Section**

**Los Angeles County
Bar Association Labor and
Employment Law Section**



**Consumer Attorneys
Association of Los Angeles**



**Southern California
Defense Counsel**



**Association of
Business Trial Lawyers**



**California Employment
Lawyers Association**

The Early Organizational Meeting Stipulation, Discovery Resolution Stipulation, and Motions in Limine Stipulation are voluntary stipulations entered into by the parties. The parties may enter into one, two, or all three of the stipulations; however, they may not alter the stipulations as written, because the Court wants to ensure uniformity of application. These stipulations are meant to encourage cooperation between the parties and to assist in resolving issues in a manner that promotes economic case resolution and judicial efficiency.

*The following organizations endorse the goal of promoting efficiency in litigation and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases.*

**◆Los Angeles County Bar Association Litigation Section◆**

**◆ Los Angeles County Bar Association Labor and Employment Law Section◆**

**◆Consumer Attorneys Association of Los Angeles◆**

**◆Southern California Defense Counsel◆**

**◆Association of Business Trial Lawyers◆**

**◆California Employment Lawyers Association◆**

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | FAX NO. (Optional): | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **STIPULATION – EARLY ORGANIZATIONAL MEETING** | CASE NUMBER: |
|---|---|

**This stipulation is intended to encourage cooperation among the parties at an early stage in the litigation and to assist the parties in efficient case resolution.**

**The parties agree that:**

1. The parties commit to conduct an initial conference (in-person or via teleconference or via videoconference) within 15 days from the date this stipulation is signed, *to discuss and consider whether there can be agreement on the following*:

    a. Are motions to challenge the pleadings necessary? If the issue can be resolved by amendment as of right, or if the Court would allow leave to amend, could an amended complaint resolve most or all of the issues a demurrer might otherwise raise? If so, the parties agree to work through pleading issues so that a demurrer need only raise issues they cannot resolve. Is the issue that the defendant seeks to raise amenable to resolution on demurrer, or would some other type of motion be preferable? Could a voluntary targeted exchange of documents or information by any party cure an uncertainty in the pleadings?

    b. Initial mutual exchanges of documents at the "core" of the litigation. (For example, in an employment case, the employment records, personnel file and documents relating to the conduct in question could be considered "core." In a personal injury case, an incident or police report, medical records, and repair or maintenance records could be considered "core.");

    c. Exchange of names and contact information of witnesses;

    d. Any insurance agreement that may be available to satisfy part or all of a judgment, or to indemnify or reimburse for payments made to satisfy a judgment;

    e. Exchange of any other information that might be helpful to facilitate understanding, handling, or resolution of the case in a manner that preserves objections or privileges by agreement;

    f. Controlling issues of law that, if resolved early, will promote efficiency and economy in other phases of the case. Also, when and how such issues can be presented to the Court;

    g. Whether or when the case should be scheduled with a settlement officer, what discovery or court ruling on legal issues is reasonably required to make settlement discussions meaningful, and whether the parties wish to use a sitting judge or a private mediator or other options as

| SHORT TITLE: | CASE NUMBER: |
|---|---|
|  |  |

discussed in the "Alternative Dispute Resolution (ADR) Information Package" served with the complaint;

   h.  Computation of damages, including documents, not privileged or protected from disclosure, on which such computation is based;

   i.  Whether the case is suitable for the Expedited Jury Trial procedures (see information at **www.lacourt.org** under "*Civil*" and then under "*General Information*").

2.  The time for a defending party to respond to a complaint or cross-complaint will be extended to _____ for the complaint, and _____ for the cross-complaint, which is comprised of the 30 days to respond under Government Code § 68616(b), and the 30 days permitted by Code of Civil Procedure section 1054(a), good cause having been found by the Civil Supervising Judge due to the case management benefits provided by this Stipulation. A copy of the General Order can be found at **www.lacourt.org** under "*Civil*", click on "*General Information*", then click on "*Voluntary Efficient Litigation Stipulations*".
(INSERT DATE) (INSERT DATE)

3.  The parties will prepare a joint report titled "Joint Status Report Pursuant to Initial Conference and Early Organizational Meeting Stipulation, and if desired, a proposed order summarizing results of their meet and confer and advising the Court of any way it may assist the parties' efficient conduct or resolution of the case. The parties shall attach the Joint Status Report to the Case Management Conference statement, and file the documents when the CMC statement is due.

4.  References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day

The following parties stipulate:

Date: _____

_____ (TYPE OR PRINT NAME)  ➤  _____ (ATTORNEY FOR PLAINTIFF)

Date: _____

_____ (TYPE OR PRINT NAME)  ➤  _____ (ATTORNEY FOR DEFENDANT)

Date: _____

_____ (TYPE OR PRINT NAME)  ➤  _____ (ATTORNEY FOR DEFENDANT)

Date: _____

_____ (TYPE OR PRINT NAME)  ➤  _____ (ATTORNEY FOR DEFENDANT)

Date: _____

_____ (TYPE OR PRINT NAME)  ➤  _____ (ATTORNEY FOR _____)

Date: _____

_____ (TYPE OR PRINT NAME)  ➤  _____ (ATTORNEY FOR _____)

Date: _____

_____ (TYPE OR PRINT NAME)  ➤  _____ (ATTORNEY FOR _____)

Print    Save    Clear

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|

TELEPHONE NO.:
E-MAIL ADDRESS (Optional):              FAX NO. (Optional):
ATTORNEY FOR (Name):

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **STIPULATION – DISCOVERY RESOLUTION** | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide a fast and informal resolution of discovery issues through limited paperwork and an informal conference with the Court to aid in the resolution of the issues.**

**The parties agree that:**

1. Prior to the discovery cut-off in this action, no discovery motion shall be filed or heard unless the moving party first makes a written request for an Informal Discovery Conference pursuant to the terms of this stipulation.

2. At the Informal Discovery Conference the Court will consider the dispute presented by parties and determine whether it can be resolved informally.  Nothing set forth herein will preclude a party from making a record at the conclusion of an Informal Discovery Conference, either orally or in writing.

3. Following a reasonable and good faith attempt at an informal resolution of each issue to be presented, a party may request an Informal Discovery Conference pursuant to the following procedures:

    a. The party requesting the Informal Discovery Conference will:

        i. File a Request for Informal Discovery Conference with the clerk's office on the approved form (copy attached) and deliver a courtesy, conformed copy to the assigned department;

        ii. Include a brief summary of the dispute and specify the relief requested; and

        iii. Serve the opposing party pursuant to any authorized or agreed method of service that ensures that the opposing party receives the Request for Informal Discovery Conference no later than the next court day following the filing.

    b. Any Answer to a Request for Informal Discovery Conference must:

        i. Also be filed on the approved form (copy attached);

        ii. Include a brief summary of why the requested relief should be denied;

**STIPULATION – DISCOVERY RESOLUTION**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

    iii.   Be filed within two (2) court days of receipt of the Request; and

    iv.   Be served on the opposing party pursuant to any authorized or agreed upon method of service that ensures that the opposing party receives the Answer no later than the next court day following the filing.

  c.  No other pleadings, including but not limited to exhibits, declarations, or attachments, will be accepted.

  d.  If the Court has not granted or denied the Request for Informal Discovery Conference within ten (10) days following the filing of the Request, then it shall be deemed to have been denied.  If the Court acts on the Request, the parties will be notified whether the Request for Informal Discovery Conference has been granted or denied and, if granted, the date and time of the Informal Discovery Conference, which must be within twenty (20) days of the filing of the Request for Informal Discovery Conference.

  e.  If the conference is not held within twenty (20) days of the filing of the Request for Informal Discovery Conference, unless extended by agreement of the parties and the Court, then the Request for the Informal Discovery Conference shall be deemed to have been denied at that time.

4.  If (a) the Court has denied a conference or (b) one of the time deadlines above has expired without the Court having acted or (c) the Informal Discovery Conference is concluded without resolving the dispute, then a party may file a discovery motion to address unresolved issues.

5.  The parties hereby further agree that the time for making a motion to compel or other discovery motion is tolled from the date of filing of the Request for Informal Discovery Conference until (a) the request is denied or deemed denied or (b) twenty (20) days after the filing of the Request for Informal Discovery Conference, whichever is earlier, unless extended by Order of the Court.

    It is the understanding and intent of the parties that this stipulation shall, for each discovery dispute to which it applies, constitute a writing memorializing a "specific later date to which the propounding [or demanding or requesting] party and the responding party have agreed in writing," within the meaning of Code Civil Procedure sections 2030.300(c), 2031.320(c), and 2033.290(c).

6.  Nothing herein will preclude any party from applying *ex parte* for appropriate relief, including an order shortening time for a motion to be heard concerning discovery.

7.  Any party may terminate this stipulation by giving twenty-one (21) days notice of intent to terminate the stipulation.

8.  References to "days" mean calendar days, unless otherwise noted.  If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day.

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

**The following parties stipulate:**

Date: _____

➤ _____
(TYPE OR PRINT NAME)               (ATTORNEY FOR PLAINTIFF)

Date: _____

➤ _____
(TYPE OR PRINT NAME)               (ATTORNEY FOR DEFENDANT)

Date: _____

➤ _____
(TYPE OR PRINT NAME)               (ATTORNEY FOR DEFENDANT)

Date: _____

➤ _____
(TYPE OR PRINT NAME)               (ATTORNEY FOR DEFENDANT)

Date: _____

➤ _____
(TYPE OR PRINT NAME)               (ATTORNEY FOR _____)

Date: _____

➤ _____
(TYPE OR PRINT NAME)               (ATTORNEY FOR _____)

Date: _____

➤ _____
(TYPE OR PRINT NAME)               (ATTORNEY FOR _____)

[ Print ]  [ Save ]                                            [ Clear ]

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|

TELEPHONE NO.:                    FAX NO. (Optional):
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name):

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **INFORMAL DISCOVERY CONFERENCE**<br>(pursuant to the Discovery Resolution Stipulation of the parties) | CASE NUMBER: |
|---|---|

1. This document relates to:

    ☐    Request for Informal Discovery Conference
    ☐    Answer to Request for Informal Discovery Conference

2. Deadline for Court to decide on Request: _____ (insert date 10 calendar days following filing of the Request).

3. Deadline for Court to hold Informal Discovery Conference: _____ (insert date 20 calendar days following filing of the Request).

4. **For a Request for Informal Discovery Conference, <u>briefly</u> describe the nature of the discovery dispute, including the facts and legal arguments at issue. For an Answer to Request for Informal Discovery Conference, <u>briefly</u> describe why the Court should deny the requested discovery, including the facts and legal arguments at issue.**

**INFORMAL DISCOVERY CONFERENCE**
(pursuant to the Discovery Resolution Stipulation of the parties)

Print          Save          Clear

NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY:

STATE BAR NUMBER

Reserved for Clerk's File Stamp

TELEPHONE NO.:
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name):

FAX NO. (Optional):

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

### STIPULATION AND ORDER – MOTIONS IN LIMINE

CASE NUMBER:

**This stipulation is intended to provide fast and informal resolution of evidentiary issues through diligent efforts to define and discuss such issues and limit paperwork.**

**The parties agree that:**

1. At least _____ days before the final status conference, each party will provide all other parties with a list containing a one paragraph explanation of each proposed motion in limine. Each one paragraph explanation must identify the substance of a single proposed motion in limine and the grounds for the proposed motion.

2. The parties thereafter will meet and confer, either in person or via teleconference or videoconference, concerning all proposed motions in limine. In that meet and confer, the parties will determine:

   a. Whether the parties can stipulate to any of the proposed motions. If the parties so stipulate, they may file a stipulation and proposed order with the Court.

   b. Whether any of the proposed motions can be briefed and submitted by means of a short joint statement of issues. For each motion which can be addressed by a short joint statement of issues, a short joint statement of issues must be filed with the Court 10 days prior to the final status conference. Each side's portion of the short joint statement of issues may not exceed three pages. The parties will meet and confer to agree on a date and manner for exchanging the parties' respective portions of the short joint statement of issues and the process for filing the short joint statement of issues.

3. All proposed motions in limine that are not either the subject of a stipulation or briefed via a short joint statement of issues will be briefed and filed in accordance with the California Rules of Court and the Los Angeles Superior Court Rules.

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

## The following parties stipulate:

Date: _____

_____
(TYPE OR PRINT NAME)

Date: _____

_____
(TYPE OR PRINT NAME)

Date: _____

_____
(TYPE OR PRINT NAME)

Date: _____

_____
(TYPE OR PRINT NAME)

Date: _____

_____
(TYPE OR PRINT NAME)

Date: _____

_____
(TYPE OR PRINT NAME)

Date: _____

_____
(TYPE OR PRINT NAME)

➢ _____
(ATTORNEY FOR PLAINTIFF)

➢ _____
(ATTORNEY FOR DEFENDANT)

➢ _____
(ATTORNEY FOR DEFENDANT)

➢ _____
(ATTORNEY FOR DEFENDANT)

➢ _____
(ATTORNEY FOR _____)

➢ _____
(ATTORNEY FOR _____)

➢ _____
(ATTORNEY FOR _____)

## THE COURT SO ORDERS.

Date: _____

_____
JUDICIAL OFFICER

| Print | Save | | Clear |
|---|---|---|---|

# FILED

LOS ANGELES SUPERIOR COURT

MAY 1 1 2011

JOHN A. CLARKE, CLERK

*N. Navarro*

BY NANCY NAVARRO, DEPUTY

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

General Order Re                          )    ORDER PURSUANT TO CCP 1054(a),
Use of Voluntary Efficient Litigation     )    EXTENDING TIME TO RESPOND BY
Stipulations                              )    30 DAYS WHEN PARTIES AGREE
                                          )    TO EARLY ORGANIZATIONAL
                                          )    MEETING STIPULATION
                                          )

Whereas the Los Angeles Superior Court and the Executive Committee of the

Litigation Section of the Los Angeles County Bar Association have cooperated in

drafting "Voluntary Efficient Litigation Stipulations" and in proposing the stipulations for

use in general jurisdiction civil litigation in Los Angeles County;

Whereas the Los Angeles County Bar Association Litigation Section; the Los

Angeles County Bar Association Labor and Employment Law Section; the Consumer

Attorneys Association of Los Angeles; the Association of Southern California Defense

Counsel; the Association of Business Trial Lawyers of Los Angeles; and the California

Employment Lawyers Association all "endorse the goal of promoting efficiency in

litigation, and ask that counsel consider using these stipulations as a voluntary way to

promote communications and procedures among counsel and with the court to fairly

resolve issues in their cases;"

-1-

ORDER PURSUANT TO CCP 1054(a)

1
2
3

Whereas the Early Organizational Meeting Stipulation is intended to encourage cooperation among the parties at an early stage in litigation in order to achieve litigation efficiencies;

4
5
6

Whereas it is intended that use of the Early Organizational Meeting Stipulation will promote economic case resolution and judicial efficiency;

7
8
9
10
11
12

Whereas, in order to promote a meaningful discussion of pleading issues at the Early Organizational Meeting and potentially to reduce the need for motions to challenge the pleadings, it is necessary to allow additional time to conduct the Early Organizational Meeting before the time to respond to a complaint or cross complaint has expired;

13
14
15

Whereas Code of Civil Procedure section 1054(a) allows a judge of the court in which an action is pending to extend for not more than 30 days the time to respond to a pleading "upon good cause shown";

16
17
18
19
20
21
22
23

Now, therefore, this Court hereby finds that there is good cause to extend for 30 days the time to respond to a complaint or to a cross complaint in any action in which the parties have entered into the Early Organizational Meeting Stipulation. This finding of good cause is based on the anticipated judicial efficiency and benefits of economic case resolution that the Early Organizational Meeting Stipulation is intended to promote.

24
25
26
27
28

IT IS HEREBY ORDERED that, in any case in which the parties have entered into an Early Organizational Meeting Stipulation, the time for a defending party to respond to a complaint or cross complaint shall be extended by the 30 days permitted

-2-

ORDER PURSUANT TO CCP 1054(a)

1    by Code of Civil Procedure section 1054(a) without further need of a specific court

2    order.

3

4    DATED: _May 11, 2011_         _Carolyn B. Kuhl_

5                            Carolyn B. Kuhl, Supervising Judge of the

6                            Civil Departments, Los Angeles Superior Court

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-3-

ORDER PURSUANT TO CCP 1054(a)

**FILED**
Superior Court of California
County of Los Angeles

MAY 03 2019

Sherri R. Carter, Executive Officer/Clerk
By _____, Deputy
Rizalinda Mina

1
2
3
4
5

SUPERIOR COURT OF THE STATE OF CALIFORNIA

6

FOR THE COUNTY OF LOS ANGELES

7

8   IN RE LOS ANGELES SUPERIOR COURT )    FIRST AMENDED GENERAL ORDER
    — MANDATORY ELECTRONIC FILING        )
9   FOR CIVIL                            )
                                         )
10                                       )
                                         )
11 _____ )

12        On December 3, 2018, the Los Angeles County Superior Court mandated electronic filing of all

13  documents in Limited Civil cases by litigants represented by attorneys. On January 2, 2019, the Los

14  Angeles County Superior Court mandated electronic filing of all documents filed in Non-Complex

15  Unlimited Civil cases by litigants represented by attorneys. (California Rules of Court, rule 2.253(b).)

16  All electronically filed documents in Limited and Non-Complex Unlimited cases are subject to the

17  following:

18  1) DEFINITIONS

19      a) **"Bookmark"**  A bookmark is a PDF document navigational tool that allows the reader to

20         quickly locate and navigate to a designated point of interest within a document.

21      b) **"Efiling Portal"**  The official court website includes a webpage, referred to as the efiling

22         portal, that gives litigants access to the approved Electronic Filing Service Providers.

23      c) **"Electronic Envelope"**  A transaction through the electronic service provider for submission

24         of documents to the Court for processing which may contain one or more PDF documents

25         attached.

26      d) **"Electronic Filing"**  Electronic Filing (eFiling) is the electronic transmission to a Court of a

27         document in electronic form. (California Rules of Court, rule 2.250(b)(7).)

28

e) **"Electronic Filing Service Provider"**  An Electronic Filing Service Provider (EFSP) is a person or entity that receives an electronic filing from a party for retransmission to the Court. In the submission of filings, the EFSP does so on behalf of the electronic filer and not as an agent of the Court.  (California Rules of Court, rule 2.250(b)(8).)

f) **"Electronic Signature"**  For purposes of these local rules and in conformity with Code of Civil Procedure section 17, subdivision (b)(3), section 34, and section 1010.6, subdivision (b)(2), Government Code section 68150, subdivision (g), and California Rules of Court, rule 2.257, the term "Electronic Signature" is generally defined as an electronic sound, symbol, or process attached to or logically associated with an electronic record and executed or adopted by a person with the intent to sign the electronic record.

g) **"Hyperlink"**  An electronic link providing direct access from one distinctively marked place in a hypertext or hypermedia document to another in the same or different document.

h) **"Portable Document Format"**  A digital document format that preserves all fonts, formatting, colors and graphics of the original source document, regardless of the application platform used.

2) MANDATORY ELECTRONIC FILING

a) Trial Court Records

Pursuant to Government Code section 68150, trial court records may be created, maintained, and preserved in electronic format.  Any document that the Court receives electronically must be clerically processed and must satisfy all legal filing requirements in order to be filed as an official court record (California Rules of Court, rules 2.100, et seq. and 2.253(b)(6)).

b) Represented Litigants

Pursuant to California Rules of Court, rule 2.253(b), represented litigants are required to electronically file documents with the Court through an approved EFSP.

c) Public Notice

The Court has issued a Public Notice with effective dates the Court required parties to electronically file documents through one or more approved EFSPs.  Public Notices containing effective dates and the list of EFSPs are available on the Court's website, at www.lacourt.org.

d) Documents in Related Cases

Documents in related cases must be electronically filed in the eFiling portal for that case type if electronic filing has been implemented in that case type, regardless of whether the case has been related to a Civil case.

3) EXEMPT LITIGANTS

a) Pursuant to California Rules of Court, rule 2.253(b)(2), self-represented litigants are exempt from mandatory electronic filing requirements.

b) Pursuant to Code of Civil Procedure section 1010.6, subdivision (d)(3) and California Rules of Court, rule 2.253(b)(4), any party may make application to the Court requesting to be excused from filing documents electronically and be permitted to file documents by conventional means if the party shows undue hardship or significant prejudice.

4) EXEMPT FILINGS

a) The following documents shall not be filed electronically:

    i) Peremptory Challenges or Challenges for Cause of a Judicial Officer pursuant to Code of Civil Procedure sections 170.6 or 170.3;

    ii) Bonds/Undertaking documents;

    iii) Trial and Evidentiary Hearing Exhibits

    iv) Any ex parte application that is filed concurrently with a new complaint including those that will be handled by a Writs and Receivers department in the Mosk courthouse; and

    v) Documents submitted conditionally under seal. The actual motion or application shall be electronically filed. A courtesy copy of the electronically filed motion or application to submit documents conditionally under seal must be provided with the documents submitted conditionally under seal.

b) Lodgments

Documents attached to a Notice of Lodgment shall be lodged and/or served conventionally in paper form. The actual document entitled, "Notice of Lodgment," shall be filed electronically.

//

//

5) ELECTRONIC FILING SYSTEM WORKING PROCEDURES

Electronic filing service providers must obtain and manage registration information for persons and entities electronically filing with the court.

6) TECHNICAL REQUIREMENTS

a) Electronic documents must be electronically filed in PDF, text searchable format **when** technologically feasible without impairment of the document's image.

b) The table of contents for any filing must be bookmarked.

c) Electronic documents, including but not limited to, declarations, proofs of service, and exhibits, must be bookmarked within the document pursuant to California Rules of Court, rule 3.1110(f)(4). Electronic bookmarks must include links to the first page of each bookmarked item (e.g. exhibits, declarations, deposition excerpts) and with bookmark titles that identify the bookedmarked item and briefly describe the item.

d) Attachments to primary documents must be bookmarked. Examples include, but are not limited to, the following:

   i)    Depositions;

   ii)   Declarations;

   iii)  Exhibits (including exhibits to declarations);

   iv)   Transcripts (including excerpts within transcripts);

   v)    Points and Authorities;

   vi)   Citations; and

   vii)  Supporting Briefs.

e) Use of hyperlinks within documents (including attachments and exhibits) is strongly encouraged.

f) Accompanying Documents

Each document acompanying a single pleading must be electronically filed as a **separate** digital PDF document.

g) Multiple Documents

Multiple documents relating to one case can be uploaded in one envelope transaction.

h) Writs and Abstracts

Writs and Abstracts must be submitted as a separate electronic envelope.

i) Sealed Documents

If and when a judicial officer orders documents to be filed under seal, those documents must be filed electronically (unless exempted under paragraph 4); the burden of accurately designating the documents as sealed at the time of electronic submission is the submitting party's responsibility.

j) Redaction

Pursuant to California Rules of Court, rule 1.201, it is the submitting party's responsibility to redact confidential information (such as using initials for names of minors, using the last four digits of a social security number, and using the year for date of birth) so that the information shall not be publicly displayed.

7) ELECTRONIC FILING SCHEDULE

a) Filed Date

i) Any document received electronically by the court between 12:00 am and 11:59:59 pm shall be deemed to have been effectively filed on that court day if accepted for filing. Any document received electronically on a non-court day, is deemed to have been effectively filed on the next court day if accepted. (California Rules of Court, rule 2.253(b)(6); Code Civ. Proc. § 1010.6(b)(3).)

ii) Notwithstanding any other provision of this order, if a digital document is not filed in due course because of: (1) an interruption in service; (2) a transmission error that is not the fault of the transmitter; or (3) a processing failure that occurs after receipt, the Court may order, either on its own motion or by noticed motion submitted with a declaration for Court consideration, that the document be deemed filed and/or that the document's filing date conform to the attempted transmission date.

8) EX PARTE APPLICATIONS

a) Ex parte applications and all documents in support thereof must be electronically filed no later than 10:00 a.m. the court day before the ex parte hearing.

b) Any written opposition to an ex parte application must be electronically filed by 8:30 a.m. the day of the ex parte hearing. A printed courtesy copy of any opposition to an ex parte application must be provided to the court the day of the ex parte hearing.

9) PRINTED COURTESY COPIES

a) For any filing electronically filed two or fewer days before the hearing, a courtesy copy must be delivered to the courtroom by 4:30 p.m. the same business day the document is efiled. If the efiling is submitted after 4:30 p.m., the courtesy copy must be delivered to the courtroom by 10:00 a.m. the next business day.

b) Regardless of the time of electronic filing, a printed courtesy copy (along with proof of electronic submission) is required for the following documents:

   i)    Any printed document required pursuant to a Standing or General Order;

   ii)   Pleadings and motions (including attachments such as declarations and exhibits) of 26 pages or more;

   iii)  Pleadings and motions that include points and authorities;

   iv)   Demurrers;

   v)    Anti-SLAPP filings, pursuant to Code of Civil Procedure section 425.16;

   vi)   Motions for Summary Judgment/Adjudication; and

   vii)  Motions to Compel Further Discovery.

c) Nothing in this General Order precludes a Judicial Officer from requesting a courtesy copy of additional documents. Courtroom specific courtesy copy guidelines can be found at www.lacourt.org on the Civil webpage under "Courtroom Information."

10) WAIVER OF FEES AND COSTS FOR ELECTRONICALLY FILED DOCUMENTS

a) Fees and costs associated with electronic filing must be waived for any litigant who has received a fee waiver. (California Rules of Court, rules 2.253(b)(), 2.258(b), Code Civ. Proc. § 1010.6(d)(2).)

b) Fee waiver applications for waiver of court fees and costs pursuant to Code of Civil Procedure section 1010.6, subdivision (b)(6), and California Rules of Court, rule 2.252(f), may be electronically filed in any authorized action or proceeding.

1   11) SIGNATURES ON ELECTRONIC FILING

2       For purposes of this General Order, all electronic filings must be in compliance with California

3       Rules of Court, rule 2.257.  This General Order applies to documents filed within the Civil

4       Division of the Los Angeles County Superior Court.

5

6          This First Amended General Order supersedes any previous order related to electronic filing,

7   and is effective immediately, and is to remain in effect until otherwise ordered by the Civil

8   Supervising Judge and/or Presiding Judge.

9

10  DATED:  May 3, 2019



KEVIN C. BRAZILE
Presiding Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED GENERAL ORDER RE MANDATORY ELECTRONIC FILING FOR CIVIL

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Stanley Mosk Courthouse<br>111 North Hill Street, Los Angeles, CA 90012 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>**12/07/2022**<br>Sherri R. Carter, Executive Officer / Clerk of Court<br>By: _____ R. Perez _____ Deputy |
| NOTICE OF CASE ASSIGNMENT<br><br>UNLIMITED CIVIL CASE | |
| **Your case is assigned for all purposes to the judicial officer indicated below.** | CASE NUMBER:<br>22STCV38165 |

### THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

| | ASSIGNED JUDGE | DEPT | ROOM | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|
| ✔ | Gail  Killefer | 37 | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record

on 12/08/2022
(Date)

Sherri R. Carter, Executive Officer / Clerk of Court

By R. Perez _____, Deputy Clerk

LACIV 190 (Rev 6/18)
LASC Approved 05/06

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

## APPLICATION
The Division 7 Rules were effective January 1, 2007. They apply to all general civil cases.

## PRIORITY OVER OTHER RULES
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

## CHALLENGE TO ASSIGNED JUDGE
A challenge under Code of Civil Procedure Section 170.6 must be made within **15** days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

## TIME STANDARDS
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

## COMPLAINTS
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

## CROSS-COMPLAINTS
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed. Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

## STATUS CONFERENCE
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

## FINAL STATUS CONFERENCE
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date. All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference. These matters may be heard and resolved at this conference. At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

## SANCTIONS
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules. Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is imperative.**

## Class Actions
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

## *Provisionally Complex Cases
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status. If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

# EXHIBIT 7

1  Jeffrey M. Galen, Esq. (SBN 134705)
   **GALEN & DAVIS LLP**
2  2945 Townsgate Road, Suite 200
3  Westlake Village, California 91361
   Telephone: (818) 986-5685
4  Facsimile: (818) 986-1859
   Email: jeffrey.galen@galendavislaw.com
5  *Attorneys for Plaintiff*

6  James G. Sammataro, Esq. (State Bar No. 204882)
7  jsammataro@pryorcashman.com
   **PRYOR CASHMAN LLP**
8  1801 Century Park East, 24th Floor
9  Los Angeles, California 90067
   Telephone: 310-683-6900
10 Facsimile: 310-943-3397
11 *Attorney for Defendants*

12

13

14            **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

15                    **COUNTY OF LOS ANGELES**

16

17  JARVIS KHATTRI, an individual,            ) CASE NO.: 22STCV38165
                                              )
18                                            ) *Assigned For All Purposes To:*
                                              ) *Honorable Gail Lillefer*
19                  Plaintiff                 ) *Dept.: 37*
                                              )
20  vs.                                       ) **STIPULATION AND [PROPOSED]**
                                              ) **ORDER TO ARBITRATE AND STAY**
21  SIMPLY GREATNESS PRODUCTIONS,             ) **ACTION**
    LLC, a Delaware Limited Liability         )
22  Company, AUSTIN MCBROOM, an               )
    individual, ALLEN MCBROOM, an             )
23  individual, and DOES 1 to 50, inclusive,  )
                                              )
24                                            )
                                              )
25                  Defendants                )

26

27     Plaintiff, Jarvis Khattri ("Plaintiff" or "Khattri"), and Defendants, Simply Greatness

28  Productions ("SGP"), Austin McBroom, and Allen McBroom (collectively, "Defendants"),

LAW
OFFICES
OF
GALEN &

1   through their respective counsel, hereby stipulate as follows:

2        On December 7, 2022, Plaintiff filed a Complaint against Defendants alleging causes of
3 action for Breach of Contract; Breach of Implied Covenant of Good Faith and Fair Dealing; Fraud;
4
Negligent Misrepresentation; Intentional Interference with Contractual Relations; and Civil
5
6 Conspiracy, arising out of a Talent Agreement entered on or about March 4, 2021.

7        By way of this executed stipulation, Plaintiff and Defendants, hereby stipulate to submit
8 all claims here or thereafter brought by Plaintiff against Defendants and all applicable defenses
9
thereof to binding arbitration with Judicial Arbitration and Mediation Services ("JAMS") in
10
11 accordance with the JAMS Comprehensive Arbitration Rules and Procedures
12 (https://www.jamsadr.com/rules-comprehensive-arbitration/);

13       Plaintiff and Defendants further understand that the parties shall share the expense and fees
14 of the neutral arbitrator (*i.e.*, 50% - Plaintiff; 50% - Defendants), together with other expenses of
15
the arbitration incurred or approved by the neutral arbitrator, not including counsel fees or witness
16
17 fees or other expenses incurred by a party for his or her own benefit, pursuant to Code of Civil
18 Procedure § 1284.2.

19       Plaintiff and Defendants agree to cooperate in good faith and will endeavor to select an
20 arbitrator as expeditiously as possible.
21

22       Plaintiff and Defendants further understand the civil action will be stayed by the Court
23 pending outcome of the arbitration with JAMS, with the Court to retain jurisdiction to adjudicate
24 matters arising under Code of Civil Procedure § 1280, et seq., and for entry and confirmation of a
25 proposed judgment upon motion of a party following any award by the neutral arbitrator.
26
27     **THEREFORE**, the parties respectfully request that the Court order that this action be stayed
28 pending arbitration and that this Court retain jurisdiction pending the completion of the arbitration

1  | or dismissal of the action by the parties.

2

3

4

Dated: July 11, 2023.

5

6        By: _____

7            Jeffrey M. Galen
            *Attorney for Plaintiff*

8

9

10       By: _____

11           James G. Sammataro
            *Attorney for Defendants*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW
OFFICES
OF
GALEN &

# EXHIBIT 8

**IN ARBITRATION BEFORE JUDICIAL ARBITRATION AND MEDIATION SERVICES, INC. (JAMS)**

| | |
|---|---|
| JARVIS KHATTRI, an individual, ) | Case No.: 5210000405 |
| ) | |
| Claimant, ) | Arbitrator: The Honorable Gail Andler |
| ) | |
| v. ) | |
| ) | |
| SIMPLY GREATNESS PRODUCTIONS, ) | **RESPONDENTS' MOTION TO LIMIT THE SCOPE OF ARBITRATION TO CLAIMS ARISING OUT OF THE PARTIES' ENFORCEABLE SETTLEMENT AGREEMENT** |
| LLC, a Delaware Limited Liability ) | |
| Company, AUSTIN MCBROOM, an ) | |
| individual, ALLEN MCBROOM, an ) | |
| individual, and DOES 1 to 50, inclusive, ) | |
| ) | |
| Respondents. ) | |
| ) | |

Pursuant to Rule 11 of the JAMS Comprehensive Arbitration Rules & Procedures, respondents, Simply Greatness Productions, LLC ("SGP"), Austin McBroom, and Allen McBroom (collectively, "Respondents"), hereby submit this Motion for the Tribunal to Limit the Scope of the Arbitration to Claims Arising Out of the Parties' Enforceable Settlement Agreement ("Motion").

**INTRODUCTION**

Jarvis Khattri f/k/a Faze Jarvis ("Claimant") entered into a Confidential Settlement Agreement and Mutual General Release with SGP on June 9, 2022 ("Settlement Agreement"). The Settlement Agreement was the byproduct of heavy negotiations in which Claimant was represented by Akin Gump Strauss Hauer & Feld, LLP ("Akin Gump").[1] As part of the Settlement Agreement, Claimant expressly and unequivocally released all disputes between himself and SGP relating to Claimant's participation in SGP's celebrity boxing event. Specifically, Claimant agreed to settle *all* claims that he had against SGP relating to the event and the parties' underlying agreement,

---

[1] (https://www.akingump.com/en).

DEFENDANTS' MOTION TO DETERMINE THE THRESHOLD ISSUE AS TO SCOPE OF THE ARBITRATION

Pryor Cashman LLP
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 683-6900
Facsimile: (310) 943-3397

Pryor Cashman LLP
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 683-6900
Facsimile: (310) 943-3397

1    including Claimant's entitlement to the original contractual amount ($1,025,000.00). The

2    Settlement Agreement – which contains an integration clause emphasizing that it supersedes all

3    prior and contemporaneous agreements, including the original talent agreement – required SGP to

4    pay $200,000.00 payable in two installments.

5        After SGP missed the first installment payment, Claimant filed suit in the Superior Court

6    for Los Angeles County, seeking "at least $1,000,000.00," as well as punitive damages.

7    Claimant's 26-page complaint shockingly made *no mention* of the Settlement Agreement and,

8    instead, attempted to litigate the very claims that were resolved as part the parties' settlement.[2]

9    The parties subsequently stipulated that the Claimant's claim must be arbitrated pursuant to JAMS'

10   Comprehensive Arbitration Rules & Procedures ("Comprehensive Rules") in accordance with the

11   arbitration provision contained in the Settlement Agreement.  (A true and correct copy of the

12   Stipulation and Order to Arbitrate and Stacy Action is attached hereto as **Exhibit A**).

13       Rule 11 of the Comprehensive Rules endows the Tribunal with the authority to resolve all

14   disputes regarding the scope of the arbitration, including the proper claims subject to arbitration

15   and the proper parties to the arbitration. This matter necessitates a Rule 11 interpretation, as

16   Claimant is not entitled to pretend as though the Settlement Agreement does not exist.

17       Despite SGP's failure to timely pay the first installment, the Settlement Agreement remains

18   an enforceable contract.  Under clear California precedent, Claimant's remedy is limited to the

19   enforcement of the Settlement Agreement.  He is not entitled to "turn back the clock" and re-

20   litigate the already-settled claims.  In light of this clear precedent, the Tribunal should rule that the

21   scope of the Arbitration is limited solely to any claims that can be brought pursuant to the parties'

---

[2] A true and correct copy of Claimant's complaint (without its exhibits) is attached hereto as **Exhibit B**.

DEFENDANTS' MOTION TO DETERMINE THE THRESHOLD ISSUE
AS TO SCOPE OF THE ARBITRATION

Pryor Cashman LLP
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 683-6900
Facsimile: (310) 943-3397

1    Settlement Agreement, and that Claimant's recoverable damages are limited to solely those

2    amounts that can reasonably be expected to flow from a breach of the Settlement Agreement.

3                                            **FACTUAL BACKGROUND**

4    **A.    SGP Ambitiously, But Unsuccessfully, Launches a First-of-its-Kind, Pay-Per-View Boxing Event Pitting "YouTubers" versus "TikTokers."**

5

6    Claimant's lawsuit centers around SGP's June 12, 2021 celebrity boxing event, "Social

7    Gloves: Battle of the Platforms" ("Event"), which occurred in Miami, Florida. Conceived by SGP,

8    the Event was a first-of-its kind, live pay-per-view entertainment boxing event, wherein the

9    world's largest social media stars from YouTube and TikTok were pitted against each other in the

10   boxing ring. The Event was envisioned as the perfect concoction of celebrity, social media,

11   technology, pop culture and sport, and sought to tap into the "fighters'" collective audience of 300

12   million social media followers.

13   **B.    SGP and FaZe Clan Enter into a Talent Agreement for Claimant to Perform at the Event.**

14

15   Claimant is an English YouTuber, Twitch steamer, and a member of the gaming

16   organization FaZe Clan.[3] Claimant rose to fame on his gaming prowess. The plan was for Claimant

17

18   to serve on Team "YouTube" and fight Michael Le, a TikTok star ("Bout").

19   In order to secure Claimant's performance, SGP entered into an agreement with FaZe Clan,

20   Inc. ("Faze Clan") on March 4, 2021, through which Faze Clan was to furnish Claimant's services

21   ("Talent Agreement").  (A true and correct copy of the Talent Agreement is attached hereto as

22   **Exhibit C**).  As part of the Talent Agreement (and as further provided in Addendum A to the

23   Agreement), Faze Clan also agreed to provide marketing services ("Marketing Services") for the

24

25

26   _____
     [3] Since its inception in 2010, FaZe Clan has established itself as one of the world's most prominent
27   and influential gaming organizations. *See* https://fazeclan.com/about/.

28                                            Page | 2
     _____
                   DEFENDANTS' MOTION TO DETERMINE THE THRESHOLD ISSUE
                            AS TO SCOPE OF THE ARBITRATION

Pryor Cashman LLP
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 683-6900
Facsimile: (310) 943-3397

1    Event through members of Faze Clan. *Id.*

2    In consideration for Claimant's full participation in the Event and Faze Clan's completion

3    of the Marketing Services, SGP agreed to compensate Faze Clan and Claimant as follows: (a)

4    $25,000.00 within five business days of the execution of the Talent Agreement; and (b)

5    $1,000,000.00 (hereinafter, "<u>Original Contractual Amount</u>")[4] contingent on Jarvis' participation

6

7    in the Event. (Ex. C, ¶ 4).[5]

8    **C.    The Event Spurs Litigation; Heaps Substantial Financial Loss on the Respondents; and Results in a Settlement Between SGP and Claimant.**

9

10    The Event fell well woefully short of expectations – losing millions.  For their part,

11    Respondents never received a single penny from the Event; suffered substantial financial losses;

12    and were forced to initiate litigation against the Event's distribution partner (LiveXLive Media,

13    Inc.)[6] in order to ensure that as many of the Event's participants as possible were compensated.[7]

14

15    Desirous of "doing right" by the Event's participants, SGP – a single purpose entity – elected not

16    to file for bankruptcy[8] and instead entered into agreements with the Event's investors, participants

17

18    ───────────────────

19    [4] SGP's lack of experience in event promotion led to it paying wildly-inflated, above-market fees to participants.  By way of example, the amount paid to Claimant was approximately 300% above the prevailing market rate.  Notably, and contrary to the Complaint's demonstrably false allegations, the undersigned was ***not*** involved in negotiating the talent agreements.  (*Compare* Ex. C, ¶ 3).

20

21

22    [5] Faze Clan, thereafter, purportedly assigned its rights under the Talent Agreement to Claimant.

23    [6] *See Simply Greatness Productions, LLC v. LiveXLive Corp.*, LASC Case No. 21 STCV26865 (July 2021).

24

25    [7] The Bout launched Claimant's boxing career.  Claimant has since participated in three additional fights.

26

27    [8] On June 21, 2021, the leading bankruptcy boutique (Pachulski, Stang Ziehl Jones) provided notice to Jordan Galen of FaZe Clan, advising that the firm had been retained "… to represent SGP in connection with either a workout of the claims of all of its creditors, or, if a workout is not

28

and fighters.

To this end, and to avoid costly litigation, Claimant – represented by Akin Gump – heavily negotiated and ultimately entered into the Settlement Agreement.  (A true and correct copy of the Settlement Agreement is attached hereto as **Exhibit D**).  Pursuant to the Settlement Agreement, the parties agreed that the oversized Original Contractual Amount was to be satisfied through the payment of $200,000.00 ("Settlement Amount").  The Settlement Amount was to be paid in two equal $100,000.00 installments.  (*See* Ex. D, ¶ 2).

As part of the Settlement Agreement, Claimant agreed to fully and forever resolve all past, present and future claims against SGP relating to the Talent Agreement, the Event, the Bout and the Original Contractual Amount. (*Id.*, ¶ 4(a)).  The Parties' intent in entering into the heavily-negotiated Settlement Agreement is clearly delineated therein:

> [T]o **avoid litigation** and to **obtain finality** and repose with respect to any and all past, present and future claims and potential claims pertaining to the Talent Agreement, the Original Contractual Amount, Event, the Bout, and the other claims of [Jarvis], **SGP and Jarvis have fully, finally and forever [agreed] to settle any claims and demands which exist, may exist, are pending or anticipated between them relating to or concerning the Event, the Talent Agreement, the Bout and SGP's financial obligations to [Jarvis] and agree to compromise the claims and causes of action held, asserted or threatened or that could have been asserted or threatened in any legal proceedings** related to or concerning the Event, the Talent Agreement, the Bout, the Original Contractual Amount, and SGP's contractual and financial obligations to [Jarvis].

(Ex. D, p. 1) (emphasis added).

In order to extinguish any doubt as to the scope of the parties' respective releases, they exchanged California Civil Code Section 1542 Releases.  (*Id.*, ¶ 4(c)). For his part, Claimant agreed that he was:

> specifically waiv[ing] to the fullest extent permitted by law the provisions of California Civil Code Section 1542 with respect to any and all claims against the SGP Parties which are released under the terms of this Settlement Agreement.

---

feasible, a likely bankruptcy filing," (*See* **Exhibit E**).

Pryor Cashman LLP
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 683-6900
Facsimile: (310) 943-3397

Pryor Cashman LLP
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 683-6900
Facsimile: (310) 943-3397

(*Id.*, ¶ 4(c)(iii)).

Like the Talent Agreement, the Settlement Agreement contains an arbitration and choice of law clause, which provides that any disputes must be arbitrated through JAMS, and that "THIS SETTLEMENT AGREEMENT SHALL BE CONSTRUED, AND SHALL BE ENFORCED, PURSUANT TO THE LAWS OF THE STATE OF CALIFORNIA …". ( *Id.*, ¶ 10).

Critically, the Settlement Agreement also contains an integration clause which states that the Settlement Agreement "constitutes the entire agreement among the Parties pertaining to the subject matter" (*i.e.* the Talent Agreement, the Event, and the Bout), and that the Settlement Agreement "*supersedes all prior or contemporaneous agreements, representations or negotiations among the parties, including but not limited to the Talent Agreement*." (*Id.* at ¶ 18) (emphasis added).

**D.      SGP's Request for an Extension to Make the Settlement Payment is Denied.**

After the parties executed the Settlement Agreement, SGP was unable to timely pay the Settlement Amount owed to Claimant under the terms of the Settlement Agreement – as SGP's follow-up "Social Gloves" event also proved financially disastrous.  In recognition of its breach, SGP requested an extension of the payment deadline in exchange for an additional $25,000.00 payment by SGP.  Claimant denied this request. Claimant similarly rejected SGP's direct overtures, demanding full payment of the Overall Contractual Amount (*i.e.*, $1,025,000.00).  This demand resulted in an impasse.

**E.      Ignoring the Agreements' Arbitration Provision, Claimant Files Suit in California State Court Without Any Mention of the Settlement Agreement.**

Even though both the original Talent Agreement and the Settlement Agreement unmistakably contain arbitration clauses, Claimant filed an action in the Superior Court of the State of California in the County of Los Angeles, styled *Jarvis Khattri v. Simply Greatness*

DEFENDANTS' MOTION TO DETERMINE THE THRESHOLD ISSUE
AS TO SCOPE OF THE ARBITRATION

Pryor Cashman LLP
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 683-6900
Facsimile: (310) 943-3397

1  *Productions, LLC, Austin McBroom, Allen McBroom, and Does 1-50*, Case No. 22-ST-CV-38165

2  ("Action").

3  Incredibly, in a shocking lack of candor, Claimant's six-count, twenty-six page complaint

4  ("Complaint") fails to make *any* reference to the Settlement Agreement with SGP. [9]  Instead,

5  Claimant's Complaint cited only to the Talent Agreement and sought to bring claims against SGP

6

7  for its breach of the Talent Agreement, as well as claims surrounding in fraud against Austin

8  McBroom and Allen McBroom – despite the fact that Claimant released these *claims* by entering

9  into the Settlement Agreement with SGP.  Moreover, the Complaint seeks damages well in excess

10  of the Settlement Amount.

11  After several conferrals amongst counsel, the Parties ultimately stipulated "any and all

12  claims or disputes arising out of the Talent Agreement would be arbitrated with JAMS, and in

13  accordance with the JAMS Comprehensive Arbitration Rules and Procedures."

14

15  **LEGAL ARGUMENT**

16  A.  **The Scope of this Arbitration Must Be Decided At the Outset in Accordance with Rule 11 of the JAMS' Rules.**

17

18  As an initial matter, the Tribunal shall determine the scope of this arbitration in accordance

19  with Rule 11 of JAMS' Comprehensive Rules.

20  In their Settlement Agreement, the parties elected to delegate all issues relating to the

21  arbitrability to the arbitrator.  (*See* Ex. D, ¶ 10).  Specifically, the arbitration provision provides

22  that "any action arising out of or related to this settlement agreement shall be resolved through a

23  final and binding arbitration administered by JAMS in accordance with its arbitration rules and

24

25

26  [9] In an apparent attempt to coerce a settlement, the complaint goes to great pains to needlessly drag

27  Austin through the mud, repeatedly false (and irrelevant) allegations previously splashed on tabloid websites.  (*See* Ex. B, ¶ 1).

28

DEFENDANTS' MOTION TO DETERMINE THE THRESHOLD ISSUE
AS TO SCOPE OF THE ARBITRATION

Pryor Cashman LLP
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 683-6900
Facsimile: (310) 943-3397

1   procedures or subsequent versions thereof." (*Id.*).  Given this provision, it is for the Tribunal to

2   decide the scope of this proceedings.  *See Greenspan v. LADT, LLC*, 185 Cal.App.4th 1413, 1442

3   (2010) (holding that where the "parties explicitly incorporate rules that empower an arbitrator to

4   decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the

5   parties' intent to delegate such issues to an arbitrator"); *Belnap v. Iasis Healthcare*, 844 F.3d 1272,

6   1283 (10th Cir. 2017) ("All of [the] sister circuits to address the issue have unanimously concluded

7   that incorporation of the ... AAA Rules constitutes clear and unmistakable evidence of an

8   agreement to arbitrate arbitrability.").

9       Rule 11 specifically endows the arbitrator to resolve all disputes over "… the interpretation

10  or scope of the agreement under which Arbitration is sought, and *who are the proper Parties to*

11  *the Arbitration* " (emphasis added).  These gating issues must be resolved.

12  **B.      The Arbitration is Limited to Claimant's Claim that SGP Breached the Settlement**
    **Agreement**.

13      Claimant's claim should be limited to the enforcement of the Settlement Agreement against

14  SGP, as all claims relating to the Event, the Bout, and/or the Talent Agreement have been expressly

15  released and extinguished as a matter of law.

16      California law favors and encourages the settlement of controversies made in or out of

17  court. *See The Ebensteiner Company, Inc. v. The Chadmar Group*, 143 Cal. App. 4th 1174, 1179

18  (2006); *Stambaugh v. Superior Court*, 62 Cal. App. 3d 231, 236 (1976) ("Settlement agreements

19  are highly favored as productive of peace and goodwill in the community, and reducing the

20  expense and persistency of litigation"). *See also Skulnick v. Roberts Express Co.*, 2 Cal. App. 4th

21  884, 891 (1992) ("Public policy strongly discourages litigation and encourages settlement.");

22  *Gorman v. Holte*, 164 Cal. App. 3d 984, 988 (1985) (noting "the well-established and long-

23  supported public policy of encouraging pre-trial settlements").

DEFENDANTS' MOTION TO DETERMINE THE THRESHOLD ISSUE
AS TO SCOPE OF THE ARBITRATION

Critically, the breach of a settlement agreement by one party does *not* restore the parties to their status before the settlement. Instead, in the absence of a basis to avoid the settlement, the settlement agreement operates as a bar to the reopening of the original controversy. *See Folsom v. Butte County Ass'n of Governments*, 32 Cal. 3d 668, 677 (1982) (valid settlement agreement "has many attributes of a judgment" and "is decisive of the rights of the parties thereto and operates as a bar to the reopening of the original controversy") (*quoting Shriver v. Kuchel*, 113 Cal. App. 2d 421, 425 (1952)); *A.J. Industries, Inc. v. Ver Halen*, 75 Cal. App. 3d 751, 759 (1977) ("A settlement contract has the attributes of a judgment in that it serves to bar reopening of the issues settled."); *see also Argonaut Ins. Exchange v. Industrial Accident Comm'n*, 49 Cal. 2d 706, 711 (1958) (the settlement agreement establishes the "measure" of the party's rights and obligations going forward).

Consequently, where a settlement agreement has been breached, a party's "remedy for the failure to perform the settlement agreement *must be based 'exclusively' on that agreement*." *Ebensteiner Co.*, 143 Cal. App. 4th at 1180 (emphasis added). Indeed, as long explained by the California Supreme Court, "a settlement operates as a merger and ban as to all pre-existing claims and those alleged in the lawsuit that have been resolved." *Armstrong v. Sacramento Valley Realty Co.*, 179 Cal. 648, 651 (1919); *see also, Gregory v. Hamilton*, 77 Cal. App. 3d 213, 221 (1978) (same); *A.J. Industries*, 75 Cal. App. 3d at 753 (a settlement agreement "serves to bar re-opening of the issues settled").

The Settlement Agreement expressly contemplated that it was resolving all then-existing claims relating to the Talent Agreement, the Original Contractual Amount, the Event and the Bout. In addition to an express Section 1542 waiver, the Settlement Agreement includes an unequivocal integration claim. (*See* Ex. D, ¶ 2, ¶ 4(a), ¶ 4(c), ¶ 18). Consequently, whatever claims that Claimant possessed regarding Talent Agreement, the Original Contractual Amount, the Event and the Bout are forever gone. Claimant's sole available claim is for the Settlement Amount (which

Pryor Cashman LLP
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 683-6900
Facsimile: (310) 943-3397

DEFENDANTS' MOTION TO DETERMINE THE THRESHOLD ISSUE
AS TO SCOPE OF THE ARBITRATION

1   would have been paid absent Claimant's demand for the Original Contractual Amount). Claimant

2   is not entitled to pretend as though the Settlement Agreement does not exist. Nor is he entitled to

3   litigate the merits of the original controversy.

4        In light of the foregoing, this Tribunal should rule that the scope of the arbitration is limited

5   solely to a claim against SGP for its untimely payment of the parties' Settlement Agreement.

6   **C.    Claimants' Claim is Limited to the $200,000.00 Settlement Amount.**

7        The purpose a contract is to protect the parties' reasonable expectations. *See Medina v.*

8   *South Coast Car Co., Inc.*, 15 Cal. App. 5th 671, 681 (2017). In seeking the Original Contractual

9   Amount – which was superseded by the Settlement Amount agreed upon in the Settlement

10  Agreement – Claimant ignores clear precedent that a party's failure to pay an amount agreed to in

11
12  a settlement agreement solely entitles the non-breaching party to recover damages up to the

13  settlement amount – *e.g.*, U.S. $200,000.00.

14      *Greentree Financial Group, Inc. v. Execute Sports, Inc.* is instructive. *See* 163 Cal. App.

15  4th 495 (2008). In *Greentree*, the plaintiff sued the defendant for breach of contract, seeking the

16  $45,000.00 due under the parties' agreement in consideration for Greentree's financial services.

17  *Id.* at 497. Before trial, the parties agreed to settle the case for a total of $20,000.00, payable in

18
19  two installments. *Id.* at 498. The settlement agreement provided that, if the defendant defaulted

20  on either installment payment, the plaintiff could file a stipulation for entry of judgment in the

21  amount of $45,000.00, as well as pre-judgment interest, attorney fees, and costs. *Id.* After the

22  defendant failed to make the first payment, the trial court entered judgment against the defendant

23  pursuant to the terms of the parties' stipulation. *Id.*

24      On appeal, the Appellate Court held that "[u]nder consistent authority, the judgment

25  constitutes an unenforceable penalty because it bears no reasonable relationship to the range of

26  actual damages the parties could have anticipated would flow from a breach of their settlement

27
28

Pryor Cashman LLP
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 683-6900
Facsimile: (310) 943-3397

DEFENDANTS' MOTION TO DETERMINE THE THRESHOLD ISSUE
AS TO SCOPE OF THE ARBITRATION

Pryor Cashman LLP
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 683-6900
Facsimile: (310) 943-3397

1   agreement." *Id.* at 497-98 (internal citations omitted). The Appellate Court reversed the trial

2   court's decision and remanded with directions to the trial court to enter judgment in the amount

3   specified in the settlement agreement. *Id.* at 498. Countless California courts have followed

4   *Greentree,* establishing a clear precedent that, in the event of a breached settlement agreement, the

5   non-breaching parties' remedy is to recover the settlement amount, ***not litigate the underlying***

6   ***dispute and open the door to an amount of damages that the parties did not agree, or reasonably***

7   ***contemplate, to flow from any breach of the negotiated settlement agreement.***

8

9       Here, Claimant indisputably entered into the Settlement Agreement, agreeing to waive all

10  of his previous claims in exchange for $200,000.00.  Therefore, the range of actual damages the

11  parties could have reasonably anticipated to flow from any breach of the Settlement Agreement is

12  $200,000.00, and nothing more.

13                              **CONCLUSION**

14

15      In light of clear and unequivocal California precedent, respondents Simply Greatness

16  Productions, Austin McBroom, and Allen McBroom respectfully request that this Tribunal limit

17  the scope of the Arbitration to claims against Simply Greatness Productions arising from its

18  untimely payment of the Settlement Amount under the parties' Settlement Agreement.

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION TO DETERMINE THE THRESHOLD ISSUE
AS TO SCOPE OF THE ARBITRATION

1    Respectfully submitted,

2                                        **PRYOR CASHMAN LLP**

3

4    Dated:  December 4, 2023        By:    *James G. Sammataro*

5                                           James G. Sammataro
                                            *Attorneys for Respondents*

6

7

8

9

10

11

12

13    Pryor Cashman LLP
      1801 Century Park East, 24th Floor
14    Los Angeles, California 90067
      Telephone: (310) 683-6900
15    Facsimile: (310) 943-3397

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION TO DETERMINE THE THRESHOLD ISSUE
AS TO SCOPE OF THE ARBITRATION

# EXHIBIT A

1  Jeffrey M. Galen, Esq. (SBN 134705)
   **GALEN & DAVIS LLP**
2  2945 Townsgate Road, Suite 200
3  Westlake Village, California 91361
   Telephone: (818) 986-5685
4  Facsimile: (818) 986-1859
   Email: jeffrey.galen@galendavislaw.com
5  *Attorneys for Plaintiff*

6
   James G. Sammataro, Esq. (State Bar No. 204882)
7  jsammataro@pryorcashman.com
   **PRYOR CASHMAN LLP**
8  1801 Century Park East, 24th Floor
9  Los Angeles, California 90067
   Telephone: 310-683-6900
10 Facsimile: 310-943-3397
   *Attorney for Defendants*
11

12

13

14              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

15                        **COUNTY OF LOS ANGELES**

16
   JARVIS KHATTRI, an individual,       )   CASE NO.: 22STCV38165
17                                       )
18                                       )   *Assigned For All Purposes To:*
                                         )   *Honorable Gail Lillefer*
19              Plaintiff                )   *Dept.: 37*
                                         )
20 vs.                                   )   **STIPULATION AND [PROPOSED]**
                                         )   **ORDER TO ARBITRATE AND STAY**
21 SIMPLY GREATNESS PRODUCTIONS,         )   **ACTION**
   LLC, a Delaware Limited Liability     )
22 Company, AUSTIN MCBROOM, an           )
   individual, ALLEN MCBROOM, an         )
23 individual, and DOES 1 to 50, inclusive, )
                                         )
24                                       )
                                         )
25              Defendants               )
26
27      Plaintiff, Jarvis Khattri ("Plaintiff" or "Khattri"), and Defendants, Simply Greatness

28 Productions ("SGP"), Austin McBroom, and Allen McBroom (collectively, "Defendants"),

G&D
*LAW*
*OFFICES*
*OF*
*GALEN &*

1   through their respective counsel, hereby stipulate as follows:

2       On December 7, 2022, Plaintiff filed a Complaint against Defendants alleging causes of

3   action for Breach of Contract; Breach of Implied Covenant of Good Faith and Fair Dealing; Fraud;

4   Negligent Misrepresentation; Intentional Interference with Contractual Relations; and Civil

5   Conspiracy, arising out of a Talent Agreement entered on or about March 4, 2021.

6

7       By way of this executed stipulation, Plaintiff and Defendants, hereby stipulate to submit

8   all claims here or thereafter brought by Plaintiff against Defendants and all applicable defenses

9   thereof to binding arbitration with Judicial Arbitration and Mediation Services ("JAMS") in

10  accordance    with    the    JAMS    Comprehensive    Arbitration    Rules    and    Procedures

11  (https://www.jamsadr.com/rules-comprehensive-arbitration/);

12

13      Plaintiff and Defendants further understand that the parties shall share the expense and fees

14  of the neutral arbitrator (*i.e.*, 50% - Plaintiff; 50% - Defendants), together with other expenses of

15  the arbitration incurred or approved by the neutral arbitrator, not including counsel fees or witness

16  fees or other expenses incurred by a party for his or her own benefit, pursuant to Code of Civil

17  Procedure § 1284.2.

18

19      Plaintiff and Defendants agree to cooperate in good faith and will endeavor to select an

20  arbitrator as expeditiously as possible.

21

22      Plaintiff and Defendants further understand the civil action will be stayed by the Court

23  pending outcome of the arbitration with JAMS, with the Court to retain jurisdiction to adjudicate

24  matters arising under Code of Civil Procedure § 1280, et seq., and for entry and confirmation of a

25  proposed judgment upon motion of a party following any award by the neutral arbitrator.

26

27      **THEREFORE**, the parties respectfully request that the Court order that this action be stayed

28  pending arbitration and that this Court retain jurisdiction pending the completion of the arbitration

1  or dismissal of the action by the parties.

2

3

4

5  Dated: July 11, 2023.

6  By: _____

7  Jeffrey M. Galen
   *Attorney for Plaintiff*

8

9

10 By: _____

11 James G. Sammataro
   *Attorney for Defendants*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STIPULATION TO ARBITRATE AND TO STAY ACTION

G&D
LAW
OFFICES
OF
GALEN &

# EXHIBIT B

Electronically FILED by Superior Court of California, County of Los Angeles on 12/07/2022 03:39 PM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Perez,Deputy Clerk
Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Gail Killefer

1  Jeffrey M. Galen, Esq. [SBN 134705]
2  Glenn D. Davis, Esq. [SBN 150744]
   GALEN & DAVIS, LLP
3  2945 Townsgate Road, Suite 200
   Westlake Village, California 91361
4  Telephone:(818) 986-5685
   Facsimile: (818) 986-1859
5

6  Attorneys for Plaintiff,
   JARVIS KHATTRI
7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                     COUNTY OF LOS ANGELES

10

11 JARVIS KHATTRI, an individual,        )    Case No.:  22STCV38165
                                         )
12                                       )    **COMPLAINT FOR:**
                                         )
13                   Plaintiff,          )    **1) BREACH OF CONTRACT**
                                         )    **2) BREACH OF IMPLIED**
14  vs.                                  )       **COVENANT OF GOOD FAITH**
                                         )       **AND FAIR DEALING:**
15                                       )    **3) FRAUD**
16 SIMPLY GREATNESS                      )    **4) NEGLIGENT**
   PRODUCTIONS, LLC, a Delaware          )       **MISREPRESENTATION**
17 Limited Liability Company, AUSTIN     )    **5) INTENTIONAL INTERFERENCE**
   MCBROOM, an individual, ALLEN         )       **WITH CONTRACTUAL**
18 MCBROOM, an individual, and DOES      )       **RELATIONS**
   1 to 50, inclusive,                   )    **6) CIVIL CONSPIRACY**
19                                       )
20                                       )
                     Defendants,         )
21 _____  )

22

23

24

25

26

27                          1

28 _____
                   **COMPLAINT FOR DAMAGES**

Plaintiff, JARVIS KHATTRI ("Plaintiff") by and through his undersigned

attorneys, submit this Complaint against Defendants SIMPLY GREATNESS

PRODUCTIONS, LLC, AUSTIN MCBROOM and ALLEN MCBROOM (collectively,

"Defendants"), and in support thereof, avers as follows:

## INTRODUCTION

1. Austin McBroom ("McBroom") and his family gained notoriety in 2017 on

YouTube vlogging their day-to-day lives on their own "Ace Family Channel". As

scandals involving McBroom surfaced and there were many (allegations of cheating

and rape, sexist and racist tweets, a staged burglary, fraudulent charity events, a sham

fan club with false promises of merchandise) - the McBrooms' number of followers

grew. As the number of followers grew, the McBroom financial fortune swelled

sustaining, for now, their insatiable appetite for extravagance; a $10 million house, an

orange Lamborghini, and a Rolls Royce.

2. Capitalizing on the introduction of boxing exhibitions involving social media

celebrities first introduced three years ago, McBroom conceived of Social Gloves:

Battle of the Platforms (the "Event" or "Social Gloves"). Like previous exhibitions, the

event would feature amateur boxing matches. However, Social Gloves event was

designed to drive more followers to the nascent Social Gloves empire.  This event

would pit YouTubers against TikTokers. The key, for McBroom, was to entice event

participants with large number of online followers. In turn, these followers would be

attracted to an event which gave top billing to Austin McBroom. In other words, Austin

**COMPLAINT FOR DAMAGES**

1    McBroom sought to grow his empire on the shoulders of other internet social media

2    personalities.

3        3.    First, to accomplish his scheme, McBroom needed credibility. McBroom

4    engaged Paul Cazers as the Executive Producer-a veteran in the entertainment world

5    specializing in new media, digital/social platforms. McBroom supplemented his team

6    with two entertainment law firms to assist with organizing the Event and negotiating the

7    deals with the Talent; Jason Ziven of Sanders Roberts and Jason Sammataro of Pryer

8    Cashman (collectively, the "SGP's Attorneys").

9

10       4.    As the social media world can be very competitive, McBroom's ability to

11   attract other social media stars would be contingent on his hiding his ownership of this

12   Event from the other social media influencers whose involvement McBroom pursued.

13   The ruse began with McBroom's incorporating a single-purpose limited liability

14   company - Simply Greatness Productions ("SGP"). McBroom and Ziven chose

15   Delaware as the state of incorporation where McBroom could take advantage of the

16   state's anonymity protocols.

17

18       5.    When the other social media stars began to ask questions of SGP, Austin

19   McBroom and the SGP Attorneys had a secondary scheme which they employed.

20   Allen McBroom and Ziven suggested that ownership of the LLC be transferred to

21   Cazers on the day of a significant contract signing. Allen McBroom further suggested

22   that following the execution of the agreement, ownership would then be returned to

23   Austin McBroom. Cazers was stunned by Allen McBroom and Ziven's devious plotting.

24

25

26

27

28

COMPLAINT FOR DAMAGES

In other instances, McBroom and SGP Attorneys would simply forego SGP's executing the Talent Agreements.

6.    Next, it was important to entice an investor to underwrite the cost of producing the Event. This McBroom would accomplish with promises of a large-scale event and a large payday. To do this, Austin McBroom packaged his own Marketing Deck entitled "The Largest PPV Event in History". (Exhibit "1"). In another version of his Marketing Deck, McBroom showed Kevin Hart as the Host for Social Gloves despite McBroom's never approaching Hart, directly, for the project. McBroom knew that Kevin Hart would be out of the country during the Event. (Exhibit 2").

7.    McBroom developed a dazzling mathematical formula based upon social media followers. The equation yielded promises of a combined reach of 393,000,000 million followers and projected gross revenue of $500,000,000.00.

8.    McBroom shopped the Event to potential investors. McBroom landed James Harden and Lil Baby (Co-Investors). The Investors advanced Two Million Dollars ($2,000,000.00) with the promise of being in a "first priorty position" to recoup their hard money and an additional 10% of the Adjusted Gross Revenue.

9.    McBroom would use the same Deck to entice prominent YouTubers and TikTokers. With a Marketing Deck that demonstrated astronomical revenues, if McBroom was going to engage these social media influencers, he would have to tempt them with their own big paydays. In a span of a month, McBroom - behind the veil of SGP and the SGP Attorneys - offered colossal payouts to the social media personalities (the "Talent"). For the Talent's promises to enter the ring for three to six

4

rounds, SGP agreed to pay the Talent as much as Five Million Dollars ($5,000,000.00). In the case of Plaintiff, Jarvis Khattri, SGP offered $1,025,000.00. Relatively small initial payments were paid prior to the Event, with regard to Plaintiff , he was paid $25,000.00 up front. The majority of the "Contingent Compensation" would be paid after the Event. For the Talent who were concerned about getting paid, McBroom had to secretly field requests for "first position and first priority".

10.    The problem for McBroom was that there could only be one "first priority" position. However, as long as each Talent making the request did not know what the other Talent was promised, McBroom could acquiesce to the multiple requests for first position. So, under the cloak of confidentiality provisions in each agreement SGP secretly agreed to "first priority" provisions for at least 3 fighters, it's executive producer, and its primary investor, unbeknownst to Plaintiff.

11.    The one-month spending spree in order to lock up the Talent with exorbitant contracts caused McBroom's business manager, Mark Goodman, to state to McBroom, "You are spending like a "drunken sailor".

12.    McBroom and SGP attempted to land Live Nation to stream the Event. Live Nation ultimately opted to forego participating in the Event. Cazers managed to land LiveXLive with less than 3 months before the Event. As LiveXLive's revenue was transaction based, LiveXLive agreed to act as the livestream partner with the provision that SGP collaborate with LiveXLive on marketing strategies. LiveXLive developed an extensive marketing plan for SGP with the goal of achieving 2.2 million Pay Per View (PPV) sales. The plan, however, required an investment of marketing dollars.

5

COMPLAINT FOR DAMAGES

13.    Austin McBroom refused to heed the recommendation of LiveXLive's marketing team.  McBroom insisted it was sufficient to rely on the power of social media.  In fact, SGP's agreements with the Talent all included the following provision: "Talent shall promote their participation in the Event across Talent's social media channels".  That is, SGP required the Talent to promote an event which gave top-billing to Austin McBroom.

14.    McBroom was warned by two experts that SGP's promotional strategy will not drive ticket purchases.  Jackie Stone, LiveXLive's Chief Marketing Officer, went on record with McBroom warning that his strategy will not generate no more than 200,000 PPV sales.  McBroom pointed to all the "impressions" the Event was generating. Ms. Stone admonished that "impressions" do not equal "conversions".  But McBroom already knew that.  McBroom's goal was to elevate his number of followers - the element which brought him and his family wealth during the last 4 years.

15.    McBroom's business manager, Goodman, also sounded the alarm.  He advised McBroom to cancel the Event because there was little chance that, based upon the numbers at that point in time, the Event would generate sufficient sales to cover the Talent's contracts and other contracts.

16.    On or about April 12, 2021, Cazers left a message the McBrooms later acknowledged by Allen McBroom in a return text: "Hey Bro...You left us a voicemail over the weekend on how concerned you are with us not communicating and that we we're [sic.] making deals with artists and promising all this money that we don't have and that we we're {sic.] pulling a Ponzi scheme".

**COMPLAINT FOR DAMAGES**

17.    Neither Allen McBroom nor Austin McBroom responded substantively to Cazers indictment. McBroom failed to listen to anyone, and had another plan.

18.    The Event did, in fact , proceed.  Plaintiff and the remaining Talent lived up to their end of the bargin.  On June 12, 2021, Plaintiff and the other Talent came to the Event and fought their fights. When the evening concluded, it was announced that the PPV audience was 136,000 - a far cry from the numbers McBroom had touted in his Deck.  Yet, the numbers were consistent with the projections of Ms. Stone.

19.    McBroom then activated the final two components of his plan.  First, McBroom deflected and blamed LiveXLive for lying about the numbers. LiveXLive's accounting was audited by McBroom's consultant, FTI, and validated.  Second, McBroom and SGP retained the legal services of the high-powered bankruptcy attorney, Richard Pachulski of Pachulski, Stang, Ziehl & Jones. On June 21, 2021, Pachulski sent a letter to the Talent stating:

"In light of the apparent underperformance of the Event, our firm has been retained to represent SGP in connection with either a workout of the claims of all its creditors, or, if a workout is not feasible, a likely bankruptcy filing".

20.    While Pachulski was preparing the letter notifying the Talent of the impending cram down or a bankruptcy, McBroom, on June 19, 2021, dropped a new video in which the ACE Family touted the success of Social Gloves and, at the end of the video, McBroom announced part two of the Battle of the Platforms boxing event. Without paying Plaintiff the $1,000,000.00 as required under the Agreement, shockingly Defendants proceeded with Social Gloves 2 on September 10, 2022, at the

7

Bank of California Stadium in Los Angeles California, once again giving top billing to Austin McBroom. (Exhibit 3). It is believed that Defendants had five boxing matches in Social Gloves 2, which included Austin McBroom's brother Landon McBroom and that the fighters/talent in Social Gloves 2 were paid, despite Defendants not paying Plaintiff One Million Dollars ($1,000,000.00) he is due for his participation in Social Gloves 1.

21. Plaintiff JARVIS KHATTRI, is an entertainer and performer, who has over the course of his career, amassed a massive following over social media platforms. Plaintiff has over 13 million followers on the social media platforms, including 6.51 million subscribers on YouTube, 2.9 million followers on TikTok, 2.2 million followers on Instagram, and 707 thousand followers on Twitter. In April 2019, Plaintiff joined FaZeClan ("FaZe"), one of the worlds most prominent and influential gaming organizations with a global fan base of over 510 million combined across social platforms and quickly became one of FaZe's most popular entertainers. Plaintiff is ranked in the top 150 most followed social media entertainers in the United Kingdom, and bringing mass amounts of exposure to any brand or event he promotes.

22. In February 2021, Plaintiff was recruited by SGP to take part in a pay-per-view boxing event, Social Gloves: Battle of the Platforms (the "Event" or "Social Gloves"), to take place at Hard Rock Stadium, in Miami Florida. The Event pitted stars of some of the most-followed accounts on YouTube against some of the most-followed stars of TikTok, and it required Plaintiff and other boxers in the event (the "Talent") to train for the boxing match, market the Event on their own social media channels, and to ultimately participate in the Event. As one of the most-followed performer in the

COMPLAINT FOR DAMAGES

Event, Plaintiff's presence was sought to expand the reach of the Event. Further, Defendants represented to Plaintiff that SGP was fully capitalized to make payment to the Talent.

23. In consideration for Plaintiff's performance in the Event, Plaintiff was promised a total of $1,025,000.00; $25,000 of which was paid as an initial payment for the Event, and the other $1,000,000 guaranteed to be paid upon Plaintiff's participation in the Event. However, despite Plaintiff and the other Talent participating in the event on June 12, 2021, SGP has failed to pay Plaintiff and purportedly failed to pay or paid reduced amounts to other Talent.

24. Instead of working to pay Plaintiff and the other Talent the compensation they are due, SGP has employed a series of tactics sought to allow SGP to shirk it's financial responsibilities, such as employing the services of a premier bankruptcy firm to threaten bankruptcy and to request the Talent not make any demand for payment due to the alleged underperformance of the Event on pay per view.

25. Despite Plaintiff's demand for payment to be made, none has yet come. Some of the other Talent have also enacted litigation, and SGP and LiveXLive had brought actions against one another. All the while evidence has arisen that SGP and Social Gloves was created and managed by Defendant, Austin McBroom, one of the fighters in the Event, and his father Defendant, Allen McBroom, for the sole purpose of avoiding personal liability if the Event underperformed. Further, Defendants McBroom and his father sought to keep their ownership of SGP anonymous by incorporating in the State of Delaware and devising a scheme whereby McBroom would transfer

9

ownership to Paul Cazers-executive producer of the Event-only for the days that SGP executed agreements with the Talent.

26.  Defendants Austin and Allen McBroom were also aware that the Event, which they promoted as likely receiving five to ten million pay-per-view purchases, would likely generate no more than 200,000 sales based on the their marketing strategy, as the LiveXLive Chief Marketing Officer, Jackie Stone, informed them. The McBrooms, however, did not let those projections and warnings slow them from putting on the Event, despite numerous indicators and warnings showing that the earnings would not be sufficient enough to pay the Talent.

27.  Despite these warning signs and red flags the Event proceeded, and ultimately garnered approximately 136,000 pay-per-view purchases, consistent with the projections of Ms. Stone to the McBrooms, but a far cry from the projections of five to ten million that the McBrooms touted to the Talent. These numbers were known to the McBrooms and SGP but ignored. The Defendants McBrooms hoped to build a social media boxing promotion enterprise that was leveraged on the backs of their fellow peers and social media stars. The plan was carried out on the false promises of financial gain to their investors and Talent. As a result, Plaintiff, Jarvis Khattri trained for months with a professional boxing trainer in Las Vegas, Nevada at his own expense, promoted the Event on his social media platforms and put his physical health at risk in a boxing ring, only to find out that Event itself and any promise of compensation was simply a fraud by the Defendants McBrooms for their own financial gain.

**PARTIES**

28.   Plaintiff JARVIS KHATTRI, is a citizen of the United Kingdom of Great Britain and an individual residing inthe County of Los Angeles, State of California.

29.   Defendant SIMPLY GREATNESS PRODUCTIONS, LLC ("SGP"), is a Limited Liability Corporation organized and existing under the laws of the State of Delaware. The Event was run by SGP, which was incorporated in the State of Delaware on December 28, 2020, and thereafter assumed the name Social Gloves.

30.   Defendant AUSTIN MCBROOM, is an individual, who resides in the County of Los Angeles, State of California.

31.   Defendant ALLEN MCBROOM, is an individual, who resides in the County of Los Angeles, State of California.

32.   Plaintiff is ignorant of the true names and capacities, whether corporate, associate, individual or otherwise, of defendants sued herein as Does 1 to 50, inclusive, and Plaintiffs therefore sue said Defendants by such fictitious names.  Each of the Defendants designated herein as Doe is responsible in some manner for the events and happenings herein referred to, and proximately caused the injuries and damages to Plaintiff, in a manner hereinafter alleged.  Plaintiffs will ask leave of court to amend this Complaint to show their true names and capacities when the same have been ascertained.

33.   Defendants, and each of them, were at all times mentioned herein, the agents, servants, employees and/or directors of each of the remaining Defendants, and each of them, and in doing the things hereinafter alleged, were acting within the

11

course and scope of their authority as such agents, servants, employees and/or

directors with the knowledge, permission and/or consent of the remaining Defendants,

and each of them.

## JURISDICTION AND VENUE

34.  This Court has jurisdiction over the subject matter in this action pursuant to

Article VI, Section 10 of the California Constitution, because this case is not given by

statue to other trial courts.

35.  The amount in controversy exceeds the minimum for unlimited civil

jurisdiction of this Court.

36.  This Court has jurisdiction over Defendants because, on information and

belief, they regularly conduct business in the State of California, and this unlawful

conduct toward Plaintiff predominantly occurred and caused harm in the State of

California.

37.  Venue properly lies in this County in that Defendants regularly conduct

business in this County and the conduct and events giving rise to the claims described

herein occurred in this County.  Moreover, a number of the witnesses to the events in

question reside or regularly transact business in this County, and relevant evidence is

believed to be located in ths County as well.

## FACTUAL ALLEGATIONS

38.  Social Gloves was an amateur boxing exhibition featuring various YouTube

and TikTok celebrities.  The main event was between YouTube celebrity Defendant

Austin McBroom and TikTok celebrity Bryce Hall. The undercard included a bout

12

between YouTube celebrity and Plaintiff Jarvis Khattri (YouTube name "FaZe Jarvis")

and TikToker Michael Le. The Event took place on June 12, 2021, at Hard Rock

Stadium in Miami Gardens, Florida.

39.    The event was organized by SGP and its principal members, Austin

McBroom and Allen McBroom with the assistance of Jason Ziven of Sanders Roberts

LLP. Paul Cazers was the Executive Producer of Social Gloves.

40.    On or about February 2021, Austin McBroom approached Plaintiff and his

representatives to participate in the Event. Subsequent meetings were held between

Plaintiff and his representatives with Austin McBroom, Allen McBroom, Paul Cazers,

and Jason Ziven regarding both the amount Plaintiff would be compensated for in

participating in the Event and the agreed to pre-fight promotion of the Event that

Plaintiff would provide on his various social media platforms.

41.    Plaintiff, Jarvis Khattri is an social media personality and entertainer best

known for his videos on YouTube. Plaintiff is one of the platforms' most- followed

members with over 6.51 million followers.

42.  Defendants Austin McBroom and SGP represented to Plaintiff, through

promotional materials, including a slide deck and verbal representations, that the Event

would garner at least 5 million pay-per-view buyers and that the Event would generate

more than $500 million. In order to get to the lofty number, Austin McBroom stated

"We are marketing like crazy." On another occasion prior to Plaintiff agreeing to

participate in the Event, Austin McBroom said "I am going to promote like a

motherf**ker." Austin McBroom further stated "We will fully leverage the Ace Family

13

COMPLAINT FOR DAMAGES

YouTube channel." Catherine McBroom (Austin McBroom's wife) was also going to promote the Event on Instagram and Snapchat. Austin McBroom's whole power as a marketer was his YouTube channel; but he only did one video.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Breach of Contract

### (By Jarvis Khattri against SGP only)

43. Plaintiff hereby incorporates by reference all preceding allegations as through fully set forth herein.

44. On or about March 4, 2021, SGP, FaZe and Plaintiff entered into a written agreement for the services of Plaintiff (the "Agreement"). Pursuant to the Agreement Plaintiff was to participate in the boxing match and promote his participation in the Event across Plaintiff's social media channels. FaZe agreed to to have members of FaZe Clan to provide marketing services on various social media platforms. SGP agreed to pay Plaintiff twenty-five thousand dollars ($25,000.00) as a initial payment within five (5) business days of the execution of the Agreement. Further, SGP agreed to pay Plaintiff one million dollars ($1,000,000.00) provided that Plaintiff participate in the Event . Further, at the time of entering into the Agreement, Defendants represented that SGP was fully capitalized to make payment to the Talent. (A copy of the Agreement is attached hereto as Exhibit 4).

45. On September 15, 2022, FaZe and Plaintiff entered into an Assignment of Agreement (the "Assignment") . Pursuant to the Assignment, FaZe agreed to assign to Plaintiff all its interests, rights and benefits held by FaZe in the Agreement.

1    Accordingly, Plaintiff assumed all of FaZe's interests, rights and benefits remaining in

2    the Agreement. (A redacted copy of the Assignment is attached hereto as Exhibit 5).

3         46.    Upon information and belief, SGP received the notice of revenues from

4    LiveXLive no later than June 21, 2021, when SGP sent letters to members of the

5    Talent notifying them of poor pay-per-view numbers and notifying Talent it would be

6

7    holding on to all distributions of revenues indefinitely.

8         47.    Plaintiff fully performed his part of the Agreement by participating in the

9    Social Gloves boxing exhibition on June 12, 2021, and fighting against TikToker

10   Michael Le at the Event as well as promoting the Event across his social media

11   channels. Further, FaZe fully performed it's duties under the Agreement by having

12   various members promote the Event on various social media platforms.

13

14        48.    Defendant SGP, has breached the Agreement by failing to pay Plaintiff the

15   $1,000,000.00 agreed to for the services of Plaintiff at the Event and remaining on the

16   Agreement.

17

18        49.    Plaintiff has performed all conditions, covenants, and promises in

19   accordance with the terms and conditions of the Agreement except for those which

20   Defendant SGP prevented Plaintiff from performing or which were waived by

21   Defendant SGP, or which were excused by SGP's breach and other misconduct.

22        50.    At all times pertinent hereto, Defendants Austin McBroom and Allen

23   McBroom,  were the agents of SGP; as such, Defendant SGP is vicariously liable for

24   their actions occurring within the course and scope of their agency, which includes the

25

26   misrepresentation regarding the capitalization of SGP.  Therefore, SGP's

27                                    15

28   _____
                    COMPLAINT FOR DAMAGES

undercapitalization makes Defendants Austin McBroom and Allen McBroom personally liable.

51.   As a direct and proximate result of Defendant SGP's continuous and willful breaches, Plaintiff has suffered an extreme financial loss in the amount of at least $1,000,000.00, or in an amount according to proof at the time of trial.

## SECOND CAUSE OF ACTION

### Breach of the Implied Covenant of Good Faith and Fair Dealing

### (By Jarvis Khattri against SGP only)

52.   Plaintiff hereby incorporates by reference all preceding allegations as through fully set forth herein.

53.   Implied in every contract is a covenant of good faith and fair dealing that neither party will engage in any act or omission that is intended or has the natural tendency to deprive the other party of the full benefits of its bargain.  This covenant is implied into the Agreement between SGP and Plaintiff. This covenant imposes upon SGP a duty not to engage in acts or omissions that would frustrate the enjoyment of Plaintiff of any of the rights and benefits owned or reasonably expected under their respective agreements.

54.   By virtue of the relationship between Plaintiff and SGP, Plaintiff placed trust and confidence in SGP to perform all the duties and obligations owed and reasonably expected pursuant to the terms of the Agreement. Plaintiff placed the trust and confidence in SGP to honor the implied covenant to act in good faith and not to take any action which would unduly or unreasonably impair or harm any rights or benefits

1    owed or reasonably expected under the Agreement.

2        55.   Despite Plaintiff's contract including numerous representation by Defendants,

3    Plaintiff is informed and believes that SGP secretly contracted with multiple other

4    members of the Talent for "first position and first priority" in the payments made to

5

6    Talent.

7        56.   Plaintiff is informed and believes that such priority provisions were offered by

8    SGP to Austin McBroom, Bryce Hall, and Tayler Holder of the Talent. Plaintiff is further

9    informed and believes that Paul Cazers, as well as SGP Co-Investors James Harden

10   and Dominique Jones ("Lil Baby") also had positions of "first priority." SGP was aware

11   of these various and successive agreements yet intentionally withheld the existence of

12

13   these priorty positions from Plaintiff.

14       57.   Plaintiff is informed and believes that some of these "priority payments" have

15   been made by SGP or its agents to at least one of the Talent.

16       58.   SGP has breached the implied covenant of good faith and fair dealing and

17   denied Plaintiff the rights and benefits to which he is entitled or reasonably expected

18

19   under the Agreement by engaging in the aforementioned conduct.  By permitting and

20   conspiring with Defendants to allow for multiple parties gain "first position" and

21   concealing these dealings, SGP has frustrated the purpose of the payment provision of

22   the Agreement.  SGP has prevented Plaintiff from receiving the benefits reasonably

23   expected under their respective agreement, including payment for his services

24

25   contemplated in the Agreement in the amount of  $1,000,000.00.

26       59.   Plaintiff is informed and believes and thereon alleges that SGP pursued this

27                                                    17

28   _____
                         **COMPLAINT FOR DAMAGES**

course of conduct in bad faith and with the intent and knowledge that it would interfere with, injure and frustrate the enjoyment of the benefits and rights conferred upon Plaintiff pursuant to the terms of the Agreement.

60.   Even if and to the extent that SGP's conduct did not constitute a breach of the express contractual terms in the Agreement, SGP's conduct as alleged herein has unfairly frustrated the agreed common purposes of the Agreement and has disappointed the reasonable expectations of Plaintiff, and deprived Plaintiff of the benefits reasonably expected under the Agreement.

61.   As a direct and proximate result of the breaches of the covenant of good faith and fair dealing inherent in the Agreement, Plaintiff has sustained damages in an amount of at least $1,000,000.00 or in an amount according to proof at the time of trial.

## THIRD CAUSE OF ACTION

### Fraud

### (By Jarvis Khattri Against All Defendants)

62.   Plaintiff hereby incorporates by reference all preceding allegations as through fully set forth herein.

### A. Misrepresentation No. 1: That Plaintiff Would Be Paid For The Event

63.   On or about March 4, 2021, Defendants and each of them misrepresented to Plaintiff that Plaintiff would be paid for his services if he performed in the Event regardless of any revenue being collected. Defendants assured Plaintiff payment could be made to Plaintiff and agreed to pay Plaintiff the full payment of compensation of $1,000,000.00.  SGP was obligated to make full payment to Plaintiff within 15 days

18

COMPLAINT FOR DAMAGES

1    after LiveXLive provides SGP notice of revenues.

2        64. This representation was not true. At the time, SGP was not sufficiently

3    capitalized to make such a representation that guaranteed payment regardless of the

4

5    outcome of the event. Further, Defendants were at the time aware of low pay-per-view

6    projections.

7      **B.  Misrepresentation No. 2: Intentionally Concealing That Priority Positions**

8            **For Payment Were Promised To Other Talent**

9        65. On or about March 4, 2021, Defendants, and each of them, were aware that

10

11    SGP had agreed to multiple priority and first position promises with multiple other

12    Talent, producers, or investors. Defendants concealed this information from Plaintiff,

13    along with projections of low pay-per-view numbers, and the recommendations made

14    to Defendants to cancel the Event because of the probable low performance.

15      **C. Misrepresentation No. 3: Defendants Misrepresented That Paul Cazers**

16   **Was The Single Owner of SGP; and Concealed that Austin McBroom Was The**

17

18   **Sole Member of SGP**

19        66. On or about March 4, 2021, Defendants and each of them concealed from

20    Plaintiff that Defendant, Austin McBroom was the single member owner of SGP, LLP.

21    Defendants further misrepresented to Plaintiff that Paul Cazers was the owner and

22    manager of SPG.

23

24        67. The truth is that Paul Cazers is not now nor has he ever been a member of

25    the SGP limited liability company. Rather, SGP is owned by Defendant Austin

26    McBroom. Allen McBroom and the attorneys for SGP devised a fraudulent scheme to

27 19

28 COMPLAINT FOR DAMAGES

hide from the Talent, Austin McBroom's ownership of SGP. The scheme entailed removing Austin McBroom from his membership position with the LLC on the day of SGP's execution and then returning Austin McBroom back to his ownership position immediately following the signing date.

68. Defendants further perpetuated this fraud by not returning to Plaintiff a signed Agreement which would have reflected Austin McBroom as the sole member of SGP.

## D.  Misrepresentation No. 4: Defendants Misrepresented That SGP would Extensively Market The Event

69. On or about March 4, 2021, Defendants Austin McBroom, Allen McBroom and each of them, misrepresented to Plaintiff and representatives that SGP intended to extensively promote the Event. The truth is, Defendants failed to market the Event, other than one video.

## E.  Misrepresentation No. 5: Defendants Misrepresented That The Florida Athletic Commission Sanctioned The Event

70. Defendants, Austin McBroom, Allen McBroom and each of them represented to Plaintiff that the Florida Athletic Commission has sanctioned the amateur boxing exhibition.

71. The truth is that the Florida Athletic Commission did not sanction the Event.

72. Defendants  Austin McBroom, Allen McBroom, SGP and each of them, intended to induce Plaintiff to rely on their misrepresentations.

73.  Plaintiff relied upon the representations of Defendants.  Plaintiff's reliance on Defendants' representations was justified and reasonable.

74.  Defendants  Austin McBroom, Allen McBroom, SGP and each of them, knew they would be unlikely to perform on the payment provisions of their Agreement, and still allowed the Event to take place on June 12, 2021.  Their actions constitute a fraudulent inducement.

75.  As a proximate result of the fraudulent conduct of the Defendants as herein alleged , Plaintiff was induced to enter into the Agreement and to participate in the Event. Further, Plaintiff was induced to take only $25,000.00 as an initial payment.

76.  At the time Defendants made the above promises and representations to Plaintiff, they had no intention of ever performing them and were made falsely and fraudulently with the intent to deceive, defraud, mislead and induce Plaintiff to enter into the Agreement and to participate in the Event.

77.  In justifiable reliance on said promises and representations by Defendants Plaintiff entered into the Agreement and participated in the Event. If Plaintiff would have known the actual intentions of Defendants to not pay Plaintiff for participating in the Event, Plaintiff  would not have entered into the Agreement.

78.  As a direct result of the false representations by Defendants, Plaintiff has suffered damages in an amount of at least $1,000,000.00 or in an amount according to proof at the time of trial.

79. The aforementioned conduct of the Defendants was an intentional misrepresentation, deceit, or concealment of material facts known to Defendants with

COMPLAINT FOR DAMAGES

the intention on the part of the Defendants of thereby depriving Plaintiff of property and

legal rights otherwise causing injury, and this despicable conduct subjected the

Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights.

Defendants and have acted with malice, fraud, and/or oppression and Plaintiff is

therefore entitled to punitive and/or exemplary damages in an amount to be

determined at the time of trial.

## FOURTH CAUSE OF ACTION

### Negligent Misrepresentation

### (By Jarvis Khattri Against All Defendants)

80.   Plaintiff hereby incorporates by reference all preceding allegations as through

fully set forth herein.

81.   Defendants represented certain facts as true:

(A)  Plaintiff would be paid if he performed in the Event, and his pay was not

contingent on any receipt of revenues from the Event;

(B)  Plaintiff would be paid for performing in the Event whether or not SGP

made any money from the Event;

(C)  Paul Cazers was a single member of the SGP limited liability company

and thus, concealed that Defendant Austin McBroom was the owner of SGP;

(D)  The Florida Athletic Commission sanctioned the Event; and

(E)   SGP would be extensively marketing the Event.

82.   These representations were false. Defendants made these representations

22

knowing the falsity of the representations and made them with the intent to induce Plaintiff to perform under the Agreement.

83.    Defendants had no reasonable grounds for believing their representations were true when they were made.

84.    Defendants intended that Plaintiff rely on these representations to induce Plaintiff to contract for his services, and to induce Plaintiff to fight in the Social Gloves Event.

85.    Plaintiff reasonably and justifiable relied on Defendants' representations.

86.    Plaintiff was harmed as a result of his reliance on Defendants' misrepresentations.

87.    Plaintiff's reliance on Defendants' representations was a substantial factor in causing him harm.

88.    As a direct result of the misrepresentations by Defendants, Plaintiff has incurred monetary and other damages in an amount of at least $1,000,000.00 or in an amount according to proof at the time of trial.

## FIFTH CAUSE OF ACTION

### Intentional Interference with Contractual Relations

### (By Jarvis Khattri Against Austin McBroom & Allen McBroom)

89.    Plaintiff hereby incorporates by reference all preceding allegations as through fully set forth herein.

90.    Ziven, Sanders Roberts, Sammataro, Pryor Cashman, Austin McBroom and

1  Allen McBroom knew of SGP's first priority positions provided to other Talent and
2  investors and  intentionally concealed and withheld such information from Plaintiff in
3  inducing him to execute the Agreement.
4
5      91.   Austin McBroom's self serving conduct prevented performance or made
6  performance of Plaintiff's Agreement more risky.  Austin McBroom was informed and
7  aware that Brycehallbiz would not agree to lend out the services of Bryce Hall unless
8  it was given priority and a Letter of Direction. Austin McBroom believed that he would
9  reap greater financial benefits with Bryce Hall's participation in the Event and was
10  willing to undercut the contractual obligations previously agreed to with Plaintiff.
11
12     92.   Defendants intended to disrupt the performance of the Plaintiff's Agreement
13  or knew that disruption of performance was certain or substantially certain to occur.
14     93.   As a direct result of the intentional acts by Defendants, Plaintiff has
15  suffered damages in an amount of at least $1,000,000.00 or in an amount according to
16  proof at the time of trial.
17
18     94. The aforementioned conduct of the Defendants was an intentional
19  misrepresentation, deceit, or concealment of material facts known to Defendants with
20  the intention on the part of the Defendants of thereby depriving Plaintiff of property and
21  legal rights otherwise causing injury, and this despicable conduct subjected the
22  Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights.
23  Defendants and have acted with malice, fraud, and/or oppression and Plaintiff is
24  therefore entitled to punitive and/or exemplary damages in an amount to be
25  determined at the time of trial.
26
27                                    24
28  _____
                    COMPLAINT FOR DAMAGES

## SIXTH CAUSE OF ACTION

### Civil Conspiracy

### (By Jarvis Khattri Against All Defendants)

95.    Plaintiff hereby incorporates by reference all preceding allegations as through fully set forth herein.

96.    From March through June 2021, Defendants and other nonparties and each of them knowingly and willfully conspired and agreed among themselves to fraudulently induce Plaintiff to participate in a boxing match.

97.    In order to secure the engagement of Plaintiff, Defendants conspired to conceal the true ownership of SGP, concealed promises of priority, withheld adequate event marketing, and misrepresented Defendants' engagement with the Florida Athletic Commission.

98.    As a direct result of the intentional acts by Defendants, Plaintiff has suffered damages in an amount of at least $1,000,000.00 or in an amount according to proof at the time of trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against the Defendants and each of them, as follows:

1.    For monetary damages in an amount of at least $1,000,000.00 or in an amount according proof at the time of trial;

25

2. For punitive and exemplary damages, according to proof at trial;

3. For pre-judgment interest allowable by law;

4. For costs of suit allowable by law; and

5. For such further relief as the Court may deem just and proper.

DATED: December 2, 2022                    GALEN & DAVIS LLP

                                           By: _____
                                           Jeffrey M. Galen, Esq.
                                           Attorneys for Plaintiff
                                           JARVIS KHATTRI

COMPLAINT FOR DAMAGES

# EXHIBIT C

DocuSign Envelope ID: 114BE470-887E-4E68-AC05-2AC59D528991

AGREEMENT

This agreement ("Agreement") is made and entered into as of March 4, 2021 ("Effective Date"), by and between Simply Greatness Productions ("SGP"), a Delaware LLC, and FaZe Clan Inc. ("Faze") f/s/o Jarvis Khattri p/k/a Faze Jarvis ("Talent") with respect to Talent's Boxing and Publicity services in connection with the live pay per view exhibition boxing event (the "Event"), and marketing services by members of Faze Clan.

1. <u>Grant of Rights</u>. Faze shall cause Talent to hereby grant to SGP the right to require Talent to render reasonable amateur exhibition boxing entertainment and publicity services (collectively referred to herein as the "Services") solely in connection with the Event and to use the results and proceeds of Talent's Services therefrom, including but not limited to all commercial media rights, streaming rights, rights in connection with the advertising and publicity, and the right to commercially exploit any and all such right in perpetuity and throughout the universe, all as more specifically set forth herein. SGP shall at all times use reasonable efforts to portray Talent in a favorable light. For the avoidance of doubt, all copyrights, design rights, patents, trademarks, trade secrets, and other intellectual property and proprietary rights (i) in FaZe Clan, Talent and/or other members shall be and remain the sole and exclusive property of FaZe Clan and/or Talent, and (ii) in SGP's logos and trademarks shall be and remain the sole and exclusive property of SGP. The parties hereby acknowledge and agree that, except as otherwise set forth explicitly herein, all intellectual property rights in and to any photos, videos, social media posts and similar digital and promotional content created, conceived or developed in whole or in part by FaZe Clan, Talent, or other members of FaZe Clan in connection with its activities under this Agreement and Addendum A shall be owned by FaZe Clan. SGP assumes all liability in connection with the Event and releases FaZe Clan from any and all liability in connection therewith.

2. <u>Date</u>. The Event will be held in May or June of 2021, subject to Events of Force Majeure (described below). The Event shall not occur prior to May 2021. If the Event is cancelled for Force Majeure, the Event will be rescheduled within three (3) months of the original Event date.

3. <u>Services</u>.

    a. Faze shall cause Talent to commence the Services by participating in a boxing match against a competitor to be mutually agreed upon between the parties. The competitor shall be Michael Le. In the event there is a required substitution, Talent has agreed to fight a replacement, subject to approval of the replacement by Talent, with any proposed replacement to be of a similar level of size, stature and boxing experience. Talent shall not unreasonably withhold approval.

    Each round will last approximately two-three minutes. Talent shall prepare for the Event in a manner in line with industry standard for an amateur boxing exhibition. Talent shall make reasonable efforts to

DocuSign Envelope ID: 114BE470-887E-4E68-AC05-2AC59D52899T

comply with all reasonable directions, rules and regulations of SGP in connection with such Services.

b. Marketing Services. Faze shall cause members of FaZe Clan to provide marketing services in Addendum A (the "Marketing Services").

4. Compensation. SGP agrees to pay Faze, and Faze agrees to accept, as full and complete compensation for all rights granted herein and all undertakings and services:

    a. Initial Payment. SGP shall pay Faze Twenty-Five Thousand Dollars USD ($25,000) within five business days upon Faze's execution of Agreement. Notwithstanding, Talent must submit an invoice to SGP.

    b. Contingent Compensation. Provided that Talent participates in Event and is not in uncured material breach of the Agreement and Faze fully completes the Marketing Services, SGP shall pay Talent an amount equal One Million USD ($1,000,000) ("Contingent Compensation").

All payments due to Faze hereunder shall be made to FaZe Clan Inc. by domestic wire transfer using payment instructions to be provided by FaZe Clan's Chief Financial Officer (amit.bajaj@fazeclan.com). SGP's billing contact is as follows: Name: Gelfand Rehnert & Feldman Attn: Mark Goodman; Email: mgoodman@grfllp.com; Address: 1800 Century Park East #1600 Los Angeles, CA 90067; Phone: (310) 556-6658.

SGP shall pay Talent within fifteen (15) business days of Producer's receipt of revenue from streaming partner. Notwithstanding, Talent must submit an invoice to SGP.

If SGP cancels Event for any other reason, aside from a reason listed below in section 12, then SGP will pay talent Two Hundred Thousand USD ($200,000) within ten days of notifying Talent of the cancelation.

SGP shall provide Talent with at least thirty-five (35) tickets to the Event for Talent's guests.

5. Promotion. Talent shall promote his participation in the Event across Talent's social media channels, including but not limited to Instagram, YouTube, Twitter, and TikTok. Talent shall have full creative approval over the post and caption, as applicable. Specific promotions shall be negotiated in good faith but shall not be less than the below:

    a. Twitter.

        i. Talent shall post a minimum of three (3) static tweets ("Tweet") in connection with (i) the announcement of the fight card; (ii) any pre-sale date of the fight; (iii) promotion of Event within the last

2

DocuSign Envelope ID: 114BE470-887E-4E68-AC05-2AC59D528991

> week and date of the fight. Talent may not remove the post for at
> least five business days after the completion of Event.
>
> ii. Each Tweet shall include the image of the official fight poster and
> the link to purchase tickets to the stream.
>
> iii. Talent shall pin the first two Tweets for a minimum of five (5)
> days.
>
> b. Instagram.
>
>   i. Talent shall post a minimum of three (3) static posts in connection
>   with (i) the announcement of the fight card; (ii) any pre-sale date
>   of the fight; (iii) promotion of Event within the last week and date
>   of the fight. Talent may not remove the post for at least five
>   business days after the completion of Event.
>
>   ii. Talent must simultaneously publish at least two (2) Instagram
>   stories in promotion of Event in conjunction with each of the three
>   static Instagram posts referenced above. The stories must include a
>   swipe up link to the Event, provided to Talent by SGP. Thus,
>   Talent must publish at least six (6)
>
> c. YouTube. Talent must publish three (3) separate YouTube videos that
> promotes the Event with an integration that lasts a minimum of sixty (60)
> seconds within the first two minutes of the respective video. The
> promotional videos should correspond to: (i) the announcement of the
> fight card; (ii) any pre-sale date of the fight; (iii) the week before the
> Event.
>
> d. Tik Tok. Talent must publish at least one promotion video on Tik Tok
> that includes a call to action to buy streams to the Event.
>
> e. Talent represents and warrants that they shall at all times comply with all
> required FTC regulations with respect to social media post.
>
> f. Talent shall provide a reasonable amount of approved audio and visual
> materials to be used in conjunction with promotion of Event.
>
> g. Talent's social media posts in promotion of Event are defined as "Social
> Media Posts."

6. **Photoshoot**. Talent agrees to participate in a photoshoot lasting at least two (2) days. For clarity, each day shall be no longer than eight (8) hours. SGP shall arrange and directly pay for Talent's ground transportation within Southern California to and from the photoshoot, as well as a reasonable per diem to cover Talent's meals.

7. **Name and Likeness**. During the Term, SGP shall have the right, solely in connection with Event, to use Talent's name, approved nickname, approved biographical information, approved image and approved likeness and Social Media Posts solely in the form originally posted by Talent, in the following media, manner and formats: (i) via any websites, e-mail and digital and social media channels, owned or operated by SGP or by any production partner (including via paid media), (ii) in print media, (iii) for public relation, marketing and publicity purposes via any and all media and formats throughout the universe.

3

DocuSign Envelope ID: 114BE470-887E-4E68-AC05-2AC59D528991

If Talent objects to any of the aforementioned uses, SGP shall work with Talent in good faith to resolve such objection. SGP has the non-exclusive right to record Talent as part of content produced in conjunction with the Event such as behind the scenes footage and/or documentary and/or docu-series to be used solely in connection with the commercial exploitation, marketing and promotion of the Event, subject to Talent's prior written approval in each instance. SGP shall at all times use reasonable efforts to portray Talent in a favorable light. For the avoidance of doubt, SGP may use "FaZe Jarvis" solely in connection with the Event, but no license shall be granted to FaZe Clan's intellectual property, including without limitation the use of the word "FaZe," the words "FaZe Clan" or the FaZe Clan logo without FaZe Clan's prior written approval.

8. <u>Exclusivity</u>. Talent shall not participate in any exhibition boxing match "Competitive Event" from the Effective Date until six months after the Event.

9. <u>Option</u>. SGP will have the option to contract Talent to participate in a derivative event within twelve months following the Event, subject to good faith negotiations.

10. <u>Further documents</u>. Talent agrees to execute any and all other documents and perform any and all acts and deeds reasonably necessary to carry out Talent's obligations under the Agreement.

11. <u>Insurance</u>. SGP shall, at no cost to FaZe Clan, maintain the following minimum insurance in full force and effect throughout the Term, naming both FaZe Clan and Talent as additional insureds on the policies: public liability and general liability insurance (either in combined form or in separate policies), including coverage for bodily injury, claims by one insured against another insured, and SGP's defense and indemnity obligations under the Agreement, with coverage of not less than $2,000,000 USD combined single limit per occurrence and $2,000,000 USD annual aggregate; and errors and omission insurance in line with industry standard.

12. <u>Suspension and Termination</u>. SGP shall have the right to suspend and/or terminate its obligations for Talent's incapacity, default, or the occurrence of a force majeure event (defined below).

Default shall include (i) Talent's uncured material breach (after receiving written or e-mail notification per section 19(f) below and failing to cure within seventy-two hours); (ii) Talent's inability to be insured to SGP's reasonable satisfaction; (iii) Talent being charged with a crime involving moral turpitude in SGP reasonable determination that adversely affects Event; or (iv) Talent's actions (including publication or declaration of a statement) that may reasonably be considered immoral, scandalous and/or obscene; and such action damages or otherwise negatively affects the Event's reputation.

Force Majeure. An event of "Force Majeure" shall exist hereunder if Event is impaired, hampered, interrupted, prevented, suspended, postponed or

4

DocuSign Envelope ID: 114BE470-887E-4E68-AC05-2AC59D52699T

discontinued by reason of any war or armed conflict, public health crisis, act of a public enemy, riot, civil disturbance, epidemic, fire, casualty, flood, explosion, earthquake, boycott, labor controversy, governmental statute, law, act of God.

13. <u>Remedies</u>. If Faze is in uncured material breach of any of the material marketing obligations, then Faze's compensation will be reduced by twenty percent (20%) percent (after receiving written or e-mail notification per section 20(f) below and failing to cure within seventy-two hours), pro-rata. Faze acknowledges that the rights granted hereunder and Talent services hereunder are unique and

5

DocuSign Envelope ID: 114BE470-887E-4E68-AC05-2AC59D526991

extraordinary, SGP therefore would be entitled to all available equitable remedies in case of breach or threatened breach of Agreement by Talent. Any remedies, rights, and obligations contained in this Agreement shall be cumulative and none of them shall be in limitation of any other remedy, rights, undertaking, or obligation of either party. **HOWEVER, NO BREACH OF THIS AGREEMENT BY TALENT SHALL ENTITLE TALENT TO TERMINATE OR RESCIND ANY OF THE RIGHTS GRANTED TO SGP HEREIN, AND IN THE EVENT OF ANY QUESTION OF SGP'S PERFORMANCE OF ITS OBLIGATION HEREUNDER, TALENT HEREBY WAIVES THE RIGHT, IN THE EVENT OF ANY SUCH BREACH, TO EQUITABLE RELIEF OR TO ENJOIN, RESTRAIN OR INTERFERE WITH THE EXHIBITION OF EVENT OR THE EXERCISE OF ANY OF THE GRANTED RIGHTS, IT BEING TALENT'S UNDERSTANDING THAT THE SOLE REMEDY SHALL BE THE RIGHT TO RECOVER MONETARY DAMAGES WITH RESPECT ONLY TO THE ACTUAL HARM CAUSED BY ANY SUCH BREACH. IN ANY EVENT, NEITHER PARTY WILL BE LIABLE TO THE OTHER FOR CONSEQUENTIAL, INCIDENTAL PUNITIVE OR SPECIAL DAMAGES, OR DAMAGES FOR LOST PROFITS OR LOSS OF BUSINESS OPPORTUNITIES. Notwithstanding the foregoing, either party may bring an action or suit seeking injunctive relief to protect its intellectual property rights in any court having jurisdiction. Notwithstanding anything to the contrary contained herein, FaZe Clan's aggregate liability under this Agreement shall under no circumstances exceed the payments which Talent received or is entitled to receive under this Agreement.**

14. Representations and Warranties. Each party hereby represents and warrants that
    a. It has full right, power and authority to enter into and fully perform this Agreement and no third party's consent is required;
    b. the execution and delivery of the Agreement and the performance of its obligations hereunder will not constitute a breach or default of or otherwise violate any agreement to which such party or any of its affiliates are a party;
    c. The content it provides under this Agreement does not infringe or violate the rights of any third party;
    d. It will not use any images or marks to which it does not have the rights;
    e. It will comply with all applicable ordinances, codes, standards, laws, rules, regulations, and orders of any governmental authority having jurisdiction in its performance under this Agreement.

15. Indemnification. Each party will indemnify, defend, and hold harmless the other and each of its officers, directors, owners, shareholders, representatives, officials, employees, agents, subsidiaries, affiliates, successors and assigns, harmless from any and all claims, damages, losses, liabilities, actions, judgments, costs and expenses (including reasonable attorneys' fees) brought by the other party or a third party arising out of or in connection with indemnifying party's breach or claimed breach of its representations, warranties, or covenants hereunder.

6

DocuSign Envelope ID: 114BE470-887E-4E68-AC05-2AC59D528991

16. <u>Relationship of Parties</u>. Nothing contained herein shall constitute a partnership between or by the Parties hereto.

DocuSign Envelope ID: 114BE470-887E-4E68-AC05-2AC59D52899T

17. <u>Confidentiality</u>. This Agreement shall be deemed confidential in its entirety and no publication, distribution or dissemination of any kind shall be permitted, except upon the express prior and written consent of both parties, to any other individuals outside of the immediate parties to this contract, their attorneys, agents and authorized representatives. Notwithstanding the foregoing, the terms of this Agreement may be disclosed subject to any requirement by a judicial process, from a court of competent jurisdiction or otherwise as a matter of law, pursuant to a mutually agreeable press release, or in connection with a proposed merger (of any kind), any debt or equity financing, in connection with a public offering of shares or sale of such party's business.

18. <u>Governing Law; Dispute</u>. This Agreement shall be governed by under the laws of California, without reference to conflicts of law principles. Any dispute, claim or controversy arising out of or relating to this Agreement shall be determined by confidential and binding arbitration in Los Angeles, California, before a single neutral arbitrator who shall be a retired state or federal jurist. The arbitration shall be administered by JAMS pursuant to its Streamlined Arbitration Rules and Procedures. Judgment on the Award may be entered in any court having jurisdiction. The arbitrator(s) are not empowered to award punitive or exemplary damages, and the parties waive any right to recover any such damages.

19. Miscellaneous
    a. <u>Entire Agreement</u>. This Agreement constitutes the complete agreement of the parties with respect to the subject matter hereof, and this Agreement supersedes and replaces any or all prior or contemporaneous negotiations, promises, covenants, representation and agreement of every kind or nature whatsoever with respect thereto, retroactive to the inception thereof, all of which have become merged and finally integrated into this Agreement.
    b. <u>Waiver and Amendment</u>. No modification, amendment, or waiver of any provision of this Agreement will be effective unless such amendment or waiver is made in writing and signed by authorized representatives of both Parties.
    c. <u>Partial Invalidity</u>. If any provision of this Agreement is held be invalid, illegal or unenforceable, then the validity, legality and enforceability of all of the other provisions of the Agreement shall remain in full force and effect.
    d. <u>Assignability</u>. Neither party may not assign this Agreement or its rights hereunder in whole or in part.
    e. <u>Counterparts</u>. This Agreement may be executed in one or counterparts, each of which shall be deemed to be an original and, which taken together, shall be deemed to constitute one and the same agreement.
    f. <u>Notices</u>. All notices to Talent shall be sent to Talent, with a copy to Talent's manager (Jordan.galen@fazeclan.com) and FaZe Clan Business and Legal Affairs (Erika.georgiou@fazeclan.com).

8

DocuSign Envelope ID: 114BE470-887E-4E68-AC05-2AC59D528991

[SIGNATURE TO FOLLOW]

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the day and year first written above.

FAZE

By: _Erika Georgiou_____

Name: __Erika Georgiou_____

Date: __3/8/2021_____

SGP, LLC

By: _____

Name: ___Paul Cazers_____

Date: ___3/10/2021_____

TALENT

By: _Jarvis Khattri_____

Name: __Jarvis Khattri_____

Date: _3/8/2021_____

9

DocuSign Envelope ID: 114BE470-887E-4E68-AC05-2AC59D528991

Addendum A

Faze shall cause the below talent to promote the Event:

Faze Kay
    a. Instagram.
            i. Talent shall post the fight flier on Talent's static Instagram feed at least five days before Event. Talent shall not remove the post for a minimum of Three (3) days after the Event.
           ii. Talent must simultaneously publish at least three (3) Instagram stories in promotion of Event in conjunction with Talent's static post. Each story must include a swipe up link to the Event, provided to Faze by SGP.
    b. Twitter. Talent shall post a minimum of one Tweet at least five (5) days before Event that includes the image of the official fight poster and the link to purchase tickets to the stream. Talent shall pin the Tweet for a minimum of forty-eight hours before Event.
    c. YouTube. Talent must publish at least two (2) separate YouTube videos that promotes the Event with an integration that lasts a minimum of sixty (60) seconds within the first two minutes of the respective video. The promotional videos should correspond to: (i) the announcement of the fight card; (ii) any pre-sale date of the fight; or (iii) the week before the Event.
    d. Tik Tok. Talent must publish at least one promotion video on Tik Tok that includes a call to action to buy streams to the Event.

Faze Adapt
    a. Faze shall cause Faze Adapt to publish the official fight flier one (1) time as an Instagram story with a swipe up link and call to action to purchase streams, and one (1) Instagram story with a swipe up link and call to action to purchase streams, creative content of story per Talent's discretion. For avoidance of doubt, Faze will cause Faze Adapt to publish two (2) Instagram Stories in promotion of Event.

Additional Faze Talent
    b. Faze shall cause eight (8) additional FaZe Clan talent to publish the official fight flier as an Instagram story with a swipe up link and call to action to purchase streams within five days of the Event.

FAZE represents and warrants that talent shall at all times comply with all required FTC regulations with respect to social media post.

1

DocuSign Envelope ID: 114BE470-887E-4E68-AC09-2AC59D52899T

FAZE                                           SGP, LLC

By  *Erika Georgiou*                           By:_____

Name:  Erika Georgiou                          Name: _____

Date:  3/8/2021                                Date:_____

1

# EXHIBIT D

DocuSign Envelope ID: 7A0E9FFA-BF34-4987-B96D-ECCACB85EB15

## CONFIDENTIAL SETTLEMENT AGREEMENT AND MUTUAL GENERAL RELEASE

This Confidential Settlement Agreement and Release ("Settlement Agreement"), effective as of June __, 2022 ("Effective Date"), is entered into between Simply Greatness Productions, LLC ("SGP"), on the one hand, and Jarvis Khattri *p/k/a* Faze Jarvis ("Talent"), on the other hand. SGP and the Talent may be individually referred to as a "Party" and collectively as the "Parties."

### RECITALS

WHEREAS, SGP was the promoter of a celebrity boxing event known as the "Social Gloves: Battle of the Platforms: YouTubers vs. TikTokers" ("Event") that took place on June 12, 2021 at the Hard Rock Stadium near Miami, Florida;

WHEREAS, the Parties entered into an Agreement, dated March 4, 2021 ("Talent Agreement"), in which Talent was to participate in the Event;

WHEREAS, Talent fought Michael Le ("Bout");

WHEREAS, the Talent Agreement provided that Talent was to receive an initial payment of twenty-five thousand dollars (U.S. $25,000.00) and one million dollars (U.S $1,000,000.00) provided that Talent participated in the Event and was not in uncured material breach of the Agreement, for a total potential compensation of one million and twenty-five thousand dollars (U.S. $1,025,000.00) ("Original Contractual Amount");

WHEREAS, the Bout occurred;

WHEREAS, to avoid litigation and to obtain finality and repose with respect to any and all past, present and future claims and potential claims pertaining to the Talent Agreement, the Original Contractual Amount, Event, the Bout, and the other claims of Talent, SGP and Talent have agreed fully, finally and forever to settle any claims and demands which exist, may exist, are pending or anticipated between them relating to or concerning the Event, the Talent Agreement, the Bout and SGP's financial obligations to Talent and agree to compromise the claims and causes of action held, asserted or threatened or that could have been asserted or threatened in any legal proceedings related to or concerning the Event, the Talent Agreement, the Bout, the Original Contractual Amount, and SGP's contractual and financial obligations to the Talent (collectively, the "Dispute");

NOW, THEREFORE, in consideration of the mutual promises, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties hereby stipulate and agree as follows:

### AGREEMENT

1.    Recitations.  The foregoing recitations are true and correct and are incorporated herein.

2.    Settlement Consideration.  In full and final consideration of the Original Contractual Amount, the settlement of the Dispute, as well as all pending disagreements and all

DocuSign Envelope ID: 7A0E9FFA-BF34-4987-B96D-ECCACB85EB15

prospective claims, SGP will pay Talent the amount of one hundred thousand dollars (U.S. $100,000.00) by wire within thirty (30) days of Talent executing and returning this Agreement and an additional one hundred thousand dollars (U.S. $100,000.00) within ninety (90) days after the first payment, for a total of two hundred thousand dollars (U.S. $200,000.00) ("Settlement Payment"). The Settlement Payment shall be wired to the following account:

Name on Account: Faze Clan, Inc.
Bank Name: Bank of America
Bank Address: 6300 Sunset Blvd
            Hollywood, CA 90028
RTN/ABA: 026009593
Account #: 483065076191

Talent shall provide all information reasonably required by SGP to process and transfer the Settlement Payment, a W-9 Statement, within ten (10) days of the full execution of this Agreement.

       3.      No Admissions. The Parties hereto acknowledge and agree that this Agreement and the settlement of claims and potential claims hereunder are entered into by the Parties to avoid the costs, expenses and uncertainties of litigation.  To this end, SGP and Talent acknowledge and agree that this Settlement Agreement is not in any respect, nor for any purpose, in any proceeding, to be deemed or construed to be an admission or conclusion of any liability or wrongdoing whatsoever on the part of any party, and other than as set forth in this Settlement Agreement.

       4.      Release.

          a.      Talent's Release in Favor of SGP and Covenant Not Sue.  Subject to SGP's timely payment in full of the Settlement Payment, Talent hereby releases and forever discharges SGP, as well as SGP's parents, principals (including but not limited Allen McBroom, Austin McBroom and Catherine Paiz McBroom), subsidiaries, affiliates, attorneys, agents and other representatives (collectively, the "SGP Parties"), of and from all causes of action, suits, debts, dues, sums of money, commissions, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, executions, claims and demands whatsoever, in law or in equity, which Talent ever had, now has, or may have, against the SGP Parties in relation to the Dispute, including, but not limited to the Talent Agreement (including the Original Contractual Amount and all other amounts otherwise owed under the Talent Agreement), the Event, the Bout and SGP's contractual and financial obligations to the Talent under the Talent Agreement, SGP's conduct in connection with the Event and all other claims of any kind or nature which were raised or could have been raised by Talent in relation to the Event and/or the Dispute, whether known, unknown, suspected or unsuspected to exist, from the beginning of time to the end of the world.

          b.      SGP's Release in Favor of Talent and Covenant Not to Sue. SGP hereby releases and forever discharges Talent, as well as his affiliates, employees, attorneys, agents (including but not limited to A3 Artists) and other representatives (collectively, the "Talent Parties"), of and from all causes of action, suits, debts, dues, sums of money, commissions, accounts, reckonings, bonds, bills, specialties, controversies, variances, trespasses, damages, judgments, executions, claims and demands whatsoever, in law or in equity, which SGP ever had,

DocuSign Envelope ID: 7A0E9FFA-BF34-4987-B96D-ECCACB85EB15

now has, or may have, against the Talent Parties, in relation to the Dispute, including, but not limited to the Talent Agreement, the Event, the Bout and the Talent's contractual and financial obligations to the SGP, the Talent's conduct in connection with the Event and all other claims of any kind or nature which were raised or could have been raised by SPG in relation to the Event or the Parties' relationship and/or all other claims of any kind or nature which were raised or could have been raised in relation to the Event and/or the Dispute, whether known, unknown, suspected or unsuspected to exist, from the beginning of time to the end of the world.

       c.   Waiver Under California Civil Code Section 1542. The Parties each realize and acknowledge that, at the time of this Settlement Agreement, there may exist claims and/or causes of action herein released that are not known to the Party releasing the same or the nature of which has not yet been discovered. It is expressly understood and agreed by each of the Parties that the possibility that such claims and/or causes of action may exist has been explicitly taken into account by them in determining the consideration to be given by the Parties to this Settlement Agreement. Accordingly:

       (i)   Talent hereby specifically waives to the fullest extent permitted by law the provisions of California Civil Code Section 1542 with respect to any and all claims against the SGP Parties which are released under the terms of this Settlement Agreement.

       (ii)   SGP hereby specifically waives to the fullest extent permitted by law the provisions of California Civil Code Section 1542 with respect to any and all claims against the Talent Parties which are released under the terms of this Settlement Agreement.

       (iii)   Section 1542 provides as follows:

       "CERTAIN CLAIMS NOT AFFECTED BY GENERAL RELEASE. A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

     5.   Final Accord and Satisfaction. Subject to the timely and full payment of the Settlement Payment, this Agreement and the releases contained herein are intended to be final and binding between the Parties hereto and are further to be effective as a full and complete accord and satisfaction between the Parties hereto as to the claims, causes of action, and other matters released herein. The Parties acknowledge that they are each expressly relying on the finality of this Agreement as a substantial, material factor inducing its execution of this Agreement.

     6.   Non-Disparagement.

       a.   Talent agrees that he will not make any derogatory or disparaging statement(s) to anyone concerning the SGP Parties, at any time, the impact of which would materially damage the reputation of the SGP Parties, including statements relating to SGP's

DocuSign Envelope ID: 7A0E9FFA-BF34-4987-B96D-ECCACB85EB15

production capabilities, marketability, integrity, honor, character or skill. Specifically, Talent agrees to refrain from making any statement regarding the Event, the Event's financial success, SGP's failure to satisfy the Original Contractual Amount outlined in the Talent Agreement; and SGP's financial wherewithal.

        b.     SGP agrees that it will not make any derogatory or disparaging statement(s) to anyone concerning the Talent Parties at any time, the impact of which would materially damage the reputation of the Talent Parties including statements relating to the Talent's capabilities, marketability, integrity, honor, character or skill.

        c.     The Parties acknowledge and agree that the non-disparagement obligation is an important, essential component of this Settlement Agreement, and that but for this clause, the Parties would not have resolved the Dispute or entered into this Settlement Agreement.

    7.    <u>Confidentiality.</u>

        a.     The Parties expressly agree that confidentiality of the terms and provisions of this Agreement is of material importance to the Parties and was a material inducement to the execution of this Agreement. Each Party promises and covenants not to directly or indirectly divulge, disclose, or publicize (including via any social media platform, app, or website), or cause to be divulged, disclosed or publicized, any of the specific terms of this Agreement to any person or entity or to the public; <u>provided however,</u> that the Parties and each of them are entitled to make general statements, including via any social media platform, app, or website, along the lines of the "matter has been resolved amicably," "the terms of such settlement are confidential" and/or, in the case of SGP, "SGP reached an agreement with Faze Jarvis on payment" or "SGP and Faze Jarvis have amicably resolved their Dispute."

        b.     Notwithstanding the provisions of Paragraph 7(a), this confidentiality provision shall not preclude the Parties or their counsel from disclosing the terms of this Agreement as follows:

        i.     Information contained in this Agreement may be disclosed by the Parties to their present and future attorneys, accountants, beneficiaries, insurers, indemnitors, lenders, and investors, provided that such persons are made aware that the information is confidential and are advised to keep such information confidential;

        ii.     Information contained in this Agreement may be disclosed to the extent required by law or any court order in any proceedings provided that such persons are made aware that the information is confidential and written notice with a reasonable opportunity to object is given to the other non-disclosing Parties;

        iii.     Information contained in this Agreement may be disclosed to any duly authorized public authority or regulator such as the Internal Revenue Service or local taxing authority;

        iv.     Information contained in this Agreement may be disclosed in any Court proceeding as necessary to enforce the terms of this Agreement or in response to a proper discovery

DocuSign Envelope ID: 7A0E9FFA-BF34-4987-B96D-ECCACB85EB15

request, provided however that disclosure of this Agreement and its terms shall be afforded protection under a Court-issued confidentiality or protective order;

          v.     Information contained in this Agreement may, upon the entry of a confidentiality agreement/protective order/non-disclosure agreement, be used by SGP in an attempt to resolve other outstanding claims relating to the Event; and

          vi.     Information contained in this Agreement may be disclosed as otherwise may be agreed upon by the Parties in writing.

          c.     The Parties shall keep the material terms and amount of this Settlement Agreement confidential. Nothing in this section, however, shall prohibit any Party from disclosing the relevant terms of this Settlement Agreement: (i) in confidence to its representatives, attorneys, auditors, investors, or others who, in the ordinary course of such Party's business, are required to know the terms of this Settlement Agreement; (ii) if ordered by a court of competent jurisdiction to disclose such information; (iii) if necessary for the preparation and filing of tax returns; (iv) if necessary for compliance with any applicable national, local, state, territorial or federal laws and process; or (v) in an action to enforce the terms of the Settlement Agreement.

          d.     In the event that either Party breaches this confidentiality clause, each Party acknowledges and agrees that: (i) the non-breaching Party will suffer irreparable harm; (ii) the non-breaching Party shall have no adequate remedy at law; (iii) an injunction would serve the public interest; and (iv) the non-breaching Party shall be entitled to immediate injunctive relief, a temporary restraining order, and/or other equitable relief without the necessity of posting a bond. Any right to obtain an injunction, restraining order, or other equitable relief shall not be deemed a waiver of the arbitration provision or any other right to assert any other remedy that may be available at law or in equity. Additionally, if a court of competent jurisdiction determines that a Party breached this confidentiality clause, the breaching Party may be liable for other claims and damages.

          e.     The Parties acknowledge and agree that this confidentiality clause is an important, essential component of this Settlement Agreement, and that but for this clause, the Parties would not have resolved the Dispute or entered into this Settlement Agreement.

    8.     <u>Nature and Effect of the Settlement Agreement.</u>

          a.     The Parties represent and warrant that they have each taken all corporate, partnership and/or other action on its part necessary for the authorization, execution and delivery of this Settlement Agreement, and that this Settlement Agreement constitutes a legal, valid and binding obligation, enforceable in accordance with its terms.

          b.     Talent represents and warrants he is the sole, exclusive and lawful owner of all right, title and interest in and to every claim, cause of action, and other matter released herein, and he has not assigned or transferred, or purported to assign or transfer, to any person or entity any claims or other matters herein released.

          c.     SPG represents and warrants that it is the sole exclusive and lawful owner

DocuSign Envelope ID: 7A0E9FFA-BF34-4987-B96D-ECCACB85EB15

of all right, title and interest in and to every claim, cause of action, and other matter released herein, and it has not assigned or transferred, or purported to assign or transfer, to any person or entity any claims or other matters herein released.

        d.      This Settlement Agreement is entered into by the Parties without reliance upon any statement, representation or promise not expressly contained within this Settlement Agreement.

        e.      Each Party has cooperated in the drafting and preparation of this Settlement Agreement. Consequently, this Settlement Agreement shall not be construed against any Party on the basis that one such Party was the drafter of the Settlement Agreement. The headings are for the convenience of the Parties and are not to be used in construing the meaning of any provision of this Settlement Agreement.

        f.      The Parties acknowledge that they have been represented by independent legal counsel of their own choice, or had the opportunity to obtain legal representation and voluntarily declined to do so, throughout the negotiations that preceded the execution of this Settlement Agreement, and that they have executed this Settlement Agreement with the consent of, and on the advice of, such independent legal counsel, if so represented. The Parties further acknowledge that they and their counsel (if counsel was obtained) have had adequate opportunity to make whatever investigation or inquiry that they may deem necessary or desirable in connection with the subject matter of this Settlement Agreement prior to the execution hereof, and the delivery and acceptance of the consideration specified herein.

      9.      Severability. In the event that any one or more of the provisions of this Settlement Agreement is held void, voidable, invalid, illegal, or unenforceable for any reason, then said provision shall be deemed to be severed and removed from this Settlement Agreement and the remainder of this Settlement Agreement shall remain in full force and effect as if said provision(s) had never been contained herein.

      10.     Arbitration, Choice of Law and Venue. ALL ISSUES, MATTERS, AND DISPUTES BETWEEN THE PARTIES CONCERNING THIS SETTLEMENT AGREEMENT SHALL BE CONSTRUED, AND SHALL BE ENFORCED, PURSUANT TO THE LAWS OF THE STATE OF CALIFORNIA WITHOUT REGARD TO ITS CHOICE OF LAW PROVISIONS AND REGARDLESS OF THE PLACE OR PLACES OF EXECUTION OR PERFORMANCE. THE PARTIES AGREE THAT ANY ACTION ARISING OUT OF OR RELATED TO THIS SETTLEMENT AGREEMENT SHALL BE RESOLVED THROUGH A FINAL AND BINDING ARBITRATION ADMINISTERED BY JAMS IN ACCORDANCE WITH ITS ARBITRATION RULES AND PROCEDURES OR SUBSEQUENT VERSIONS THEREOF, INCLUDING ITS OPTIONAL APPEAL PROCEDURE (THE "JAMS RULES, AVAILABLE AT WWW.JAMSADR.COM), INCLUDING WITHOUT LIMITATION, THE RULE PROVIDING THAT EACH PARTY SHALL PAY ITS PRO RATA SHARE OF JAMS FEES AND EXPENSES, AND THE RULES PROVIDING FOR LIMITED DISCOVERY AND EXCHANGE OF INFORMATION. THE JAMS RULES FOR SELECTION OF AN ARBITRATOR SHALL BE FOLLOWED EXCEPT THAT THE ARBITRATOR SHALL BE EXPERIENCED IN THE ENTERTAINMENT INDUSTRY AND LICENSED TO PRACTICE LAW IN CALIFORNIA OR A RETIRED JUDGE. ALL PROCEEDINGS BROUGHT

DocuSign Envelope ID: 7A0E9FFA-BF34-4987-B96D-ECCACB85EB15

PURSUANT TO THIS PARAGRAPH SHALL BE CONDUCTED IN THE COUNTY OF LOS ANGELES. THE PARTIES FURTHER AGREE, THAT WITH THE SOLE EXCEPTION OF A BREACH OF THE CONFIDENTIALITY PROVISION, NEITHER PARTY SHALL BE ENTITLED TO RECOVER PUNITIVE OR EXEMPLARY DAMAGES OR SEEK INJUNCTIVE OR ANY OTHER EQUITABLE RELIEF.

11.    **Notice and Cure.** Prior to initiating a lawsuit or other legal proceeding relating to any purported breach of this Settlement Agreement, other than the failure to timely pay the Settlement Payment, the Party claiming the breach ("Complaining Party") agrees to first provide written notice of the alleged breach ("Notice of Dispute") to the other Party ("Noticed Party"). The Noticed Party shall have ten (10) business days to respond to the Complaining Party's Notice of Dispute. Thereafter, the Complaining Party and the Noticed Party shall participate in a conference call within ten (10) business days after the Complaining Party's receipt of the Noticed Party's response. Should the Noticed Party fail to provide a written response, or should the Parties not resolve the dispute during the conference call, either the Complaining Party or the Noticed Party may pursue their legal actions, defenses or remedies in accordance with Paragraph 10. With respect any failure to timely pay the Settlement Payment, SPG shall have five (5) Business Days from the date such Settlement Payment is due pursuant to this Agreement to cure any such default.

12.    **Execution of Additional Documents.** The Parties shall execute and deliver such additional documents that are consistent with the terms of this Settlement Agreement, and which may be reasonably necessary to effectuate the intent, terms and purpose of this Settlement Agreement.

13.    **Notices.** All notices, requests, demands, and other communications hereunder shall be in writing and shall be deemed to have been duly given when delivered by hand, courier, or express delivery addressed as follows:

| If to SGP: | Simply Greatness Productions, LLC<br>Attn: Allen McBroom<br>514 Commerce Avenue, Suite D<br>Palmdale, California 93551<br>Email: allenm@shopacefamily.com |
|---|---|
| with a mandatory copy (which shall not constitute notice) to: | Pryor Cashman LLP<br>James G. Sammataro, Esq.<br>855 Alhambra Circle, 8th Floor<br>Miami, Florida 33134<br>Telephone: (786) 582-3010<br>Email: jsammataro@pryorcashman.com |

DocuSign Envelope ID: 7A0E9FFA-BF34-4987-B96D-ECCACB85EB15

|  |  |
|---|---|
| If to Talent: | Jarvis Khattri<br>6 Church Lane<br>Oxtejd, Surrey, RH8 9LH<br>United Kingdom<br>Telephone: +44.7795.578623<br>jarvisjaay@gmail.com |
| with a mandatory copy<br>(which shall not constitute<br>notice) to: | Faze Clan, Inc.<br>Tammy Brandt, CLO and Head of Business<br>and Legal Affairs<br>720 North Cahuenga Blvd<br>Los Angeles, CA 90038<br>tb@faceclan.com |
|  | Akin Gump Strauss Hauer & Feld, LLP<br>Sarah Link Schultz, Esq.<br>2300 N. Field Street, Suite 1800<br>Dallas, Texas 75201-2481<br>Telephone: (214) 969-4367<br>Email: sschultz@AkinGump.com |

14.    Amendment. This Settlement Agreement may not be amended, altered or modified except by a writing executed by the Parties hereto.

15.    Agents, Successors, and Assigns. This Settlement Agreement shall inure to the benefit of, and shall be binding upon, the Parties, and each of them, and their respective parents, subsidiaries, divisions, licensees, successors, assigns, representatives, and agents of any kind.

16.    Execution in Counterparts. This Settlement Agreement may be executed in multiple counterparts and transmitted by facsimile, PDF or electronic copy, each of which shall constitute an original and, when taken together, shall constitute a single instrument.

17.    If either party brings legal proceeding or action to enforce or interpret the terms hereof or declare the rights hereunder, the prevailing party in any such proceeding, action, or appeal thereon, shall be entitled to recover its reasonable attorneys' fees and court costs incurred therein, and to be paid by the losing party. The attorneys' fee award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees and court costs reasonably incurred in good faith.

18.    Entire Agreement. This Settlement Agreement constitutes the entire agreement among the Parties pertaining to the subject matter hereof. This Settlement Agreement supersedes all prior or contemporaneous agreements, representations or negotiations among the Parties hereto, including but not limited to the Talent Agreement, and cannot be modified or amended except in writing executed by each of the Parties. The promises and undertakings set forth herein are the sole consideration for this Settlement Agreement and, upon satisfaction of the express condition precedent outlined in Paragraph 3, the conditions stated herein are contractual and not a mere

DocuSign Envelope ID: 7A0E9FFA-BF34-4987-B96D-ECCACB85EB15

recital and all agreements and undertakings on the subject matter hereof are expressed and embodied herein. Anything herein to the contrary notwithstanding, this Settlement Agreement may be fully enforced by any action at law or in equity and nothing herein contained shall preclude or be construed to preclude any action at law or in equity to enforce by specific performance the provisions of this Settlement Agreement.

19.    <u>Waiver</u>.  No waiver of any term, covenant or condition of this Settlement Agreement shall be construed as a waiver of any other term, covenant or condition of this Settlement Agreement, nor shall any waiver of any default under this Settlement Agreement be construed as a continuing waiver of any term, condition or covenant or as a waiver of any other default.

19.    <u>Authority to Execute</u>. Each individual signing this Agreement expressly represents and warrants that he has the right, legal capacity, and full authority to execute this Settlement Agreement.

*  *  *

**IN WITNESS WHEREOF**, the Parties have signed this Agreement effective for all purposes as of the Effective Date.

| SIMPLY GREATNESS PRODUCTIONS, LLC | JARVIS KHATTRI |
|---|---|
| By: _Austin McBroom_ <br> Name: *Austin McBroom* <br> Title: <br> Date: 6/9/22 | By: _Jarvis Khattri_ <br> Date: 6/8/2022 |

# EXHIBIT E



**PACHULSKI**

**STANG**

**ZIEHL**

**JONES**

L A W   O F F I C E S
LIMITED LIABILITY PARTNERSHIP

L O S   A N G E L E S ,   C A
S A N   F R A N C I S C O ,   C A
W I L M I N G T O N ,   D E
N E W   Y O R K ,   N Y
H O U S T O N ,   T X

10100 SANTA MONICA BLVD.
13th FLOOR
LOS ANGELES
CALIFORNIA 90067-4003

TELEPHONE: 310.277.6910

FACSIMILE: 310.201.0760

SAN FRANCISCO
150 CALIFORNIA STREET
15th FLOOR
SAN FRANCISCO
CALIFORNIA 94111-4500

TELEPHONE: 415.263.7000

FACSIMILE: 415.263.7010

DELAWARE
919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

TELEPHONE: 302.652.4100

FACSIMILE: 302.652.4400

NEW YORK
780 THIRD AVENUE
34th FLOOR
NEW YORK
NEW YORK 10017-2024

TELEPHONE: 212.561.7700

FACSIMILE: 212.561.7777

TEXAS
440 LOUISIANA STREET
SUITE 900
HOUSTON
TEXAS 77002-1062

TELEPHONE: 713.691.9385

FACSIMILE: 713.691.9407

WEB: www.pszjlaw.com

Richard M. Pachulski                   June 21, 2021                   310.772.2342
                                                                       rpachulski@pszjlaw.com

**Via E-mail**

Faze Clan
c/o Erika Georgious
Erika.georgious@fazeclan.com

Jordan Galen
Jordan.galen@fazeclan.com

Re:    **Social Gloves Battle of Platform – Faze Clan**

Dear Ms. Georgious and Mr. Galen:

While Simply Great Productions, LLC ("SGP") had
conservatively anticipated that there would be at least 500,000 pay
per view ("PPV") purchases of the June 12th Social Gloves – Battle
of the Platforms live stream event ("Event"), SGP has been advised
by LiveXLive Corp, Inc. ("LXL") that the total PPV purchases was
only approximately 136,000. Since all of the information necessary
to accurately determine the total number of PPV purchases lies in
the possession of third parties, SGP has retained a leading consulting
firm, FTI Consulting Corp. ("FTI"), to conduct a forensic audit of
the Event in order to allow SGP to expeditiously confirm the total
number of PPV purchases.

In light of the apparent underperformance of the Event, our
firm has been retained to represent SGP in connection with either a
workout of the claims of all of its creditors, or, if a workout is not
feasible, a likely bankruptcy filing.

SGP anticipates that FTI will complete the first stage of its
forensic audit within the next seven to ten days. Upon the
completion of this audit, SGP will be in a position to (1) inform you
and all of SGP's other creditors of the preliminary results of the
audit and (2) offer an anticipated range of the likely distributions to



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

June 21, 2021
Page 2

creditors. While this process may be slowed if any of the third parties possessing information regarding the revenues or expenses of the Event fail to cooperate with FTI, SGP does not currently anticipate a lack of cooperation.

An additional potential impediment to SGP's ability to promptly devise and present a proposed workout plan will be if one or more creditors decide to file lawsuits against SGP in the hope that that may result in the litigating creditor(s) being offered better terms than the non-litigating creditors. This will not happen, nor will SGP allow any such litigant to obtain a priority for its debt. And all creditors will be injured by the costs incurred by SGP in responding to such lawsuit(s).

If you would like further specifics regarding any of the foregoing in advance of SGP's communication to you of the preliminary results of FTI's audit and its workout proposal, I will be happy to discuss the matter further with you at your earliest convenience.

Very truly yours,

Richard M. Pachulski

RMP:gld

**EXHIBIT 9**

1  Jeffrey M. Galen, Esq. [SBN 134705]
   Glenn D. Davis, Esq. [SBN 150744]
2  GALEN & DAVIS LLP
3  2945 Townsgate Road, Suite 200
   Westlake Village, California 91361
4  Telephone: (818) 986-5685
   Facsimile: (818) 986-1859
5  Email: jeffrey.galen@galendavislaw.com

6
   Attorneys for Claimant,
7  JARVIS KHATTRI

8

9                    **IN RE ARBITRATION**

10

11

12  JARVIS KHATTRI, an individual,         )   Case No.: 5210000405
                                           )
13                                         )   Arbitrator: Honorable Gail Andler
                                           )
14                  Plaintiff              )
                                           )   **CLAIMANT'S OPPOSITION TO**
15  vs.                                    )   **RESPONDENTS' MOTION TO LIMIT**
                                           )   **THE SCOPE OF ARBITRATION TO**
16                                         )   **CLAIMS ARISING OUT OF THE**
    SIMPLY GREATNESS PRODUCTIONS,          )   **PARTIES' SETTLEMENT AGREEMENT**
17  LLC, a Delaware Limited Liability      )
    Company, AUSTIN MCBROOM, an            )
18  individual, ALLEN MCBROOM, an          )
    individual, and DOES 1 to 50, inclusive, )
19                                         )
                                           )
20                  Respondents            )
                                           )
21

22        Pursuant to Rule 11 of the Judicial Arbitration and Mediation Services (JAMS)

23  Comprehensive Arbitration Rules & Procedures, Claimant Jarvis Khattri ("Claimant")

24  hereby submits this Opposition to Respondents' Simply Greatness Productions, LLC

25  ("SGP"), Austin McBroom, and Allen McBroom (collectively "Respondents"), Motion to

26

27

28

G&D
LAW
OFFICES
OF
GALEN &
DAVIS, LLP

1  Limit the Scope of the Arbitration to Claims Arising Out of the Parties' Settlement

2  Agreement ("Motion").

3  **INTRODUCTION**

4

5  The Respondents' Motion seeks a determination from this Tribunal to limit the

6  scope of the Arbitration to only claims and amount arising out of the Confidential

7  Settlement Agreement and Mutual General Release entered into with Respondents on

8  June 9, 2022 ("Settlement Agreement").

9  Prior to entering into the Settlement Agreement, on March 4, 2021, SGP and

10  Claimant entered into a written contract for the services of Plaintiff (the "Original Talent

11  Contract"), to participate in a boxing match and promote his participation in the event

12  across Claimant's social media channels. SGP agreed to pay Claimant Twenty-Five

13  Thousand Dollars ($25,000.00) as an initial payment within five (5) business days of the

14  execution of the Original Talent Contract. Further, SGP agreed to pay Claimant One

15  Million Dollars ($1,000,000.00) provided that Claimant participate in the boxing event. (A

16  true and correct copy of the March 4, 2021, Talent Agreement is attached hereto as

17  Exhibit 1).

18  Claimant fully performed his part of the Original Talent Contract by participating

19  in the Social Gloves: Battle of the Platforms ("Event") boxing event on June 12, 2021,

20  and fought against TikToker Michael Le at the Event, as well as promoted the Event

21  across his social media channels.

22

23  SGP breached the Original Talent Contract by failing to pay Claimant

24  $1,000,000.00. Thereafter, the parties entered into the Settlement Agreement in which

25

26

27

28

2

CLAIMANT'S OPPOSITION TO RESPONDENTS' MOTION TO LIMIT THE SCOPE OF ARBITRATION
TO CLAIMS ARISING OUT OF THE SETTLEMENT AGREEMENT

**G**&**D**
LAW
OFFICES
OF
GALEN &
DAVIS, LLP

Claimant agreed to settle his claims against SGP, in exchange for SGP's *actual performance of paying* Claimant the amount of Two Hundred Thousand Dollars ($200,000.00), in two installment payments. SGP breached the Settlement Agreement by not performing under the agreement, by failing to make the first installment payment. (A true and correct copy of the Settlement Agreement is attached hereto as Exhibit 2).

On December 7, 2022, Claimant filed suit in the Superior Court of Los Angeles to enforce the underlying amount due under the Original Talent Contract in the sum of $1,000,000.00. The parties subsequently stipulated that Claimant's claim will be arbitrated pursuant JAMS' Comprehensive Arbitration Rules & Procedures (A true and correct copy of the Stipulation and Order to Arbitrate and Stay Action is attached hereto as Exhibit 3).

SGP by their Motion contend that the Settlement Agreement, even though it is undisputed, that SGP breached the Settlement Agreement, is an enforceable contract and Claimant's recoverable damages are limited to solely the amount of $200,000.00 from breach of the Settlement Agreement. Respondents incorrectly allege in their Motion that Claimant is not allowed to pursue the underlying amount due under the Original Talent Contract.

Under clear precedent, the Settlement Agreement is an accord and satisfaction agreement in which the Claimant suspends SGP's obligation to pay the underlying Original Talent Contract amount, provided that the SGP makes all of the agreed upon settlement payments. It is not until after SGP **fully performs** under the settlement agreement, that the underlying original contractual amount is extinguished. On the other

CLAIMANT'S OPPOSITION TO RESPONDENTS' MOTION TO LIMIT THE SCOPE OF ARBITRATION
TO CLAIMS ARISING OUT OF THE SETTLEMENT AGREEMENT

G&D
LAW
OFFICES
OF
GALEN &
DAVIS, LLP

hand, if the SGP **does not *fully perform*** under the Settlement Agreement, the underlying original contractual amount is not extinguished, and Claimant may declare a breach of the Settlement Agreement and proceed to enforce the underlying Original Talent Contract amount of $1,000,000.00.

Accordingly, pursuant to this precedent, after SGP failed to perform under the Settlement Agreement, Claimant had the right to declare a breach of the Settlement Agreement and file the Superior Court action to enforce the underlying Original Talent Contractual amount of $1,000,000.00.

Further, it has been held, an "executory contract" constituting an accord is not a bar to an action upon the original claim, "satisfaction", the full performance of the contract of accord, is necessary. In the present matter, the Settlement Agreement was an "executory accord", and pending full performance of the Settlement Agreement by SGP, the underlying Original Talent Contract amount is merely suspended. The underlying Original Talent Contract amount of $1,000,000.00 is not discharged until the promised performance is complete. Breach of the Settlement Agreement by SGP, empowers Claimant with the right to enforce the underlying original contract amount.

Accordingly, the Tribunal should deny Respondents' Motion and rule that the scope of the Arbitration is not limited to the claims and amount of the Settlement Agreement. Further, the Tribunal should rule that as a result of Respondents' breach of the Settlement Agreement, Claimant has the right to enforce the underlying Original Talent Contract amount in the amount of $1,000,000.00.

CLAIMANT'S OPPOSITION TO RESPONDENTS' MOTION TO LIMIT THE SCOPE OF ARBITRATION
TO CLAIMS ARISING OUT OF THE SETTLEMENT AGREEMENT

LAW
OFFICES
OF
GALEN &
DAVIS, LLP

## FACTUAL BACKGROUND

**1. Social Gloves: Battle of the Platforms:**

Social Gloves: Battle of the Platforms ("Event") was an amateur celebrity boxing exhibition featuring various YouTube and TikTok celebrities. Conceived by the Respondents, and organized by SGP and its principal members, Austin McBroom and Allen McBroom. The Event was a pay-per-view boxing event, to take place on June 12, 2021, at Hard Rock Stadium, in Miami Florida. The Event pitted stars of some of the most-followed accounts on YouTube against some of the most-followed stars of TikTok, and it required Claimant and other boxers in the event (the "Talent") to train for the boxing match, market the Event on their own social media channels, and to ultimately participate in the Event.

In February 2021, Respondents approached Claimant and his representatives to participate in the Event. Subsequent meetings were held between Claimant's representatives and Respondents, regarding both the amount Claimant would be compensated for in participating in the Event and the agreed to pre-fight promotion of the Event that Claimant would provide on his various social media platforms.

Respondents represented to Claimant, through promotional materials, including a slide deck and verbal representations, that the Event would garner at least 5 million pay-per-view buyers and that the Event would generate more than $500,000,000.00. Respondents developed a dazzling mathematical formula based upon social media followers. The Respondents' equation yielded promises of a combined reach of 393,000,000 million followers and projected gross revenue of $500,000,000.00.

GᴬD
LAW
OFFICES
OF
GALEN &
DAVIS, LLP

Respondents attempted to land Live Nation to stream the Event. Live Nation ultimately opted to forego participating in the Event. Respondents then contracted with LiveXLive to stream the Event. As LiveXLive's revenue was transaction based, LiveXLive agreed to act as the livestream partner with the provision that SGP collaborate with LiveXLive on marketing strategies.

## 2. Respondents Breach the Talent Agreement entered into with Claimant and FaZe Clan:

Claimant is a social media personality and entertainer best known for his videos on YouTube. Claimant is one of the platforms' most- followed members with over 6.51 million followers. As one of the most-followed performer in the Event, Claimant's presence was sought to expand the reach of the Event. Further, Respondents represented to Claimant that SGP was fully capitalized to make payment to the Talent.

On March 4, 2021, SGP, FaZe Clan, Inc. ("FaZe Clan") and Claimant entered into a written Talent Agreement for the services of Plaintiff (the "Original Talent Contract"). Pursuant to the Original Talent Contract, Claimant agreed to participate in the boxing match and promote his participation in the Event across Claimant's social media channels. FaZe agreed to have members of FaZe Clan to provide marketing services on various social media platforms. SGP agreed to pay Claimant twenty-five thousand dollars ($25,000.00) as an initial payment within five (5) business days of the execution of the Agreement. Further, SGP agreed to pay Claimant one million dollars ($1,000,000.00) provided that Claimant participate in the Event . Claimant did receive the initial payment of $25,000.00 under the Original Talent Contract.

GᐪD
LAW
OFFICES
OF
GALEN &
DAVIS, LLP

Claimant fully performed his part of the Original Talent Contract, by participating in the Social Gloves boxing exhibition on June 12, 2021, and fighting against TikToker Michael Le at the Event as well as promoting the Event across his social media channels. Respondents breached the Original Talent Agreement, by failing to pay Claimant $1,000,000.00.

**3. Respondents were Aware that the Event would Fail to Generate the Revenue They Represented to Claimant and other Talent:**

Respondents were fully aware that the Event, which they promoted as likely receiving five to ten million pay-per-view purchases, would generate no more than 200,000 sales based on the their marketing strategy, as LiveXLive's Chief Marketing Officer, informed them. Respondents was warned by two experts that SGP's promotional strategy will not drive ticket purchases. Respondents however, did not let those projections and warnings slow them from putting on the Event, despite numerous indicators and warnings showing that the earnings would not be sufficient enough to pay the Talent.

Despite these warning signs and red flags the Event proceeded, and ultimately garnered approximately 136,000 pay-per-view purchases, consistent with the projections of LiveXLive's Chief Marketing Officer to the Respondents, but a far cry from the projections of five to ten million that the Respondents touted to Claimant. These numbers were known to the Respondents but simply ignored. The plan was carried out on the false promises of financial gain to their investors, Claimant and other Talent.

CLAIMANT'S OPPOSITION TO RESPONDENTS' MOTION TO LIMIT THE SCOPE OF ARBITRATION
TO CLAIMS ARISING OUT OF THE SETTLEMENT AGREEMENT

G&D
LAW
OFFICES
OF
GALEN &
DAVIS, LLP

1    Despite Claimant's demand for payment to be made, Respondents failed to pay

2    Claimant. Instead of working to pay Claimant and the other Talent the compensation

3    they are due, Respondents employed a series of tactics sought to allow Respondents to

4    shirk it's financial responsibilities, such as employing the services of a premier

5    bankruptcy firm to threaten bankruptcy and to request the Talent and Claimant not

6    make any demand for payment due to the alleged underperformance of the Event on

7    pay per view.

8    **4.  Respondents Receive Financial Windfall from the Event from**

9    **LiveXLive:**

10        In their Moving papers , Respondents try to mislead the Arbitrator  by

11    alleging that the Respondents incurred financial loss as a result of the Event.

12    Respondents even go as far to state "Respondents never received a single penny from

13    the Event".  What Respondents conveniently and intentionally omit, is the fact that

14    Respondents initiated litigation against LiveXLive, and entered into a confidential

15    settlement with LiveXLive, in which Respondent received substantial financial gain.

16    Respondents reaped such a great financial reward, they invested and organized a

17    second boxing event entitled Social Gloves: Battle of the Platforms II. Further,

18    Respondents have paid all Talent from the Event and Social Gloves: Battle of the

19    Platforms II, except Claimant.

20    **5.  Respondents Breach the Settlement Agreement by Failing to**

21    **Perform:**

CLAIMANT'S OPPOSITION TO RESPONDENTS' MOTION TO LIMIT THE SCOPE OF ARBITRATION
TO CLAIMS ARISING OUT OF THE SETTLEMENT AGREEMENT

**G&D**
LAW
OFFICES
OF
GALEN &
DAVIS, LLP

On June 9, 2022, the Respondents and Claimant entered into a Confidential Settlement Agreement and Mutual General Release. Pursuant to the Settlement Agreement, Claimant agreed to settle his claims against Respondents, for Respondents' *actual performance of paying* Claimant the amount of Two Hundred Thousand Dollars ($200,000.00), in two installment payments. Consistent with their previous conduct in this matter ,Respondents' intentionally breached the Settlement Agreement by failing to perform thereunder by failing to make the first installment payment.

On December 7, 2022, Claimant filed suit in the Superior Court of Los Angeles to enforce the underlying amount due under the Original Talent Contract in the sum of $1,000,000.00.

Respondents by their Motion contend that the Settlement Agreement, even though it was breached by SGP, is an enforceable contract and Claimant's recoverable damages are limited to solely the amount of $200,000.00 from breach of the Settlement Agreement. Respondents incorrectly contend in their Motion that Claimant is not allowed to pursue the underlying amount due under the Original Talent Contract.

The Settlement Agreement specifically Section 4 (a), entitled **"Release"** states in its pertinent part: " Talent's Release in Favor of SGP and Covenant Not Sue. **Subject to SGP's timely payment in full of the Settlement Payment,** Talent hereby releases and forever discharges SGP, as well as SGP's parents, principal (including but not limited Allen McBroom, Austin McBroom and Catherine Paiz McBroom), subsidiaries.........."

CLAIMANT'S OPPOSITION TO RESPONDENTS' MOTION TO LIMIT THE SCOPE OF ARBITRATION
TO CLAIMS ARISING OUT OF THE SETTLEMENT AGREEMENT

G&D
LAW
OFFICES
OF
GALEN &
DAVIS, LLP

It is abundantly clear from a reading of the Settlement Agreement and the authority cited herein, that the Settlement Agreement is an accord and satisfaction agreement in which the Claimant suspends SGP's obligation to pay the underlying Original Talent Contract amount, provided that the SGP makes all of the agreed upon settlement payments.

It is not until after SGP **fully performs** under the settlement agreement, that the underlying original contractual amount is extinguished. On the other hand, if the SGP **does not fully perform** under the Settlement Agreement, the underlying original contractual amount is not extinguished, and Claimant may declare a breach of the Settlement Agreement and proceed to enforce the underlying Original Talent Contract amount of $1,000,000.00.

Accordingly, due to SGP failure to perform under the Settlement Agreement, Claimant had the right to declare a breach of the Settlement Agreement and file the Superior Court action to enforce the underlying Original Talent Contractual amount of $1,000,000.00.

## **ARGUMENT**

1. **In Accordance with Rule 11 of the JAMS' Rules, the Tribunal Shall Determine the Scope of the Arbitration:**

Under Rule 11 of JAMS' Comprehensive Rules, the Tribunal shall determine the scope of this Arbitration. Pursuant to Rule 11 of JAMS' Comprehensive Rules, the Arbitrator shall resolve jurisdictional and arbitrability disputes, including disputes over

CLAIMANT'S OPPOSITION TO RESPONDENTS' MOTION TO LIMIT THE SCOPE OF ARBITRATION
TO CLAIMS ARISING OUT OF THE SETTLEMENT AGREEMENT

**G**&**D**
LAW
OFFICES
OF
GALEN &
DAVIS, LLP

1  formation, existence, validity, interpretation or scope of the agreement under which
2  Arbitration is sought, shall be submitted and ruled on by the Arbitrator.

3  ## 2. Enforceability of Settlement Terms in California Courts:

4  California's public policy has long been to encourage settlement over litigation
5
6  in the interests of efficiency and economy for the courts and for the parties involved.
7  *Kaufman v. Goldman*, 195 Cal. App. 4th 734, 745 (2011);; *Zhou v. Unisource*
8  *Worldwide, Inc.,* 157 Cal. App. 4th 1471, 1475 (2007). California has long had a "strong
9  public policy….to encourage the voluntary settlement of litigation," *Osumi v. Sutton,*
10 151 Cal. App.4[th] 1355, 1359 (2007).
11

12 Respondents' contend that Claimant is limited to the $200,000.00 Settlement
13 Amount. Respondents' allege in their moving papers that Claimant in seeking the
14 original contractual amount in the Action, which was superseded by the Settlement
15 Agreement, ignores precedent that a party's failure to pay an amount agreed to in a
16
17 settlement agreement solely entitles the non-breaching party to recover damages up
18 to the settlement amount – *i.e. $200,000.00.* To support their argument they rely on
19 the case of *Greentree Financial Group, Inc. v. Execute Sports, Inc.* 163 Cal. App 4th
20 495 (2008).
21
22 An analysis of the *Greentree Financial Group, Inc. v. Execute Sports, Inc.,* case
23 reveals that the facts of *Greentree* are distinguishable from the present matter. As will
24 be shown, Claimant's claim is not limited to the $200,000.00 settlement amount.

25 ## 3. Enforceability of Liquidated Damages Provisions in Settlement
26
27    Agreements:
28

In *Greentree Financial Group, Inc. v. Execute Sports, Inc.*, *supra*, *Greentree* sued Execute Sports, Inc., (ESI) for breach of contract. *Greentree* alleged ESI failed to pay $45,000.00 due under the contract. Prior to trial, the parties agreed to settle the breach of contract claim for $20,000.00, payable in two installment payments. The Parties entered into a settlement agreement that included a stipulation for entry of judgment. The settlement agreement provided that, if ESI defaulted on either of its two installment payments, *Greentree* could file the stipulation for entry of judgment in the amount of $61,232.50 which included the amount of $45,000.00 in damages as well as $13,912.50 prejudgment interest, and $2,320.00 for attorney's fees and costs. ESI defaulted on the first installment payment, the trial court entered judgment against ESI in the amount of $61,232.50. ESI appealed.

The Court of Appeal reversed, holding that the judgment constituted an unenforceable penalty. In determining whether the terms of the stipulation amount to an illegal penalty, we start with the language of *Civil Code* § 1671(b): "[A] provision in a contract liquidating the damages for the breach of the contract is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made."

In interpreting this statute, the Supreme Court has noted: "A liquidated damage will generally be considered unreasonable, and hence unenforceable under section 1671(b), if it bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach". The amount set as liquidated damages "must represent the result of a reasonable endeavor by the parties

CLAIMANT'S OPPOSITION TO RESPONDENTS' MOTION TO LIMIT THE SCOPE OF ARBITRATION
TO CLAIMS ARISING OUT OF THE SETTLEMENT AGREEMENT

**G&D**
LAW
OFFICES
OF
GALEN &
DAVIS, LLP

1   to estimate a fair average compensation for any loss that may be sustained." *Ridgley*

2   *v. Topa Thrift & Loan Assn.*, 17 Cal. 4th 970,977.

3       The Court of Appeal in *Greentree*, held that the amount of the judgment , which

4   awarded Greentree approximately $40,000 more than the settlement amount, did not

5   compensate Greentree- it rewarded Greentree by penalizing ESI. The Court found

6   that the key in determining whether the damages are a penalty, however, is if there is

7   a reasonable relationship between the amount to be paid and the damages. The

8   stipulated judgment of $61,232.50 would result in a penalty assessment of

9   approximately $40,000.00 more than the total $20,000.00 due under the stipulation. A

10  late payment penalty fee of approximately $40,000.00 bears no reasonable

11  relationship to any actual damages that might flow from ESI's failure to make the first

12  installment payment.

13      California law will not enforce such liquated damages clauses if they bear no

14  reasonable relationship to the amount of liability under the settlement agreement and

15  the actual damages that the parties have anticipated in a stipulated judgment would

16  flow from the breach.

17      The facts of *Greentree Financial Group, Inc. v. Execute Sports, Inc.*, *supra* are

18  distinguishable from the present matter on numerous grounds. Commonly, parties will

19  settle litigation by entering into a settlement agreement that includes a stipulated

20  judgment setting out a set sum payable upon failure of a party to perform under the

21  terms of the settlement agreement.  None of these facts exist in the present matter.

22  There is no liquidated damages clause within the Settlement Agreement and therefore

G&D
LAW
OFFICES
OF
GALEN &
DAVIS, LLP

the determination of whether there is a reasonable relationship between the damages that could have been anticipated based on a failure to pay the settlement amount when due and the amount established in event of default does not exist. No set sum was contemplate by the parties as payable upon default of the Settlement Agreement.

Whether the amount of liquidated damages reflects a reasonable estimate of actual damages is, however, just one of the factors courts must consider when determining whether the provision in unreasonable. Courts are also directed to look at the circumstances existing at the time of the making of the contract. They must consider the relative equality of bargaining power between the parties, whether the parties were represented by lawyers at the time the settlement agreement was made, and whether the liquidated damages are part of a form contract.

As set forth in their moving papers, Respondents' state "The Settlement Agreement was the byproduct of heavy negotiations in which Claimant was represented by Akin Gump Strauss Hauser & Feld, LLP". Respondents, were represented by their present counsel at the time of Settlement Agreement. Therefore, it is apparent both parties to the Settlement Agreement had equal bargaining power.

With regard to the issue of whether the amount of liquidated damages reflects a reasonable estimate of actual damages, this issue cannot be determined in this matter, since the Settlement Agreement is vacant as to any language or the intent of the parties as to damages in the event of default or breach under the terms of the Settlement Agreement. The Settlement Agreement contains no provisions with regard to a Stipulated Judgment in the event of breach or default in payments; no penalty is

G&D
LAW
OFFICES
OF
GALEN &
DAVIS, LLP

1  contemplated in the Settlement Agreement; nor was any judgment amount
2  contemplated in the event of default under the Settlement Agreement as in *Greentree*.
3  These facts simply don't pertain to our case and therefore the analysis and findings of
4  *Greentree* do not apply to this matter.
5
6       The Arbitrator cannot address or determine whether the liquidated damage
7  provision or the amount of liquidated damages in this matter is reasonable from
8  breach of the Settlement Agreement, since such a provision doesn't exist.
9
       **4. The Intention of the Parties was not to Include a Provision Regarding**
10
          **Default or Breach under the Settlement Agreement:**
11
12       In the case of *Folsom v. Butte County Assn. of Governments*, 32 Cal. 3d. 668
13  (1982), where the central issue was "whether that settlement agreement operates as a
14  merger and bar of all preexisting claims, depriving the trial court of jurisdiction to award
15  costs and statutory attorney fees". The Court of Appeal in *Folsom*, concluded that an
16  agreement silent as to costs and fees does not create a bar to either a cost bill or a
17  motion pursuant to section 1021.5. As in the present matter, the Settlement Agreement
18  is completely silent with regard to damages in the event of default or breach of the
19  Settlement Agreement. Therefore , it is clearly apparent that the intent of the parties at
20  the time of entering into the Settlement Agreement, in which each party was
21  represented by counsel and had equal bargaining power was to not to include a
22  liquidated damages provision, a stipulation for judgment, or any terms and conditions in
23  the event of default under the Settlement Agreement.
24
25
26
27
28

CLAIMANT'S OPPOSITION TO RESPONDENTS' MOTION TO LIMIT THE SCOPE OF ARBITRATION
TO CLAIMS ARISING OUT OF THE SETTLEMENT AGREEMENT

GD
LAW
OFFICES
OF
GALEN &
DAVIS, LLP

As set forth in *Folsom*, settlement agreements are of course "governed by the legal principles applicable to contracts generally". They "regulate and settle only such matters and differences as appear clearly to be comprehended in them by the **intention of the parties** and the necessary consequences thereof, **and do not extend to matters which the parties never intended to include therein, although existing at the time**". (emphasis added). It is obvious that the intent of the parties at the time of entering into the Settlement Agreement, was to not to include a liquidated damages provision, a stipulation for judgment, or any terms and conditions in the event of default under the Settlement Agreement. Accordingly, Claimant never intended to waive his right to proceed in an action for the underlying original contract amount in the event of default under the Settlement Agreement. None of the facts surrounding the Settlement Agreement suggest that the parties intended a waiver of Claimants right to proceed for the underlying Original Talent Contract amount in the event Respondents' fail to actually perform under the Settlement Agreement.

**5. The Arbitration is _Not_ Limited to the Claims or the Amount of the Settlement Agreement:**

Respondents' are gravely mistaken in their analysis that Claimant's claims and amount of damages are limited to the Settlement Agreement. It is Claimant's contention that the Settlement Agreement is an *"executory accord and satisfaction"*, agreement wherein, Claimant accepted ***actual performance*** of the compromise under the Settlement Agreement as satisfaction of his underlying claims and original contractual amount. Accordingly, since Respondents' breached the Settlement

CLAIMANT'S OPPOSITION TO RESPONDENTS' MOTION TO LIMIT THE SCOPE OF ARBITRATION
TO CLAIMS ARISING OUT OF THE SETTLEMENT AGREEMENT

G&D
LAW
OFFICES
OF
GALEN &
DAVIS, LLP

1  Agreement by failing to perform and remit the first installment payment, Claimant is

2  not precluded from pursuing Respondents for the full amount of the underlying

3  Original Talent Contract.

4  **A. The Settlement Agreement is an Accord and Satisfaction Agreement:**

5

6  According to California *Civil Code* § 1521, an accord is an agreement to

7  accept, in extinction of an obligation, something different from or less than that to which

8  the person agreeing to accept is entitled.

9  Pursuant to California *Civil Code* § 1523, satisfaction is an acceptance, by the

10  creditor, of the consideration of an accord. *Satisfaction extinguishes the*

11  *obligation.*(emphasis added).

12

13  An accord and satisfaction is a legal agreement between two parties to resolve

14  a dispute or settle a debt. Usually, accord and satisfaction involves a party's offer of

15  payment and the other party's acceptance of a lesser amount than the party originally

16  claimed to be owed. It is the method of discharging a claim by settlement of the claim

17  and performing a new agreement. The *accord* is the agreement and the *satisfaction* it

18  the performance. The distinctive feature of an accord and satisfaction agreement is that

19  the creditor does not intend to discharge the existing claim merely upon the making of

20  the accord. The party can do so *only upon performance or satisfaction. If the*

21  *satisfaction is not tendered, the party may sue under the original claim or breach of the*

22  *accord. See Paramount Aviation Corp. v. Agusta*, 178 F.3d 132, (1999). (emphasis

23  added). Any violation of the accord will, result in a lawsuit regarding the original

24  contract.

25

26

27

28

CLAIMANT'S OPPOSITION TO RESPONDENTS' MOTION TO LIMIT THE SCOPE OF ARBITRATION
TO CLAIMS ARISING OUT OF THE SETTLEMENT AGREEMENT

**G&D**
*LAW*
*OFFICES*
*OF*
*GALEN &*
*DAVIS, LLP*

The Settlement Agreement in this matter, is an accord and satisfaction agreement in which the Claimant suspended SGP's obligation to pay the underlying Original Talent Contract amount, provided that the SGP made all of the agreed upon settlement payments. It is not until after SGP *fully performs* under the settlement agreement, that the underlying original contractual amount is extinguished. Since SGP did not *fully perform* under the Settlement Agreement, the underlying Original Talent Contractual amount is not extinguished, and Claimant may declare a breach of the Settlement Agreement and proceed to enforce the underlying Original Talent Contract amount of $1,000,000.00. Accordingly, pursuant to this precedent, after SGP failed to perform under the Settlement Agreement, Claimant had the right to declare a breach of the Settlement Agreement and file the Superior Court action to enforce the underlying original contract amount of $1,000,000.00.

**B. The Settlement Agreement is Unenforceable on the Ground it is an Executory Accord:**

Claimant contends that the Settlement Agreement is an "executory accord" wherein Claimant **accepted actual performance** by Respondents' under the Settlement Agreement as satisfaction of it's underlying Original Talent Contract claim.

It has been held, that ordinarily an "executory contract" constituting an accord is not a bar to an action upon the original claim, "satisfaction", that is, full performance of the contract of accord, is necessary. In the present matter, the Settlement Agreement is an "executory accord", and pending full performance of the Settlement Agreement by SGP, the underlying original contract amount is merely suspended. The underlying

**G&D**
LAW
OFFICES
OF
GALEN &
DAVIS, LLP

1  original contract amount of $1,000,000.00 is not discharged until the promised

2  performance is complete. Breach of the Settlement Agreement by SGP, empowers

3  Claimant to with the right to enforce the underlying original contract amount.

4        An executory accord is defined in *6 Corbin on Contracts* § 1268 (1962) as

5  follows:

6

7        "The term "accord executory" is and always has been used to mean an

8        agreement for the future discharge of an existing claim by a substituted

9        performance. In order for an agreement to fall within this definition, it is the

10        the promised performance that is to discharge the existing claim, and

11        not the promise to render such performance....." *See also The Law of*

12        *Contracts* § 21-4 (2d.ed. 1977)

13

14      It is often extremely difficult to determine the factual question of whether the

15  parties to a compromise agreement intended to create an executory accord or a

16  substitute contract. However, unless the evidence demonstrates that the new

17  agreement was designed to be a substitute for the original cause of action, it is

18  presumed that the parties each intended to surrender their old rights and liabilities only

19  upon performance of the new agreement. In other words, unless there is clear

20  evidence to the contrary, an agreement to discharge a pre-existing claim will be

21  regarded as an executory accord. *Clark v. Elza*, 286 Md. 208 (1979); *Porter v. Berwyn*

22  *Fuel Feed* 244 Md. 629 (1966).

23

24      An executory accord is unenforceable and is no defense against a suit on the

25  prior claim. *Addison v. Sommers* ,404 F. Supp. 715 (1975).

26

27

28

CLAIMANT'S OPPOSITION TO RESPONDENTS' MOTION TO LIMIT THE SCOPE OF ARBITRATION
TO CLAIMS ARISING OUT OF THE SETTLEMENT AGREEMENT

**G&D**
LAW
OFFICES
OF
GALEN &
DAVIS, LLP

In the present matter, the Settlement Agreement is an "executory accord", and pending full performance of the Settlement Agreement by SGP, the underlying Original Talent Contract amount is merely suspended. The underlying Original Talent Contract amount of $1,000,000.00 is not discharged until the promised performance is complete. Since, SGP breached Settlement Agreement by failing to perform and pay the first installment payment, Claimant has the right to proceed with a lawsuit for the original contractual amount of $1,000,000.00.

**C. The Release of Claimant's Claims Only Becomes Effective Upon Actual Performance by Respondents:**

Remedies and rights for breach of a settlement agreement may depend upon whether the settlement agreement is construed to be a "substituted contract" wherein a plaintiff accepted the *promise to perform* the compromise as satisfaction of it's underlying claim or, alternatively, an "executory accord" wherein a plaintiff accepted *actual performance* of the compromise as satisfaction of its underlying claim.

The case of *Rosen v. Ascentry Technologies, Inc.*, 177 P. 3d. 765 (2008) is directly on point with the facts of the present matter. This case concerns the effect of a settlement agreement entered into by Appellant ("*Rosen*") after he sued the Respondents ("*Ascentry*"). *Rosen* contends that in light of *Ascentry's* failure to pay, the settlement agreement is unenforceable by *Ascentry* and he should be allowed to pursue his original claims. *Ascentry* concedes it breached the agreement, but argues that *Rosen* may no longer pursue his original claims because he clearly released them in exchange for *Ascentry* promise to pay $50,000.00 and not exchange for payment

G&D
LAW
OFFICES
OF
GALEN &
DAVIS, LLP

itself. The trial court ruled that the parties reached a binding agreement, dismissed

*Rosen's* case with prejudice and ordered *Ascentry* to pay *Rosen* $50,000.00 consistent

with the settlement agreement. *Rosen* appealed and the Court of Appeal reversed the

trial court's ruling on the grounds that *because it was not clear from the agreement that*

*Rosen released his original claims in exchange for Ascentry's promise to pay.*

The Court of Appeal went on to state that It is not clear that the parties

intended that *Rosen* would immediately release his claims in exchange for *Ascentry's*

promise to pay. The agreement states, "In exchange for Mr. *Rosen's* release of all

known and unknown claims, *Ascentry* agrees to pay Mr. *Rosen* the sum of Fifty

Thousand Dollars ($50,000) as payment for disputed claims of non-wage general

damages for breach of contract ("Settlement Payment")." *Ascentry* relies heavily on this

provision, it does not clearly state Rosen released his claims in exchange for *Ascentry's*

promise to pay.

Further, *Ascentry* claims that "the agreement made it clear that in the event of

defendant's default, *Rosen* could proceed immediately to judgment under the terms of

the agreement. But, *Ascentry* does not cite to any provision in the agreement to

support this statement or any provision that restricts Rosen to collecting $50,000 in

case of default. *In fact , the agreement does not discuss Default at all."* Which is the

exact same issue in the present matter, the Settlement Agreement makes no reference

whatsoever as to default at all. (emphasis added).

Further, as set forth in *Rosen*, citing *Corbin on Contracts*, "…with an executory

accord, pending full performance of the accord-the compromise agreement-the original

G&D
LAW
OFFICES
OF
GALEN &
DAVIS, LLP

1  claim is merely suspended. It is not discharged until the promised performance is

2  complete. Breach of the accord empowers the claimant with the choice of enforcing the

3  accord or the original claim."

4        The facts of our case are analogous to *Rosen*. As set forth previously herein,

5
6  the Settlement Agreement is an "executory accord", and pending full performance of the

7  Settlement Agreement by Respondents, the underlying original contract amount is

8  merely suspended. The underlying Original Talent Contract amount of $1,000,000.00 is

9  not discharged until the promised performance is complete.

10        It is evident from the Release provision in the Settlement Agreement that

11
12  the parties intended that *actual performance* by Respondents, in making the installment

13  payments, was the satisfaction required. Pending full performance of the Settlement

14  Agreement by Respondents, the underlying original contract amount is merely

15  suspended. The underlying original contract amount of $1,000,000.00 is not discharged

16
17  until the promised performance is complete.

18        The Settlement Agreement specifically Section 4 (a), entitled "Release" states in

19  its pertinent part:

20        " <u>Talent's Release in Favor of SGP and Covenant Not Sue</u>. **Subject to**

21
22        **SGP's timely payment in full of the Settlement Payment,** Talent hereby

23        releases and forever discharges SGP, as  well as SGP's parents, principal

24        (including but not limited Allen McBroom, Austin McBroom and Catherine

25        Paiz McBroom), subsidiaries, affiliates, attorneys, agents and other

26        representatives (collectively, the "SGP Parties") ................ of and from

27
28

CLAIMANT'S OPPOSITION TO RESPONDENTS' MOTION TO LIMIT THE SCOPE OF ARBITRATION
TO CLAIMS ARISING OUT OF THE SETTLEMENT AGREEMENT

1      all causes of action, suits, debts, dues, sums of money, commissions,

2      accounts,.......... claims and demands whatsoever, in law or in equity,

3      which Talent ever had, now has ,or may have, against the SGP Parties in

4      relation to the Dispute, including but not limited to the Talent Agreement

5      (including the Original Contractual Amount and all other amounts

6      otherwise owed under the Talent Agreement), the Event, the Bout,and

7      SGP's contractual and financial obligations to the talent under the Talent

8      Agreement .......... And all other claims of any kind or nature which were

9      raised or could have been raised by Talent in relation to the Event and/or

10      the Dispute, whether known, unknown, suspected or unsuspected to exist,

11      ..." (See Exhibit 2, Page 2, ¶ 4(a). (emphasis added).

12          The Release clearly shows that there was no intent of the parties to discharge

13 the claims and amount under the Original Talent Contract until full performance by SGP.

14 The Release specifically states "**Subject to SGP's timely payment in full of the**

15 **Settlement Payment,** Talent hereby releases and forever discharges SGP,......."

16 Accordingly, SGP's failure to make the first installment payment under the Settlement

17 Agreement, thereby breaching the Agreement, Claimant has the right to pursue the

18 Original Talent Contract claims and contractual amount.

### 6.    CONCLUSION

         Based upon the foregoing reasons and the authority cited, the Settlement
Agreement is an "executory accord", and pending full performance of the Settlement
Agreement by Respondents, the underlying original contract amount is merely

G&D
LAW
OFFICES
OF
GALEN &
DAVIS, LLP

1    suspended. The underlying original contract amount of $1,000,000.00 is not

2    discharged until the promised performance is complete. Since, Respondents failed to

3    perform under the agreement and pay the first installment payment, Claimant has the

4    right to proceed with a lawsuit for the original contractual amount of $1,000,000.00.

5

6

7

8

9    Dated: January 16, 2024                    GALEN & DAVIS LLP

10                                              By:

11                                                  Jeffrey M. Galen, Esq.
                                                    Attorneys for Claimant
12                                                  JARVIS KHATTRI

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28


LAW
OFFICES
OF
GALEN &
DAVIS, LLP

CLAIMANT'S OPPOSITION TO RESPONDENTS' MOTION TO LIMIT THE SCOPE OF ARBITRATION
TO CLAIMS ARISING OUT OF THE SETTLEMENT AGREEMENT

# EXHIBIT 1

DocuSign Envelope ID: 114BE470-887E-4E68-AC05-2AC59D528991

## AGREEMENT

This agreement ("Agreement") is made and entered into as of March 4, 2021 ("Effective Date"), by and between Simply Greatness Productions ("SGP"), a Delaware LLC, and FaZe Clan Inc. ("Faze") f/s/o Jarvis Khattri p/k/a Faze Jarvis ("Talent") with respect to Talent's Boxing and Publicity services in connection with the live pay per view exhibition boxing event (the "Event"), and marketing services by members of Faze Clan.

1. **Grant of Rights**. Faze shall cause Talent to hereby grant to SGP the right to require Talent to render reasonable amateur exhibition boxing entertainment and publicity services (collectively referred to herein as the "Services") solely in connection with the Event and to use the results and proceeds of Talent's Services therefrom, including but not limited to all commercial media rights, streaming rights, rights in connection with the advertising and publicity, and the right to commercially exploit any and all such right in perpetuity and throughout the universe, all as more specifically set forth herein. SGP shall at all times use reasonable efforts to portray Talent in a favorable light. For the avoidance of doubt, all copyrights, design rights, patents, trademarks, trade secrets, and other intellectual property and proprietary rights (i) in FaZe Clan, Talent and/or other members shall be and remain the sole and exclusive property of FaZe Clan and/or Talent, and (ii) in SGP's logos and trademarks shall be and remain the sole and exclusive property of SGP. The parties hereby acknowledge and agree that, except as otherwise set forth explicitly herein, all intellectual property rights in and to any photos, videos, social media posts and similar digital and promotional content created, conceived or developed in whole or in part by FaZe Clan, Talent, or other members of FaZe Clan in connection with its activities under this Agreement and Addendum A shall be owned by FaZe Clan. SGP assumes all liability in connection with the Event and releases FaZe Clan from any and all liability in connection therewith.

2. **Date**. The Event will be held in May or June of 2021, subject to Events of Force Majeure (described below). The Event shall not occur prior to May 2021. If the Event is cancelled for Force Majeure, the Event will be rescheduled within three (3) months of the original Event date.

3. **Services**.

   a. Faze shall cause Talent to commence the Services by participating in a boxing match against a competitor to be mutually agreed upon between the parties. The competitor shall be Michael Le. In the event there is a required substitution, Talent has agreed to fight a replacement, subject to approval of the replacement by Talent, with any proposed replacement to be of a similar level of size, stature and boxing experience. Talent shall not unreasonably withhold approval.

   Each round will last approximately two-three minutes. Talent shall prepare for the Event in a manner in line with industry standard for an amateur boxing exhibition. Talent shall make reasonable efforts to

DocuSign Envelope ID: 114BE470-887E-4E68-AC05-2AC59D528991

comply with all reasonable directions, rules and regulations of SGP in connection with such Services.

    b. Marketing Services. Faze shall cause members of FaZe Clan to provide marketing services in Addendum A (the "Marketing Services").

4. <u>Compensation</u>. SGP agrees to pay Faze, and Faze agrees to accept, as full and complete compensation for all rights granted herein and all undertakings and services:

    a. <u>Initial Payment</u>. SGP shall pay Faze Twenty-Five Thousand Dollars USD ($25,000) within five business days upon Faze's execution of Agreement. Notwithstanding, Talent must submit an invoice to SGP.

    b. <u>Contingent Compensation</u>. Provided that Talent participates in Event and is not in uncured material breach of the Agreement and Faze fully completes the Marketing Services, SGP shall pay Talent an amount equal One Million USD ($1,000,000) ("Contingent Compensation").

All payments due to Faze hereunder shall be made to FaZe Clan Inc. by domestic wire transfer using payment instructions to be provided by FaZe Clan's Chief Financial Officer (amit.bajaj@fazeclan.com). SGP's billing contact is as follows: Name: Gelfand Rehnert & Feldman Attn: Mark Goodman; Email: mgoodman@grfllp.com; Address: 1800 Century Park East #1600 Los Angeles, CA 90067; Phone: (310) 556-6658.

SGP shall pay Talent within fifteen (15) business days of Producer's receipt of revenue from streaming partner. Notwithstanding, Talent must submit an invoice to SGP.

If SGP cancels Event for any other reason, aside from a reason listed below in section 12, then SGP will pay talent Two Hundred Thousand USD ($200,000) within ten days of notifying Talent of the cancelation.

SGP shall provide Talent with at least thirty-five (35) tickets to the Event for Talent's guests.

5. <u>Promotion</u>. Talent shall promote his participation in the Event across Talent's social media channels, including but not limited to Instagram, YouTube, Twitter, and TikTok. Talent shall have full creative approval over the post and caption, as applicable. Specific promotions shall be negotiated in good faith but shall not be less than the below:

    a. Twitter.

        i. Talent shall post a minimum of three (3) static tweets ("Tweet") in connection with (i) the announcement of the fight card; (ii) any pre-sale date of the fight; (iii) promotion of Event within the last

2

DocuSign Envelope ID: 114BE470-887E-4E68-AC05-2AC69D528991

week and date of the fight. Talent may not remove the post for at least five business days after the completion of Event.

    ii. Each Tweet shall include the image of the official fight poster and the link to purchase tickets to the stream.

    iii. Talent shall pin the first two Tweets for a minimum of five (5) days.

b. Instagram.

    i. Talent shall post a minimum of three (3) static posts in connection with (i) the announcement of the fight card; (ii) any pre-sale date of the fight; (iii) promotion of Event within the last week and date of the fight. Talent may not remove the post for at least five business days after the completion of Event.

    ii. Talent must simultaneously publish at least two (2) Instagram stories in promotion of Event in conjunction with each of the three static Instagram posts referenced above. The stories must include a swipe up link to the Event, provided to Talent by SGP. Thus, Talent must publish at least six (6)

c. YouTube. Talent must publish three (3) separate YouTube videos that promotes the Event with an integration that lasts a minimum of sixty (60) seconds within the first two minutes of the respective video. The promotional videos should correspond to: (i) the announcement of the fight card; (ii) any pre-sale date of the fight; (iii) the week before the Event.

d. Tik Tok. Talent must publish at least one promotion video on Tik Tok that includes a call to action to buy streams to the Event.

e. Talent represents and warrants that they shall at all times comply with all required FTC regulations with respect to social media post.

f. Talent shall provide a reasonable amount of approved audio and visual materials to be used in conjunction with promotion of Event.

g. Talent's social media posts in promotion of Event are defined as "Social Media Posts."

6. <u>Photoshoot</u>. Talent agrees to participate in a photoshoot lasting at least two (2) days. For clarity, each day shall be no longer than eight (8) hours. SGP shall arrange and directly pay for Talent's ground transportation within Southern California to and from the photoshoot, as well as a reasonable per diem to cover Talent's meals.

7. <u>Name and Likeness</u>. During the Term, SGP shall have the right, solely in connection with Event, to use Talent's name, approved nickname, approved biographical information, approved image and approved likeness and Social Media Posts solely in the form originally posted by Talent, in the following media, manner and formats: (i) via any websites, e-mail and digital and social media channels, owned or operated by SGP or by any production partner (including via paid media), (ii) in print media, (iii) for public relation, marketing and publicity purposes via any and all media and formats throughout the universe.

3

DocuSign Envelope ID: 114BE470-887E-4E68-AC05-2AC59D528991

If Talent objects to any of the aforementioned uses, SGP shall work with Talent in good faith to resolve such objection. SGP has the non-exclusive right to record Talent as part of content produced in conjunction with the Event such as behind the scenes footage and/or documentary and/or docu-series to be used solely in connection with the commercial exploitation, marketing and promotion of the Event, subject to Talent's prior written approval in each instance. SGP shall at all times use reasonable efforts to portray Talent in a favorable light. For the avoidance of doubt, SGP may use "FaZe Jarvis" solely in connection with the Event, but no license shall be granted to FaZe Clan's intellectual property, including without limitation the use of the word "FaZe," the words "FaZe Clan" or the FaZe Clan logo without FaZe Clan's prior written approval.

8. Exclusivity. Talent shall not participate in any exhibition boxing match "Competitive Event" from the Effective Date until six months after the Event.

9. Option. SGP will have the option to contract Talent to participate in a derivative event within twelve months following the Event, subject to good faith negotiations.

10. Further documents. Talent agrees to execute any and all other documents and perform any and all acts and deeds reasonably necessary to carry out Talent's obligations under the Agreement.

11. Insurance. SGP shall, at no cost to FaZe Clan, maintain the following minimum insurance in full force and effect throughout the Term, naming both FaZe Clan and Talent as additional insureds on the policies: public liability and general liability insurance (either in combined form or in separate policies), including coverage for bodily injury, claims by one insured against another insured, and SGP's defense and indemnity obligations under the Agreement, with coverage of not less than $2,000,000 USD combined single limit per occurrence and $2,000,000 USD annual aggregate; and errors and omission insurance in line with industry standard.

12. Suspension and Termination. SGP shall have the right to suspend and/or terminate its obligations for Talent's incapacity, default, or the occurrence of a force majeure event (defined below).

Default shall include (i) Talent's uncured material breach (after receiving written or e-mail notification per section 19(f) below and failing to cure within seventy-two hours); (ii) Talent's inability to be insured to SGP's reasonable satisfaction; (iii) Talent being charged with a crime involving moral turpitude in SGP reasonable determination that adversely affects Event; or (iv) Talent's actions (including publication or declaration of a statement) that may reasonably be considered immoral, scandalous and/or obscene; and such action damages or otherwise negatively affects the Event's reputation.

Force Majeure. An event of "Force Majeure" shall exist hereunder if Event is impaired, hampered, interrupted, prevented, suspended, postponed or

DocuSign Envelope ID: 114BE470-887E-4E68-AC05-2AC59D528991

discontinued by reason of any war or armed conflict, public health crisis, act of a public enemy, riot, civil disturbance, epidemic, fire, casualty, flood, explosion, earthquake, boycott, labor controversy, governmental statute, law, act of God.

13. <u>Remedies</u>. If Faze is in uncured material breach of any of the material marketing obligations, then Faze's compensation will be reduced by twenty percent (20%) percent (after receiving written or e-mail notification per section 20(f) below and failing to cure within seventy-two hours), pro-rata. Faze acknowledges that the rights granted hereunder and Talent services hereunder are unique and

5

DocuSign Envelope ID: 114BE470-887E-4E68-AC05-2AC59D528991

extraordinary, SGP therefore would be entitled to all available equitable remedies in case of breach or threatened breach of Agreement by Talent. Any remedies, rights, and obligations contained in this Agreement shall be cumulative and none of them shall be in limitation of any other remedy, rights, undertaking, or obligation of either party. **HOWEVER, NO BREACH OF THIS AGREEMENT BY TALENT SHALL ENTITLE TALENT TO TERMINATE OR RESCIND ANY OF THE RIGHTS GRANTED TO SGP HEREIN, AND IN THE EVENT OF ANY QUESTION OF SGP'S PERFORMANCE OF ITS OBLIGATION HEREUNDER, TALENT HEREBY WAIVES THE RIGHT, IN THE EVENT OF ANY SUCH BREACH, TO EQUITABLE RELIEF OR TO ENJOIN, RESTRAIN OR INTERFERE WITH THE EXHIBITION OF EVENT OR THE EXERCISE OF ANY OF THE GRANTED RIGHTS, IT BEING TALENT'S UNDERSTANDING THAT THE SOLE REMEDY SHALL BE THE RIGHT TO RECOVER MONETARY DAMAGES WITH RESPECT ONLY TO THE ACTUAL HARM CAUSED BY ANY SUCH BREACH. IN ANY EVENT, NEITHER PARTY WILL BE LIABLE TO THE OTHER FOR CONSEQUENTIAL, INCIDENTAL PUNITIVE OR SPECIAL DAMAGES, OR DAMAGES FOR LOST PROFITS OR LOSS OF BUSINESS OPPORTUNITIES. Notwithstanding the foregoing, either party may bring an action or suit seeking injunctive relief to protect its intellectual property rights in any court having jurisdiction. Notwithstanding anything to the contrary contained herein, FaZe Clan's aggregate liability under this Agreement shall under no circumstances exceed the payments which Talent received or is entitled to receive under this Agreement.**

14. <u>Representations and Warranties</u>. Each party hereby represents and warrants that
    a. It has full right, power and authority to enter into and fully perform this Agreement and no third party's consent is required;
    b. the execution and delivery of the Agreement and the performance of its obligations hereunder will not constitute a breach or default of or otherwise violate any agreement to which such party or any of its affiliates are a party;
    c. The content it provides under this Agreement does not infringe or violate the rights of any third party;
    d. It will not use any images or marks to which it does not have the rights;
    e. It will comply with all applicable ordinances, codes, standards, laws, rules, regulations, and orders of any governmental authority having jurisdiction in its performance under this Agreement.

15. <u>Indemnification</u>. Each party will indemnify, defend, and hold harmless the other and each of its officers, directors, owners, shareholders, representatives, officials, employees, agents, subsidiaries, affiliates, successors and assigns, harmless from any and all claims, damages, losses, liabilities, actions, judgments, costs and expenses (including reasonable attorneys' fees) brought by the other party or a third party arising out of or in connection with indemnifying party's breach or claimed breach of its representations, warranties, or covenants hereunder.

6

DocuSign Envelope ID: 114BE470-887E-4E68-AC05-2AC59D528991

16. <u>Relationship of Parties</u>. Nothing contained herein shall constitute a partnership between or by the Parties hereto.

7

DocuSign Envelope ID: 114BE470-887E-4E68-AC05-2AC59D528991

17. <u>Confidentiality</u>. This Agreement shall be deemed confidential in its entirety and no publication, distribution or dissemination of any kind shall be permitted, except upon the express prior and written consent of both parties, to any other individuals outside of the immediate parties to this contract, their attorneys, agents and authorized representatives. Notwithstanding the foregoing, the terms of this Agreement may be disclosed subject to any requirement by a judicial process, from a court of competent jurisdiction or otherwise as a matter of law, pursuant to a mutually agreeable press release, or in connection with a proposed merger (of any kind), any debt or equity financing, in connection with a public offering of shares or sale of such party's business.

18. <u>Governing Law; Dispute</u>. This Agreement shall be governed by under the laws of California, without reference to conflicts of law principles. Any dispute, claim or controversy arising out of or relating to this Agreement shall be determined by confidential and binding arbitration in Los Angeles, California, before a single neutral arbitrator who shall be a retired state or federal jurist. The arbitration shall be administered by JAMS pursuant to its Streamlined Arbitration Rules and Procedures. Judgment on the Award may be entered in any court having jurisdiction. The arbitrator(s) are not empowered to award punitive or exemplary damages, and the parties waive any right to recover any such damages.

19. Miscellaneous
    a. <u>Entire Agreement</u>. This Agreement constitutes the complete agreement of the parties with respect to the subject matter hereof, and this Agreement supersedes and replaces any or all prior or contemporaneous negotiations, promises, covenants, representation and agreement of every kind or nature whatsoever with respect thereto, retroactive to the inception thereof, all of which have become merged and finally integrated into this Agreement.
    b. <u>Waiver and Amendment</u>. No modification, amendment, or waiver of any provision of this Agreement will be effective unless such amendment or waiver is made in writing and signed by authorized representatives of both Parties.
    c. <u>Partial Invalidity</u>. If any provision of this Agreement is held be invalid, illegal or unenforceable, then the validity, legality and enforceability of all of the other provisions of the Agreement shall remain in full force and effect.
    d. <u>Assignability</u>. Neither party may not assign this Agreement or its rights hereunder in whole or in part.
    e. <u>Counterparts</u>. This Agreement may be executed in one or counterparts, each of which shall be deemed to be an original and, which taken together, shall be deemed to constitute one and the same agreement.
    f. <u>Notices</u>. All notices to Talent shall be sent to Talent, with a copy to Talent's manager (Jordan.galen@fazeclan.com) and FaZe Clan Business and Legal Affairs (Erika.georgiou@fazeclan.com).

8

DocuSign Envelope ID: 114BE470-887E-4E68-AC05-2AC59D528991

[SIGNATURE TO FOLLOW]

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the day and year first written above.

FAZE

By: Erika Georgiou

Name: Erika Georgiou

Date: 3/8/2021

SGP, LLC

By: _____
Paul Cazers

Name: _____

Date: 3/10/2021

TALENT

By: Jarvis khattri

Name: Jarvis Khattri

Date: 3/8/2021

DocuSign Envelope ID: 114BE470-887E-4E68-AC05-2AC59D528991

Addendum A

Faze shall cause the below talent to promote the Event:

Faze Kay
    a.  Instagram.
        i.  Talent shall post the fight flier on Talent's static Instagram feed at least five days before Event. Talent shall not remove the post for a minimum of Three (3) days after the Event.
        ii.  Talent must simultaneously publish at least three (3) Instagram stories in promotion of Event in conjunction with Talent's static post. Each story must include a swipe up link to the Event, provided to Faze by SGP.
    b.  Twitter. Talent shall post a minimum of one Tweet at least five (5) days before Event that includes the image of the official fight poster and the link to purchase tickets to the stream. Talent shall pin the Tweet for a minimum of forty-eight hours before Event.
    c.  YouTube. Talent must publish at least two (2) separate YouTube videos that promotes the Event with an integration that lasts a minimum of sixty (60) seconds within the first two minutes of the respective video. The promotional videos should correspond to: (i) the announcement of the fight card; (ii) any pre-sale date of the fight; or (iii) the week before the Event.
    d.  Tik Tok. Talent must publish at least one promotion video on Tik Tok that includes a call to action to buy streams to the Event.

Faze Adapt
    a.  Faze shall cause Faze Adapt to publish the official fight flier one (1) time as an Instagram story with a swipe up link and call to action to purchase streams, and one (1) Instagram story with a swipe up link and call to action to purchase streams, creative content of story per Talent's discretion. For avoidance of doubt, Faze will cause Faze Adapt to publish two (2) Instagram Stories in promotion of Event.

Additional Faze Talent
    b.  Faze shall cause eight (8) additional FaZe Clan talent to publish the official fight flier as an Instagram story with a swipe up link and call to action to purchase streams within five days of the Event.

FAZE represents and warrants that talent shall at all times comply with all required FTC regulations with respect to social media post.

DocuSign Envelope ID: 114BE470-887E-4E88-AC05-2AC59D528991

FAZE                                            SGP, LLC

By _*Erika Georgiou*_                           By: _____

Name: _Erika Georgiou_                          Name: _____

Date: _3/8/2021_                                Date: _____

1

# EXHIBIT 2

DocuSign Envelope ID: 7A0E9FFA-BF34-4987-B96D-ECCACB65EB15

## CONFIDENTIAL SETTLEMENT AGREEMENT AND MUTUAL GENERAL RELEASE

This Confidential Settlement Agreement and Release ("Settlement Agreement"), effective as of June __, 2022 ("Effective Date"), is entered into between Simply Greatness Productions, LLC ("SGP"), on the one hand, and Jarvis Khattri p/k/a Faze Jarvis ("Talent"), on the other hand. SGP and the Talent may be individually referred to as a "Party" and collectively as the "Parties."

### RECITALS

**WHEREAS**, SGP was the promoter of a celebrity boxing event known as the "Social Gloves: Battle of the Platforms: YouTubers vs. TikTokers" ("Event") that took place on June 12, 2021 at the Hard Rock Stadium near Miami, Florida;

**WHEREAS**, the Parties entered into an Agreement, dated March 4, 2021 ("Talent Agreement"), in which Talent was to participate in the Event;

**WHEREAS**, Talent fought Michael Le ("Bout");

**WHEREAS**, the Talent Agreement provided that Talent was to receive an initial payment of twenty-five thousand dollars (U.S. $25,000.00) and one million dollars (U.S $1,000,000.00) provided that Talent participated in the Event and was not in uncured material breach of the Agreement, for a total potential compensation of one million and twenty-five thousand dollars (U.S. $1,025,000.00) ("Original Contractual Amount");

**WHEREAS**, the Bout occurred;

**WHEREAS**, to avoid litigation and to obtain finality and repose with respect to any and all past, present and future claims and potential claims pertaining to the Talent Agreement, the Original Contractual Amount, Event, the Bout, and the other claims of Talent, SGP and Talent have agreed fully, finally and forever to settle any claims and demands which exist, may exist, are pending or anticipated between them relating to or concerning the Event, the Talent Agreement, the Bout and SGP's financial obligations to Talent and agree to compromise the claims and causes of action held, asserted or threatened or that could have been asserted or threatened in any legal proceedings related to or concerning the Event, the Talent Agreement, the Bout; the Original Contractual Amount, and SGP's contractual and financial obligations to the Talent (collectively, the "Dispute");

**NOW, THEREFORE**, in consideration of the mutual promises, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties hereby stipulate and agree as follows:

### AGREEMENT

1.    Recitations.  The foregoing recitations are true and correct and are incorporated herein.

2.    Settlement Consideration.  In full and final consideration of the Original Contractual Amount, the settlement of the Dispute, as well as all pending disagreements and all

DocuSign Envelope ID: 7A0E9FFA-BF34-4987-B96D-ECCACB85EB15

prospective claims, SGP will pay Talent the amount of one hundred thousand dollars (U.S. $100,000.00) by wire within thirty (30) days of Talent executing and returning this Agreement and an additional one hundred thousand dollars (U.S. $100,000.00) within ninety (90) days after the first payment, for a total of two hundred thousand dollars (U.S. $200,000.00) ("Settlement Payment"). The Settlement Payment shall be wired to the following account:

Name on Account: Faze Clan, Inc.
Bank Name: Bank of America
Bank Address: 6300 Sunset Blvd
     Hollywood, CA 90028
RTN/ABA: 026009593
Account #: 483065076191

Talent shall provide all information reasonably required by SGP to process and transfer the Settlement Payment, a W-9 Statement, within ten (10) days of the full execution of this Agreement.

    3. No Admissions. The Parties hereto acknowledge and agree that this Agreement and the settlement of claims and potential claims hereunder are entered into by the Parties to avoid the costs, expenses and uncertainties of litigation.   To this end, SGP and Talent acknowledge and agree that this Settlement Agreement is not in any respect, nor for any purpose, in any proceeding, to be deemed or construed to be an admission or conclusion of any liability or wrongdoing whatsoever on the part of any party, and other than as set forth in this Settlement Agreement.

    4. Release.

     a. Talent's Release in Favor of SGP and Covenant Not Sue. Subject to SGP's timely payment in full of the Settlement Payment, Talent hereby releases and forever discharges SGP, as well as SGP's parents, principals (including but not limited Allen McBroom, Austin McBroom and Catherine Paiz McBroom), subsidiaries, affiliates, attorneys, agents and other representatives (collectively, the "SGP Parties"), of and from all causes of action, suits, debts, dues, sums of money, commissions, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, executions, claims and demands whatsoever, in law or in equity, which Talent ever had, now has, or may have, against the SGP Parties in relation to the Dispute, including, but not limited to the Talent Agreement (including the Original Contractual Amount and all other amounts otherwise owed under the Talent Agreement), the Event, the Bout and SGP's contractual and financial obligations to the Talent under the Talent Agreement, SGP's conduct in connection with the Event and all other claims of any kind or nature which were raised or could have been raised by Talent in relation to the Event and/or the Dispute, whether known, unknown, suspected or unsuspected to exist, from the beginning of time to the end of the world.

     b. SGP's Release in Favor of Talent and Covenant Not to Sue. SGP hereby releases and forever discharges Talent, as well as his affiliates, employees, attorneys, agents (including but not limited to A3 Artists) and other representatives (collectively, the "Talent Parties"), of and from all causes of action, suits, debts, dues, sums of money, commissions, accounts, reckonings, bonds, bills, specialties, controversies, variances, trespasses, damages, judgments, executions, claims and demands whatsoever, in law or in equity, which SGP ever had,

DocuSign Envelope ID: 7A0E9FFA-BF34-4987-B98D-ECCACB85EB15

now has, or may have, against the Talent Parties, in relation to the Dispute, including, but not limited to the Talent Agreement, the Event, the Bout and the Talent's contractual and financial obligations to the SGP, the Talent's conduct in connection with the Event and all other claims of any kind or nature which were raised or could have been raised by SPG in relation to the Event or the Parties' relationship and/or and all other claims of any kind or nature which were raised or could have been raised in relation to the Event and/or the Dispute, whether known, unknown, suspected or unsuspected to exist, from the beginning of time to the end of the world.

    c.   Waiver Under California Civil Code Section 1542. The Parties each realize and acknowledge that, at the time of this Settlement Agreement, there may exist claims and/or causes of action herein released that are not known to the Party releasing the same or the nature of which has not yet been discovered. It is expressly understood and agreed by each of the Parties that the possibility that such claims and/or causes of action may exist has been explicitly taken into account by them in determining the consideration to be given by the Parties to this Settlement Agreement. Accordingly:

    (i)   Talent hereby specifically waives to the fullest extent permitted by law the provisions of California Civil Code Section 1542 with respect to any and all claims against the SGP Parties which are released under the terms of this Settlement Agreement.

    (ii)   SGP hereby specifically waives to the fullest extent permitted by law the provisions of California Civil Code Section 1542 with respect to any and all claims against the Talent Parties which are released under the terms of this Settlement Agreement.

    (iii)  Section 1542 provides as follows:

    "CERTAIN CLAIMS NOT AFFECTED BY GENERAL RELEASE. A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

    5.   Final Accord and Satisfaction. Subject to the timely and full payment of the Settlement Payment, this Agreement and the releases contained herein are intended to be final and binding between the Parties hereto and are further to be effective as a full and complete accord and satisfaction between the Parties hereto as to the claims, causes of action, and other matters released herein.   The Parties acknowledge that they are each expressly relying on the finality of this Agreement as a substantial, material factor inducing its execution of this Agreement.

    6.   Non-Disparagement.

    a.   Talent agrees that he will not make any derogatory or disparaging statement(s) to anyone concerning the SGP Parties, at any time, the impact of which would materially damage the reputation of the SGP Parties, including statements relating to SGP's

DocuSign Envelope ID: 7A0E9FFA-BF34-4987-B96D-ECCACB85EB15

production capabilities, marketability, integrity, honor, character or skill.  Specifically, Talent agrees to refrain from making any statement regarding the Event, the Event's financial success, SGP's failure to satisfy the Original Contractual Amount outlined in the Talent Agreement; and SGP's financial wherewithal.

      b.    SGP agrees that it will not make any derogatory or disparaging statement(s) to anyone concerning the Talent Parties at any time, the impact of which would materially damage the reputation of the Talent Parties including statements relating to the Talent's capabilities, marketability, integrity, honor, character or skill.

      c.    The Parties acknowledge and agree that the non-disparagement obligation is an important, essential component of this Settlement Agreement, and that but for this clause, the Parties would not have resolved the Dispute or entered into this Settlement Agreement.

7.    <u>Confidentiality</u>.

      a.    The Parties expressly agree that confidentiality of the terms and provisions of this Agreement is of material importance to the Parties and was a material inducement to the execution of this Agreement.  Each Party promises and covenants not to directly or indirectly divulge, disclose, or publicize (including via any social media platform, app, or website), or cause to be divulged, disclosed or publicized, any of the specific terms of this Agreement to any person or entity or to the public; <u>provided however</u>, that the Parties and each of them are entitled to make general statements, including via any social media platform, app, or website, along the lines of the "matter has been resolved amicably," "the terms of such settlement are confidential" and/or, in the case of SGP, "SGP reached an agreement with Faze Jarvis on payment" or "SGP and Faze Jarvis have amicably resolved their Dispute."

      b.    Notwithstanding the provisions of Paragraph 7(a), this confidentiality provision shall not preclude the Parties or their counsel from disclosing the terms of this Agreement as follows:

      i.    Information contained in this Agreement may be disclosed by the Parties to their present and future attorneys, accountants, beneficiaries, insurers, indemnitors, lenders, and investors, provided that such persons are made aware that the information is confidential and are advised to keep such information confidential;

      ii.    Information contained in this Agreement may be disclosed to the extent required by law or any court order in any proceedings provided that such persons are made aware that the information is confidential and written notice with a reasonable opportunity to object is given to the other non-disclosing Parties;

      iii.    Information contained in this Agreement may be disclosed to any duly authorized public authority or regulator such as the Internal Revenue Service or local taxing authority;

      iv.    Information contained in this Agreement may be disclosed in any Court proceeding as necessary to enforce the terms of this Agreement or in response to a proper discovery

DocuSign Envelope ID: 7A0E9FFA-BF34-4987-B96D-ECCACB85EB15

request, provided however that disclosure of this Agreement and its terms shall be afforded protection under a Court-issued confidentiality or protective order;

     v.    Information contained in this Agreement may, upon the entry of a confidentiality agreement/protective order/non-disclosure agreement, be used by SGP in an attempt to resolve other outstanding claims relating to the Event; and

     vi.    Information contained in this Agreement may be disclosed as otherwise may be agreed upon by the Parties in writing.

     c.    The Parties shall keep the material terms and amount of this Settlement Agreement confidential. Nothing in this section, however, shall prohibit any Party from disclosing the relevant terms of this Settlement Agreement: (i) in confidence to its representatives, attorneys, auditors, investors, or others who, in the ordinary course of such Party's business, are required to know the terms of this Settlement Agreement; (ii) if ordered by a court of competent jurisdiction to disclose such information; (iii) if necessary for the preparation and filing of tax returns; (iv) if necessary for compliance with any applicable national, local, state, territorial or federal laws and process; or (v) in an action to enforce the terms of the Settlement Agreement.

     d.    In the event that either Party breaches this confidentiality clause, each Party acknowledges and agrees that: (i) the non-breaching Party will suffer irreparable harm; (ii) the non-breaching Party shall have no adequate remedy at law; (iii) an injunction would serve the public interest; and (iv) the non-breaching Party shall be entitled to immediate injunctive relief, a temporary restraining order, and/or other equitable relief without the necessity of posting a bond. Any right to obtain an injunction, restraining order, or other equitable relief shall not be deemed a waiver of the arbitration provision or any other right to assert any other remedy that may be available at law or in equity. Additionally, if a court of competent jurisdiction determines that a Party breached this confidentiality clause, the breaching Party may be liable for other claims and damages.

     e.    The Parties acknowledge and agree that this confidentiality clause is an important, essential component of this Settlement Agreement, and that but for this clause, the Parties would not have resolved the Dispute or entered into this Settlement Agreement.

     8.    Nature and Effect of the Settlement Agreement.

     a.    The Parties represent and warrant that they have each taken all corporate, partnership and/or other action on its part necessary for the authorization, execution and delivery of this Settlement Agreement, and that this Settlement Agreement constitutes a legal, valid and binding obligation, enforceable in accordance with its terms.

     b.    Talent represents and warrants he is the sole, exclusive and lawful owner of all right, title and interest in and to every claim, cause of action, and other matter released herein, and he has not assigned or transferred, or purported to assign or transfer, to any person or entity any claims or other matters herein released.

     c.    SPG represents and warrants that it is the sole exclusive and lawful owner

DocuSign Envelope ID: 7A0E9FFA-BF34-4987-B96D-ECCACB85EB15

of all right, title and interest in and to every claim, cause of action, and other matter released herein, and it has not assigned or transferred, or purported to assign or transfer, to any person or entity any claims or other matters herein released.

    d.    This Settlement Agreement is entered into by the Parties without reliance upon any statement, representation or promise not expressly contained within this Settlement Agreement.

    e.    Each Party has cooperated in the drafting and preparation of this Settlement Agreement. Consequently, this Settlement Agreement shall not be construed against any Party on the basis that one such Party was the drafter of the Settlement Agreement. The headings are for the convenience of the Parties and are not to be used in construing the meaning of any provision of this Settlement Agreement.

    f.    The Parties acknowledge that they have been represented by independent legal counsel of their own choice, or had the opportunity to obtain legal representation and voluntarily declined to do so, throughout the negotiations that preceded the execution of this Settlement Agreement, and that they have executed this Settlement Agreement with the consent of, and on the advice of, such independent legal counsel, if so represented. The Parties further acknowledge that they and their counsel (if counsel was obtained) have had adequate opportunity to make whatever investigation or inquiry that they may deem necessary or desirable in connection with the subject matter of this Settlement Agreement prior to the execution hereof, and the delivery and acceptance of the consideration specified herein.

    9.    <u>Severability.</u>  In the event that any one or more of the provisions of this Settlement Agreement is held void, voidable, invalid, illegal, or unenforceable for any reason, then said provision shall be deemed to be severed and removed from this Settlement Agreement and the remainder of this Settlement Agreement shall remain in full force and effect as if said provision(s) had never been contained herein.

    10.    <u>Arbitration, Choice of Law and Venue.</u>  ALL ISSUES, MATTERS, AND DISPUTES BETWEEN THE PARTIES CONCERNING THIS SETTLEMENT AGREEMENT SHALL BE CONSTRUED, AND SHALL BE ENFORCED, PURSUANT TO THE LAWS OF THE STATE OF CALIFORNIA WITHOUT REGARD TO ITS CHOICE OF LAW PROVISIONS AND REGARDLESS OF THE PLACE OR PLACES OF EXECUTION OR PERFORMANCE. THE PARTIES AGREE THAT ANY ACTION ARISING OUT OF OR RELATED TO THIS SETTLEMENT AGREEMENT SHALL BE RESOLVED THROUGH A FINAL AND BINDING ARBITRATION ADMINISTERED BY JAMS IN ACCORDANCE WITH ITS ARBITRATION RULES AND PROCEDURES OR SUBSEQUENT VERSIONS THEREOF, INCLUDING ITS OPTIONAL APPEAL PROCEDURE (THE "<u>JAMS RULES,</u> AVAILABLE AT WWW.JAMSADR.COM), INCLUDING WITHOUT LIMITATION, THE RULE PROVIDING THAT EACH PARTY SHALL PAY ITS PRO RATA SHARE OF JAMS FEES AND EXPENSES, AND THE RULES PROVIDING FOR LIMITED DISCOVERY AND EXCHANGE OF INFORMATION.   THE JAMS RULES FOR SELECTION OF AN ARBITRATOR SHALL BE FOLLOWED EXCEPT THAT THE ARBITRATOR SHALL BE EXPERIENCED IN THE ENTERTAINMENT INDUSTRY AND LICENSED TO PRACTICE LAW IN CALIFORNIA OR A RETIRED JUDGE.   ALL PROCEEDINGS BROUGHT

DocuSign Envelope ID: 7A0E9FFA-BF34-4987-B96D-ECCACB85EB15

PURSUANT TO THIS PARAGRAPH SHALL BE CONDUCTED IN THE COUNTY OF LOS ANGELES. THE PARTIES FURTHER AGREE, THAT WITH THE SOLE EXCEPTION OF A BREACH OF THE CONFIDENTIALITY PROVISION, NEITHER PARTY SHALL BE ENTITLED TO RECOVER PUNITIVE OR EXEMPLARY DAMAGES OR SEEK INJUNCTIVE OR ANY OTHER EQUITABLE RELIEF.

11. <u>Notice and Cure</u>. Prior to initiating a lawsuit or other legal proceeding relating to any purported breach of this Settlement Agreement, other than the failure to timely pay the Settlement Payment, the Party claiming the breach ("Complaining Party") agrees to first provide written notice of the alleged breach ("Notice of Dispute") to the other Party ("Noticed Party"). The Noticed Party shall have ten (10) business days to respond to the Complaining Party's Notice of Dispute. Thereafter, the Complaining Party and the Noticed Party shall participate in a conference call within ten (10) business days after the Complaining Party's receipt of the Noticed Party's response. Should the Noticed Party fail to provide a written response, or should the Parties not resolve the dispute during the conference call, either the Complaining Party or the Noticed Party may pursue their legal actions, defenses or remedies in accordance with Paragraph 10. With respect any failure to timely pay the Settlement Payment, SPG shall have five (5) Business Days from the date such Settlement Payment is due pursuant to this Agreement to cure any such default.

12. <u>Execution of Additional Documents</u>. The Parties shall execute and deliver such additional documents that are consistent with the terms of this Settlement Agreement, and which may be reasonably necessary to effectuate the intent, terms and purpose of this Settlement Agreement.

13. <u>Notices</u>. All notices, requests, demands, and other communications hereunder shall be in writing and shall be deemed to have been duly given when delivered by hand, courier, or express delivery addressed as follows:

| | |
|---|---|
| If to SGP: | Simply Greatness Productions, LLC<br>Attn: Allen McBroom<br>514 Commerce Avenue, Suite D<br>Palmdale, California 93551<br>Email: allenm@shopacefamily.com |
| with a mandatory copy<br>(which shall not constitute<br>notice) to: | Pryor Cashman LLP<br>James G. Sammataro, Esq.<br>855 Alhambra Circle, 8th Floor<br>Miami, Florida 33134<br>Telephone: (786) 582-3010<br>Email: jsammataro@pryorcashman.com |

DocuSign Envelope ID: 7A0E9FFA-BF34-4987-B96D-ECCACB85EB15

If to Talent:                                   Jarvis Khattri
                                                6 Church Lane
                                                Oxtejd, Surrey, RH8 9LH
                                                United Kingdom
                                                Telephone: +44.7795.578623
                                                jarvisjaay@gmail.com


with a mandatory copy                           Faze.Clan, Inc.
(which shall not constitute                     Tammy Brandt, CLO and Head of Business
notice) to:                                     and Legal Affairs
                                                720 North Cahuenga Blvd
                                                Los Angeles, CA 90038
                                                tb@faceclan.com

                                                Akin Gump Strauss Hauer & Feld, LLP
                                                Sarah Link Schultz, Esq.
                                                2300 N. Field Street, Suite 1800
                                                Dallas, Texas 75201-2481
                                                Telephone: (214) 969-4367
                                                Email: sschultz@AkinGump.com

14.    Amendment. This Settlement Agreement may not be amended, altered or modified except by a writing executed by the Parties hereto.

15.    Agents, Successors, and Assigns. This Settlement Agreement shall inure to the benefit of, and shall be binding upon, the Parties, and each of them, and their respective parents, subsidiaries, divisions, licensees, successors, assigns, representatives, and agents of any kind.

16.    Execution in Counterparts. This Settlement Agreement may be executed in multiple counterparts and transmitted by facsimile, PDF or electronic copy, each of which shall constitute an original and, when taken together, shall constitute a single instrument.

17.    If either party brings legal proceeding or action to enforce or interpret the terms hereof or declare the rights hereunder, the prevailing party in any such proceeding, action, or appeal thereon, shall be entitled to recover its reasonable attorneys' fees and court costs incurred therein, and to be paid by the losing party. The attorneys' fee award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees and court costs reasonably incurred in good faith.

18.    Entire Agreement. This Settlement Agreement constitutes the entire agreement among the Parties pertaining to the subject matter hereof. This Settlement Agreement supersedes all prior or contemporaneous agreements, representations or negotiations among the Parties hereto, including but not limited to the Talent Agreement, and cannot be modified or amended except in writing executed by each of the Parties. The promises and undertakings set forth herein are the sole consideration for this Settlement Agreement and, upon satisfaction of the express condition precedent outlined in Paragraph 3, the conditions stated herein are contractual and not a mere

DocuSign Envelope ID: 7A0E9FFA-BF34-4987-B96D-ECCACB85EB15

recital and all agreements and undertakings on the subject matter hereof are expressed and embodied herein. Anything herein to the contrary notwithstanding, this Settlement Agreement may be fully enforced by any action at law or in equity and nothing herein contained shall preclude or be construed to preclude any action at law or in equity to enforce by specific performance the provisions of this Settlement Agreement.

19.    Waiver.    No waiver of any term, covenant or condition of this Settlement Agreement shall be construed as a waiver of any other term, covenant or condition of this Settlement Agreement, nor shall any waiver of any default under this Settlement Agreement be construed as a continuing waiver of any term, condition or covenant or as a waiver of any other default.

19.    Authority to Execute. Each individual signing this Agreement expressly represents and warrants that he has the right, legal capacity, and full authority to execute this Settlement Agreement.

*  *  *

**IN WITNESS WHEREOF**, the Parties have signed this Agreement effective for all purposes as of the Effective Date.

| SIMPLY GREATNESS PRODUCTIONS, LLC | JARVIS KHATTRI |
|---|---|
| By: _Kush M Br_ | By: _Jarvis Khattri_ (DocuSigned by) |
| Name: Austin McBroom | Date: 6/8/2022 |
| Title: | |
| Date: 6/9/22 | |

**EXHIBIT 3**

1   Jeffrey M. Galen, Esq. (SBN 134705)
    **GALEN & DAVIS LLP**
2   2945 Townsgate Road, Suite 200
3   Westlake Village, California 91361
    Telephone: (818) 986-5685
4   Facsimile: (818) 986-1859
    Email: jeffrey.galen@galendavislaw.com
5   *Attorneys for Plaintiff*

6
    James G. Sammataro, Esq. (State Bar No. 204882)
7   jsammataro@pryorcashman.com
    **PRYOR CASHMAN LLP**
8   1801 Century Park East, 24th Floor
9   Los Angeles, California 90067
    Telephone: 310-683-6900
10  Facsimile: 310-943-3397
    *Attorney for Defendants*
11

12

13

14              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

15                       **COUNTY OF LOS ANGELES**

16
    JARVIS KHATTRI, an individual,          )    CASE NO.: 22STCV38165
17                                          )
18                                          )    *Assigned For All Purposes To:*
                                            )    *Honorable Gail Lillefer*
19                 Plaintiff                )    *Dept.: 37*
                                            )
20  vs.                                     )    **STIPULATION AND [PROPOSED]**
                                            )    **ORDER TO ARBITRATE AND STAY**
21  SIMPLY GREATNESS PRODUCTIONS,           )    **ACTION**
    LLC, a Delaware Limited Liability       )
22  Company, AUSTIN MCBROOM, an             )
    individual, ALLEN MCBROOM, an           )
23  individual, and DOES 1 to 50, inclusive,)
                                            )
24                                          )
                                            )
25                 Defendants               )

26

27          Plaintiff, Jarvis Khattri ("Plaintiff" or "Khattri"), and Defendants, Simply Greatness

28  Productions ("SGP"), Austin McBroom, and Allen McBroom (collectively, "Defendants"),

---

1

STIPULATION TO ARBITRATE AND TO STAY ACTION

1   through their respective counsel, hereby stipulate as follows:

2          On December 7, 2022, Plaintiff filed a Complaint against Defendants alleging causes of

3   action for Breach of Contract; Breach of Implied Covenant of Good Faith and Fair Dealing; Fraud;

4

5   Negligent Misrepresentation; Intentional Interference with Contractual Relations; and Civil

6   Conspiracy, arising out of a Talent Agreement entered on or about March 4, 2021.

7          By way of this executed stipulation, Plaintiff and Defendants, hereby stipulate to submit

8   all claims here or thereafter brought by Plaintiff against Defendants and all applicable defenses

9   thereof to binding arbitration with Judicial Arbitration and Mediation Services ("JAMS") in

10

11  accordance    with    the    JAMS        Comprehensive    Arbitration    Rules    and    Procedures

12  (https://www.jamsadr.com/rules-comprehensive-arbitration/);

13         Plaintiff and Defendants further understand that the parties shall share the expense and fees

14  of the neutral arbitrator (*i.e.*, 50% - Plaintiff; 50% - Defendants), together with other expenses of

15

16  the arbitration incurred or approved by the neutral arbitrator, not including counsel fees or witness

17  fees or other expenses incurred by a party for his or her own benefit, pursuant to Code of Civil

18  Procedure § 1284.2.

19         Plaintiff and Defendants agree to cooperate in good faith and will endeavor to select an

20  arbitrator as expeditiously as possible.

21

22         Plaintiff and Defendants further understand the civil action will be stayed by the Court

23  pending outcome of the arbitration with JAMS, with the Court to retain jurisdiction to adjudicate

24  matters arising under Code of Civil Procedure § 1280, et seq., and for entry and confirmation of a

25  proposed judgment upon motion of a party following any award by the neutral arbitrator.

26         **THEREFORE**, the parties respectfully request that the Court order that this action be stayed

27  pending arbitration and that this Court retain jurisdiction pending the completion of the arbitration

28

LAW
OFFICES
OF
GALEN &

1   or dismissal of the action by the parties.

2

3

4

5   Dated: July 11, 2023.

6               By:

7                         Jeffrey M. Galen

8                         *Attorney for Plaintiff*

9

10              By:

11                       James G. Sammataro

12                       *Attorney for Defendants*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 10**

1

**IN ARBITRATION BEFORE JUDICIAL ARBITRATION AND MEDIATION SERVICES, INC. (JAMS)**

2

| | | |
|---|---|---|
| 3 | JARVIS KHATTRI, an individual, | ) |
| | | ) |
| 4 | Claimant, | ) |
| | | ) |
| 5 | v. | ) |
| | | ) |
| 6 | SIMPLY GREATNESS PRODUCTIONS, | ) |
| | LLC, a Delaware Limited Liability | ) |
| 7 | Company, AUSTIN MCBROOM, an | ) |
| | individual, ALLEN MCBROOM, an | ) |
| 8 | individual, and DOES 1 to 50, inclusive, | ) |
| | | ) |
| 9 | Respondents. | ) |
| | | ) |
| 10 | | ) |
| | | ) |
| 11 | | ) |

Case No.: 5210000405

Arbitrator: The Honorable Gail Andler

**RESPONDENTS' REPLY TO CLAIMANT'S OPPOSITION TO LIMIT THE SCOPE OF ARBITRATION TO CLAIMS ARISING OUT OF THE PARTIES' SETTLEMENT AGREEMENT**

12

Respondents, Simply Greatness Productions, LLC, Austin McBroom, and Allen McBroom

13 (collectively, "Respondents"), through counsel, hereby collectively file their Reply to Claimant's

14 Opposition to Limit the Scope of Arbitration to Claims Arising Out of the Parties' Settlement

15

16 Agreement ("Opposition").[1]

17 **INTRODUCTION**

18 California law governs this arbitration. Despite this fact – and because California law

19 cripples his argument – Claimant's Opposition primarily relies on *Washington* law for the

20 proposition that a settlement agreement is presumptively an "executory accord" unless explicitly

21 stated to the contrary.[2] In reliance on this out-of-state, and non-precedential body of law –

22

23 Claimant asserts that, because Respondents failed to timely pay the settlement amount, Claimant

24 may unilaterally set aside the Settlement Agreement and litigate the original controversy as if the

25

26 [1] All undefined capitalized terms shall have the meaning ascribed to them in Respondents' Motion to Limit the Scope of Arbitration to Claims Arising Out of the Parties' Settlement Agreement

27 ("Motion").

28 [2] *See Rosen v. Ascentry Technologies*, 143 Wash. App. 364 (2008).

Page | 1

Pryor Cashman LLP
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 683-6900
Facsimile: (310) 943-3397

Settlement Agreement never existed. Tellingly, Claimant's Opposition fails to cite a *single* California decision to support this argument. This is not an oversight – as there is no such presumption in California. To the contrary, the California courts consistently hold that: (a) settlement agreements operate as a merger and bar to the reopening of the original controversy; and (b) the damages recoverable from the breach of a settlement agreement are *limited* to the settlement amount, and nothing more.

SGP and Claimant agreed to the application of California law – in both the original Talent Agreement and the subsequent Settlement Agreement. Claimant cannot now ignore California precedent simply because it vitiates his claim. This Tribunal must apply California law, which mandates that the scope of the Arbitration be limited to a claim against SGP arising from its untimely payment under the parties' Settlement Agreement.

## ARGUMENT

I.  **Claimant Wrongfully Ignores California Precedent, and Attempts to Rely Upon Washington Law.**

Claimant was represented by top-notch counsel in negotiating the Talent Agreement and the subsequent Settlement Agreement.[3] Both of these agreements expressly provide that California law governs in the event of any dispute arising therefrom. (*See* Motion, Ex. C (Talent Agreement) ¶ 18; Motion Ex. D (Settlement Agreement), ¶ 10).

Yet, Claimant's principal argument (*i.e.* that the Settlement Agreement is an "executory accord") is based on a decision from the Washington Court of Appeals applying Washington law. *See Rosen*, 143 Wash. App. 364 (2008). Claimant's need to resort to Washington law tells this Tribunal everything it needs to know about Claimant's Opposition: his position is unsupported

---

[3] Moreover, as Claimant concedes, "both parties to the Settlement Agreement had equal bargaining power." (*See* Opposition, p. 14).

Pryor Cashman LLP
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 683-6900
Facsimile: (310) 943-3397

Pryor Cashman LLP
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 683-6900
Facsimile: (310) 943-3397

1  under California law.

2    Washington law is unique with respect to settlement agreements. Unlike California law –

3  under Washington law, a settlement agreement is presumed to be an executory accord, not a

4  substituted contract.

5
> Settlement agreements may have the effect of immediately and permanently
> extinguishing one party's claims in exchange for the other party's promise to
> perform. But under Washington law, the intent to establish such an agreement must
> be expressly clear.

6

7

8  *See Rosen*, 143 Wash. App. 364 at 366.

9    California law provides for the exact opposite: settlement agreements are presumed to

10 permanently extinguish the original controversy. There is no presumption – much less an

11 automatic presumption – in favor of an accord. *Compare Fanucchi & Limi Farms v. United Agri*

12

13 *Products*, 414 F.3d 1075, 1086 (9th Cir. 2005) ("Judge Beezer reads California law to contain an

14 automatic across-the board presumption in favor of accord and against novation. This is an

15 overreading of the California case law.").[4]

16

17   Consequently, there is no requirement under California law for settlement agreements to

18 expressly include language specifying an intention to create a substituted contract (*i.e.*, to

19 extinguish one party's claims in exchange for the other party's promise to perform). Instead, by

20 its very nature and existence, the execution of a settlement agreement in California serves to

21 extinguish the original controversy that served as the basis for the parties' entry into the settlement

22 agreement.

23   However, even if this were not the case, the Settlement Agreement could not be any clearer.

24

25

---

26 [4] Under California law, accord and satisfaction is an affirmative defense raised for the benefit of
the **defendant**. *See FEI Enterprises Inc. v. Kee Man Yoon*, 194 Cal. App. 4th 790, 803 (2011)
27 ("The affirmative defense of accord and satisfaction is applicable to the disposition of a dispute
over an unliquidated claim."); *Dieti v. Heisler*, 188 Cal. App. 2d 358, 365 (1961) (noting that the
28 defendant has the burden of proving the defense of accord and satisfaction).

Its purpose was to fully, finally and forever resolve all underlying disputes relating to the Event, the Talent Agreement, the Bout and SGP's financial obligations to Claimant. To this end, the Settlement Agreement's recitals unequivocally provide:

> [T]o avoid litigation and to obtain finality and repose with respect to any and all past, present and future claims and potential claims pertaining to the Talent Agreement, the Original Contractual Amount, Event, the Bout, and the other claims of [Jarvis], SGP and Jarvis have fully, finally and forever [agreed] to settle any claims and demands which exist, may exist, are pending or anticipated between them relating to or concerning the Event, the Talent Agreement, the Bout and SGP's financial obligations to [Jarvis] and agree to compromise the claims and causes of action held, asserted or threatened or that could have been asserted or threatened in any legal proceedings . . . .

(*See* Motion, Ex. D (Settlement Agreement, p. 1) (emphasis added).

The parties also agreed to Section 1542 waivers. (*Id.*, ¶ 4(c)). Further, the Settlement Agreement contains an integration clause which expressly provides that the Settlement Agreement "constitutes the entire agreement among the Parties pertaining to the subject matter" (*i.e.* the Talent Agreement, the Event, and the Bout), and that the Settlement Agreement "*supersedes all prior or contemporaneous agreements, representations or negotiations among the parties, including but not limited to the Talent Agreement*." (*Id.* at ¶ 18) (emphasis added). The language of the Settlement Agreement could not be clearer: the parties' shared intention was to extinguish the original controversy.

Respondent's Motion cites a litany of California decisions where California courts ruled that settlement agreements operate as a *merger and bar* as to the pre-existing claims between the parties, including:

- *Armstrong v. Sacramento Valley Realty Co.*, 179 Cal. 648, 651 (1919) ("a settlement operates as a merger and ban as to all pre-existing claims and those alleged in the lawsuit that have been resolved."); *Gregory v. Hamilton*, 77 Cal. App. 3d 213, 221 (1978) (same);

- *A.J. Industries, Inc. v. Ver Halen*, 75 Cal. App. 3d 751, 759 (1977) ("A settlement contract has the attributes of a judgment in that it serves to bar reopening of the issues settled" and "[a settlement agreement] serves to bar re-opening of the issues settled");

Pryor Cashman LLP
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 683-6900
Facsimile: (310) 943-3397

- *Folsom v. Butte County Ass'n of Governments*, 32 Cal. 3d 668, 677 (1982) (valid settlement agreement "has many attributes of a judgment" and "is decisive of the rights of the parties thereto and operates as a bar to the reopening of the original controversy") (*quoting Shriver v. Kuchel*, 113 Cal. App. 2d 421, 425 (1952));

- *Argonaut Ins. Exchange v. Industrial Accident Comm'n*, 49 Cal. 2d 706, 711 (1958) (the settlement agreement establishes the "measure" of the party's rights and obligations going forward).

(*See* Motion, pp. 7-9).

Claimant makes no attempt to address this established California precedent. Instead, he wrongly attempts to impose both a presumption and requirement upon SGP that: (a) do not exist under California law; and (b) could not have possibly been contemplated by SGP in entering into the Settlement Agreement under California law.[5] In sum, the *Rosen* opinion is not binding and should be discarded out of hand as it undermines California law's "well-established and long-supported public policy" of encouraging settlement agreement. (*See* Motion, p. 7).

## II.    The Settlement Agreement Provides for an Express Remedy in the Event of a Breach.

Claimant alternatively argues that the supposed "absence" of any provisions in the Settlement Agreement regarding what was to occur in the event of a default somehow supports his position that the parties intended to form an accord. Setting aside the speciousness of this argument (in which Claimant attempts to warp *Folsom v. Butte County Assn. of Governments*), it is factually incorrect. The Settlement Agreement expressly provides protections in the event of a breach that is not cured, including providing the prevailing party in an enforcement action with an entitlement to attorneys' fees. (*See* Motion, Ex. D (Settlement Agreement), ¶ 11 ("Notice and Cure") and ¶ 17 (prevailing party provisions)). Stated differently, the parties agreed upon a remedy in the event

---

[5] Had the parties discussed the potential application of Washington law (which they did not given that no party resides in Washington and none of the underlying events occurred in Washington), SGP's counsel would have drafted the agreement to avoid the presumption that Claimant belatedly seeks to foist upon SGP.

Pryor Cashman LLP
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 683-6900
Facsimile: (310) 943-3397

1  of a breach: attorneys' fees, *not* re-opening the original controversy. Had Claimant wanted this

2  remedy, he could have sought it. Having negotiated for a different remedy, Claimant is bound by

3  the deal that he negotiated. This Tribunal does not have the power to re-write the Settlement

4  Agreement. *See Coral Farms, L.P. v. Mahony*, 63 Cal. App. 5th 719, 730 (2021) (noting that the

5  courts cannot rewrite contracts or make better agreements for parties than they themselves have

6  been satisfied to enter into).

7

8       Moreover, an actual read of *Folsom* reveals that Claimant misinterprets the opinion. The

9  question in *Folsom* was whether the parties' settlement agreement deprived the trial court of

10  jurisdiction to award costs and attorneys' fees to the 'prevailing party' under the California Code

11  of Civil Procedure Section 1021.5. *See* 32 Cal. 3d 668 (1982). The referenced statute permits an

12  award of attorney's fees to a "successful party . . . in any action which has resulted in the

13  enforcement of an important right affecting the public interest if: (a) a significant benefit ... has

14  been conferred on the general public or a large class of persons . . . ." *Id.* at 671, n. 1. The plaintiffs

15  in *Folsom* were elderly, disabled, of limited income and dependent on public transportation. *Id.*

16  at 668. They sought declaratory and injunctive relief to prevent the county from allocating certain

17  public funds to street and road projects "until 'such time as an adequate public transportation

18  system is operating which reasonably meets the public transit needs in . . . Butte County.'" *Id.* at

19  673.

20       The *Folsom* parties entered into a settlement agreement, through which some of

21  the defendants promised to establish four new transit systems, and the plaintiffs in turn promised

22  to file a dismissal with prejudice against those defendants within one week of the date that the new

23  transit systems initiated service. *Id.* at 675. Ten days later, the plaintiffs filed a cost bill and

24  motion for attorneys' fees under Section 1021.5, which was awarded by the trial court. *Id.* at 675-

25  76. The defendants appealed, contending that the settlement agreement operated as a merger and

26  bar of all issues framed by the complaint and hence left the trial court without jurisdiction to award

27  costs or fees. *Id.* at 676. The plaintiffs responded that they remained entitled to the award because

28  the settlement agreement was silent as to costs and statutory fees. *Id.*

Pryor Cashman LLP
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 683-6900
Facsimile: (310) 943-3397

1      The California Supreme Court, emphasizing that settlement agreements have "long been

2  favored" under California law, provided that:

> 3  [Compromise agreements] . . . settle only such matters and differences as appear
> clearly to be comprehended in them by the intention of the parties and the necessary
> 4  consequences thereof, and do not extend to matters which the parties never intended
> to include therein, although existing at the time. **Thus they ordinarily conclude**
> 5  **all matters put in issue by the pleadings—that is, questions that otherwise**
> **would have been resolved at trial.** They do not, however (absent affirmative
> 6  agreement of the parties), conclude matters incident to the judgment that were not
> part of the cause of the action.
> 7

8  *Id.* at 677 (internal citations omitted).   The California Supreme Court affirmed the award to

9  Plaintiffs, noting that, although the parties' respective claims concluded upon entering into the

10  settlement agreement, the trial court retained jurisdiction to entertain the cost bill and to consider

11  the attorney fee motion because the settlement agreement was silent as to those matters, and

12  because the showing required by § 1021.5 could not have been made prior to judgment. *Id.* at 678-

13  79.

14      Thus, rather than providing any support to Claimant's position, *Folsom* narrowly focuses

15  on a finite and inapplicable issue – *i.e.,* whether a statutory fee award was merged into the

16  settlement agreement, when the agreement was silent as to statutory fees.   *Folsom* is factually

17  distinguishable for a litany of reasons, including that the case involved an award of statutory fees

18  in favor of elderly, low-income plaintiffs against the government; it raised issues relating to public

19  transportation affecting the public at large; and, more relevant here, the settlement agreement in

20  *Folsom* was silent as to statutory fees.

21      *Folsom* provides no support for Claimant's contention that the Settlement Agreement is an

22  accord.   The fact that the inapplicable *Folsom* opinion is the only California case that Claimant

23  can muster underscores that, under California law, there is no support for his claim that he can

24  reopen the original controversy.

25  **III.   The Principles Underlying the California Appellate Court's Decision in *Greentree* are**
26      **Instructive in this Matter.**

27      Claimant dedicates a significant portion of his Opposition attempting to distinguish

28  *Greentree Financial Group, Inc. v. Execute Sports, Inc.*, 163 Cal. App. 4th 495 (2008).   Claimant

Pryor Cashman LLP
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 683-6900
Facsimile: (310) 943-3397

argues that *Greentree* is inapplicable here because the Settlement Agreement does not contain a liquidated damages provision. This argument misses the mark, and ignores the overarching principles explained by the California Court of Appeals; specifically, that the recoverable damages arising from a breach of a settlement agreement is the ***settlement amount*** – and not the amounts in controversy in the parties' previous contract(s) and/or underlying claims. *See id.* at 497-98; *see also Viatech International v. Sporn*, 16 Cal. App. 5th 796, 815 (2017) (citing to *Greentree* and holding that upon the party's breach of the settlement agreement in failing to timely pay the settlement funds, the non-breaching party was entitled to recover the settlement amount).

Here, the parties entered into the Settlement Agreement for $200,000.00. *Greentree* and its progeny hold that the amount of damages that Claimant could reasonably anticipate to flow from SGP's breach of the Settlement Agreement is $200,000.00. For Claimant to now demand the full $1,000,000.00 under the previous (superseded) Talent Agreement directly contravenes California public policy which favors the upholding of settlement agreements.

## CONCLUSION

In light of clear and unequivocal California precedent, respondents Simply Greatness Productions, Austin McBroom, and Allen McBroom respectfully request that this Tribunal limit the scope of the Arbitration to claims against Simply Greatness Productions arising from its untimely payment of the Settlement Amount under the parties' Settlement Agreement.

Respectfully submitted,

**PRYOR CASHMAN LLP**

Dated: February 2, 2024        By:    *James G. Sammataro*

James G. Sammataro
*Attorneys for Respondents*

**EXHIBIT 11**

# JAMS ARBITRATION
## No. 5210000405

**KHATTRI, JARVIS,**

    **Claimant,**

       **v.**

**SIMPLY GREATNESS PRODUCTIONS, LLC;**
**AUSTIN McBROOM; ALLEN McBROOM**

    **Respondents.**

---

## ORDER ON MOTION TO LIMIT SCOPE OF ARBITRATION

On or about December 4, 2023, Respondents Simply Greatness Productions, LLC ("SGP"), Austin McBroom, and Allen McBroom (collectively, "Respondents") filed a Motion to Limit the Scope of Arbitration to Claims Arising Out of the Parties' Enforceable Settlement Agreement ("Motion"). The Motion is made on the grounds that under California law, Respondents' alleged breach of the Settlement Agreement for nonpayment of the $200,000 settlement amount does not void the Settlement Agreement and revive the extinguished underlying original contract. On or about January 16, 2024, Claimant Jarvis Khattri ("Claimant") filed his Opposition asserting the Motion should be denied because the Settlement Agreement is an "executory accord" and since Respondents failed to perform under the Settlement Agreement, Claimant has the right to seek the original contractual amount of $1,000,000. On or about February 2, 2024, Respondents filed their Reply asserting that Claimant's Opposition is based on out-of-state law and under California law, the Claimant's claims against it are limited in scope to claims arising from its untimely payment of the settlement amount under the parties' Settlement Agreement. On February 5, 2024, a hearing was held via Zoom.

The Arbitrator, having read the parties' submissions and having heard oral argument at the hearing, hereby rules as follows:

### I.    FACTUAL BACKGROUND

The present arbitration arises out of the alleged failure by Respondents to pay Claimant Jarvis Khattri (p/k/a Faze Jarvis), an English YouTuber, Twitch streamer, and a member of the gaming organization FaZe Clan, Inc. ("Faze Clan") to fight in a celebrity boxing event called "Social Gloves: Battle of the Platforms" ("Event"). The Event occurred in Miami, Florida, on June 12, 2021, with the Claimant

fighting TikTok star Michael Le ("Bout"). The Event was a live, pay-per-view boxing event pitting two social media stars from YouTube and TikTok against each other in the boxing ring.

To secure Claimant's performance, SGP, as the promoter of the Event entered into an agreement with Claimant and FaZe Clan on March 4, 2021, through which Faze Clan was to furnish Claimant's services and provide marketing ("Talent Agreemenbt"). In exchange, SGP agreed to pay Claimant $1,025,000.00 ("Original Contract Amount") by paying (a) $25,000.00 within five business days of executing the Talent Agreement and (b) $1,000,000 following Claimant's participation in the Event. (Motion, Ex. C.)

Claimant received the initial payment of $25,000 under the Talent Agreement. Claimant asserts he participated in the boxing Event on June 12, 2021, and FaZe Clan provided the agreed-upon marketing services by promoting the Event across Claimant's social media channel. Claimant contends that Respondent thereafter failed to pay Claimant the remaining $1,000,000 as required under the Talent Agreement.

To avoid litigation and have finality regarding the dispute, the parties entered into a settlement agreement on or about June 9, 2022 ("Settlement Agreement"). The parties agreed that SGP was to pay Claimant $200,000 as "full and final consideration of the Original Contractual Amount" by wiring "within thirty (30) days" of execution of the Settlement Agreement the first installment of $100,000 and the second installment "within ninety (90) days after the first payment."

The pertinent sections of the Settlement Agreement states, in relevant part, as follows:

"...*to avoid litigation and to obtain finality* and repose with respect to any and all past, present and future claims and potential claims pertaining to the Talent Agreement, the Original Contractual Amount, Event, the Bout, and the other claims of [Jarvis], ...

4. **Release. a. Talent's [Claimant] Release in Favor of SGP and Covenant Not to Sue**. Subject to SGP's timely payment in full of the Settlement Payment*, Talent hereby releases and forever discharges SGP, as well as SGP's parents, principals (including but not limited Allen McBroom Austin McBroom ....from all causes of action, suits,* ... claims and demands whatsoever, in law or in equity, which Talent ever had, nor has or may have against the SGP Parties *in relation to the Dispute*, including, but not limited to *the Talent Agreement (including the Original Contractual Amount* and all other amounts otherwise owed under the Talent Agreement), the Event, the Bout and SGP's contractual and financial obligations to the Talent ...

5. **Final Accord and Satisfaction**. Subject to the timely and full payment of the Settlement Payment, this Agreement and *the releases contained herein are intended to be final and binding between the Parties hereto* and are further to be effected as a full and complete accord and satisfaction between the Parties hereto as to the claims, causes of action, and any other matters released herein. *The Parties acknowledge that they are each expressly relying on the finality of this Agreement as a substantial, material factor* inducing its execution of this Agreement." ...

2

ORDER ON MOTION TO LIMIT SCOPE OF ARBITRATION

10. **Arbitration, Choice of Law and Venue**. ALL ISSUES, MATTERS AND DISPUTES ...CONCERNING THIS SETTLEMENT AGREEMENT SHALL BE CONSTRUED, AND SHALL BE ENFORCED, PURUANT TO CALIFORNIA LAW ...ANY ACTION ARISING OUT OF OR RELATED TO THIS SETTLEMENT AGREEMENT SHALL BE RESOLVED THOUGHT A FINAL AND BINDING ARBITRATION ADMINISTERED BY JAMS ...WITH THE SOLE EXCEPTION OF THE A BREACH OF THE CONFIDENTIALITY PROVISION, NEITHER PARY SHALL BE ENTITLED TO RECOVER PUNITIVE OR EXEMPLARY DAMAGES OR SEEK INJUNCTIVE OR ANY OTHER EQUITABLE RELIEF. ...

18. **Entire Agreement**. This Settlement Agreement constitutes the entire agreement among the Parties pertaining to the subject matter hereof. This Settlement Agreement supersedes all prior or contemporaneous agreements ..." (Motion, Ex. D, emphasis added.)

Following the execution of the Settlement Agreement, the Claimant asserts that the Respondents failed to make the first installment payment of $100,000 within thirty days. Thereafter, on December 7, 2022, Claimant filed a complaint against Respondents for (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) fraud, (4) negligent misrepresentation, (5) intentional misrepresentation, (6) civil conspiracy in Los Angeles Superior Court ("Civil Action") arising out of the Talent Agreement. (Motion, Ex. B.)

On or about July 11, 2023, the parties entered into a written stipulation "to submit all claims here to thereafter bought by Plaintiff against Defendants and all applicable defenses thereto to binding arbitration with Judicial Arbitration and Mediation Services ("JAMS") in accordance with the JAMS Comprehensive Arbitration Rules and Procedures ...the civil action will be stayed by the Court pending outcome of the arbitration with JAMS ..." (Motion, Ex. A, pg. 2.)

## II.    LEGAL ANALYSIS

"The powers of an arbitrator derive from, and are limited by, the agreement to arbitrate." (*Advanced Mirco Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 366.) JAMS Rule 11(b) provides that "[j]urisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or *scope of the agreement under which Arbitration is sought*, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter." (Emphasis added.)

Respondents assert the scope of this arbitration is limited to the agreed-upon settlement amount of $200,000 in the Settlement Agreement because the execution of a settlement agreement under California law "serves to extinguish" the original controversy. Respondents argue even if this were not the law, the Settlement Agreement explicitly states the parties agreed that they fully, finally, and forever resolved all underlying disputes "pertaining to the Talent Agreement, the Original Contractual Amount, the Event, the Bout, and the other claims of [Claimant]." (Motion, Ex. D, pgs. 1, 2.)

In contrast, Claimant, relying upon out-of-state cases, argues that the Settlement Agreement is an "executory accord." Claimant contends that since the Respondents failed to timely pay the first installment

3

of the settlement amount, he can avoid the Settlement Agreement and sue to obtain the Original Contractual Amount outlined in the Talent Agreement.

The Arbitrator finds that Respondents have the more persuasive argument. Settlement agreements are contracts. (*Owens v. County of Los Angeles* (2013) 220 Cal.App.4th 107, 114 n.3 ["A settlement agreement is simply a contract."].) As such, settlement agreements are generally governed by contract law principles. (*Stewart v. Preston Pipeline Inc.* (2005)134 Cal.App.4th 1565, 1585–86 ["A settlement agreement is a contract, and the legal principles [that] apply to contracts generally apply to settlement contracts.'].) When interpreting a contract, courts give effect to the parties' mutual intentions, first examining the contract's plain language. (Civ. Code, § 1636; *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264.) The language governs if it is clear, explicit, and does not involve an absurdity. (Civ. Code § 1638.) It must be read in the context of the whole instrument and circumstances of the case. (*Bank of the West, supra,* at p. 1265.) The construction should give effect to all provisions without inserting or omitting text. (Code Civ. Proc., § 1858.) In the absence of extrinsic evidence interpreting a contract is a matter of law. (*Taylor v. Nu Digital Marketing, Inc.* (2016) 245 Cal.App.4th 283, 288.)

Any grounds that exist in contract law to avoid a contract may be asserted to avoid a settlement if the facts support the assertion. (*Levitz v. The Warlocks* (2007) 148 Cal.App.4th 531, 534–35 ["A settlement with open material terms is not a .. settlement at all because, like all contracts, it is not binding until the settling parties agree on all its material terms."] However, without a basis to avoid the settlement agreement or a limitation in its terms, the settlement agreement operates as a bar to any reopening of the original controversy. (*Carachure v. Scott* (2021) 70 Cal.App.5th 16, 34 ["It is generally the rule that the merits of the original controversy are no longer an issue where a compromise agreement is made in good faith and without fraud, duress or undue influence."].)

Here, the Settlement Agreement itself demonstrated each element of the contract. It identified the parties, facially evidenced mutual consent, had a lawful object (resolution of a dispute regarding the Talent Agreement, the Original Contractual Amount, the Event, the Bout, etc.), and contained mutual promises (sufficient consideration). The Settlement Agreement states that the parties agreed that it was entered into "to avoid litigation and to obtain finality and repose with respect to *any and all past, present and future claims* and potential claims pertaining to the Talent Agreement, the Original Contractual Amount, Event, the Bout, and the other claims of [Jarvis], …." Thus, the evidence indicates that the parties reached an enforceable agreement, even if Claimant challenges the scope of that agreement. The Settlement Agreement terminated the disputes concerning the merits of the original controversy and constitutes the measure of the rights and obligations of the parties going forward. In other words, a breach of the Settlement Agreement by one party does not restore the parties to their status before the settlement. (*Ebensteiner Co., Inc. v. Chadmar Group* (2006)143 Cal.App.4th 1174, 1181 ["Plaintiff's remedy for the failure to perform the settlement agreement must be based 'exclusively' on that agreement."]

During oral argument, Claimant's counsel cited the case of *Gormey v. Gonzales* (2022) 84 Cal.App.5th 72. The Arbitrator finds Claimant's reliance on *Gormey* is misplaced. *Gormey* involved a settlement agreement containing a liquidated damages clause of $50,000 per month with a cap at $1.5 million that was upheld as reasonable under the circumstances existing when the settlement agreement was made. Here, the parties did not include a liquidated damages clause in the Settlement Agreement. Of note, the Parties do not dispute that they were each represented by competent counsel in negotiating and drafting the Settlement Agreement. Claimant was represented by Akin Gump Strauss Hauer & Feld, LLP and

4

ORDER ON MOTION TO LIMIT SCOPE OF ARBITRATION

Respondents were represented by Pryor Cashman LLP. The Arbitrator finds that the parties were of relatively equal bargaining power. Each had the ability to negotiate the types of remedies desired for breach of the Settlement Agreement, including breach due to nonpayment. The parties could have but did not, agree to a stipulated judgment or liquidated damages under Civil Code section 1671(b) in the event of a breach of the Settlement Agreement for nonpayment. This Arbitrator cannot rewrite the party's Settlement Agreement to fit what the Claimant believes, in hindsight, is fair and reasonable. (*Walnut Creek Pipe Distributors, Inc. v. Gates Rubber Co.* (1964) 228 Cal. App. 2d 810, 815 ["The courts cannot make better agreements for parties than they themselves have been satisfied to enter into or rewrite contracts because they operate harshly or inequitably."].)

Claimant also cited to *Estate of Jones* (2022) 82 Cal.App.5[th] 948 during oral argument for the proposition that the payment of the settlement amount was a condition precedent to which Respondents failure to satisfy vitiated the Settlement Agreement. The Arbitrator finds the *Estate of Jones* is inapposite. While the court in *Estate of Jones* opined the payment "method" (i.e., through the sale of the property) was a condition precedent, it held the actual "promise to pay ...[was] enforceable and remains payable upon the property's sale." In other words, the promise to pay was *not* a condition precedent that rendered the settlement agreement null and void. In fact, the court held that condition precedents are "disfavored and are strictly construed against the party arguing the agreement imposed one" and "Courts will not interpret a provision as a condition precedent absent clear, unambiguous language requiring such a construction." (*Id.* at 953.)

Accordingly, Respondents' Motion to Limit the Scope of Arbitration to Claims Arising Out of the Parties' Enforceable Settlement Agreement is hereby **GRANTED**. The Scope of the Arbitration is the determination of whether there has been a breach of the Settlement Agreement and if so, a determination of damages arising under the Settlement Agreement. The Scope of the Arbitration does not include a determination of the merits of the underlying claim pertaining to the Event and the related payment and performance issues which led to the negotiated Settlement Agreement. This ruling addresses only the issue specifically presented by the Motion and argument of counsel at the hearing. Matters pertaining to the types of relief sought by the Demand are not presently before the Arbitrator and the Arbitrator declines to issue an advisory opinion.

**IT IS SO ORDERED.**

DATED: February 8 , 2024

_____
Hon. Gail Andler, Ret.
Arbitrator

5

ORDER ON MOTION TO LIMIT SCOPE OF ARBITRATION